**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

STERLING SMALL MARKET    )
EDUCATION FUND, L.P. and SRC   )
INTERMEDIATE HOLDINGS, INC.,   )
                )
   *Plaintiffs*,        )
                )   Case No.
v.                )
                )
MICHAEL PERIK, NICOLE ROWE   )   **JURY TRIAL DEMANDED**
COLCLASURE, JOHN HASELEY,    )
DANIEL JONES, HIGHER      )
EDUCATION PARTNERS, LLC,    )
RRGTHREE, LLC, USS GUARANTOR,  )
LLC, and MWJ HOLDINGS, LLC,   )
                )
   *Defendants*.

## COMPLAINT

Plaintiffs Sterling Small Market Education Fund, L.P. ("Sterling") and SRC Intermediate

Holdings, Inc. ("SRC Holdings") (collectively, "Plaintiffs") bring this action against Defendants

Michael Perik, Nicole Rowe Colclasure, John Haseley, Daniel Jones, Higher Education Partners,

LLC ("Higher Education Partners"), RRGTHREE, LLC ("RRGTHREE"), USS Guarantor, LLC

("USS Guarantor"), and MWJ Holdings, LLC ("MWJ Holdings") (collectively, "Defendants").

## INTRODUCTION

1.  This action is brought by Plaintiffs Sterling and SRC Holdings to hold Defendants

accountable for their fraudulent conduct, which induced Sterling and SRC Holdings to enter into

a Unit Purchase Agreement on June 25, 2021 to acquire Defendants' company, Student Resource

Center, LLC ("Student Resource Center" or the "Company").  (*See* Exhibit A (Unit Purchase

Agreement) (referred to herein as the "Purchase Agreement").)  Sterling and SRC Holdings also

bring this action for Defendants' post-closing fraud.  Indeed, not only did Defendants make

multiple false representations and material omissions to Sterling and SRC Holdings before closing, but they also engaged in a monthslong cover-up scheme after the parties entered the Purchase Agreement.

2.     Student Resource Center is a business that partners with higher education institutions in the development and management of affordable, high-quality college courses and programs for unions and other professional associations.  At the time of the transaction, Student Resource Center's primary institutional partner was Eastern Gateway Community College ("EGCC").

3.     During the parties' negotiation and due diligence period, the issue of EGCC's accreditation was discussed at length as EGCC's ability to service students in a manner compliant with accreditation standards relates directly to Student Resource Center's own commercial viability and educational impact.

4.     At multiple meetings and on follow-up regulatory diligence calls, Sterling representatives asked Defendants about the status of EGCC's accreditation and whether Defendants knew about or had seen any reports from EGCC's accrediting body, the Higher Learning Commission (the "HLC" or "Commission") with respect to a mid-cycle review that was underway.  In response to Sterling's many questions, Defendants repeatedly said they were unaware of any EGCC accreditation issues and had not seen a visit team report from the HLC.

5.     Consistent with these pre-closing statements, in Section 3.21 of the Purchase Agreement, Defendants represented and warranted that, to their knowledge, EGCC had "been in material compliance with all Educational Laws [which includes any "Accrediting Body standard or other requirement thereof"]"; had "obtained and held all Educational Approvals necessary to conduct its operations as currently conducted"; was "in material compliance with the terms and

conditions of all such Educational Approvals"; and that "no action for the suspension,

revocation, termination or cancellation of any of Educational Approval . . . [was] pending or

threatened."

6.       Sterling and SRC Holdings later discovered that Defendants' pre-closing

statements were knowingly false, as were Defendants' representations and warranties in Section

3.21 of the Purchase Agreement.

7.       On November 8, 2021, the HLC publicly released the results of its accreditation

review for EGCC and concluded that the school had to be placed on probation for failing to meet

a number of HLC's standards and other requirements.  The HLC's probation letter caught

Sterling and SRC Holdings by complete surprise.

8.       Defendants, however, were well aware of the HLC's plans to sanction EGCC,

because Defendants had received a draft of the Commission's visit team report in December

2020—*six months before the parties closed their transaction*, and Defendants actively assisted

EGCC in its response to the report.  And, in March 2021—three months before closing—

Defendants received a copy of the HLC's final visit team report, and Defendants continued to

actively help EGCC respond to the report.  The Commission's findings in that final report were

so severe that EGCC was found, by Defendants' own determination at the time, to be out of

compliance with more than double the number of accreditation "Core Components" than any

other institution then on probation with the HLC.

9.       Despite receiving copies of these reports months in advance of closing,

Defendants never mentioned the fact that EGCC had been found to be out of compliance with

HLC accreditation standards and requirements and was headed toward probation.  Defendants

never disclosed the HLC's findings during the parties' negotiations, discussions, pre-closing

meetings, or diligence calls.  And, even after the transaction closed in June 2021, the Defendants who remained as SRC executives continued to hide from Plaintiffs the HLC's report and EGCC's probation problems.  Due to this deceit, Sterling and SRC Holdings found out about the HLC's report like any member of the public, on November 8, 2021, when the HLC's probation letter was published online.

10.     That EGCC had, and continues to have, accreditation issues is a significant operational and financial hardship for Student Resource Center, and undermines its ability to fulfill its educational mission and impact.  The Company derives revenue by providing a bundle of services necessary to facilitate the development of low cost, debt-free educational programs on behalf of union and professional associations.  Revenue derived from the provision of such services in conjunction with students' enrollment at EGCC represents approximately 95% of Student Resource Center's annual revenue.  Simply put, EGCC's probation has, and will continue to, undermine the educational mission and impact of Student Resource Center, and has and will continue to cause the Company to suffer significant revenue loss and material reputational harm, which in turn has caused severe financial damage to Sterling and SRC Holdings.

11.     Sterling and SRC Holdings have also been damaged by being forced to reckon with the issues underlying the Commission's report and its finding that EGCC was out of compliance with multiple accreditation standards.  In addition, Defendants' systematic, post-closing lies about EGCC have caused grave harm to Student Resource Center's educational impact and commercial viability.  By shielding Sterling and SRC Holdings from the truth for months after closing, Defendants put students' educational pursuits at risk, endangered the Company's relationship with existing partners, imperiled future business prospects, and

diminished the Company's value.  During this lost time, Sterling and SRC Holdings could have been establishing new school partnerships to diversity educational choices beyond EGCC, helping EGCC, where appropriate, with its HLC remediation efforts, and preparing evidence to support the Company's good standing with external stakeholders.

12.    Had it not been for Defendants' pre-closing false representations and material omissions regarding EGCC and Defendants' false representations and warranties in the Purchase Agreement, Sterling and SRC Holdings would have never agreed to enter into the Purchase Agreement to acquire the Company.

13.    And had it not been for Defendants' ongoing false representations and material omissions regarding EGCC after the transaction closed, Sterling and SRC Holdings would have had time to plan and react to the HLC report before it became public, potentially mitigating losses and avoiding public relations crises and operational disruption.

14.    Sterling and SRC Holdings bring this action to recover the damages they have suffered due to Defendants' pre- and post-closing fraud.

## PARTIES

15.    Plaintiff Sterling Small Market Education Fund, L.P. is a limited partnership organized and existing under the laws of Delaware.  Sterling's general partner is Sterling Fund Management, LLC, a Delaware limited liability company, with members residing in Illinois, Maryland, and Florida.  None of Sterling's partners are citizens of states in which Defendants are citizens.

16.    Plaintiff SRC Intermediate Holdings, Inc. is a citizen of the states of Delaware and Illinois.  SRC Holdings is a corporation organized and existing under the laws of Delaware, with its principal place of business at 401 North Michigan Avenue, Suite 3300, Chicago, Illinois 60611.

17. Defendant Michael Perik was the Chief Executive Officer and Co-Founder of Student Resource Center, LLC. Mr. Perik is a citizen of Rhode Island and resides at 10 High Street, Jamestown, Rhode Island 02835.

18. Defendant Nicole Rowe Colclasure was the President and Co-Founder of Student Resource Center, LLC. Ms. Rowe is a citizen of Arkansas and resides at 2704 North Fillmore Street, Little Rock, Arkansas 72207.

19. Defendant John Haseley was the Chief Strategy Officer and Co-Founder of Student Resource Center. Mr. Haseley is a citizen of Ohio and resides at 9546 Hooper Road, Athens, Ohio 45701.

20. Defendant Daniel Jones was the Chief Engagement Officer of Student Resource Center, LLC. Mr. Jones is a citizen of Ohio and resides at 1400 Oak Knoll Drive, Cincinnati, Ohio 45224.

21. Upon information and belief, Defendant Higher Education Partners, LLC is not a citizen of states in which Plaintiffs are citizens. Higher Education Partners, LLC is a Delaware limited liability company, with its principal place of business at 10 High Street, Jamestown, Rhode Island 02835. Upon information and belief, Higher Education Partners, LLC's members include Defendant Perik, Monitor Clipper Equity Partners III, L.P., and Monitor Clipper Equity Partners (NQP) III, L.P. Defendant Perik is a citizen of Rhode Island. Upon information and belief, Higher Education Partners, LLC's remaining members are citizens of Massachusetts.

22. Upon information and belief, Defendant RRGTHREE, LLC is a citizen of Ohio. RRGTHREE, LLC is an Ohio limited liability company, with its principal place of business at 35 North Street, Suite 340, Columbus, Ohio 43215. Upon information and belief, RRGTHREE, LLC is a single-member LLC, with John Haseley as its sole member. Mr. Haseley resides in

6

Athens, Ohio, and is thus a citizen of Ohio.

23.    Upon information and belief, Defendant USS Guarantor, LLC is a citizen of Rhode Island.  USS Guarantor, LLC is a Rhode Island limited liability company, with its principal place of business at 101 Dyer Street, Suite 3A, Providence, Rhode Island 02903.  Upon information and belief, USS Guarantors, LLC is a single-member LLC, with Defendant Michael Perik as its sole member.  Defendant Perik is a citizen of Rhode Island.

24.    Upon information and belief, MWJ Holdings, LLC is a citizen of Rhode Island. MWJ Holdings, LLC is a Delaware limited liability company, with its principal place of business at 10 High Street, Jamestown, Rhode Island 02835.  Upon information and belief, MWJ Holdings, LLC is a single-member LLC, with Defendant Michael Perik as its sole member. Defendant Perik is a citizen of Rhode Island.

### JURISDICTION & VENUE

25.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.

26.    This Court has personal jurisdiction over each Defendant because each Defendant consented to personal jurisdiction in this Court pursuant to Section 8.15 of the Purchase Agreement, titled "Jurisdiction and Venue."  That section states, in pertinent part, "Each of the Parties submits to the exclusive jurisdiction of any state or federal court sitting in Wilmington, Delaware . . . in any action or proceeding arising out of or relating to this Agreement."  (Exhibit A.)  This Court also has personal jurisdiction over each Defendant because, for among other reasons, each Defendant has availed itself, himself, or herself to the rights and benefits of Delaware law or has otherwise engaged in substantial and continuing contacts with Delaware.

27.    Venue in this Court is proper pursuant 28 U.S.C. § 1391(b)(3) because each

Defendant is subject to this Court's personal jurisdiction.  Venue in this Court is also proper

pursuant to the parties' forum selection clause contained in Section 8.15 of the Purchase

Agreement, which includes a "waiv[er] [of] any defense of inconvenient forum to the

maintenance of any action or proceeding" brought within "any state or federal court sitting in

Wilmington, Delaware."  (Exhibit A.)

**FACTS**

I. **Student Resource Center's Business.**

28. In 2015, Defendants Perik, Rowe, and Haseley founded Student Resource Center.

29. Student Resource Center partners with higher education institutions in the

development and administration of high quality, affordable courses and programs in service of

union and professional association members, including the provision of evidence-based student

supports, such as coaching and advising.  More specifically, the Company provides a number of

services to partnering schools, including: (i) identifying courses and programs not currently

available which may meet the unmet needs of adult learners; (ii) assisting with the administration

of educational benefit programs offered to unions and professional associations; and (iii)

providing non-academic coaching and other student support services to improve student

persistence and completion outcomes.

30. Student Resource Center also partners with unions and other professional

associations to provide the educational programs offered by the Company's partnering schools

on a free or heavily discounted basis as a benefit of union or association membership.  Further, if

a union or association member is interested in one of the educational programs offered by a

collaborating school, Student Resource Center provides that prospective student with guidance

and support, as well as ongoing mentoring services post-enrollment.

31. Since its founding in 2015, Student Resource Center has, and continues to,

collaborate with certain educational institutions, including EGCC and Central State University ("CSU").

32.     Of those schools, EGCC is the Company's primary partner.  EGCC is an Ohio-based, public institution of higher learning founded in 1968.  EGCC offers associate degrees and certificates in numerous areas, and it conducts classes online and in person at its Youngstown, Ohio and Steubenville, Ohio campuses.[1]

33.     The HLC is the accrediting body for EGCC.

34.     The HLC "is an independent corporation that was founded in 1895 as one of six regional institutional accreditors in the United States."[2]

35.     The HLC's reaccreditation process is rigorous, requiring the involvement of many school administrators, faculty, and staff.  First, a school must draft a voluminous document called a self-study, written to prove to the HLC that all academic and non-academic standards are being met.  Second, the HLC conducts a site visit, relying on a team of administrators and faculty from other colleges and universities.  Third, depending on the conclusions of the site visit, which are memorialized in a written report, the HLC may provide feedback and renew accreditation or recommend some other action.

36.     Under certain circumstances, the HLC may determine that a school, like EGCC, is "at risk of being out of compliance or out of compliance with HLC requirements," and consequently place that institution "on a sanction, including Notice or Probation."[3]  "In such cases, the institution is required to undergo additional evaluations to demonstrate that it has

---

[1] *See* Eastern Gateway Community College, "Who We Are," https://egcc.edu/about-us/institution/who-we-are/.
[2] *See* Higher Learning Commission, "About the Higher Learning Commission," https://www.hlcommission.org/About-HLC/about-hlc.html.
[3] *See* Higher Learning Commission, "Overview of the Accreditation Relationship," https://www.hlcommission.org/Accreditation/accreditation-overview.html.

9

addressed the issues identified and is in compliance with HLC requirements," and in "some

cases, the HLC Board may elect to take an adverse action, such as withdrawing accreditation

from an accredited institution."[4]

37.     As reported in the media, it is rare for accreditors, including the HLC, to sanction

schools for being out of compliance with accreditation standards.  For instance, the HLC and five

other organizations "oversee more than 3,000 colleges," but as of a few years ago, had

"rescinded the membership of [just] 26 educational institutions."[5]

## II.     Student Resource Center Generates Significant Interest in the Educational Benefit Program.

38.     Through its collaborations with schools, like EGCC and CSU, and its partnerships

with unions and professional associations, Student Resource Center has helped institutions serve

thousands of students, with college participation numbers increasing every year between 2015

and 2020.

39.     For instance, in 2019, Student Resource Center, EGCC, and CSU worked in

collaboration to serve more than 22,000 students for the school's respective fall semesters.  In

2020, that figure increased to over 39,000 students.

40.     As a result of the program's success, and through its contractual arrangements

with schools and unions and professional associations, Student Resource Center has generated

millions of dollars in revenue while simultaneously enabling access to higher education for tens

of thousands of students.

41.     Student Resource Center's adjusted earnings totaled approximately $7.5 million

in 2020.  For 2021, Student Resource Center earned roughly $12 million due to increased

---

[4] *Id.*
[5] Andrea Fuller and Douglas Belkin, "The Watchdogs of College Education Rarely Bite," Wall Street Journal (June 17, 2015), *available at* https://www.wsj.com/articles/the-watchdogs-of-college-education-rarely-bite-1434594602.

enrollment numbers.

III.    **Student Resource Center Hits the Market, and Sterling Considers Acquiring the Company.**

42.     In or around November 2020, Defendants, as the owners of Student Resource Center, started to seek buyers of, or potential investors in, Student Resource Center, and enlisted the services of an investment bank specializing in the education sector.

43.     On December 22, 2020, after receiving some initial materials regarding Student Resource Center, Sterling submitted an Indication of Interest to the investment bank.  That Indication notified the investment bank that Sterling was interested in acquiring Student Resource Center.

44.     On January 11, 2021, representatives of Sterling participated in their first meeting with Student Resource Center's management and the investment bank regarding a potential deal to purchase Student Resource Center.  At that meeting, the parties discussed Student Resource Center's business and operational model, including a description of how Student Resource contracts with unions, professional associations, EGCC, and CSU.  The parties also discussed how Student Resource Center provides non-academic coaching and other student support services to improve student persistence and completion outcomes.

45.     Roughly two weeks later, on January 26, 2021, Sterling representatives had a follow-up meeting with the investment bank and Defendants, specifically Perik and Rowe, to discuss Student Resource Center's business.  At that meeting, Sterling's representatives asked Perik and Rowe whether Student Resource Center, EGCC, or CSU had any issues with accreditation authorities, including the HLC.  In response, both Perik and Rowe stated that Student Resource Center, EGCC, and CSU did not have any issues with accreditors, including the HLC.  As explained below, Defendants' representations were false, and both Perik and Rowe

11

knew they were false at the time they were made.

46.     Sterling's immediate focus on EGCC's accreditation was due to the fact that Student Resource Center's own sustainability was intrinsically linked to EGCC's ability to service students in a manner compliant with the HLC.  EGCC represents approximately 95% of Student Resource Center's annual revenue, thus anything that could jeopardize the school's ability to enroll students—like accreditation sanctions—would in turn cause severe damage to Student Resource Center's business.

47.     On January 27, 2021, the parties met again to discuss Student Resource Center's financial performance.  Defendant Perik attended this meeting on behalf of Student Resource Center; he did not mention any issues with EGCC's accreditation.

48.     Following these initial introductory meetings, on February 10, 2021, Sterling submitted an initial letter of intent to the investment bank, stating that it intended to negotiate a definitive purchase agreement with Defendants, as owners of Student Resource Center, to acquire the company.

49.     Upon receipt of Sterling's letter of intent, the investment bank informed Sterling's representatives that Defendants had already begun exclusive negotiations with another potential buyer, and thus rejected Sterling's letter of intent.

50.     Nearly three months later, on May 3, 2021, the investment bank contacted Sterling to inform it that the deal between Defendants and the other potential buyer had fallen through, and that Sterling could start exclusive negotiations with Defendants if Sterling was still interested in acquiring Student Resource Center.

51.     The next day, May 4, 2021, Sterling and Student Resource Center signed a letter of intent to negotiate an acquisition deal.  Defendant Perik signed the letter of intent on behalf of

Student Resource Center.

**IV.    Sterling Conducts Due Diligence Into Student Resource Center, Including Accreditation Issues.**

52.    Over the next few weeks, Sterling conducted due diligence of Student Resource Center.

53.    As an initial step, Sterling requested access to, and reviewed, documents and information related to Student Resource Center, including materials related to the Company's contracts with EGCC and documents and information concerning educational regulatory matters, such as EGCC's accreditation status.  During this process, Defendants never provided materials in their possession related to the HLC's review of EGCC, including the HLC's draft or final visit team report on EGCC, even though the Defendants' knowledge of the existence of these reports was specifically asked of Defendants during Sterling's diligence inquiries.

54.    While Sterling engaged in documentary due diligence, it also continued to meet with Defendants to discuss Student Resource Center's business and a possible acquisition deal.

55.    On May 11, 2021, Defendants Perik and Rowe met, via Zoom, with Sterling's representatives to discuss Student Resource Center's business, including its partnerships with unions and professional associations.  At that meeting, the parties also talked, in general terms, about Student Resource Center's collaboration agreement with EGCC.

56.    The parties had another Zoom meeting on May 13, 2021.  Defendants Perik, Rowe, Jones, and Haseley attended on behalf of Student Resource Center, and the parties focused their discussion on regulatory matters.  At that meeting, Sterling's representatives questioned Defendants directly about matters involving the HLC, including the status of a mid-cycle review site visit that EGCC had recently undergone, and Sterling's representatives specifically asked whether the visit team had issued its visit team report.

13

57.     In response, Defendant Perik said (a) that he had not received a copy of a draft HLC report regarding EGCC, and (b) that he did not know if EGCC had ever received a copy of a draft HLC report.  Perik further said that no one else within Student Resource Center would know more about the status of that review than him.  As explained below, Perik's statements were false, and he knew they were false when he made them.  Defendants Rowe, Jones, and Haseley sat silent in the face of Perik's answers, even though they each knew that Perik's responses to Sterling's questions were false when made.

58.     The issue of EGCC's relationship with the HLC was raised again at a Zoom meeting with Sterling's representatives on May 27, 2021, at which Perik and Rowe participated. At that meeting, Perik raised, as a follow up to the May 13 Zoom meeting, that HLC had made an inquiry in the past about the scope of services that Student Resource Center provided to EGCC, but that he did not know the context of the inquiry.  As explained below, Perik was well aware of the context of that inquiry.

59.     Following the May 27, 2021 Zoom meeting, Sterling submitted a written diligence request to Defendants.  The request was related to the HLC inquiry Perik raised on the May 27 Zoom call, and included a request for a copy of the HLC inquiry.  In response, Perik stated that Student Resource Center had never had an inquiry from the Commission, nor did it have any knowledge that EGCC ever had such an inquiry.

60.     Indeed, on June 3, 2021, Perik wrote:

SRC has never had an inquiry from HLC nor to our knowledge has [EGCC] ever had such an inquiry. We simply had a request from the College after last Fall's HLC visit to make sure that we clarified our duties and responsibilities under the Collaboration Agreement of 2017. That agreement included language from an earlier deal with Pearson related to the provision of content and faculty training. We do not currently perform those services and as such both parties saw it fit to amend our agreement to reflect that. The attached amendment was recently executed by myself and the College. To my knowledge that is where the matter

14

ended and there were no further communication with HLC on this topic.

61.     This representation, written by Perik on behalf of Student Resource Center, was false and misleading, and Perik knew it was false and misleading when he made the statement.

62.     In fact,  in February 2021, Perik, who was assigned the responsibility of responding to issues raised in the draft HLC visit report that referenced Student Resource Center, insisted that Student Resource Center and EGCC amend their collaboration agreement to account for concerns raised by the HLC in its draft visit report.  Perik knew that, on June 3, 2021, the "matter" had not "ended," but was rather progressing toward the HLC's public release of its report on EGCC in which it recommended sanctions in the form of probation.

**V.     Sterling Forms SRC Holdings, And SRC Holdings Executes A Purchase Agreement With Defendants To Acquire Student Resource Center.**

63.     The parties continued their negotiations through May and June 2021, and in anticipation of the deal closing after an extensive due diligence process, Sterling formed an entity to purchase Student Resource Center: Plaintiff SRC Holdings.

64.     On June 25, 2021, SRC Holdings, Defendants, and other owners of Student Resource Center executed the Purchase Agreement to govern SRC Holding's acquisition of the Company. (Exhibit A.)  The parties agreed to a Purchase Price of $120 million, an amount based on a multiple of the earnings of Student Resource Center.  (Exhibit A, Sections 1.1 and 2.4.)

65.     Article II of the Purchase Agreement, titled "Purchase and Sale," provides terms related to the date of closing; the parties' closing deliverables; the purchase price paid to Defendants by SRC Holdings; and other post-closing payments and receivables.  (*See* Exhibit A, Sections 2.1 through 2.7.)

66.     Article III of the Purchase Agreement, titled "Representations and Warranties Regarding the Company," provides Defendants' representations and warranties to SRC Holding

related to Student Resource Center.  (*See* Exhibit A, Sections 3.1 through 3.21.)

67.    In Section 3.21(d), Defendants represented and warranted:

> To the Company's knowledge, since [January 1, 2018], each Institution that has entered into a Collaboration Agreement with the Company has (i) been in material compliance with all applicable Educational Laws, (ii) obtained and held all Educational Approvals necessary to conduct its operations as currently conducted, and (iii) been in materials compliance with the terms and conditions of all such Educational Approvals.  To the Company's knowledge, no action for the suspension, revocation, termination or cancellation of any of Educational Approval of any such Institution . . . is pending or threatened.

(Exhibit A, Section 3.21(d).)

68.    "To the Company's knowledge" is defined under the Purchase Agreement to include the "actual knowledge" of individuals, including Michael J. Perik, John Haseley, Nicole Rowe Colclasure, and Daniel Jones, in each case "after reasonably inquiry within the scope of his or her responsibilities."  (Exhibit A, Section 8.13.)

69.    "Institution" is defined under the Purchase Agreement as "any Title IV participating institution of higher education, and *includes Eastern Gateway Community College* and Central State University."  (Exhibit A, Section 1.1 (emphasis added).)

70.    "Educational Approval" is defined under the Purchase Agreement as "any license, permit, consent, authorization, certification, exemption, registration, or similar approval issued or required to be issued by an Educational Agency to an educational institution or to an entity that provides services to an educational institution."  (Exhibit A, Section 1.1.)

71.    "Educational Agency" is broadly defined as "any entity or organization, whether governmental or non-governmental, that engages in granting or withholding Educational Approvals, administers student financial assistance to or for students of, or otherwise regulates educational institutions, programs or courses in accordance with standards relating to the performance, operation, financial condition, privacy or academic standards of such institutions,

programs or courses, including, but not limited to, USDE, any Accrediting Body, any State Educational Agency, and any Governmental Entity with jurisdiction to enforce laws or regulations . . ."  (Exhibit A, Section 1.1.)

72.    "Educational Law" means any applicable federal, state, municipal, foreign or other Law, regulation, guidance, order, Accrediting Body standard or other requirement thereof, including, without limitation, Title IV regulations and guidance, issued or administered by, or related to, any Educational Agency.  (Exhibit A, Section 1.1.)

73.    Thus, under Section 3.21(d)(i), each Defendant represented and warranted that he or she was not aware of any material noncompliance by EGCC with any "[HLC] standard or other requirement."  As explained below, Defendants' representation was false, and Defendants knew it was false both at the time Section 3.21(d)(i) was drafted and when the Purchase Agreement was executed.

74.    Further, under Section 3.21(d)(iii), each Defendant represented and warranted that he or she was not aware of any material noncompliance by EGCC with the terms and conditions of its HLC approval.  As explained below, Defendants' representation was false, and Defendants knew it was false both at the time Section 3.21(d)(iii) was drafted and when the Purchase Agreement was executed.

75.    Further, under Section 3.21(d)(iii), each Defendant represented and warranted that he or she was not aware of any pending or threatened action against EGCC by accrediting bodies, including the HLC.  As explained below, Defendants' representation was false, and Defendants knew it was false both at the time Section 3.21(d)(iii) was drafted and when the Purchase Agreement was executed.

76.    In addition to setting forth purchase terms and representations and warranties, the

Purchase Agreement also includes several provisions that govern disputes between the parties.

77.     Article VII, titled "Indemnification," specifically excludes actions for "Fraud,"

with "Fraud" defined as:

> [Any] Party's making of a representation or warranty in this Agreement or any
> Ancillary Document to any Party hereto, which representation is made (a) with
> such Party's actual knowledge (as opposed to imputed or constructive knowledge)
> that such representation or warranty was untrue when made and (b) with an intent
> by such Party to deceive another Party with respect to the making of such
> representation or warranty (and such other Party actually relies upon such false
> representation or warranty).

(Exhibit A, Sections 1.1 and 7.5.)

78.     Section 8.3 of the Purchase Agreement establishes that Delaware law governs the

interpretation and enforcement of the Purchase Agreement, as well as any related disputes:

> This Agreement shall be governed by and construed in accordance with the laws
> of the State of Delaware, without giving effect to any choice of law or conflict of
> law provision or rule (whether of the State of Delaware or any other jurisdiction)
> that would cause the application of the law of any jurisdiction other than the State
> of Delaware.

(Exhibit A, Section 8.3.)

79.     And, finally, under Section 8.15 of the Purchase Agreement, each Party agreed to

personal jurisdiction and venue in this Court.  (Exhibit A, Section 8.15) ("Each of the Parties

submits to the exclusive jurisdiction of any state or federal court sitting in Wilmington, Delaware

. . . and agrees not to bring any action or proceeding arising out of or relating to this Agreement

in any other court.").)

**VI.     The Parties Conduct Regular Business Meetings Post-Closing.**

80.     After closing the deal on June 25, 2021, representatives of Sterling and SRC

Holdings began to meet with Defendants on a regular basis to discuss Student Resource Center's

business.  In addition to multiple board meetings of the Company, Sterling and SRC Holdings

had weekly calls with Perik and received monthly reports related to the Company from Perik and

other Defendants.

81.    These meetings took place as scheduled for months.  At no time did Perik or any other Defendant disclose their possession of the HLC's mid-cycle review report; their involvement in supporting EGCC as the school responded to the HLC's report; or their knowledge that the HLC visit team had recommended a sanction of probation for EGCC. Defendants failed to disclose these facts, even though representatives of Sterling and SRC Holdings asked questions related to the HLC and EGCC's accreditation status.

**VII.    The Higher Learning Commission Puts EGCC On Probation For Failing To Comply With Accreditation Criteria.**

82.    On November 8, 2021—less than five months after SRC Holdings and Defendants executed the Purchase Agreement—the HLC placed EGCC on probation, finding that the institution was "out of compliance with the Criteria for Accreditation."  (Exhibit B at 1 (Nov. 8, 2021 HLC Letter to Michael Geoghegan, President of EGCC).)  Probation is a public sanction by the HLC that indicates that the institution is no longer in compliance with one or more Criteria for Accreditation and/or is not in compliance with other HLC requirements which, if not resolved by the end of the period of probation, could result in the withdrawal of the institution's accreditation.

83.    The HLC specifically found that EGCC did not meet five "Core Components" for accreditation; met six other "Core Components," but "with concerns"; and was "out of conformity with" six "Assumed Practices" promulgated by the HLC.  (*Id.*)  These findings were significant in that as a condition to HLC accreditation, an institution must meet each of the Criteria for Accreditation, and the Core Components comprising them, in addition to other HLC requirements.

84.    As a result of these findings, EGCC was ordered to publicly disclose its

accreditation probation, and it "is required to host a comprehensive evaluation no later than April 2023 to determine whether [it] has ameliorated the findings that led to the imposition of the [Probation] sanction." (*Id.*) HLC will then announce in November 2023 whether EGCC will be taken off probation or further sanctioned, including by potentially losing its accreditation.

85.     The HLC's decision to place EGCC on probation—and the sheer number of non-compliance violations—sent shockwaves through Sterling and SRC Holdings, as well as the entire higher education community. It not only represented a public shaming of EGCC, and by association Student Resource Center, but it also caught Sterling and SRC Holdings by complete surprise.

86.     Immediately after the HLC released its probation letter, Sterling enlisted the help of a consulting and communications firm with expertise in education policy and regulatory matters. Sterling also provided Defendants with an experienced operating partner to help manage Student Resource Center's partnership with EGCC; began to capture student data to build evidence to support the Company's quality of service; created an external affairs and public relations team; and took other steps to help mitigate concerns raised by other stakeholders in the Company.

87.     Over the next few weeks, multiple calls were held between Sterling representatives, its consulting and communications firm, and Defendants concerning the HLC's findings and how to remediate the situation from a public relations perspective. During those calls, Defendants continued their pattern of deception.

88.     During one such call, held on November 22, 2021, Sterling's representatives confronted Perik with the HLC's probation letter, and asked if he and other Defendants knew about the HLC's findings or were they, like Sterling and SRC Holdings, blindsided by the letter.

89.     In response, Perik said that he knew the HLC was looking into EGCC, but that he was also blindsided by the HLC's letter as he only read it for the first time on November 8. Perik noted that he knew the HLC's visit was "bad," but that he was "surprised at the length of the final HLC report."  As explained below, Perik's statements concerning the HLC's probation letter were false and misleading, and he knew they were false when he made them.

90.     During another board meeting in which HLC matters were discussed, Sterling representatives once again tried to elicit information from Defendants concerning whether they knew about the HLC's probation letter before its public release.  No Defendant came forward with any information.

91.     That the HLC letter caught Sterling and SRC Holdings by surprise was due to Defendants' pre-closing false statements and material omissions, false representations in the Purchase Agreement, and post-closing false statements and material omissions.  Indeed, just a few months before the public release of the HLC letter, Defendants had stated that they were not aware of any accreditation issues, and Defendants had each represented and warranted that, to their knowledge, EGCC had "been in material compliance with all applicable Educational Laws"; "been in materials compliance with the terms and conditions of all [] Educational Approvals"; and that there was no "pending or threatened . . . action for the suspension, revocation, termination or cancellation of any of Educational Approval of any [] Institution," including EGCC.  (Exhibit A, Section 3.21(d).)

92.     As noted above, these pre-closing statements and the representation in Section 3.21(d) were necessary conditions to Plaintiffs' agreement to acquire Student Resource Center. Again, the Company generates 95% of its revenue from EGCC, and that revenue is derived from EGCC's ability to service students in a manner compliant with the HLC.  Thus, anything that

could jeopardize EGCC's ability to enroll and serve students, like a public probation sanction from the HLC, could also cause severe harm to Student Resource Center's business.

93.     In fact, Sterling viewed Student Resource Center's concentration of business with EGCC as the number one risk factor involved in the acquisition deal and a critical business priority post-closing.

94.     Had Sterling or SRC Holdings known about the HLC's report or its plans to place EGCC on probation before closing, they would have never agreed to the Purchase Agreement.

## VIII.   Defendants Knew, As Of December 2020, That The HLC Was Investigating and Evaluating EGCC.

95.     Following the public release of the HLC probation letter, Sterling instituted an investigation into the matter.  As part of that investigation, Defendants' email communications were reviewed.  Those communications show that Defendants knew—***months before the parties executed the Purchase Agreement***—that EGCC was headed toward probation.

96.     On December 15, 2020, Perik, Rowe, and Jones each received a copy of a lengthy draft report prepared by HLC related to EGCC's mid-cycle review.  In that report, the HLC found that EGCC failed to meet multiple accreditation standards and requirements, including five "Core Components" and recommended that EGCC be put on probation.

    a.   EGCC's President, Michael Geoghegan, received a copy of the report from HLC and forwarded it to Perik on December 15, 2020 using Perik's personal Hotmail email address.  In correspondence with a third party, Perik acknowledged that the report showed that "***EGCC has a serious HLC problem***."

    b.   Mr. Geoghegan also forwarded the HLC report to Jones on December 15, 2020, writing "Hi Dan. Attached is the HLC Draft Errors of Fact report . . . ***We want to keep this draft report tightly contained***."

     c.   Rowe received a copy of the report on December 15, 2020, via an email from

Perik, and noted the next day that "***page 37 is the most concerning to me.*** It can

mean courses are not eligible for Title 4 . . . ."[6]  Rowe also commented that

***EGCC "gave to get all of the 'not Mets' changed to, at least 'met with***

***concerns.'"***

97.     On December 16, 2020, Jones wrote to Perik and Rowe, "Reading [the HLC

report] again this morning, it appears that there is time for EGCC to take corrective action. It

doesn't say how long or when the follow-up would happen. . . . I'm also unclear as to what a

'mid-cycle' review means in terms of ***when the actual sanctions are announced or live***."

98.     That same day, Rowe wrote to Jones and Perik, "I think that's what we'd have to

tell the unions, ***worse case…they pulled accreditation based on a zoom meeting***."  Also that

day, in response to an email from Jones outlining a process for "***war with [an] accrediting***

***body***," Rowe asked Perik to "pull our agreement [with EGCC] and write the explanation that

refutes what [HLC] said about us?"

99.     On December 18, 2020, Perik drafted "HLC Talking Points" aimed at

discrediting the HLC report and the HLC's site visitor.  Those "Talking Points" acknowledge

that the HLC's site visitor "***threatened the accreditation***," of EGCC.

100.    On December 20, 2020, Haseley drafted a memo regarding the "Union College

Program."  To draft this memo, Haseley used Perik's "HLC Talking Points."  Haseley writes,

"Last month, HLC did a virtual site visit with Eastern Gateway.  The draft report was given to

---

[6] Title IV of the Higher Education Act ("HEA") authorizes programs that provide federal financial assistance to students to assist them in obtaining a postsecondary education at certain schools.  To be eligible to participate in Title IV funding, a school must meet several criteria related to the programs offered by the school, student enrollment, and institutional operations.  Institutional eligibility for participation in Title IV student financial aid programs is critical to SRC.

the college this week, and after an initial review, more than 100 material errors of fact were found . . . [The site visitor] told [EGCC] . . . they **would lose accreditation** . . . This is a brief rundown of what I'm aware of at this point."

101.    On December 21, 2020, Perik, Rowe, Jones, and Haseley received another email from Mr. Geoghegan, in which Geoghegan recounts a meeting with HLC and notes a "process for responding to the report and next steps and timelines."  Perik, Rowe, Jones and Haseley subsequently expended considerable time and effort in assisting EGCC in preparing its response to the draft HLC report.

102.    On December 22, 2020, Rowe, Haseley, Perik, and Amanda Wurst, who is a spokesperson for EGCC, exchanged a draft letter to the HLC, written on behalf of Geoghegan. The draft letter represents an early attempt by the Defendants to help EGCC rebut the HLC's draft report.  It begins, "As you know Eastern Gateway Community College has been going through the [HLC] Accreditation Review process."  The letter goes on to recognize that "[i]f HLC was to accept [the site visitor's] version of the visit" and his recommendation of probation, then "we start down a path that could ultimately cost tens of thousands of the working poor adults we serve access to a no cost education."

103.    That same day, Perik, upon reviewing this draft letter and in recognition of the fact that the HLC would likely stick with its findings, wrote to Rowe, Haseley, and Wurst, "I need to make the point that I have never seen an [sic] group like the HLC back down unless they face real exposure liability and embarrassment.  I am not sure this [letter] is strong enough."

104.    On January 28, 2021, as Defendants continued their scramble to respond to the HLC draft report, Jones forwarded a presentation regarding racial bias in accreditation to Perik, Rowe, Haseley, and several third parties.  Jones notes in his cover email, "***probation from an***

*accreditor hurts enrollment*."

105.    On February 18, 2021, Perik forwarded an invoice from the Remington Road Group to Haseley and others, writing, "We are using [Remington] to **help on this HLC accreditation issue**."  The Remington Road Group is a public and governmental affairs consulting group headed by Haseley.

106.    On March 3, 2021, Vanessa Birney, an interim administrator at EGCC, emailed Jones the "**final report from HLC**."  That final report maintained the visit teams' initial findings, including that EGCC failed to meet multiple accreditation standards and requirements, including five "Core Components."  And, once again, the HLC recommended that EGCC be put on probation.

107.    On March 24, 2021, Rowe created a document titled "SRC and SSC support" and forwarded it to a Student Resource Center employee, noting, "FYI, this is what we are sharing with EGCC for their next update of the HLC report."

108.    On April 14, 2021, in an email concerning potential board members for the "SRC Foundation," Rowe wrote to Perik and Haseley, **"[W]e might need to let [potential board member] know of EGCC's HLC troubles** first, just because of her role at the Association of Accreditors."

109.    On April 27, 2021—in a show of desperation to remedy the deteriorating situation—Haseley contacted representatives of a public employee union and requested that they contact James Kvaal, the U.S. Under Secretary of Education.  Haseley wanted Under Secretary Kvaal to step in and require the HLC to redo its site visit of EGCC, or alternatively, help EGCC with finding a new accreditation body.

110.    On May 23, 2021, Perik emailed Haseley and Rowe about the utility of meetings

with public officials, writing, "The important thing now is the visit in the next week or two . . . The clock starts to become our enemy. ***If the [HLC] meets and recommends probation we lose a big part of our argument. And turning it over becomes tougher***."

111.    The HLC's Board of Trustees was indeed scheduled to meet in June 2021 to make its final determination regarding EGCC's accreditation, but upon information and belief, Perik and other Defendants mounted a successful campaign to delay the HLC's meeting until after the parties' scheduled closing date of June 25, 2021.

112.    At no time prior to the execution of the Purchase Agreement did any Defendant disclose these facts or communications to Sterling or SRC Holdings, even though Defendants each had a duty to apprise Sterling and SRC Holdings about this information.

## IX.    Even After The Deal Closes, Defendants—Including Members Of Management— Continue To Withhold Information About The HLC's Review Of EGCC.

113.    For months after signing the Purchase Agreement, Defendants continued to hide the fact of EGCC's possible probation, leaving Sterling and SRC Holdings in the dark.

114.    On August 3, 2021, Haseley emailed Perik about "follow up info" related to the HLC's review of EGCC.  Haseley wrote, "Please find attached a screen shot of a December 2020 document showing findings from the HLC review that credible stakeholders have said violated Department [of Education] guidelines. Also ***attached is the notice of the August 10 meeting where the HLC IAC Committee is expected to accept the 'not met' findings and sanction the college with probation***."

115.    That same day, in yet another attempt to employ the help of the U.S. Department of Education, Haseley sent a draft email to Rowe and Perik.  That email noted, "***If HLC moves forward and puts EGCC on probation, it will cause union students to be directed elsewhere*** . . . ***Without union students, EGCC would be operating with under 3,000 students and the***

*revenues* that have subsidized the campuses and free college to all students in the district *would go away*. There's urgency because HLC will make it's  [sic] decision on August 12."

116.    On September 29, 2021, Haseley emailed Rowe and Perik about a potential independent investigation of the HLC conducted by an outside law firm on behalf of the Ohio Civil Service Employees Association ("OCSEA"), a union partner of EGCC.  The investigation would, however, be funded solely by Perik.  Indeed, Perik would be "the guarantor for all [legal] fees and expenses" and would "provide the upfront retainer of $50,000."  The investigation was needed, according to Haseley, because "*the program at Eastern Gateway is currently in jeopardy* due to an improper accreditation review by the Higher Learning Commission (HLC)."

117.    At no point during this time period did any Defendant inform Sterling or SRC Holdings about these communications, even though each Defendant had a duty to apprise Sterling and SRC Holdings of this information.  Sterling and SRC Holdings had no idea that the HLC was "expected . . . to sanction [EGCC] with probation"; that "revenues . . . would go away"; or that "Eastern Gateway is currently in jeopardy."

## X.    Representatives Of Sterling And SRC Holdings Confront Defendants, and Defendant Rowe Finally Admits to Knowing About the HLC's Review of EGCC Before The Parties Closed Their Deal.

118.    On March 9, 2022, Sterling representatives met with Perik, Rowe, Haseley, and Jones in Washington, D.C. to discuss plans for Student Resource Center's future, including the possibility of transitioning to new management.

119.    At that meeting, a Sterling representative referenced the HLC's review of EGCC and explained how Defendants knew about it "privately" and how it had caught Sterling and SRC Holdings "flat-footed."  In response, and for the first time, one Defendant finally admitted to knowing about the HLC's report on EGCC before the parties closed on the Purchase Agreement.  Rowe stated, "I didn't think that they were going on probation . . . Did I see the

27

mid-cycle review? Yes." Rowe's statement that she did not believe EGCC was likely to go on probation was false. Moreover, it was a material omission to have withheld the report from Plaintiffs, both before and after the deal. Perik, Haseley, and Jones sat there in silence, until Jones threatened a "laundry list" of litigation and a "disaster."

120.   By working at Student Resource Center after the deal closed, the Defendant employees of Student Resource Center—Perik, Haseley, Rowe, and Jones—were able to prevent Plaintiffs from discovering that the Defendants' previous representations about the HLC matter were false.

121.   Upon information and belief, since his termination as an employee of Student Resource Center, Perik has been communicating improperly with EGCC regarding the contractual relationship between Student Resource Center and EGCC—namely, their Collaboration Agreement.

122.   On March 23, 2022, two weeks after the March 9, 2022 meeting, EGCC President Geoghegan told Student Resource Center that he had been informed that Perik had been terminated and that Rowe, Jones and Haseley resigned as a result. That communication occurred prior to Defendants informing Student Resource Center that they had resigned. Defendants have obligations and duties to Student Resource Center, including but not limited to not interfering with SRC relationships, disparaging its board or shareholders, and confidentiality obligations.

123.   While a Student Resource Center employee, Perik utilized his personal email account, as well as text messages and messaging apps, to conduct Student Resource Center business. After closing, counsel for Student Resource Center requested that Perik provide Student Resource Center with any documents from his personal email accounts concerning EGCC.

124.    Upon review of the documents provided by Perik, Student Resource Center learned that Perik withheld from Student Resource Center relevant communications from Perik's personal email account regarding the HLC issue.

125.    Counsel for Student Resource Center subsequently requested that Perik provide SRC with all emails, texts, and other electronic documents related to SRC business, including HLC-related emails from Perik's personal email account.  Perik has refused to provide SRC with these business records.

## CLAIMS FOR RELIEF

### COUNT I
### (Fraudulent Inducement)

126.    Sterling and SRC Holdings restate the allegations in the paragraphs set forth above, as if those paragraphs were fully rewritten herein.

127.    On numerous occasions, Defendants made material false representations and omissions to Sterling and/or SRC Holdings concerning EGCC.  Those representations include:

a.      Perik's and Rowe's false statements concerning EGCC's HLC accreditation status on January 26, 2021;

b.      Perik's false statements concerning EGCC's HLC accreditation status, including the status of EGCC's mid-cycle review, on May 13, 2021, and Rowe's, Haseley's, and Jones' omissions regarding EGCC's HLC accreditation status on May 13, 2021;

c.      Perik's false written statement concerning EGCC's HLC accreditation status, including misstatements and/or omissions regarding the reason for the amendment of the agreement between EGCC and Student Resource Center, delivered to Sterling on June 3, 2021; and

        d.     Defendants' false representations and warranties in Section 3.21(d) of the

            Purchase Agreement.

128.    Defendants knew that each of these representations and omissions was false when

made, as shown by Defendants' contemporaneous communications.

129.    Defendants made these false representations and omissions to induce Sterling and

SRC Holdings into entering the Purchase Agreement.

130.    Sterling and SRC Holdings justifiability relied on Defendants' representations and

omissions, as they had no reason to believe that Defendants' representations and omissions were

false at the time they were made.

131.    Had Defendants not made material false representations and omissions, Sterling

and SRC Holdings would not have entered the Purchase Agreement and would not have closed

on the Agreement.  As noted, EGCC represents 95% of Student Resource Center's annual

revenue.  Had Sterling and SRC Holdings known of the existence of the HLC report or that the

HLC was about to place EGCC on probation, they would have never agreed to the Purchase

Agreement.

132.    As a direct and proximate result of Defendants' false representations and

omissions, Sterling and SRC Holdings have both suffered damages in an amount to be

determined at trial.

**COUNT II**
**(Fraudulent Concealment)**

133.    Sterling and SRC Holdings restate the allegations in the above paragraphs, as if

fully rewritten herein.

134.    On multiple occasions, Defendants either deliberately concealed material facts

concerning EGCC's HLC accreditation status or partially disclosed facts in a misleading or

30

incomplete fashion.

135.    Defendants' acts of concealment include:

     a.     Perik's and Rowe's false statements concerning EGCC's HLC accreditation status on January 26, 2021;

     b.     Perik's false statements concerning EGCC's HLC accreditation status, including the status of EGCC's mid-cycle review, on May 13, 2021, and Rowe's, Haseley's, and Jones' omissions regarding EGCC's HLC accreditation status on May 13, 2021;

     c.     Perik's false written statement concerning EGCC's HLC accreditation status, including misstatements and/or omissions regarding the reason for the amendment of the agreement between EGCC and Student Resource Center, delivered to Sterling on June 3, 2021; and

     d.     Defendants' false representations and warranties in Section 3.21(d) of the Purchase Agreement;

     e.     Defendants' false statements and omissions regarding EGCC's HLC accreditation status, made during post-closing meetings and calls held between the parties after June 25, 2021; and

     f.     Perik's false statement, on November 22, 2021, concerning his knowledge of the HLC's report on EGCC.

136.    Defendants' acts of concealment were intended to induce Sterling and SRC Holdings to enter into the Purchase Agreement without knowledge of the true state of EGCC's accreditation status.

137.    Had Defendants not fraudulently concealed material facts, Sterling and SRC

Holdings would not have entered the Purchase Agreement and would not have closed on the

Agreement.  As noted, EGCC represents 95% of Student Resource Center's annual revenue.

Had Sterling and SRC Holdings known of the existence of the HLC report or that the HLC was

about to place EGCC on probation, they would have never agreed to the Purchase Agreement.

138.    Even after the deal closed and until the HLC publicly released its report,

Defendants continued to lie and withhold information concerning EGCC's accreditation status.

SRC Holdings justifiably and detrimentally relied on these false statements and omissions as

well.

139.    As a direct and proximate result of Defendants' fraudulent concealment of

material facts, Sterling and SRC Holdings have both suffered damages in an amount to be

determined at trial.

**COUNT III**
**(Fraud)**

140.    Sterling and SRC Holdings restate the allegations in the above paragraphs, as if

fully rewritten herein.

141.    Under the Purchase Agreement, "Fraud" is defined as

[Any] Party's  making  of  a  representation  or warranty in this Agreement or any
Ancillary Document to any Party hereto, which representation is made (a) with
such Party's actual knowledge (as opposed to imputed or constructive knowledge)
that such representation or warranty was untrue when made and (b) with an intent
by such Party to deceive another Party with respect to the making of such
representation or warranty (and such other Party actually relies upon such false
representation or warranty).

142.    Defendants, as Sellers under the Purchase Agreement, represented and warranted,

pursuant to Section 3.21(d) of the Purchase Agreement:

To the Company's knowledge, since [January 1, 2018], each Institution that has
entered into a Collaboration Agreement with the Company has (i) been in material
compliance with all applicable Educational Laws, (ii) obtained and held all

32

Educational Approvals necessary to conduct its operations as currently conducted, and (iii) been in materials compliance with the terms and conditions of all such Educational Approvals.  To the Company's knowledge, no action for the suspension, revocation, termination or cancellation of any of Educational Approval of any such Institution . . . is pending or threatened.

143.     Defendants—specifically Perik, Haseley, Rowe, and Jones—knew that this representation and warranty was false when made.  (*See* Exhibit A, Section 8.13.)

144.     Those same Defendants made this false representation with the intent to deceive Sterling and SRC Holdings, and to induce Sterling and SRC Holdings into entering the Purchase Agreement.

145.     Furthermore, after entering the Purchase Agreement, Defendants made material false representations and omissions to Sterling and/or SRC Holdings concerning EGCC, including:

a.     Defendants' false statements and omissions regarding EGCC's HLC accreditation status, made during post-closing meetings and calls held between the parties after June 25, 2021; and

b.     Perik's false statement, on November 22, 2021, concerning his knowledge of the HLC's report on EGCC.

146.     Sterling and SRC Holdings justifiably relied on Defendants' representations and warranties in Section 3.21(d) of the Purchase Agreement, as they had no reason to believe Defendants' representations and warranties were false.  Indeed, even after the deal closed and until the HLC publicly released its report, Defendants continued to lie and withhold information concerning EGCC's accreditation status.  Sterling and SRC Holdings justifiably and detrimentally relied on these false statements and omissions as well.

147.     Had Defendants not made the false representations contained in Section 3.21(d) of

the Purchase Agreement, SRC Holdings would not have entered the Purchase Agreement and would not have closed on the Agreement.  As noted, EGCC represents 95% of Student Resource Center's annual review.  Had SRC Holdings known of the existence of the HLC report or that the HLC was about to place EGCC on probation, it would have never agreed to the Purchase Agreement.

148.    As a direct and proximate result of Defendants' fraud, Sterling and SRC Holdings have suffered damages in an amount to be determined at trial.

**COUNT IV**
**(Conspiracy to Commit Fraud)**

149.    Sterling and SRC Holdings restate the allegations in the above paragraphs, as if fully rewritten herein.

150.    Defendants, acting as a confederation of two or more persons, knowingly agreed to and participated in a scheme to defraud Sterling and SRC Holdings and induce them into agreeing to the Purchase Agreement.

151.    Defendants knowingly conspired to defraud Sterling and SRC Holdings by engaging in several fraudulent acts, including making material false representations and omissions, and actively concealing information that Defendants had a duty to disclose.

152.    Defendants' misrepresentations and omissions include:

      a.      Perik's and Rowe's false statements concerning EGCC's HLC accreditation status on January 26, 2021;

      b.      Perik's false statements concerning EGCC's HLC accreditation status, including the status of EGCC's mid-cycle review, on May 13, 2021, and Rowe's, Haseley's, and Jones' omissions regarding EGCC's HLC accreditation status on May 13, 2021;

    c.    Perik's false written statement concerning EGCC's HLC accreditation status, including misstatements and/or omissions regarding the reason for the amendment of the agreement between EGCC and Student Resource Center, delivered to Sterling on June 3, 2021;

    d.    Defendants' false representations and warranties in Section 3.21(d) of the Purchase Agreement;

    e.    Defendants' false statements and omissions regarding EGCC's HLC accreditation status, made during post-closing meetings and calls held between the parties after June 25, 2021; and

    f.    Perik's false statement, on November 22, 2021, concerning his knowledge of the HLC's report on EGCC.

153.    Defendants knew that each of these representations and omissions was false when made, as shown by Defendants' contemporaneous communications.

154.    Defendants made these false representations and omissions to induce Sterling and SRC Holdings into entering the Purchase Agreement.

155.    Sterling and SRC Holdings justifiability relied on Defendants' representations and omissions, as Sterling had no reason to believe that Defendants' representations and omissions were false at the time they were made.  Indeed, even after the deal closed and until the HLC publicly released its report, Defendants continued to lie and withhold information concerning EGCC's accreditation status.  SRC Holdings justifiably and detrimentally relied on these false statements and omissions as well.

156.    Had Defendants not made material false representations and omissions, Sterling and SRC Holdings would not have entered the Purchase Agreement and would not have closed

on the Agreement.  As noted, EGCC represents 95% of Student Resource Center's annual revenue.  Had Sterling and SRC Holdings known of the existence of the HLC report or that the HLC was about to place EGCC on probation, they would have never agreed to the Purchase Agreement.

157.    As a direct and proximate result of Defendants' conspiracy to commit fraud, Sterling and SRC Holdings have both suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter an order awarding them:

a.    Damages equal to the difference between the actual and represented values of Student Resource Center;

b.    Out-of-pocket costs equal to the difference between the amount paid to Defendants and the actual value of Student Resource Center;

c.    Rescissory damages in an amount to return them to the same position they held prior to Defendants' fraud;

d.    Consequential damages resulting from Defendants' fraud;

e.    Punitive damages;

f.    Reasonable attorneys' fees and costs;

g.    Pre- and post-judgment interest; and

h.    Such other relief as this Court deems just, proper, or necessary.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury.

Dated:  June 15, 2022

BAKER & HOSTETLER LLP

*/s/  Jeffrey L. Lyons*
Daniel J. Goettle (#6664)
Jeffrey J. Lyons (#6437)
1201 North Market Street, Suite 1402
Wilmington, DE  19801-1147
(302) 468-7088
dgoettle@bakerlaw.com
jjlyons@bakerlaw.com

Jonathan B. New (*pro hac vice forthcoming*)
45 Rockefeller Plaza
New York, NY 10111
(212) 589-4200
jnew@bakerlaw.com

G. Karl Fanter (*pro hac vice forthcoming*)
Joseph H. Walsh (*pro hac vice forthcoming*)
Key Tower
127 Public Square, Suite 2000
Cleveland, OH 44114
(216) 621-0200
kfanter@bakerlaw.com
jhwalsh@bakerlaw.com

*Attorneys for Plaintiffs Sterling Small Market Education Fund, L.P. and SRC Intermediate Holdings, Inc.*