**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| STERLING SMALL MARKET EDUCATION FUND, L.P., SRC INTERMEDIATE HOLDINGS, INC., and STUDENT RESOURCE CENTER, LLC, | ) ) ) ) ) | |
| | ) | C.A. No. 22-790-RGA-JLH |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| MICHAEL PERIK, NICOLE ROWE COLCLASURE, JOHN HASELEY, DANIEL JONES, HIGHER EDUCATION PARTNERS, LLC, RRGTHREE, LLC, USS GUARANTOR, LLC, and MWJ HOLDINGS, LLC, | ) ) ) ) ) ) ) | |
| *Defendants*. | ) ) | |

## SECOND AMENDED COMPLAINT

Plaintiffs Sterling Small Market Education Fund, L.P. ("Sterling"), SRC Intermediate

Holdings, Inc. ("SRC Holdings"), and Student Resource Center, LLC ("Student Resource

Center" or the "Company") (collectively, "Plaintiffs") bring this action against Defendants

Michael Perik, Nicole Rowe Colclasure, John Haseley, Daniel Jones, Higher Education Partners,

LLC ("Higher Education Partners"), RRGTHREE, LLC ("RRGTHREE"), USS Guarantor, LLC

("USS Guarantor"), and MWJ Holdings, LLC ("MWJ Holdings") (collectively, "Defendants").

## INTRODUCTION

1.     This action is brought by Plaintiffs Sterling and SRC Holdings to hold Defendants

accountable for their fraudulent conduct, which induced Sterling and SRC Holdings to enter into

a Unit Purchase Agreement on June 25, 2021 to acquire Defendants' company, Student Resource

Center.  (*See* Exhibit A (Unit Purchase Agreement) (referred to herein as the "Purchase

Agreement").)  Sterling and SRC Holdings also bring this action for Defendants' post-closing fraud.  Indeed, not only did Defendants make multiple false representations and material omissions to Sterling and SRC Holdings before closing, but they also engaged in a monthslong cover-up scheme after the parties entered the Purchase Agreement.

2.     Student Resource Center—the company acquired by Sterling and SRC Holdings—also brings this action against defendants Michael Perik and Daniel Jones for their post-termination contractual breaches and intentional interference with the Company's Collaboration Agreement with its primary institutional partner, Eastern Gateway Community College ("EGCC").  (*See* Exhibit B (referred to herein as the "Collaboration Agreement").)

3.     As further explained below, Student Resource Center is a business that partners with higher education institutions in the development and management of affordable, high-quality college courses and programs for unions and other professional associations.  Student Resource Center was founded by Michael Perik.

4.     At the time of the acquisition of Student Resource Center, EGCC was the Company's primary partner.  During the parties' negotiation and due diligence period, the issue of EGCC's accreditation was discussed at length as EGCC's ability to service students in a manner compliant with accreditation standards relates directly to Student Resource Center's own commercial viability and educational impact.

5.     At multiple meetings and on follow-up regulatory diligence calls, Sterling representatives asked Defendants about the status of EGCC's accreditation and whether Defendants knew about or had seen any reports from EGCC's accrediting body, the Higher Learning Commission (the "HLC" or "Commission") with respect to a mid-cycle review that was underway.  In response to Sterling's many questions, Defendants repeatedly said they were

unaware of any EGCC accreditation issues and had not seen a visit team report from the HLC.

6.　　Consistent with these pre-closing statements, in Section 3.21 of the Purchase Agreement, Defendants represented and warranted that, to their knowledge, EGCC had "been in material compliance with all Educational Laws [which includes any "Accrediting Body standard or other requirement thereof"]"; had "obtained and held all Educational Approvals necessary to conduct its operations as currently conducted"; was "in material compliance with the terms and conditions of all such Educational Approvals"; and that "no action for the suspension, revocation, termination or cancellation of any of Educational Approval . . . [was] pending or threatened."

7.　　Sterling and SRC Holdings later discovered that Defendants' pre-closing statements were knowingly false, as were Defendants' representations and warranties in Section 3.21 of the Purchase Agreement.

8.　　On November 8, 2021, the HLC publicly released the results of its accreditation review for EGCC and concluded that the school had to be placed on probation for failing to meet a number of HLC's standards and other requirements.  The HLC's probation letter caught Sterling and SRC Holdings by complete surprise.

9.　　Defendants, however, were well aware of the HLC's plans to sanction EGCC, because Defendants had received a draft of the Commission's visit team report in December 2020—***six months before the parties closed their transaction***, and Defendants actively assisted EGCC in its response to the report.  And, in March 2021—three months before closing— Defendants received a copy of the HLC's final visit team report, and Defendants continued to actively help EGCC respond to the report.  The Commission's findings in that final report were so severe that EGCC was found, by Defendants' own determination at the time, to be out of

compliance with more than double the number of accreditation "Core Components" than any other institution then on probation with the HLC.

10.     Despite receiving copies of these reports months in advance of closing and despite their efforts to assist EGCC with HLC accreditation standards, Defendants never mentioned the fact that EGCC had been found to be out of compliance with HLC accreditation standards and requirements and was headed toward probation.  Defendants never disclosed the HLC's findings during the parties' negotiations, discussions, pre-closing meetings, or diligence calls.  And, even after the transaction closed in June 2021, the Defendants who remained as SRC executives continued to hide from Plaintiffs the HLC's report and EGCC's probation problems.  Due to this deceit, Sterling and SRC Holdings found out about the HLC's report like any member of the public, on November 8, 2021, when the HLC's probation letter was published online.

11.     That EGCC had, and continues to have, accreditation issues is a significant operational and financial hardship for Student Resource Center, and undermines its ability to fulfill its educational mission and impact.  The Company derives revenue by providing a bundle of services necessary to facilitate the development of low cost, debt-free educational programs on behalf of union and professional associations.  Revenue derived from the provision of such services in conjunction with students' enrollment at EGCC represents approximately 95% of Student Resource Center's annual revenue.  Simply put, EGCC's probation has, and will continue to, undermine the educational mission and impact of Student Resource Center, and has and will continue to cause the Company to suffer significant revenue loss and material reputational harm, which in turn has caused severe financial damage to Sterling and SRC Holdings.

12.     Sterling and SRC Holdings have also been damaged by being forced to reckon

with the issues underlying the Commission's report and its finding that EGCC was out of compliance with multiple accreditation standards. In addition, Defendants' systematic, post-closing lies about EGCC have caused grave harm to Student Resource Center's educational impact and commercial viability. By shielding Sterling and SRC Holdings from the truth for months after closing, Defendants put students' educational pursuits at risk, endangered the Company's relationship with existing partners, imperiled future business prospects, and diminished the Company's value. During this lost time, Sterling and SRC Holdings could have been establishing new school partnerships to diversity educational choices beyond EGCC, helping EGCC, where appropriate, with its HLC remediation efforts, and preparing evidence to support the Company's good standing with external stakeholders.

13.     Had it not been for Defendants' pre-closing false representations and material omissions regarding EGCC and Defendants' false representations and warranties in the Purchase Agreement, Sterling and SRC Holdings would have never agreed to enter into the Purchase Agreement to acquire the Company.

14.     And had it not been for Defendants' ongoing false representations and material omissions regarding EGCC after the transaction closed, Sterling and SRC Holdings would have had time to plan and react to the HLC report before it became public, potentially mitigating losses and avoiding public relations crises and operational disruption.

15.     Thus, Sterling and SRC Holdings bring this action to recover the damages they have suffered due to Defendants' pre- and post-closing fraud.

16.     That fraud is, however, not the end of the story.

17.     Ever since Sterling and SRC Holdings acquired Student Resource Center and replaced the management team, Perik and Jones have directed their longtime collaborator,

EGCC's President, Geoghegan, to interfere with Student Resource Center and EGCC's contractual relationship. That interference resulted in EGCC unlawfully seeking to terminate the Collaboration Agreement, and also laid the ground work for Defendants to wrongfully try to establish a new company to compete with Student Resource Center for EGCC's business and union partnerships.

18. Perik hinted at this scheme at a March 2022 meeting, when he and other Defendants warned Sterling representatives that if their demands were not met, they could work with Geoghegan to put Student Resource Center "out of business." And since that meeting, other information—including Geoghegan's own in-court testimony, Perik's ephemeral Signal messages with Geoghegan, and email communications between Jones and Geoghegan—shows that Defendants have been and continue to be working to undermine their former company Student Resource Center.

19. The Company accordingly brings this action to recover the damages it has suffered due to Defendants' wrongful conduct.

## PARTIES

20. Plaintiff Sterling Small Market Education Fund, L.P. is a limited partnership organized and existing under the laws of Delaware. Sterling's general partner is Sterling Fund Management, LLC, a Delaware limited liability company, with members residing in Illinois, Maryland, and Florida. None of Sterling's partners are citizens of states in which Defendants are citizens.

21. Plaintiff SRC Intermediate Holdings, Inc. is a citizen of the states of Delaware and Illinois. SRC Holdings is a corporation organized and existing under the laws of Delaware, with its principal place of business at 167 N. Green Street, Chicago, IL 60607.

22. Plaintiff Student Resource Center, LLC is a citizen of the states Delaware and

Illinois.  Student Resource Center is a Delaware limited liability company.  The Company's sole member is SRC Holdings, a corporation organized and existing under the laws of Delaware, with its principal place of business also in Chicago, Illinois.

23.     Defendant Michael Perik was the Chief Executive Officer and Co-Founder of Student Resource Center, LLC, and was also a former board member of Student Resource Center Holdings, LLC.  Perik is a citizen of Rhode Island and resides at 10 High Street, Jamestown, Rhode Island 02835.

24.     Defendant Nicole Rowe Colclasure was the President and Co-Founder of Student Resource Center, LLC.  Rowe is a citizen of Arkansas and resides at 2704 North Fillmore Street, Little Rock, Arkansas 72207.

25.     Defendant John Haseley was the Chief Strategy Officer and Co-Founder of Student Resource Center.  Haseley is a citizen of Ohio and resides at 9546 Hooper Road, Athens, Ohio 45701.

26.     Defendant Daniel Jones was the Chief Engagement Officer of Student Resource Center, LLC.  Jones is a citizen of Ohio and resides at 1400 Oak Knoll Drive, Cincinnati, Ohio 45224.

27.     Defendant Higher Education Partners, LLC is not a citizen of states in which Plaintiffs are citizens.  Higher Education Partners, LLC is a Delaware limited liability company, with its principal place of business at 10 High Street, Jamestown, Rhode Island 02835.  Higher Education Partners, LLC's members include Defendant Perik, Monitor Clipper Equity Partners III, L.P., and Monitor Clipper Equity Partners (NQP) III, L.P.  Defendant Perik is a citizen of Rhode Island.  Higher Education Partners, LLC's remaining members are citizens of Massachusetts.

28.     Defendant RRGTHREE, LLC is a citizen of Ohio.  RRGTHREE, LLC is an Ohio limited liability company, with its principal place of business at 35 North Street, Suite 340, Columbus, Ohio 43215.  RRGTHREE, LLC is a single-member LLC, with John Haseley as its sole member.  Haseley resides in Athens, Ohio, and is thus a citizen of Ohio.

29.     Defendant USS Guarantor, LLC is a citizen of Rhode Island.  USS Guarantor, LLC is a Rhode Island limited liability company, with its principal place of business at 101 Dyer Street, Suite 3A, Providence, Rhode Island 02903.  USS Guarantors, LLC is a single-member LLC, with Defendant Michael Perik as its sole member.  Defendant Perik is a citizen of Rhode Island.

30.     MWJ Holdings, LLC is a citizen of Rhode Island.  MWJ Holdings, LLC is a Delaware limited liability company, with its principal place of business at 10 High Street, Jamestown, Rhode Island 02835.  MWJ Holdings, LLC is a single-member LLC, with Defendant Michael Perik as its sole member.  Defendant Perik is a citizen of Rhode Island.

## JURISDICTION & VENUE

31.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.

32.     This Court has personal jurisdiction over each Defendant because each Defendant consented to personal jurisdiction in this Court pursuant to Section 8.15 of the Purchase Agreement, titled "Jurisdiction and Venue."  That section states, in pertinent part, "Each of the Parties submits to the exclusive jurisdiction of any state or federal court sitting in Wilmington, Delaware . . . in any action or proceeding arising out of or relating to this Agreement."  (Exhibit A.)  This Court also has personal jurisdiction over each Defendant because, for among other reasons, each Defendant has availed itself, himself, or herself to the rights and benefits of

Delaware law or has otherwise engaged in substantial and continuing contacts with Delaware.

33.     Venue in this Court is proper pursuant 28 U.S.C. § 1391(b)(3) because each Defendant is subject to this Court's personal jurisdiction.  Venue in this Court is also proper pursuant to the parties' forum selection clause contained in Section 8.15 of the Purchase Agreement, which includes a "waiv[er] [of] any defense of inconvenient forum to the maintenance of any action or proceeding" brought within "any state or federal court sitting in Wilmington, Delaware."  (Exhibit A.)

## FACTS

### I.     Student Resource Center's Business.

34.     In 2015, Defendants Perik, Rowe, and Haseley founded Student Resource Center.

35.     Student Resource Center partners with higher education institutions in the development and administration of high quality, affordable courses and programs in service of union and professional association members, including the provision of evidence-based student supports, such as coaching and advising.  More specifically, the Company provides a number of services to partnering schools, including: (i) identifying courses and programs not currently available which may meet the unmet needs of adult learners; (ii) assisting with the administration of educational benefit programs offered to unions and professional associations; and (iii) providing non-academic coaching and other student support services to improve student persistence and completion outcomes.

36.     Student Resource Center also partners with unions and other professional associations to provide the educational programs offered by the Company's partnering schools on a free or heavily discounted basis as a benefit of union or association membership.  Further, if a union or association member is interested in one of the educational programs offered by a collaborating school, Student Resource Center provides that prospective student with guidance

and support, as well as ongoing mentoring services post-enrollment.

37.     Since its founding in 2015, Student Resource Center has, and continues to, collaborate with certain educational institutions, including EGCC and Central State University ("CSU").

38.     Of those schools, EGCC is the Company's primary partner.  EGCC is an Ohio-based, public institution of higher learning founded in 1968.  EGCC offers associate degrees and certificates in numerous areas, and it conducts classes online and in person at its Youngstown, Ohio and Steubenville, Ohio campuses.[1]

39.     The HLC is the accrediting body for EGCC.

40.     The HLC "is an independent corporation that was founded in 1895 as one of six regional institutional accreditors in the United States."[2]

41.     The HLC's reaccreditation process is rigorous, requiring the involvement of many school administrators, faculty, and staff.  First, a school must draft a voluminous document called a self-study, written to prove to the HLC that all academic and non-academic standards are being met.  Second, the HLC conducts a site visit, relying on a team of administrators and faculty from other colleges and universities.  Third, depending on the conclusions of the site visit, which are memorialized in a written report, the HLC may provide feedback and renew accreditation or recommend some other action.

42.     Under certain circumstances, the HLC may determine that a school, like EGCC, is "at risk of being out of compliance or out of compliance with HLC requirements," and

---

[1] *See* Eastern Gateway Community College, "Who We Are," https://egcc.edu/about-us/institution/who-we-are/.
[2] *See* Higher Learning Commission, "About the Higher Learning Commission," https://www.hlcommission.org/About-HLC/about-hlc.html.

consequently place that institution "on a sanction, including Notice or Probation."[3]  "In such cases, the institution is required to undergo additional evaluations to demonstrate that it has addressed the issues identified and is in compliance with HLC requirements," and in "some cases, the HLC Board may elect to take an adverse action, such as withdrawing accreditation from an accredited institution."[4]

43.     As reported in the media, it is rare for accreditors, including the HLC, to sanction schools for being out of compliance with accreditation standards.  For instance, the HLC and five other organizations "oversee more than 3,000 colleges," but as of a few years ago, had "rescinded the membership of [just] 26 educational institutions."[5]

**II.     Perik's Connection to EGCC.**

44.     Student Resource Center was founded by Perik, and arose, in part, out of his previous business arrangements with Geoghegan and EGCC.

45.     Perik became acquainted with Geoghegan in 2012, and they have remained friends and close confidants ever since, communicating on a regular basis.  Upon information and belief, and as explained below, Perik has been directing Geoghegan regarding the operations of EGCC.

46.     In 2012, Geoghegan was the chief financial officer at Cincinnati State Technical Community College ("CSTCC"), and CSTCC engaged Perik and his company, Defendant Higher Education Partners, LLC, to establish and develop a CSTCC campus in Middletown,

---

[3] *See* Higher Learning Commission, "Overview of the Accreditation Relationship," https://www.hlcommission.org/Accreditation/accreditation-overview.html.
[4] *Id.*
[5] Andrea Fuller and Douglas Belkin, "The Watchdogs of College Education Rarely Bite," Wall Street Journal (June 17, 2015), *available at* https://www.wsj.com/articles/the-watchdogs-of-college-education-rarely-bite-1434594602.

Ohio.[6]  As part the CSTCC-Middletown project, Higher Education Partners, LLC committed to purchase and redevelop two properties for the CSTCC campus in return for a portion of CSTCC's revenue.[7]

47.	In or around 2017, Perik and Higher Education Partners, LLC started a similar project with EGCC.  Perik and Higher Education Partners, LLC agreed to purchase and develop property around Youngstown, Ohio for EGCC's use, and in return Higher Education Partners would receive a portion of EGCC's revenue.[8]

48.	Upon information and belief, around this same time, Geoghegan was installed as EGCC's Chief Financial Officer and Treasurer through the efforts of Perik.  Perik and Higher Education Partners, LLC needed support from within EGCC, so Perik offered to help Geoghegan get a job offer from EGCC as its chief financial officer.

49.	Upon information and belief, in part through Perik's efforts, Geoghegan was elevated to EGCC's President in July 2020.  Despite taking on the presidency, Geoghegan retained his role as chief financial officer and treasurer, and was thus able to maintain control of EGCC's financial and auditing functions, as well as the school's relationship with Perik, Higher Education Partners, LLC, and Student Resource Center.

---

[6] *See* Michael D. Pitman, "First student enrolls at Cincinnati State as local officials discuss impact of campus," Dayton Daily News (April 24, 2012), *available at* https://www.daytondailynews.com/news/local/first-student-enrolls-cincinnati-state-local-officials-discuss-impact-campus/dF5Hs5zvOiIL06lPX2L2aO/.

[7] *See* City of Middletown, Higher Education Partners Section Loan Application (May 1, 2012), *available at* https://www.cityofmiddletown.org/DocumentCenter/View/90/Section-108-Loan-Application-PDF ("In essence, HEP [made] an investment in physical infrastructure and [made] educational space available to" CSTCC, and in return "CSTCC shall pay to HEP all surplus Revenue, which shall be held by HEP subject to [] annual reconciliation procedures[.]"

[8] *See* Virginia Shank, "Eastern Gateway seeks new Warren location," Tribune Chronicle (May 2, 2017), available at https://www.tribtoday.com/news/local-news/2017/05/eastern-gateway-seeks-new-warren-location/.

### III.    Student Resource Center's Collaboration Agreement with EGCC.

50.    As noted above, in 2015, Perik and other Defendants founded Student Resource Center as a business separate and apart from Higher Education Partners, LLC.

51.    In 2017, Student Resource Center and EGCC executed their Collaboration Agreement.  (*See* Exhibit B.)  The Collaboration Agreement has since been amended twice, on or around October 2019 and February 1, 2021, and it remains in force until at least June 30, 2027. (*See id.*)

52.    Under the Collaboration Agreement, Student Resource Center agreed to assist EGCC with, among other things: (a) developing and marketing high quality online courses and programs to members of unions and professional association members; (b) identifying courses and programs not currently available to EGCC students; (c) administering the educational benefit programs offered to unions professional associations; and (d) supporting students with coaching and other services.  (*See* Exhibit B, Section 2.)

53.    In return, EGCC agreed to reimburse Student Resource Center for operating expenses and to pay the Company a service fee.  (*See* Exhibit B, Section 3.)

### IV.    Student Resource Center Generates Significant Interest in the Educational Benefit Program.

54.    Through its collaborations with schools, like EGCC and CSU, and its partnerships with unions and professional associations, Student Resource Center has helped institutions serve thousands of students, with college participation numbers increasing every year between 2015 and 2020.

55.    EGCC's enrollment grew from approximately 5,549 students in fall 2016 to over 42,500 students in fall semester 2021.

56.    As a result of the program's success, and through its contractual arrangements

with schools and unions and professional associations, Student Resource Center has generated millions of dollars in revenue while simultaneously enabling access to higher education for tens of thousands of students.

57.     Student Resource Center's adjusted earnings totaled approximately $7.5 million in 2020. For 2021, Student Resource Center earned roughly $12 million due to increased enrollment numbers.

## V.     Student Resource Center Hits the Market, and Sterling Considers Acquiring the Company.

58.     In or around November 2020, Perik and the other Defendants, as the then owners of Student Resource Center, started to seek buyers of, or potential investors in, Student Resource Center, and enlisted the services of an investment bank specializing in the education sector.

59.     On December 22, 2020, after receiving some initial materials regarding Student Resource Center, Sterling submitted an Indication of Interest to the investment bank. That Indication notified the investment bank that Sterling was interested in acquiring Student Resource Center.

60.     On January 11, 2021, representatives of Sterling participated in their first meeting with Student Resource Center's management and the investment bank regarding a potential deal to purchase Student Resource Center. At that meeting, the parties discussed Student Resource Center's business and operational model, including a description of how Student Resource Center contracts with unions, professional associations, EGCC, and CSU. The parties also discussed how Student Resource Center provides non-academic coaching and other student support services to improve student persistence and completion outcomes.

61.     Roughly two weeks later, on January 26, 2021, Sterling representatives had a follow-up meeting with the investment bank and Defendants, specifically Perik and Rowe, to

discuss Student Resource Center's business. At that meeting, Sterling's representatives asked Perik and Rowe whether Student Resource Center, EGCC, or CSU had any issues with accreditation authorities, including the HLC. In response, both Perik and Rowe stated that Student Resource Center, EGCC, and CSU did not have any issues with accreditors, including the HLC. As explained below, Defendants' representations were false, and both Perik and Rowe knew they were false at the time they were made.

62.     Sterling's immediate focus on EGCC's accreditation was due to the fact that Student Resource Center's own sustainability was intrinsically linked to EGCC's ability to service students in a manner compliant with the HLC. EGCC represents approximately 95% of Student Resource Center's annual revenue, thus anything that could jeopardize the school's ability to enroll students—like accreditation sanctions—would in turn cause severe damage to Student Resource Center's business.

63.     On January 27, 2021, the parties met again to discuss Student Resource Center's financial performance. Defendant Perik attended this meeting on behalf of Student Resource Center; he did not mention any issues with EGCC's accreditation.

64.     Following these initial introductory meetings, on February 10, 2021, Sterling submitted an initial letter of intent to the investment bank, stating that it intended to negotiate a definitive purchase agreement with Defendants, as owners of Student Resource Center, to acquire the company.

65.     Upon receipt of Sterling's letter of intent, the investment bank informed Sterling's representatives that Defendants had already begun exclusive negotiations with another potential buyer, and thus rejected Sterling's letter of intent.

66.     Nearly three months later, on May 3, 2021, the investment bank contacted

Sterling to inform it that the deal between Defendants and the other potential buyer had fallen through, and that Sterling could start exclusive negotiations with Defendants if Sterling was still interested in acquiring Student Resource Center.

67.     The next day, May 4, 2021, Sterling and Student Resource Center signed a letter of intent to negotiate an acquisition deal.  Defendant Perik signed the letter of intent on behalf of Student Resource Center.

## VI.    Sterling Conducts Due Diligence Into Student Resource Center, Including Accreditation Issues.

68.     Over the next few weeks, Sterling conducted due diligence of Student Resource Center.

69.     As an initial step, Sterling requested access to, and reviewed, documents and information related to Student Resource Center, including materials related to the Company's contracts with EGCC and documents and information concerning educational regulatory matters, such as EGCC's accreditation status.  During this process, Defendants never provided materials in their possession related to the HLC's review of EGCC, including the HLC's draft or final visit team report on EGCC, even though the Defendants' knowledge of the existence of these reports was specifically asked of Defendants during Sterling's diligence inquiries.

70.     While Sterling engaged in documentary due diligence, it also continued to meet with Defendants to discuss Student Resource Center's business and a possible acquisition deal.

71.     On May 11, 2021, Defendants Perik and Rowe met, via Zoom, with Sterling's representatives to discuss Student Resource Center's business, including its partnerships with unions and professional associations.  At that meeting, the parties also talked, in general terms, about Student Resource Center's collaboration agreement with EGCC.

72.     The parties had another Zoom meeting on May 13, 2021.  Defendants Perik,

Rowe, Jones, and Haseley attended on behalf of Student Resource Center, and the parties focused their discussion on regulatory matters. At that meeting, Sterling's representatives questioned Defendants directly about matters involving the HLC, including the status of a mid-cycle review site visit that EGCC had recently undergone, and Sterling's representatives specifically asked whether the visit team had issued its visit team report.

73. In response, Defendant Perik said (a) that he had not received a copy of a draft HLC report regarding EGCC, and (b) that he did not know if EGCC had ever received a copy of a draft HLC report. Perik further said that no one else within Student Resource Center would know more about the status of that review than him. As explained below, Perik's statements were false, and he knew they were false when he made them. Defendants Rowe, Jones, and Haseley sat silent in the face of Perik's answers, even though they each knew that Perik's responses to Sterling's questions were false when made. Indeed, months before the May 13 meeting, Defendants had received a copy of the draft HLC report on EGCC from EGCC's President, Geoghegan.

74. The issue of EGCC's relationship with the HLC was raised again at a Zoom meeting with Sterling's representatives on May 27, 2021, at which Perik and Rowe participated. At that meeting, Perik raised, as a follow up to the May 13 Zoom meeting, that HLC had made an inquiry in the past about the scope of services that Student Resource Center provided to EGCC, but that he did not know the context of the inquiry. As explained below, Perik was well aware of the context of that inquiry.

75. Following the May 27, 2021 Zoom meeting, Sterling submitted a written diligence request to Defendants. The request was related to the HLC inquiry Perik raised on the May 27 Zoom call, and included a request for a copy of the HLC inquiry. In response, Perik

stated that Student Resource Center had never had an inquiry from the Commission, nor did it have any knowledge that EGCC ever had such an inquiry.

76.     On June 3, 2021, Perik wrote:

> SRC has never had an inquiry from HLC nor to our knowledge has [EGCC] ever had such an inquiry. We simply had a request from the College after last Fall's HLC visit to make sure that we clarified our duties and responsibilities under the Collaboration Agreement of 2017. That agreement included language from an earlier deal with Pearson related to the provision of content and faculty training. We do not currently perform those services and as such both parties saw it fit to amend our agreement to reflect that. The attached amendment was recently executed by myself and the College. To my knowledge that is where the matter ended and there were no further communication with HLC on this topic.

77.     This representation, written by Perik on behalf of Student Resource Center, was false and misleading, and Perik knew it was false and misleading when he made the statement.

78.     In fact,  in February 2021, Perik, who was assigned the responsibility of responding to issues raised in the draft HLC visit report that referenced Student Resource Center, insisted that Student Resource Center and EGCC amend their collaboration agreement to account for concerns raised by the HLC in its draft visit report.  Perik knew that, on June 3, 2021, the "matter" had not "ended," but was rather progressing toward the HLC's public release of its report on EGCC in which it recommended sanctions in the form of probation.

## VII.   Sterling Forms SRC Holdings, And SRC Holdings Executes A Purchase Agreement With Defendants To Acquire Student Resource Center.

79.     The parties continued their negotiations through May and June 2021, and in anticipation of the deal closing after an extensive due diligence process, Sterling formed an entity to purchase Student Resource Center: Plaintiff SRC Holdings.

80.     On June 25, 2021, SRC Holdings, Defendants, and other owners of Student Resource Center executed the Purchase Agreement to govern SRC Holding's acquisition of the Company. (Exhibit A.)  The parties agreed to a Purchase Price of $120 million, an amount based

on a multiple of the earnings of Student Resource Center.  (Exhibit A, Sections 1.1 and 2.4.)

81.     Article II of the Purchase Agreement, titled "Purchase and Sale," provides terms related to the date of closing; the parties' closing deliverables; the purchase price paid to Defendants by SRC Holdings; and other post-closing payments and receivables.  (*See* Exhibit A, Sections 2.1 through 2.7.)

82.     Article III of the Purchase Agreement, titled "Representations and Warranties Regarding the Company," provides Defendants' representations and warranties to SRC Holding related to Student Resource Center.  (*See* Exhibit A, Sections 3.1 through 3.21.)

83.     In Section 3.21(d), Defendants represented and warranted:

> To the Company's knowledge, since [January 1, 2018], each Institution that has entered into a Collaboration Agreement with the Company has (i) been in material compliance with all applicable Educational Laws, (ii) obtained and held all Educational Approvals necessary to conduct its operations as currently conducted, and (iii) been in materials compliance with the terms and conditions of all such Educational Approvals.  To the Company's knowledge, no action for the suspension, revocation, termination or cancellation of any of Educational Approval of any such Institution . . . is pending or threatened.

(Exhibit A, Section 3.21(d).)

84.     "To the Company's knowledge" is defined under the Purchase Agreement to include the "actual knowledge" of individuals, including Michael J. Perik, John Haseley, Nicole Rowe Colclasure, and Daniel Jones, in each case "after reasonably inquiry within the scope of his or her responsibilities."  (Exhibit A, Section 8.13.)

85.     "Institution" is defined under the Purchase Agreement as "any Title IV participating institution of higher education, and *includes Eastern Gateway Community College* and Central State University."  (Exhibit A, Section 1.1 (emphasis added).)

86.     "Educational Approval" is defined under the Purchase Agreement as "any license, permit, consent, authorization, certification, exemption, registration, or similar approval issued or

required to be issued by an Educational Agency to an educational institution or to an entity that provides services to an educational institution."  (Exhibit A, Section 1.1.)

87.     "Educational Agency" is broadly defined as "any entity or organization, whether governmental or non-governmental, that engages in granting or withholding Educational Approvals, administers student financial assistance to or for students of, or otherwise regulates educational institutions, programs or courses in accordance with standards relating to the performance, operation, financial condition, privacy or academic standards of such institutions, programs or courses, including, but not limited to, USDE, any Accrediting Body, any State Educational Agency, and any Governmental Entity with jurisdiction to enforce laws or regulations . . ."  (Exhibit A, Section 1.1.)

88.     "Educational Law" means any applicable federal, state, municipal, foreign or other Law, regulation, guidance, order, Accrediting Body standard or other requirement thereof, including, without limitation, Title IV regulations and guidance, issued or administered by, or related to, any Educational Agency.  (Exhibit A, Section 1.1.)

89.     Thus, under Section 3.21(d)(i), each Defendant represented and warranted that he or she was not aware of any material noncompliance by EGCC with any "[HLC] standard or other requirement."  As explained below, Defendants' representation was false, and Defendants knew it was false both at the time Section 3.21(d)(i) was drafted and when the Purchase Agreement was executed.

90.     Further, under Section 3.21(d)(iii), each Defendant represented and warranted that he or she was not aware of any material noncompliance by EGCC with the terms and conditions of its HLC approval.  As explained below, Defendants' representation was false, and Defendants knew it was false both at the time Section 3.21(d)(iii) was drafted and when the Purchase

Agreement was executed.

91.    Further, under Section 3.21(d)(iii), each Defendant represented and warranted that he or she was not aware of any pending or threatened action against EGCC by accrediting bodies, including the HLC.  As explained below, Defendants' representation was false, and Defendants knew it was false both at the time Section 3.21(d)(iii) was drafted and when the Purchase Agreement was executed.

92.    Article VI of the Purchase Agreement, titled "Covenants," sets forth certain assurances provided by the parties.

93.    Pursuant to Section 6.5(a), "Restricted Persons," defined as including Perik, Rowe, Haseley, and RRGTHREE, LLC, agreed to not "intentionally interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between [Student Resource Center] and customers or suppliers of [Student Resource Center]."  (Exhibit A, Section 6.5(a).)  As explained below, Perik breached this restrictive covenant.

94.    Further, under Section 6.5(e), the sellers of Student Resource Center and those sellers' affiliates, including Defendants, agreed to not make "any negative or disparaging public statements or public communications regarding [Student Resource Center], the Purchaser or their respective Affiliates." (Exhibit A, Section 6.5(e).)

95.    In addition to setting forth purchase terms, representations and warranties, and restrictive covenants, the Purchase Agreement also includes several provisions that govern disputes between the parties.

96.    Article VII, titled "Indemnification," specifically excludes actions for "Fraud," with "Fraud" defined as:

[Any] Party's making of a representation or warranty in this Agreement or any Ancillary Document to any Party hereto, which representation is made (a) with such Party's actual knowledge (as opposed to imputed or constructive knowledge) that such representation or warranty was untrue when made and (b) with an intent by such Party to deceive another Party with respect to the making of such representation or warranty (and such other Party actually relies upon such false representation or warranty).

(Exhibit A, Sections 1.1 and 7.5.)

97.     Section 8.3 of the Purchase Agreement establishes that Delaware law governs the interpretation and enforcement of the Purchase Agreement, as well as any related disputes:

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of Delaware.

(Exhibit A, Section 8.3.)

98.     And, finally, under Section 8.15 of the Purchase Agreement, each Party agreed to personal jurisdiction and venue in this Court.  (Exhibit A, Section 8.15) ("Each of the Parties submits to the exclusive jurisdiction of any state or federal court sitting in Wilmington, Delaware . . . and agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court.").)

## VIII.    The Parties Conduct Regular Business Meetings Post-Closing.

99.     After closing the deal on June 25, 2021, representatives of Sterling and SRC Holdings began to meet with Defendants on a regular basis to discuss Student Resource Center's business.  In addition to multiple board meetings of the Company, Sterling and SRC Holdings had weekly calls with Perik and received monthly reports related to the Company from Perik and other Defendants.

100.     These meetings took place as scheduled for months.  At no time did Perik or any other Defendant disclose their possession of the HLC's mid-cycle review report; their

communications with Geoghegan; their involvement in supporting EGCC as the school responded to the HLC's report; or their knowledge that the HLC visit team had recommended a sanction of probation for EGCC. Defendants failed to disclose these facts, even though representatives of Sterling and SRC Holdings asked questions related to the HLC and EGCC's accreditation status.

## IX. The Higher Learning Commission Puts EGCC On Probation For Failing To Comply With Accreditation Criteria.

101. On November 8, 2021—less than five months after SRC Holdings and Defendants executed the Purchase Agreement—the HLC placed EGCC on probation, finding that the institution was "out of compliance with the Criteria for Accreditation." (Exhibit C at 1 (Nov. 8, 2021 HLC Letter to Michael Geoghegan, President of EGCC).) Probation is a public sanction by the HLC that indicates that the institution is no longer in compliance with one or more Criteria for Accreditation and/or is not in compliance with other HLC requirements which, if not resolved by the end of the period of probation, could result in the withdrawal of the institution's accreditation.

102. The HLC specifically found that EGCC did not meet five "Core Components" for accreditation; met six other "Core Components," but "with concerns"; and was "out of conformity with" six "Assumed Practices" promulgated by the HLC. (*Id.*) These findings were significant in that as a condition to HLC accreditation, an institution must meet each of the Criteria for Accreditation, and the Core Components comprising them, in addition to other HLC requirements.

103. As a result of these findings, EGCC was ordered to publicly disclose its accreditation probation, and it "is required to host a comprehensive evaluation no later than April 2023 to determine whether [it] has ameliorated the findings that led to the imposition of the

[Probation] sanction." (*Id.*)  HLC will then announce in November 2023 whether EGCC will be taken off probation or further sanctioned, including by potentially losing its accreditation.

104.    The HLC's decision to place EGCC on probation—and the sheer number of non-compliance violations—sent shockwaves through Sterling and SRC Holdings, as well as the entire higher education community.  It not only represented a public shaming of EGCC, and by association Student Resource Center, but it also caught Sterling and SRC Holdings by complete surprise.

105.    Immediately after the HLC released its probation letter, Sterling enlisted the help of a consulting and communications firm with expertise in education policy and regulatory matters.  Sterling also provided Defendants with an experienced operating partner to help manage Student Resource Center's partnership with EGCC; began to capture student data to build evidence to support the Company's quality of service; created an external affairs and public relations team; and took other steps to help mitigate concerns raised by other stakeholders in the Company.

106.    Over the next few weeks, multiple calls were held between Sterling representatives, its consulting and communications firm, and Defendants concerning the HLC's findings and how to remediate the situation from a public relations perspective.  During those calls, Defendants continued their pattern of deception.

107.    During one such call, held on November 22, 2021, Sterling's representatives confronted Perik with the HLC's probation letter, and asked if he and other Defendants knew about the HLC's findings or were they, like Sterling and SRC Holdings, blindsided by the letter.

108.    In response, Perik said that he knew the HLC was looking into EGCC, but that he was also blindsided by the HLC's letter as he only read it for the first time on November 8.

Perik noted that he knew the HLC's visit was "bad," but that he was "surprised at the length of the final HLC report." As explained below, Perik's statements concerning the HLC's probation letter were false and misleading, and he knew they were false when he made them. Perik had been communicating with Geoghegan and EGCC for months concerning the HLC's report.

109. During another board meeting in which HLC matters were discussed, Sterling representatives once again tried to elicit information from Defendants concerning whether they knew about the HLC's probation letter before its public release. No Defendant came forward with any information.

110. That the HLC letter caught Sterling and SRC Holdings by surprise was due to Defendants' pre-closing false statements and material omissions, false representations in the Purchase Agreement, and post-closing false statements and material omissions. Indeed, just a few months before the public release of the HLC letter, Defendants had stated that they were not aware of any accreditation issues, and Defendants had each represented and warranted that, to their knowledge, EGCC had "been in material compliance with all applicable Educational Laws"; "been in materials compliance with the terms and conditions of all [] Educational Approvals"; and that there was no "pending or threatened . . . action for the suspension, revocation, termination or cancellation of any of Educational Approval of any [] Institution," including EGCC. (Exhibit A, Section 3.21(d).)

111. As noted above, these pre-closing statements and the representation in Section 3.21(d) were necessary conditions to Plaintiffs' agreement to acquire Student Resource Center. Again, the Company generates 95% of its revenue from EGCC, and that revenue is derived from EGCC's ability to service students in a manner compliant with the HLC. Thus, anything that could jeopardize EGCC's ability to enroll and serve students, like a public probation sanction

from the HLC, could also cause severe harm to Student Resource Center's business.

112.    In fact, Sterling viewed Student Resource Center's concentration of business with EGCC as the number one risk factor involved in the acquisition deal and a critical business priority post-closing.

113.    Had Sterling or SRC Holdings known about the HLC's report or its plans to place EGCC on probation before closing, they would have never agreed to the Purchase Agreement.

## X.    Defendants Knew, As Of December 2020, That The HLC Was Investigating and Evaluating EGCC.

114.    Following the public release of the HLC probation letter, Sterling instituted an investigation into the matter.  As part of that investigation, Defendants' email communications were reviewed.  Those communications show that Defendants knew—***months before the parties executed the Purchase Agreement***—that EGCC was headed toward probation.

115.    On December 15, 2020, Perik, Rowe, and Jones each received a copy of a lengthy draft report prepared by HLC related to EGCC's mid-cycle review.  In that report, the HLC found that EGCC failed to meet multiple accreditation standards and requirements, including five "Core Components" and recommended that EGCC be put on probation.

a.    EGCC's President, Geoghegan, received a copy of the report from HLC and forwarded it to Perik on December 15, 2020 using Perik's personal Hotmail email address.  In correspondence with a third party, Perik acknowledged that the report showed that "***EGCC has a serious HLC problem***."

b.    Geoghegan also forwarded the HLC report to Jones on December 15, 2020, writing "Hi Dan. Attached is the HLC Draft Errors of Fact report . . . ***We want to keep this draft report tightly contained***."

c.    Rowe received a copy of the report on December 15, 2020, via an email from

Perik, and noted the next day that "***page 37 is the most concerning to me.*** It can mean courses are not eligible for Title 4 . . . ."[9] Rowe also commented that ***EGCC "gave [sic] to get all of the 'not Mets' changed to, at least 'met with concerns.'"***

116. On December 16, 2020, Jones wrote to Perik and Rowe, "Reading [the HLC report] again this morning, it appears that there is time for EGCC to take corrective action. It doesn't say how long or when the follow-up would happen. . . . I'm also unclear as to what a 'mid-cycle' review means in terms of ***when the actual sanctions are announced or live***."

117. That same day, Rowe wrote to Jones and Perik, "I think that's what we'd have to tell the unions, ***worse case…they pulled accreditation based on a zoom meeting***." Also that day, in response to an email from Jones outlining a process for "***war with [an] accrediting body***," Rowe asked Perik to "pull our agreement [with EGCC] and write the explanation that refutes what [HLC] said about us?"

118. On December 18, 2020, Perik drafted "HLC Talking Points" aimed at discrediting the HLC report and the HLC's site visitor. Those "Talking Points" acknowledge that the HLC's site visitor "***threatened the accreditation***," of EGCC.

119. On December 20, 2020, Haseley drafted a memo regarding the "Union College Program." To draft this memo, Haseley used Perik's "HLC Talking Points." Haseley writes, "Last month, HLC did a virtual site visit with Eastern Gateway. The draft report was given to the college this week, and after an initial review, more than 100 material errors of fact were

---

[9] Title IV of the Higher Education Act ("HEA") authorizes programs that provide federal financial assistance to students to assist them in obtaining a postsecondary education at certain schools. To be eligible to participate in Title IV funding, a school must meet several criteria related to the programs offered by the school, student enrollment, and institutional operations. Institutional eligibility for participation in Title IV student financial aid programs is critical to SRC.

found . . . [The site visitor] told [EGCC] . . . they **would lose accreditation** . . . This is a brief rundown of what I'm aware of at this point."

120.    On December 21, 2020, Perik, Rowe, Jones, and Haseley received another email from Geoghegan, in which Geoghegan recounts a meeting with HLC and notes a "process for responding to the report and next steps and timelines." Perik, Rowe, Jones and Haseley subsequently expended considerable time and effort in assisting EGCC in preparing its response to the draft HLC report.

121.    On December 22, 2020, Rowe, Haseley, Perik, and Amanda Wurst, who is a spokesperson for EGCC, exchanged a draft letter to the HLC, written on behalf of Geoghegan. The draft letter represents an early attempt by the Defendants to help EGCC rebut the HLC's draft report. It begins, "As you know Eastern Gateway Community College has been going through the [HLC] Accreditation Review process." The letter goes on to recognize that "[i]f HLC was to accept [the site visitor's] version of the visit" and his recommendation of probation, then "we start down a path that could ultimately cost tens of thousands of the working poor adults we serve access to a no cost education."

122.    That same day, Perik, upon reviewing this draft letter and in recognition of the fact that the HLC would likely stick with its findings, wrote to Rowe, Haseley, and Wurst, "I need to make the point that I have never seen an [sic] group like the HLC back down unless they face real exposure liability and embarrassment. I am not sure this [letter] is strong enough."

123.    On January 28, 2021, as Defendants continued their scramble to respond to the HLC draft report, Jones forwarded a presentation regarding racial bias in accreditation to Perik, Rowe, Haseley, and several third parties. Jones notes in his cover email, "**probation from an accreditor hurts enrollment**."

124.     On February 18, 2021, Perik forwarded an invoice from the Remington Road Group to Haseley and others, writing, "We are using [Remington] to **help on this HLC accreditation issue**."  The Remington Road Group is a public and governmental affairs consulting group headed by Haseley.

125.     On March 3, 2021, Vanessa Birney, an interim administrator at EGCC, emailed Jones the "***final report from HLC***."  That final report maintained the visit teams' initial findings, including that EGCC failed to meet multiple accreditation standards and requirements, including five "Core Components."  And, once again, the HLC recommended that EGCC be put on probation.

126.     On March 24, 2021, Rowe created a document titled "SRC and SSC support" and forwarded it to a Student Resource Center employee, noting, "FYI, this is what we are sharing with EGCC for their next update of the HLC report."

127.     On April 14, 2021, in an email concerning potential board members for the "SRC Foundation," Rowe wrote to Perik and Haseley, ***"[W]e might need to let [potential board member] know of EGCC's HLC troubles*** first, just because of her role at the Association of Accreditors."

128.     On April 27, 2021—in a show of desperation to remedy the deteriorating situation—Haseley contacted representatives of a public employee union and requested that they contact James Kvaal, the U.S. Under Secretary of Education.  Haseley wanted Under Secretary Kvaal to step in and require the HLC to redo its site visit of EGCC, or alternatively, help EGCC with finding a new accreditation body.

129.     On May 23, 2021, Perik emailed Haseley and Rowe about the utility of meetings with public officials, writing, "The important thing now is the visit in the next week or two . . .

The clock starts to become our enemy. ***If the [HLC] meets and recommends probation we lose a big part of our argument. And turning it over becomes tougher***."

130.    The HLC's Board of Trustees was indeed scheduled to meet in June 2021 to make its final determination regarding EGCC's accreditation, but upon information and belief, Perik and other Defendants mounted a successful campaign to delay the HLC's meeting until after the parties' scheduled closing date of June 25, 2021.

131.    At no time prior to the execution of the Purchase Agreement did any Defendant disclose these facts or communications to Sterling or SRC Holdings, even though Defendants each had a duty to apprise Sterling and SRC Holdings about this information.

**XI.    Even After The Deal Closes, Defendants—Including Members Of Management—Continue To Withhold Information About The HLC's Review Of EGCC.**

132.    For months after signing the Purchase Agreement, Defendants continued to hide the fact of EGCC's possible probation, leaving Sterling and SRC Holdings in the dark. Defendants hid this information despite the fact that they continued to serve in their respective management roles at Student Resource Center, including Perik as CEO.

133.    On August 3, 2021, Haseley emailed Perik about "follow up info" related to the HLC's review of EGCC.  Haseley wrote, "Please find attached a screen shot of a December 2020 document showing findings from the HLC review that credible stakeholders have said violated Department [of Education] guidelines. Also ***attached is the notice of the August 10 meeting where the HLC IAC Committee is expected to accept the 'not met' findings and sanction the college with probation***."

134.    That same day, in yet another attempt to employ the help of the U.S. Department of Education, Haseley sent a draft email to Rowe and Perik.  That email noted, "***If HLC moves forward and puts EGCC on probation, it will cause union students to be directed elsewhere*** . . .

***Without union students, EGCC would be operating with under 3,000 students and the revenues*** that have subsidized the campuses and free college to all students in the district ***would go away***. There's urgency because HLC will make it's [sic] decision on August 12."

135.     On September 29, 2021, Haseley emailed Rowe and Perik about a potential independent investigation of the HLC conducted by an outside law firm on behalf of the Ohio Civil Service Employees Association ("OCSEA"), a union partner of EGCC.  The investigation would, however, be funded solely by Perik.  Indeed, Perik would be "the guarantor for all [legal] fees and expenses" and would "provide the upfront retainer of $50,000."  The investigation was needed, according to Haseley, because "***the program at Eastern Gateway is currently in jeopardy*** due to an improper accreditation review by the Higher Learning Commission (HLC)."

136.     At no point during this time period did any Defendant inform Sterling or SRC Holdings about these communications, even though each Defendant had a duty to apprise Sterling and SRC Holdings of this information.  Sterling and SRC Holdings had no idea that the HLC was "expected . . . to sanction [EGCC] with probation"; that "revenues . . . would go away"; or that "Eastern Gateway is currently in jeopardy."

137.     While working at Student Resource Center after the deal closed, the Defendant employees of Student Resource Center—Perik, Haseley, Rowe, and Jones—sought to prevent Sterling and SRC Holdings from discovering that the Defendants' previous representations about the HLC matter were false.

**XII.   Representatives Of Sterling And SRC Holdings Confront Defendants, and Defendant Rowe Finally Admits to Knowing About the HLC's Review of EGCC Before The Parties Closed Their Deal.  Defendants Then Threaten to Put Student Resource Center Out of Business.**

138.     On March 9, 2022, Sterling representatives met with Perik, Rowe, Haseley, and Jones in Washington, D.C. to discuss plans for Student Resource Center's future, including the

possibility of transitioning to new management.

139.    At that meeting, a Sterling representative referenced the HLC's review of EGCC and explained how Defendants knew about it "privately" and how it had caught Sterling and SRC Holdings "flat-footed."  In response, and for the first time, one Defendant finally admitted to knowing about the HLC's report on EGCC before the parties closed on the Purchase Agreement.  Rowe stated, "I didn't think that they were going on probation . . . Did I see the mid-cycle review?  Yes."  Rowe's statement that she did not believe EGCC was likely to go on probation was false.  Moreover, it was a material omission to have withheld the report from Plaintiffs, both before and after the deal.  Perik, Haseley, and Jones sat there in silence, until Jones threatened a "laundry list" of litigation and a "disaster," if changes were made to Student Resource Center's management team.

140.    At that same meeting, Perik and Jones also described their respective "deep" relationships with Geoghegan.  Jones stated that Perik talks to Geoghegan "all the time about financials and stuff" and that Haseley talks to Geoghegan "multiple times a day" and acts as Geoghegan's "political advisor."

141.    At the March 9 meeting, Perik and Haseley also described how Geoghegan expressed concerns and worries about any changes in leadership at Student Resource Center. Perik stated that Geoghegan did not want any changes to occur at the Company and that the future of Student Resource Center's business might be in peril if Perik did not have a continuing role with the Company and if Rowe did not succeed him as CEO.

142.    Dialing up the rhetoric, Jones then described how Geoghegan could put Student Resource Center "out of business" by terminating the Collaboration Agreement.  Geoghegan had "the motive to close" the Company, according to Jones, and would lead everyone "down the road

of disaster." Perik then jumped in to state that they did not attend the meeting to deliver a warning from Geoghegan, but the intent of Defendants' messaging was clear: if Sterling or SRC Holdings took any action against Defendants for failing to disclose the HLC probation, Perik and others would work to put Student Resource Center out of business. The meeting ended shortly thereafter.

143. Several days later, on March 14, 2022, Defendants delivered a letter to SRC Holdings and Student Resource Center setting forth various demands that would need to be met before Defendants would even consider a management transition plan.

144. Defendants' demands were, however, colored by threats similar to those Defendants made at the March 9 meeting. For instance, Defendants cautioned that a transition away from their management would "have an adverse impact on the business of [Student Resource Center]" because the "core" of the Company's business—its relationship with EGCC—would be jeopardized. Defendants further stated that "replacing the executive management team [*i.e.*, Defendants] . . . will be a massive challenge which will likely materially impact the future of the [Student Resource Center] business."

## XIII. Student Resource Center Terminates Perik and Notifies the Other Defendants That An Internal Investigation is Underway.

145. On March 23, 2022 at 12:14 p.m. EST, Student Resource Center issued an employment termination letter to Perik, informing him that he would be terminated effective April 1, 2022.

146. Around the same time on March 23, Student Resource Center also notified Rowe, Jones, and Haseley that the Company was conducting an investigation related to their employment and that, depending on the outcome of the investigation, their employment could be terminated in the future.

147.     Approximately two hours later, at 2:30 p.m. ET, Geoghegan sent an email to Plaintiffs' representatives criticizing the decision to terminate Perik. Geoghegan wrote:

> I have been informed today that you have fired Michael Perik as CEO of SRC and that Nicole Rowe, Dan Jones and John Haseley have resigned as a result. This is a stunning and ill-advised development and the arrogance on your part in not contacting me as to these actions is nothing short of breathtaking. You obviously do not understand how this collaboration works and your ignorance of this speaks volumes about who you are. . . . Please be advised that if you don't rescind the actions you took today, we will re-evaluate the bundled services arrangement we have with SRC which provides the Title IV exemption they have in this agreement. Hopefully, you will come to your senses.

148.     At the time of Geoghegan's email, Plaintiffs did not even know that Rowe, Jones, or Haseley intended to resign from the Student Resource Center. In fact, the Company was not informed of the anticipated resignations until 4:06 p.m. EST on March 23, when it received an email from Defendants' counsel.

149.     Thus, as Plaintiffs suspected, Geoghegan was engaging in behind-the-scenes conversations with Defendants, including at the very least Perik, about Student Resource Center's business and how to undermine that business if Defendants were relieved of their management positions.

150.     Since his termination as an employee of Student Resource Center, Perik has also been removed from the board of Student Resource Centers Holdings, LLC for cause.

151.     Moreover, as a consequence of their separations from the Company and the fact that they committed fraud, Defendants have each had their equity held in Student Resource Center repurchased by Student Resource Centers Holdings, LLC pursuant to the terms of Defendants' Restricted Units Agreements.

**XIV.     Student Resource Center Installs a New, Experienced Leadership Team.**

152.     Following Defendants' departure from the Company, Student Resource Center installed a new, experienced leadership team.

153.     Mr. Phillip Braithwaite was a natural fit to replace Perik as CEO.  Mr. Braithwaite is a multi-time CEO experienced working with and for investors like Sterling.  His expertise includes marketing, customer experience, technology development and deployment, and governmental affairs.  Additionally, Mr. Braithwaite has extensive experience in education and more specifically online education aimed at non-traditional learners, such as those serviced by SRC.

154.     In addition to Mr. Braithwaite, Student Resource Center hired other highly qualified executives to support the Company's operations, with each person possessing extensive experience in higher education and online learning.  For example, the Company hired Cecilia Retelle Zywicki as Chief of Staff and later promoted her to Chief Operating Officer.  Ms. Retelle Zywicki previously worked as the Chief Operating Officer at PresenceLearning, a leading provider of live online special education-related services.  The Company hired Pete Schatschneider as Senior Vice President of Marketing.  Mr. Schatschneider had previously worked for over 15 years at Bisk Education designing infrastructure solutions to online higher-education institutions.  The Company also hired Cecil Banhan as Vice President of Partnership Development.  Mr. Banhan previously worked in that same role for All Campus.  Sterling has invested in dozens of businesses over the years, and has deep experience and expertise in executive recruitment and placement in areas of need at the companies in which it invests.

## XV.     Perik and Jones's Interference Causes EGCC To Unlawfully Terminate the Collaboration Agreement.

155.     Despite compiling an experienced and skilled team to lead Student Resource Center, on May 10, 2022, upon information and belief, at the direction of Perik, Geoghegan, purportedly acting on behalf of EGCC, served a notice on Student Resource Center (the "Notice") falsely claiming that Student Resource Center was in material breach of the

Collaboration Agreement because of "unilateral decisions regarding [the Company's] executive management team." In particular, Geoghegan declared that Student Resource Center's decision to terminate Perik constituted a "material breach of the Agreement," which in turn "led to the departure of other leadership team members." He even went as far as to wrongfully claim that the Company "unilaterally removed these individuals," and claimed that the Company was in material breach of the Collaboration Agreement as a result. As explained below, prior to Geoghegan sending Notice, he discussed the termination of the Collaboration Agreement with Perik, and Perik provided him with assistance in sending the Notice.

156.    On May 26, 2022, Student Resource Center responded to Geoghegan's letter and explained why its decision to terminate Perik was in full compliance with the Collaboration Agreement. Section 2.5 of the Collaboration Agreement indeed provides that "[e]ach Party shall have responsibility for and *complete discretion* with respect to supervision and management of its employees and third-party contractors providing the Collaboration Activities." (Exhibit B, Section 2.5 (emphasis added).) The Company further explained that EGCC was, in fact, in breach of the Collaboration Agreement.

157.    EGCC has indeed fabricated a misleading claim of material breach to wrongfully withhold payments due and owed to Student Resource Center under the Collaboration Agreement in retaliation for the termination of Perik and as a means of avoiding the payment of what could have been over $60,000,000 over the next five years under the current term of the Collaboration Agreement.

158.    Moreover, Perik and Jones have directed EGCC, acting through Geoghegan, to usurp Student Resource Center's business opportunities under the Collaboration Agreement by setting up a new partnership directly with the Company's union partners and by poaching and

soliciting the Company's employees. This scheme to compete with Student Resource Center is prohibited by Section 8 of the Collaboration Agreement. Under Section 8, EGCC shall not "take any action for the purpose of entering into any joint venture, collaboration or similar arrangement that is competitive with the Educational Programs provided by the Collaboration to union members[.]" (*See* Exhibit B, Sections 8.)

159. Email communications show that, in late March 2022, right after Defendants' exited Student Resource Center and threatened to put the company "out of business," a meeting was held with Geoghegan to discuss a transition away from Student Resource Center and the existing collaboration.

160. Jones followed up with Geoghegan after the meeting and delivered "documents we discussed," titled "EGCC Transition Planning.xlsx," "EGCC Transition Planning.docx," "Door Number 1 ^02.xlsx," and "SRC Financial Relationship."

161. These "Transition Planning" documents identify Student Resource Center's employees and their job responsibilities under the "existing collaboration," and explicitly discuss "in-sourcing these functions," which would "result in the review/elimination of the bundled services exemption SRC needs to function …, which will impair SRC's ability to deliver any level of customer service…." The documents also emphasize the need for union help and "control" of websites to get the plan off the ground. And they appear to forecast the financial implications of Defendants' plan, showing projections for "Door Number 1" and "Door Number 2," with the figure for "EGCC Profit" being millions of dollars higher under "Door Number 2."

162. Events since the delivery of these "Transition Planning" documents show Defendants' plan was put in place.

163. Upon information and belief, Geoghegan announced during an all-EGCC

employee meeting that EGCC would terminate the Collaboration Agreement with Student Resource Center regardless of the Company's actions, and intends to pursue a similar collaboration directly with the Company's union partners.

164.    Upon information and belief, EGCC and its agents and representatives have already contacted Student Resource Center's union partners advising them of EGCC's decision to terminate the Collaboration Agreement and enter into new relationships with Student Resource Center's union partners.  For instance, in June 2022, EGCC contacted the Company's union partners and informed them that EGCC had made Student Resource Center aware of the possible need to permit union members to enroll directly through EGCC without Student Resource Center's involvement if the Collaboration Agreement was deemed no longer enforceable based on EGCC and Geoghegan's false representations and unwillingness to engage on a transition timetable.

165.    Moreover, on or around June 28, 2022, EGCC coordinated with Student Resource Center's union partners to replace the Student Resource Center subdomain pages and links on union partner websites with recently created websites controlled by EGCC.  These actions are in clear violation of the Collaboration Agreement, which remains in full force and effect.

166.    As envisioned in the "Transition Planning" documents, to help carry out the interference with Student Resource Center's business relations and to compete with Student Resource Center, EGCC and Geoghegan have started a campaign to solicit and poach Company employees, including Monica Allison, Cassandra Balvin, Chelsey Balvin, Amy Barcus, Zachary Burns, Hank Clegg, Katherine Corcoran, Cassandra Cornell, Breanna Gassner, Nyasha Jones, Katie Mattern, Lindsey Mattern, Crissie Moran, Donna Singh, and John Ward.

167.    Upon information and belief, Perik and Jones have precipitated all of this tortious

conduct.  Perik helped Geoghegan prepare EGCC's Notice purportedly terminating the

Collaboration Agreement,  and continues to direct EGCC and Geoghegan to usurp Student

Resource Center's business opportunities under the Collaboration Agreement.  And Perik and

Jones have assisted EGCC and Geoghegan poach and solicit Student Resource Company's

employees.  Simply put, Perik, Jones, and EGCC, through Geoghegan, have taken actions to

interfere with Student Resource Center, and the students are collateral damage in these wrongful

efforts to terminate the Collaboration Agreement without just cause.

168.    Despite the fact that the Collaboration Agreement remains in full force and effect,

EGCC has, in fact, begun to limit access to information required to be provided to Student

Resource Center under the Agreement.

169.    Notwithstanding Perik's, Jones's, and EGCC's actions, Student Resource Center

has repeatedly informed EGCC that it intends to continue to operate by the terms of the

Collaboration Agreement and has continued to provide high-quality services just as well as, if

not better than, Student Resource Center's previous management team led by Defendants.

170.    On June 30, 2022, Student Resource Center filed a complaint against EGCC

requesting a preliminary injunction to enjoin EGCC from: (1) wrongfully attempting to terminate

the Collaboration Agreement; and (2) usurping Student Resource Center's business opportunities

contemplated by the Agreement.  (*See Student Resource Center, LLC v. EGCC*, Case No. 22-cv-

02653 (S.D. Ohio).)  The Company's complaint further alleged that EGCC breached the

Collaboration Agreement's non-competition provision and EGCC's obligation to pay amounts

previously owed under the Collaboration Agreement.

171.    The Ohio district court agreed with Student Resource Center, and issued an order

preliminary enjoining EGCC from: (1) terminating the Collaboration Agreement for the reasons

set forth in EGCC's May 12, 2022 Notice; and (2) breaching the Collaboration Agreement's non-competition provision by starting and operating a competing business.

172.    In so ruling, the court rejected EGCC's position that Student Resource Center needed EGCC's consent prior to replacing the Company's CEO or other high-level managers. Citing Geoghegan's own testimony, the court noted that "concerns about the qualifications of [Student Resource Center's] new executive team appear pretextual.  By Geoghegan's own testimony, EGCC was inclined to exit the contract from the day Perik was terminated, unless Perik and the other executives were hired back.  No other cure was acceptable."

173.    The court further held that the evidence indicated that EGCC was taking preparatory steps to form a new venture similar to the Student Resource Center-EGCC collaboration, even though the Collaboration Agreement remained in effect.  And, as a result, Student Resource Center was likely to succeed on its claim for breach of the Collaboration Agreement's non-competition clause.

174.    Despite the district court's order, EGCC continued to withhold profit-sharing payments owed to Student Resource Center under the Collaboration Agreement.  EGCC ignored the Company's efforts to seek reimbursement without court intervention from, and Student Resource Center was left with no other option but to move for an expansion of the preliminary injunction to receive those payments.

175.    On August 23, 2022, the Ohio district court issued a second order further enjoining EGCC from withholding profit-sharing payments for semesters ending prior December 31, 2021 in the amount of $2,357,153.08 as demonstrated by EGCC's own financial statements.

176.    Even after two preliminary injunction rulings from a federal court, EGCC continues to wrongfully withhold amounts due and owed to Student Resource Center under the

Collaboration Agreement.

177.     In addition, EGCC has refused to perform its obligations under the Collaboration Agreement, which in turn has prevented Student Resource Center from performing its own obligations.  For example, EGCC refuses to provide Student Resource Center with necessary information that must be exchanged pursuant to the Collaboration Agreement.  Furthermore, EGCC has breached several representations and warranties under Section 4 of the Collaboration Agreement.

**XVI.    Perik's Communications with EGCC Following his Termination from Student Resource Center.**

178.     As noted above, since his termination as an employee of Student Resource Center, Perik has been communicating regularly with EGCC, through Geoghegan, regarding the contractual relationship between Student Resource Center and EGCC—namely, their Collaboration Agreement.

179.     In addition to alerting Geoghegan about his termination from Student Resource Center and the other Defendants' resignations, Perik has communicated with Geoghegan regarding Student Resource Center's business, and their separate scheme to interfere with that business and establish a competing organization.

180.     Communications between Perik and Geoghegan demonstrate that Perik worked with Geoghegan on EGCC's Notice purportedly terminating the Collaboration Agreement with Student Resource Center.  In one message, Perik provides Plaintiffs' address for the Notice.  In another message, Geoghegan informed Perik that he had "sent the termination letter out," and Perik responded stating he would try to help Geoghegan "get access to the SRC [] info so [he] can take over [] new student contact."

181.     Testifying at the preliminary injunction hearing in the Southern District of Ohio

case, Geoghegan admitted that he "probably talked to [Perik] every day" following Perik's termination from Student Resource Center, "through emails, phone calls."

182.     Geoghegan also admitted that he communicated with Perik using ephemeral messaging apps, like Signal, in an attempt to hide their conversations out of concern about "SRC's investigation."[10]

183.     Using Signal, Perik and Geoghegan communicated about Student Resource Center employees becoming "EGCC employees." They also exchanged messages regarding the establishment of a "sister company" to Student Resource Center, and a list of the Company's union partners. Geoghegan even asked Perik for information about whether Student Resource Center had "MOUs" with certain unions.

184.     Additional Signal communications between Perik and Geoghegan show Perik disparaging Student Resource Center's new management. Perik noted that certain enrollment figures were due to a "customer service issue" at Student Resource Center, and claimed that the Company's new management engaged in "neglect" and lacked "focus." Perik's statements are not true but demonstrate his intent to bolster EGCC's false claims about Student Resource Center's new management and undercut Student Resource Center's Collaboration Agreement with EGCC.

185.     Furthermore, while a Student Resource Center employee, Perik utilized his personal email account, as well as text messages and other messaging apps, to conduct Student Resource Center business. After the acquisition of the Company, counsel for Student Resource Center requested that Perik provide the Company with any documents from his personal email

---

[10] Ephemeral messaging apps, like Signal, typically automatically delete the content of the parties' communications from devices, and the failure to preserve such relevant communications would be contrary to the parties' duties to preserve evidence.

accounts concerning EGCC.

186.    Upon review of the documents provided by Perik, Student Resource Center learned that Perik withheld from Student Resource Center relevant communications from Perik's personal email account regarding the HLC issue at EGCC.

187.    Counsel for Student Resource Center subsequently requested that Perik provide the Company with all emails, texts, and other electronic documents related to the Company's business, including HLC-related emails from Perik's personal email account.  Perik has refused to provide the Company with these business records.

188.    Upon information and belief, Perik is continuing his campaign to put Student Resource Center out of business.

## CLAIMS FOR RELIEF

### COUNT I – FRAUDULENT INDUCEMENT
### (Against All Defendants)

189.    Sterling and SRC Holdings restate the allegations in the paragraphs set forth above, as if those paragraphs were fully rewritten herein.

190.    On numerous occasions, Defendants made material false representations and omissions to Sterling and/or SRC Holdings concerning EGCC.  Those representations include:

    a.      Perik's and Rowe's false statements concerning EGCC's HLC accreditation status on January 26, 2021;

    b.      Perik's false statements concerning EGCC's HLC accreditation status, including the status of EGCC's mid-cycle review, on May 13, 2021, and Rowe's, Haseley's, and Jones' omissions regarding EGCC's HLC accreditation status on May 13, 2021;

    c.      Perik's false written statement concerning EGCC's HLC accreditation

status, including misstatements and/or omissions regarding the reason for the amendment of the agreement between EGCC and Student Resource Center, delivered to Sterling on June 3, 2021; and

d.    Defendants' false representations and warranties in Section 3.21(d) of the Purchase Agreement.

191.    Defendants knew that each of these representations and omissions was false when made, as shown by Defendants' contemporaneous communications.

192.    Defendants made these false representations and omissions to induce Sterling and SRC Holdings into entering the Purchase Agreement.

193.    Sterling and SRC Holdings justifiability relied on Defendants' representations and omissions, as they had no reason to believe that Defendants' representations and omissions were false at the time they were made.

194.    Had Defendants not made material false representations and omissions, Sterling and SRC Holdings would not have entered the Purchase Agreement and would not have closed on the Agreement. As noted, EGCC represents 95% of Student Resource Center's annual revenue. Had Sterling and SRC Holdings known of the existence of the HLC report or that the HLC was about to place EGCC on probation, they would have never agreed to the Purchase Agreement.

195.    As a direct and proximate result of Defendants' false representations and omissions, Sterling and SRC Holdings have both suffered damages in an amount to be determined at trial.

## COUNT II - FRAUDULENT CONCEALMENT
### (Against All Defendants)

196.    Sterling and SRC Holdings restate the allegations in the above paragraphs, as if

fully rewritten herein.

197.    On multiple occasions, Defendants either deliberately concealed material facts
concerning EGCC's HLC accreditation status or partially disclosed facts in a misleading or
incomplete fashion.

198.    Defendants' acts of concealment include:

a.    Perik's and Rowe's false statements concerning EGCC's HLC
accreditation status on January 26, 2021;

b.    Perik's false statements concerning EGCC's HLC accreditation status,
including the status of EGCC's mid-cycle review, on May 13, 2021, and
Rowe's, Haseley's, and Jones' omissions regarding EGCC's HLC
accreditation status on May 13, 2021;

c.    Perik's false written statement concerning EGCC's HLC accreditation
status, including misstatements and/or omissions regarding the reason for
the amendment of the agreement between EGCC and Student Resource
Center, delivered to Sterling on June 3, 2021; and

d.    Defendants' false representations and warranties in Section 3.21(d) of the
Purchase Agreement;

e.    Defendants' false statements and omissions regarding EGCC's HLC
accreditation status, made during post-closing meetings and calls held
between the parties after June 25, 2021; and

f.    Perik's false statement, on November 22, 2021, concerning his
knowledge of the HLC's report on EGCC.

199.    Defendants' acts of concealment were intended to induce Sterling and SRC

Holdings to enter into the Purchase Agreement without knowledge of the true state of EGCC's accreditation status.

200.    Had Defendants not fraudulently concealed material facts, Sterling and SRC Holdings would not have entered the Purchase Agreement and would not have closed on the Agreement.  As noted, EGCC represents 95% of Student Resource Center's annual revenue. Had Sterling and SRC Holdings known of the existence of the HLC report or that the HLC was about to place EGCC on probation, they would have never agreed to the Purchase Agreement.

201.    Even after the deal closed and until the HLC publicly released its report, Defendants continued to lie and withhold information concerning EGCC's accreditation status. SRC Holdings justifiably and detrimentally relied on these false statements and omissions as well.

202.    As a direct and proximate result of Defendants' fraudulent concealment of material facts, Sterling and SRC Holdings have both suffered damages in an amount to be determined at trial.

### COUNT III - FRAUD
### (Against All Defendants)

203.    Sterling and SRC Holdings restate the allegations in the above paragraphs, as if fully rewritten herein.

204.    Under the Purchase Agreement, "Fraud" is defined as

[Any] Party's  making  of  a  representation  or warranty in this Agreement or any Ancillary Document to any Party hereto, which representation is made (a) with such Party's actual knowledge (as opposed to imputed or constructive knowledge) that such representation or warranty was untrue when made and (b) with an intent by such Party to deceive another Party with respect to the making of such representation or warranty (and such other Party actually relies upon such false representation or warranty).

205.    Defendants, as Sellers under the Purchase Agreement, represented and warranted,

pursuant to Section 3.21(d) of the Purchase Agreement:

> To the Company's knowledge, since [January 1, 2018], each Institution that has entered into a Collaboration Agreement with the Company has (i) been in material compliance with all applicable Educational Laws, (ii) obtained and held all Educational Approvals necessary to conduct its operations as currently conducted, and (iii) been in materials compliance with the terms and conditions of all such Educational Approvals. To the Company's knowledge, no action for the suspension, revocation, termination or cancellation of any of Educational Approval of any such Institution . . . is pending or threatened.

206.     Defendants—specifically Perik, Haseley, Rowe, and Jones—knew that this representation and warranty was false when made. (*See* Exhibit A, Section 8.13.)

207.     Those same Defendants made this false representation with the intent to deceive Sterling and SRC Holdings, and to induce Sterling and SRC Holdings into entering the Purchase Agreement.

208.     Furthermore, after entering the Purchase Agreement, Defendants made material false representations and omissions to Sterling and/or SRC Holdings concerning EGCC, including:

  a.  Defendants' false statements and omissions regarding EGCC's HLC accreditation status, made during post-closing meetings and calls held between the parties after June 25, 2021; and

  b.  Perik's false statement, on November 22, 2021, concerning his knowledge of the HLC's report on EGCC.

209.     Sterling and SRC Holdings justifiably relied on Defendants' representations and warranties in Section 3.21(d) of the Purchase Agreement, as they had no reason to believe Defendants' representations and warranties were false. Indeed, even after the deal closed and until the HLC publicly released its report, Defendants continued to lie and withhold information concerning EGCC's accreditation status. Sterling and SRC Holdings justifiably and

detrimentally relied on these false statements and omissions as well.

210. Had Defendants not made the false representations contained in Section 3.21(d) of the Purchase Agreement, SRC Holdings would not have entered the Purchase Agreement and would not have closed on the Agreement. As noted, EGCC represents 95% of Student Resource Center's annual review. Had SRC Holdings known of the existence of the HLC report or that the HLC was about to place EGCC on probation, it would have never agreed to the Purchase Agreement.

211. As a direct and proximate result of Defendants' fraud, Sterling and SRC Holdings have suffered damages in an amount to be determined at trial.

## COUNT IV - CONSPIRACY TO COMMIT FRAUD
### (Against All Defendants)

212. Sterling and SRC Holdings restate the allegations in the above paragraphs, as if fully rewritten herein.

213. Defendants, acting as a confederation of two or more persons, knowingly agreed to and participated in a scheme to defraud Sterling and SRC Holdings and induce them into agreeing to the Purchase Agreement.

214. Defendants knowingly conspired to defraud Sterling and SRC Holdings by engaging in several fraudulent acts, including making material false representations and omissions, and actively concealing information that Defendants had a duty to disclose.

215. Defendants' misrepresentations and omissions include:

    a.     Perik's and Rowe's false statements concerning EGCC's HLC accreditation status on January 26, 2021;

    b.     Perik's false statements concerning EGCC's HLC accreditation status, including the status of EGCC's mid-cycle review, on May 13, 2021, and

Rowe's, Haseley's, and Jones' omissions regarding EGCC's HLC accreditation status on May 13, 2021;

c.   Perik's false written statement concerning EGCC's HLC accreditation status, including misstatements and/or omissions regarding the reason for the amendment of the agreement between EGCC and Student Resource Center, delivered to Sterling on June 3, 2021;

d.   Defendants' false representations and warranties in Section 3.21(d) of the Purchase Agreement;

e.   Defendants' false statements and omissions regarding EGCC's HLC accreditation status, made during post-closing meetings and calls held between the parties after June 25, 2021; and

f.   Perik's false statement, on November 22, 2021, concerning his knowledge of the HLC's report on EGCC.

216.   Defendants knew that each of these representations and omissions was false when made, as shown by Defendants' contemporaneous communications.

217.   Defendants made these false representations and omissions to induce Sterling and SRC Holdings into entering the Purchase Agreement.

218.   Sterling and SRC Holdings justifiability relied on Defendants' representations and omissions, as Sterling had no reason to believe that Defendants' representations and omissions were false at the time they were made.  Indeed, even after the deal closed and until the HLC publicly released its report, Defendants continued to lie and withhold information concerning EGCC's accreditation status.  SRC Holdings justifiably and detrimentally relied on these false statements and omissions as well.

219.     Had Defendants not made material false representations and omissions, Sterling and SRC Holdings would not have entered the Purchase Agreement and would not have closed on the Agreement.  As noted, EGCC represents 95% of Student Resource Center's annual revenue.  Had Sterling and SRC Holdings known of the existence of the HLC report or that the HLC was about to place EGCC on probation, they would have never agreed to the Purchase Agreement.

220.     As a direct and proximate result of Defendants' conspiracy to commit fraud, Sterling and SRC Holdings have both suffered damages in an amount to be determined at trial.

## COUNT V - TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Perik and Jones)

221.     Plaintiffs restate the allegations in the paragraphs set forth above, as if those paragraphs were fully rewritten herein.

222.     Student Resource Center and EGCC are bound by their Collaboration Agreement, a valid and binding contract, with a term end date of June 30, 2027.

223.     Perik and Jones, as former executives of Student Resource Center, knew of the existence of the Collaboration Agreement between Student Resource Center and EGCC.

224.     Perik intentionally informed EGCC's President, Geoghegan, of his termination as CEO of Student Resource Center and, upon information and belief, Perik also notified Geoghegan that the Company had initiated investigations against Rowe, Haseley, and Jones and that they would resign from the Company.

225.     Ever since his termination from Student Resource Center, Perik has intentionally interfered with Student Resource Center's Collaboration Agreement with EGCC by, among other things, making disparaging comments regarding Plaintiffs and the Company's new management to third parties, including Geoghegan and EGCC; by working with Geoghegan to draft and issue

a Notice of Material Breach and Intention to Terminate the Collaboration Agreement when there were no valid grounds for termination; and by communicating with Geoghegan on a daily basis regarding a scheme to establish a business to compete with Student Resource Center.

226.    Ever since his resignation from Student Resource Center, Jones has likewise intentionally interfered with Student Resource Center's Collaboration Agreement with EGCC.

227.    Perik's and Jones's misconduct had no justification and was a significant factor in causing EGCC's breach of the Collaboration Agreement, as it induced EGCC to unlawfully terminate the Agreement.

228.    Plaintiffs have suffered damages as a result of Perik's and Jones's tortious interference with the Collaboration Agreement and EGCC's subsequent breach of that Agreement.

### COUNT VI - BREACH OF CONTRACT – UNIT PURCHASE AGREEMENT
### (Against Perik, Higher Education Partners, LLC, USS Guarantor, LLC, MWJ Holdings, LLC, and Jones)

229.    Plaintiffs restate the allegations in the above paragraphs, as if fully rewritten herein.

230.    SRC Holdings, Student Resource Center, Higher Education Partners, LLC, USS Guarantor, LLC, MWJ Holdings, LLC, Perik, Jones, and others are bound by the Unit Purchase Agreement, a valid and binding contract.

231.    Perik is the sole member of both USS Guarantor and MWJ Holdings, and a member of Higher Education Partners, LLC.  Perik executed the Unit Purchase Agreement on behalf of USS Guarantor and MWJ Holdings.  Jones also executed the Unit Purchase Agreement.

232.    Perik is a "Restricted Person" under the Unit Purchase Agreement.

233.    Higher Education Partners, LLC, USS Guarantor, LLC, MWJ Holdings, LLC, and

Jones are all "Sellers" under the Unit Purchase Agreement.

234.     In Section 6.5(a) of the Unit Purchase Agreement Perik, as a "Restricted Person," agreed to not "intentionally interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between [Student Resource Center] and customers or suppliers of [the Company]."

235.     Perik breached Section 6.5(a) by intentionally interfering with Student Resource Center's relationship with EGCC and other business partners, including various unions.

236.     In Section 6.5(b) of the Unit Purchase Agreement, Higher Education Partners, LLC, USS Guarantor, LLC, MWJ Holdings, LLC, and Jones, as "Sellers," agreed to not "directly or indirectly, persuade or encourage or attempt to persuade or encourage any business customer, partner, Affiliate, supplier, distributor, referral source or vendor of [Student Resource Center] to cease doing business with, or reduce in any way its business with, the Company."

237.     Higher Education Partners, LLC, USS Guarantor, LLC, MWJ Holdings, LLC, through Perik, and Jones breached Section 6.5(b) by persuading or encouraging EGCC and various unions to cease doing business with, or reduce their business, with Student Resource Center.

238.     In Section 6.5(e) of the Unit Purchase Agreement, Higher Education Partners, LLC, USS Guarantor, LLC, MWJ Holdings, LLC, and Jones, as "Sellers," agreed to refrain from making "any negative or disparaging public statements or public communications regarding [Student Resource Center], the Purchaser, or their respective Affiliates."
Higher Education Partners, LLC, USS Guarantor, LLC, MWJ Holdings, LLC, through Perik, and Jones breached Section 6.5(e) by making disparaging comments about Plaintiffs and Student Resource Center's new management to EGCC and other potential business partners, including

various unions.

239. As a result of Defendants' contractual breaches, Plaintiffs suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter an order awarding them:

a. Damages equal to the difference between the actual and represented values of Student Resource Center;

b. Out-of-pocket costs equal to the difference between the amount paid to Defendants and the actual value of Student Resource Center;

c. Rescissory damages in an amount to return them to the same position they held prior to Defendants' fraud;

d. Consequential damages resulting from Defendants' fraud;

e. Damages caused by Defendants' tortious interference with Student Resource Center's Collaboration Agreement with EGCC;

f. Damages caused by Defendants' breaches of the Unit Purchase Agreement;

g. Punitive damages;

h. Reasonable attorneys' fees and costs;

i. Pre- and post-judgment interest; and

j. Such other relief as this Court deems just, proper, or necessary.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury.

Dated:  December 8, 2023

BAKER & HOSTETLER LLP

/s/  Jeffrey J. Lyons
Daniel J. Goettle (#6664)
Jeffrey J. Lyons (#6437)
1201 North Market Street, Suite 1407
Wilmington, DE  19801-1147
(302) 468-7088
dgoettle@bakerlaw.com
jjlyons@bakerlaw.com

Jonathan B. New (*pro hac vice*)
45 Rockefeller Plaza
New York, NY 10111
(212) 589-4200
jnew@bakerlaw.com

G. Karl Fanter (*pro hac vice*)
Joseph H. Walsh (*pro hac vice*)
Key Tower
127 Public Square, Suite 2000
Cleveland, OH 44114
(216) 621-0200
kfanter@bakerlaw.com
jhwalsh@bakerlaw.com

*Attorneys for Plaintiffs Sterling Small Market Education Fund, L.P., SRC Intermediate Holdings, Inc., and Student Resource Center, LLC*