# Exhibit A

---

**UNIT PURCHASE AGREEMENT**

**by and among**

**STUDENT RESOURCE CENTER, LLC,**

**THE SELLERS NAMED HEREIN,**

**SRC INTERMEDIATE HOLDINGS INC.**

**and**

**HIGHER EDUCATION PARTNERS LLC,**

**solely in its capacity as Representative of the Sellers**

**DATED AS OF JUNE 25, 2021**

---

# TABLE OF CONTENTS

**Page**

Article I CERTAIN DEFINITIONS ..........................................................................................6
    Section 1.1    Certain Definitions..................................................................................6

Article II PURCHASE AND SALE .........................................................................................20
    Section 2.1    Closing ....................................................................................................20
    Section 2.2    Purchase and Sale of the Company Units ...............................................20
    Section 2.3    Closing Deliveries..................................................................................20
    Section 2.4    Purchase Price ........................................................................................22
    Section 2.5    Post-Closing Adjustment Mechanics.......................................................24
    Section 2.6    Tax Treatment ........................................................................................26
    Section 2.7    Withholding Tax .....................................................................................27

Article III REPRESENTATIONS AND WARRANTIES REGARDING THE
COMPANY   27
    Section 3.1    Organization and Qualification...............................................................27
    Section 3.2    Capitalization .........................................................................................27
    Section 3.3    Authority ................................................................................................28
    Section 3.4    Financial Statements; Undisclosed Liabilities; etc ..................................28
    Section 3.5    Consents and Approvals; No Violations; UPE ........................................30
    Section 3.6    Material Contracts..................................................................................30
    Section 3.7    Absence of Changes................................................................................32
    Section 3.8    Litigation................................................................................................33
    Section 3.9    Compliance with Applicable Law; Permits .............................................34
    Section 3.10    Employee Plans......................................................................................34
    Section 3.11    Environmental Matters............................................................................38
    Section 3.12    Intellectual Property; Data Security........................................................39
    Section 3.13    Labor and Employee Matters..................................................................42
    Section 3.14    Insurance................................................................................................44
    Section 3.15    Tax Matters ............................................................................................44
    Section 3.16    Brokers...................................................................................................47
    Section 3.17    Real and Personal Property.....................................................................48
    Section 3.18    Transactions with Affiliates ...................................................................49
    Section 3.19    Material Customers and Material Suppliers ............................................49
    Section 3.20    Bank Accounts........................................................................................49
    Section 3.21    Education Regulatory Matters. ................................................................49

Article IV REPRESENTATIONS AND WARRANTIES OF SELLERS .................................50
    Section 4.1    Authority ................................................................................................50
    Section 4.2    Consents and Approvals; No Violations..................................................51
    Section 4.3    Title to the Company Units; Ownership of Sellers...................................51
    Section 4.4    Litigation................................................................................................51

Section 4.5 Brokers ................................................................................................... 51

Article V REPRESENTATIONS AND WARRANTIES OF PURCHASER ........................... 52
Section 5.1 Organization ............................................................................................ 52
Section 5.2 Authority ................................................................................................. 52
Section 5.3 Consents and Approvals; No Violations .................................................. 52
Section 5.4 Brokers ................................................................................................... 52
Section 5.5 Acquisition of Equity for Investment ...................................................... 53

Article VI COVENANTS ................................................................................................. 53
Section 6.1 Indemnification; Directors' and Officers' Insurance. ............................... 53
Section 6.2 No Public Disclosure .............................................................................. 54
Section 6.3 Tax Matters ............................................................................................. 54
Section 6.4 Release .................................................................................................... 57
Section 6.5 Restrictive Covenants ............................................................................. 58
Section 6.6 Further Assurances .................................................................................. 61

Article VII INDEMNIFICATION ..................................................................................... 61
Section 7.1 Survival of Representations and Warranties and Covenants .................... 61
Section 7.2 General Indemnification. ......................................................................... 61
Section 7.3 Procedures. .............................................................................................. 62
Section 7.4 Limitations on Indemnification Obligations ............................................ 64
Section 7.5 Exclusive Remedy ................................................................................... 66
Section 7.6 Source of Recovery ................................................................................. 66
Section 7.7 Release of Indemnity Escrow Amount ..................................................... 67

Article VIII MISCELLANEOUS ...................................................................................... 67
Section 8.1 Entire Agreement; Assignment ................................................................ 67
Section 8.2 Notices .................................................................................................... 67
Section 8.3 Governing Law ........................................................................................ 68
Section 8.4 Fees and Expenses; R&W Policy ............................................................. 69
Section 8.5 Construction; Interpretation .................................................................... 69
Section 8.6 Exhibits and Schedules ........................................................................... 70
Section 8.7 Computation of Time ............................................................................... 70
Section 8.8 Parties in Interest .................................................................................... 70
Section 8.9 Severability ............................................................................................. 70
Section 8.10 Amendment ............................................................................................. 71
Section 8.11 Waiver .................................................................................................... 71
Section 8.12 Counterparts; Electronic Signatures ....................................................... 71
Section 8.13 Knowledge of the Company .................................................................... 71
Section 8.14 Waiver of Jury Trial ................................................................................ 71
Section 8.15 Jurisdiction and Venue ........................................................................... 72
Section 8.16 Remedies ................................................................................................ 72
Section 8.17 Non-Recourse ......................................................................................... 72

Article IX REPRESENTATIVE OF THE SELLERS ........................................................ 73
Section 9.1 Authorization of Representative ............................................................... 73

**ANNEX 1**              Company Sellers and Rollover Investors

**EXHIBITS**

Exhibit A               Net Working Capital Schedule
Exhibit B               Allocation Principles


**SCHEDULES**

Schedule 2.2            Schedule of Sellers' Pro Rata Percentages and Closing Payment Pro Rata
Percentages
Schedule 2.3(a)(x)      Consents and Waivers
Schedule 3.2            Capitalization
Schedule 3.2(ii)        Agreements Governing Equity Securities of the Company
Schedule 3.4(a)         Financial Statements
Schedule 3.4(b)         Financial Statement Exceptions
Schedule 3.4(c)         Commitments Not Disclosed on the Latest Balance Sheet
Schedule 3.4(d)         Indebtedness
Schedule 3.5            Consents and Approvals; No Violations
Schedule 3.6(a)         Material Contracts
Schedule 3.7            Absence of Changes
Schedule 3.8            Litigation
Schedule 3.9(b)         Material Permits, Licenses, Approvals, Certifciates
Schedule 3.10(a)        Employee Benefit Plans
Schedule 3.10(i)        Post-Retirement Benefits
Schedule 3.10(k)        Changes to Employee Benefit Plans
Schedule 3.10(l)        Consequences of Transactions on Employee Benefit Plans
Schedule 3.11           Environmental Matters
Schedule 3.12(a)        Company Registered Intellectual Property
Schedule 3.12(b)(i) & (ii)  Owned Intellectual Property
Schedule 3.12(b)(iii)   Liens (IP)
Schedule 3.12(e)        Licenses
Schedule 3.12(g)        Assignment Agreements
Schedule 3.12(i)(i)     Data Privacy Practices
Schedule 3.12(i)        Consequences of Transactions on Information
Schedule 3.13           Labor and Employee Matters
Schedule 3.13(j)        Certain Employee Matters
Schedule 3.14           Insurance
Schedule 3.17(a)        Real Property Leases
Schedule 3.17(b)        Personal Property
Schedule 3.18           Transitions with Affiliates
Schedule 3.19           Material Customers and Suppliers
Schedule 3.20           Bank Accounts

Schedule 3.21        Educational Regulatory Matters
Schedule 4.2         Consents and Approvals; No Violations
Schedule 4.3         Title to the Company Units; Ownership of Sellers
Schedule 7.2(a)(vii)  Special Indemnities

## **EXHIBITS**

Exhibit A            Net Working Capital Schedule
Exhibit B            Allocation Principles

# UNIT PURCHASE AGREEMENT

This **UNIT PURCHASE AGREEMENT** (this "Agreement"), dated as of June 25, 2021 (the "Effective Date"), is by and among SRC Intermediate Holdings Inc., a Delaware corporation ("Purchaser"), Student Resource Center, LLC, a Delaware limited liability company (the "Company"), each Person listed on Annex I attached hereto under the heading "Company Sellers" (such Persons, the "Company Sellers"), each Person listed on Annex I attached hereto under the heading "Rollover Investors" and any other Person who signs a Rollover Agreement prior to Closing (such Persons, the "Rollover Investors" and, collectively with the Company Sellers, "Sellers") and, solely in its capacity as Representative (as defined herein) in accordance with the terms of this Agreement, Higher Education Partners LLC, a Delaware limited liability company. Purchaser, the Company and Sellers are sometimes referred to herein collectively as the "Parties" and each individually as a "Party." Capitalized terms used but not otherwise set forth herein have the meanings ascribed to such terms in Article I.

## RECITALS

**WHEREAS**, Sellers collectively own of record all of the issued and outstanding Class A Units and Class B Units (as each is defined in the Company Operating Agreement) of the Company (collectively, the "Company Units");

**WHEREAS**, on the terms and subject to the conditions hereof, Purchaser desires to purchase from each Seller, and each Seller desires to sell to Purchaser, all of the Company Units owned of record by such Seller that are not Rollover Units immediately prior to the Closing;

**WHEREAS**, at the Closing, each Rollover Investor will enter into a Rollover Agreement with Student Resource Center Holdings LLC, a Delaware Limited liability company ("Holdco"), pursuant to which each such Rollover Investor will contribute the number of equity interests in the Company (the "Rollover Units") set forth in the applicable Rollover Agreement to the Purchaser (at the direction of Holdco) in exchange for equity interests in Holdco (such contribution, exchange, and issuance, the "Rollover"). Each party hereto acknowledges and agrees that the Rollover is intended to be treated as a tax-free transfer under Section 721 of the Code, followed by a contribution of such Rollover Units by Holdco to Purchaser that is intended to be treated as a Tax-free transfer under Section 351 of the Code, and agrees to treat the transaction for all federal, state and local income Tax purposes accordingly; and

**WHEREAS**, concurrently with the execution and delivery hereof, Purchaser has entered into a conditional binder agreement with respect to a purchaser-side representations and warranties insurance policy in connection with the transactions contemplated hereby (the "R&W Policy"), with the final form of the R&W Policy attached to such conditional binder agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the representations, warranties, covenants and agreements hereunder, and intending to be legally bound hereby, the Parties agree as follows:

# ARTICLE I

# CERTAIN DEFINITIONS

Section 1.1     Certain Definitions As used in this Agreement, the following terms have the respective meanings set forth below.

"2020 Balance Sheet" has the meaning set forth in Section 3.4(a)(i).

"Accountants' Determination" has the meaning set forth in Section 2.5(b).

"Accounting Firm" means a nationally recognized firm mutually acceptable to the Parties.

"Accounting Principles" means those accounting methodologies, practices, estimation techniques, assumptions, and principles applied by the Company in preparing the 2020 Balance Sheet, to the extent not inconsistent with GAAP.

"Accrediting Body" means any non-governmental entity, including institutional and specialized accrediting agencies, which engages in the granting or withholding of accreditation of educational institutions, programs or courses in accordance with standards relating to the performance, operations, financial condition or academic standards of such institutions, programs or courses.

"Adjustment Escrow Amount" means Two Hundred Fifty Thousand Dollars ($250,000).

"Adjustment Escrow Funds" means, collectively, at any time, the portion of the Adjustment Escrow Amount and any earnings thereon then remaining in the Escrow Account.

"Adjustment Escrow Release Date" shall have the meaning set forth in Section 2.5(e)(iv).

"Affiliate" means, with respect to any Person, any other Person who directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlled" and "controlling" have meanings correlative thereto.  For the avoidance of doubt, employees of the Company are not Affiliates of the Company.

"Aggregate Rollover Value" means Thirty Million Dollars ($30,000,000).

"Agreement" has the meaning set forth in the introductory paragraph to this Agreement.

"Allocation Principles" has the meaning set forth in Section 6.3(a).

"Allocation Schedule" has the meaning set forth in Section 6.3(a).

"Ancillary Documents" means all agreements, documents, instruments and/or certificates contemplated by this Agreement to be executed or delivered in connection with the Transactions contemplated by this Agreement.

"Business Day" means a day, other than a Saturday or Sunday, on which commercial banks in Wilmington, Delaware are open for the general transaction of business.

"CARES Act" means the Coronavirus Aid, Relief, and Economic Security Act (Pub. L. 116-136), as amended.

"Cash" means an amount equal to the sum of (i) all cash and cash equivalents (including marketable securities and other liquid investments, in each case to the extent convertible to cash within 60 days), plus (ii) all deposits in transit or deposited but uncleared bank deposits, other wire transfers and drafts deposited or received and available for deposit, less (iii) the face amount of any checks or other negotiable instruments used like checks, issued but not yet cleared, of the Company, less (iv) Restricted Cash, less (v) $2,000,000. For the avoidance of doubt, "Cash" may be a negative number and if so, shall reduce the Purchase Price accordingly.

"Closing" has the meaning set forth in Section 2.1.

"Closing Balance Sheet" has the meaning set forth in Section 2.4(a).

"Closing Cash" means the amount of Cash of the Company as of immediately prior to the Closing

"Closing Date" has the meaning set forth in Section 2.1.

"Closing Indebtedness" means the amount of Indebtedness as of as of immediately prior to the Closing.

"Closing Payment Amount" has the meaning set forth in Section 2.4(a).

"Closing Payment Pro Rata Percentage" means, with respect to each Seller, the percentage to be set forth opposite such Seller's name on Schedule 2.2 under the heading "Closing Payment Pro Rata Percentage".

"Closing Statement" has the meaning set forth in Section 2.4(a).

"Closing Adjustment Statement" has the meaning set forth in Section 2.5(a).

"Closing Working Capital" has the meaning set forth in Section 2.5(a).

"COBRA" means Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code and any similar state Law.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collaboration Agreement" means an agreement between the Company and any Institution for the provision of any services supporting the operation of such Institution or its educational programs or courses in any respect.

"Collective Bargaining Agreement" means any Contract with a Labor Organization, including all memoranda of agreement, memoranda of understanding, side letters and addenda.

"Company" has the meaning set forth in the introductory paragraph to this Agreement.

"Company Intellectual Property" means any and all Intellectual Property exploited by, held for exploitation by, owned (in whole or in part) by or licensed to or by the Company.

"Company Material Adverse Effect" means any change, event, effect, circumstance, occurrence, fact or development, that, individually or in the aggregate is, or would reasonably be expected to be, materially adverse to the business, results of operations, prospects, condition (financial or otherwise) or assets of the Company.

"Company Operating Agreement" means that certain Amended and Restated Limited Liability Company Agreement of the Company, dated as of May 18, 2018, as amended.

"Company Product(s)" means collectively all products and service offerings: (i) that are currently being marketed, offered, sold, distributed, or made commercially available, or (ii) otherwise have been provided, in each case, directly or indirectly, by the Company.

"Company Units" has the meaning set forth in the Recitals.

"Compliance Date" means January 1, 2018.

"Contract" means any agreement, contract, lease, sublease, license, sublicense, note, mortgage, debenture, indenture, letter of credit, instrument, arrangement, commitment, understanding or undertaking, in each case that creates a legally binding obligation, and in each case whether written or oral (and any amendments to any of the foregoing).

"D&O Indemnified Party" has the meaning set forth in Section 6.1(a).

"D&O Tail Party" has the meaning set forth in Section 6.1(b).

"Educational Agency" means any entity or organization, whether governmental or non-governmental, that engages in granting or withholding Educational Approvals, administers student financial assistance to or for students of, or otherwise regulates educational institutions, programs or courses in accordance with standards relating to the performance, operation, financial condition, privacy or academic standards of such institutions, programs or courses, including, but not limited to, USDE, any Accrediting Body, any State Educational Agency, and any Governmental Entity with jurisdiction to enforce laws or regulations concerning misrepresentation, unfair, deceptive or abusive acts and practices, consumer fraud, or other consumer protection laws and regulations as such laws and regulations apply to educational institutions, programs and courses.

"Educational Approval" means any license, permit, consent, authorization, certification, exemption, registration, or similar approval issued or required to be issued by an Educational Agency to an educational institution or to an entity that provides services to an educational institution.

"Educational Law" means any applicable federal, state, municipal, foreign or other Law, regulation, guidance, order, Accrediting Body standard or other requirement thereof, including, without limitation, Title IV regulations and guidance, issued or administered by, or related to, any Educational Agency.

"Employee Benefit Plan" means any retirement, pension, profit sharing, deferred compensation, stock bonus, savings, bonus, commission, incentive, cafeteria, medical, dental, vision, hospitalization, life insurance, accidental death and dismemberment, medical expense reimbursement, dependent care assistance, tuition reimbursement, disability, welfare, sick pay, holiday, vacation, employment, consulting, retention, severance, change of control (including "single trigger" and "double trigger"), equity purchase, equity option, restricted equity, phantom equity, equity appreciation right, capital interest, profits interest, fringe benefit or other compensatory or benefit plan, fund, policy, program, practice, agreement or arrangement of any kind (including any "employee benefit plan," as defined in Section 3(3) of ERISA, whether or not subject to ERISA), whether written or oral, qualified or nonqualified, funded or unfunded, or domestic or foreign, (i) that is sponsored, maintained or contributed to by the Company and that covers or benefits any current or former director, manager, officer, employee, partner, member, shareholder, or independent contractor of the Company (or the spouse, domestic partner, dependent or beneficiary of any such individual); or (ii) with respect to which the Company has (or could have) any current or future liability or obligation (including any contingent liability or obligation).

"Enforceability Exceptions" has the meaning set forth in Section 3.3.

"Environmental Laws" means all applicable Laws concerning pollution or protection of the environment, natural resource damages, waste management, the use, storage, generation, treatment, release, remediation, removal, disposal, exposure to or transport of a Hazardous Substance, human health and safety and worker health and safety, as such of the foregoing are enacted and in effect on or prior to the Closing Date.

"Environmental Permits" has the meaning set forth in Section 3.11(b).

"EPCRS" has the meaning set forth in Section 3.10(d).

"Equity Securities" means (i) equity securities, (ii) securities convertible into or exchangeable for, at any time, equity securities, and (iii) options, warrants, calls, rights or other securities, equity-based awards exercisable or exchangeable for or convertible into or other rights to acquire any equity securities or securities convertible into or exchangeable for equity securities of the Company.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade, business or Person that, together with the Company, is or, at any relevant time, was treated as a single employer under Section 414(b), (c), (m) or (o) of the Code or Section 4001(a)(14) or Section 4001(b)(1) of ERISA.

"Escrow Account" means a separate account designated by the Escrow Agent into which the Escrow Funds shall be escrowed pursuant to the terms

"Escrow Agent" means Wilmington Trust, N.A.

"Escrow Agreement" means the escrow agreement required by the Escrow Agent in a form reasonably acceptable to the Parties setting forth the terms and conditions applicable to the escrow of the Escrow Funds and disbursement of the Escrow Account.

"Escrow Funds" means, collectively, the Adjustment Escrow Funds and the Indemnity Escrow Funds.

"Estimated Purchase Price" has the meaning set forth in Section 2.4(a).

"Estimated Working Capital" has the meaning set forth in Section 2.4(a).

"Final Determination Date" has the meaning set forth in Section 2.5(c).

"Financial Statements" has the meaning set forth in Section 3.4(a).

"Fraud" means, with respect to any Party, such Party's making of a representation or warranty in this Agreement or any Ancillary Document to any Party hereto, which representation is made (a) with such Party's actual knowledge (as opposed to imputed or constructive knowledge) that such representation or warranty was untrue when made and (b) with an intent by such Party to deceive another Party with respect to the making of such representation or warranty (and such other Party actually relies upon such false representation or warranty).

"Fundamental Representations" means, collectively, Section 3.1 (Organization and Qualification), Section 3.2 (Capitalization), Section 3.3 (Authority), Section 3.16 (Brokers), Section 4.1 (Authority), Section 4.2(i) (No Violations), Section 4.3 (Title to Company Units; Ownership of Sellers) and Section 4.5 (Brokers).

"Funds Flow" has the meaning set forth in Section 2.4(a).

"GAAP" means United States generally accepted accounting principles consistently applied.

"Governing Documents" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs. For example, the "Governing Documents" of a corporation are its certificate of incorporation and by-laws, the "Governing Documents" of a limited partnership are its limited partnership agreement and certificate of limited partnership and the "Governing Documents" of a limited liability company are its operating agreement and certificate of formation.

"Governmental Entity" means any United States or non-United States (i) federal, state, local, municipal, or other government, (ii) governmental or quasi-governmental entity of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal) or (iii) body exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal, and includes any Educational Agency.

"Hart-Scott-Rodino Act" shall mean the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the relevant rules and regulations thereunder.

"Hazardous Substance" means any substance, chemical, material, or waste regulated, defined or designated as hazardous or toxic (or by any similar term) under any Environmental Law, including petroleum or petroleum products, asbestos, polychlorinated biphenyls and toxic mold.

"Health Care Reform Laws" has the meaning set forth in Section 3.10(e).

"Indebtedness" means, without duplication, the sum of the outstanding principal amount of, accrued and unpaid interest on, and other payment obligations (including prepayment penalties, premiums, breakage costs, fees and other costs and expenses associated with repayment) arising under or in connection with: (i) any indebtedness of the Company for borrowed money or any indebtedness of the Company issued in substitution for or exchange of indebtedness for borrowed money, (ii) any indebtedness of the Company evidenced by notes, bonds, debentures or other debt securities, (iii) indebtedness or obligation of another Person of the types described in this definition of Indebtedness (A) guaranteed, directly or indirectly, in any manner by the Company through an agreement, contingent or otherwise, to supply funds to, or in any other manner, invest in, the debtor, or to purchase indebtedness, primarily for the purpose of enabling the debtor to make payment of the indebtedness or to assure the owners of indebtedness against loss or (B) or secured by a Lien upon any property or asset owned by the Company, (iv) any deferred purchase price obligations for the purchase of property, rights, securities, services, business or other assets, including purchase price adjustments, seller-notes, earn-out obligations and other similar payments (whether contingent or otherwise) calculated as the maximum amount payable under or pursuant to such obligation, (v) any obligations with respect to any hedging, swap, option, collars, caps, derivative or similar financial arrangements (valued at the termination date thereof), (vi) any obligations, debts or liabilities with respect to any underfunded deferred compensation plans, phantom stock plans or similar arrangements, any unfunded or underfunded pension obligations, unpaid bonuses, COBRA reimbursement, and severance obligations triggered by terminations occurring prior to the Closing (in each case, together with the employer portion of any payroll Taxes or social security Taxes or other employment-related Taxes related thereto), (vii) all accrued but unpaid severance obligations (including the employer portion of any applicable payroll, social security, unemployment or similar Taxes), (viii) all letters of credit, performance bonds, bankers acceptances, or similar facilities (to the extent drawn down), (ix) amounts payable to Kaplan, Inc. or its Affiliates; (x) declared and unpaid distributions, or amounts owed to any Seller or any Affiliate of any Seller, (xi) amounts deferred pursuant to Section 2302 of the CARES Act, (xii) any payroll Tax obligations (including those imposed by Sections 3101(a) and 3201 of the Code) deferred (including by a failure to timely withhold, deposit or remit such amounts in accordance

with the applicable provisions of the Code and the Treasury Regulations promulgated thereunder) pursuant to or in connection with the Payroll Tax Executive Order, (xiii) obligations arising under leases that are classified as a capital or finance lease in the Financial Statements or are required to be recorded as capital or finance leases in accordance with GAAP, and (xiv) unpaid liabilities of the Company for federal, state, local and foreign accrued Taxes.  Notwithstanding anything to the contrary in the foregoing definition, any item included in Indebtedness shall not be included in Net Working Capital.

"Indemnitees" has the meaning set forth in Section 7.2(b).

"Indemnity Escrow Amount" means $600,000.

"Indemnity Escrow Funds" means, collectively, at any time, the portion of the Indemnity Escrow Amount and any earnings thereon then remaining in the Escrow Account.

"Indemnity Escrow Release Date" shall have the meaning set forth in Section 7.6.

"Information" means information or data accessed, collected, Processed, disclosed, used, distributed, held, owned or controlled by the Company or its Systems.

"Institution" means any Title IV participating institution of higher education, and includes Eastern Gateway Community College and Central State University.

"Institution Receivables" means any and all receivables owed to the Company by Eastern Gateway Community College for services performed by the Company on or before the Closing Date under the Collaboration Agreement with Eastern Gateway Community College, which receivables shall not in the aggregate exceed $5,000,000.

"Intellectual Property" means, collectively: (i) all rights (anywhere in the world, whether statutory, common law or otherwise)  in or to intellectual or industrial property or other proprietary rights recognized by applicable Law, including with respect to the following: (A) patents and applications therefor, and patents issuing thereon, including continuations, divisionals, continuations-in-part, reissues, reexaminations, renewals and extensions; (B) copyrights and registrations and applications therefor, works of authorship, "moral" rights and mask work rights, unregistered copyrights in both published works and unpublished works and copyrightable works (including Internet websites and content thereof, data, applications, course materials, curriculum, program offering materials data bases and documentation thereof); (C) domain names, uniform resource locators and other names and locators associated with the internet, including applications and registrations thereof; (D) trademarks, trade dress, trade names, logos and service marks, together with the goodwill symbolized by or associated with any of the foregoing and any applications, registrations and renewals therefor; (E) all technology, research and development, inventions, manufacturing and operating specifications and processes, schematics, know-how, formulae, customer and supplier lists, sales and marketing materials, proposals, financial and marketing plans, shop rights, designs, drawings, patterns, Trade Secrets, technical data, databases, data compilations and collections, web addresses and sites, software, computer architecture, and documentation; (F) all other similar intangible assets, properties or rights; and (G) the right to file

applications and obtain registrations for any of the foregoing and claim priority thereto; (ii) all claims, causes of action and rights to sue for past, present and future infringement or misappropriation of the foregoing, and all proceeds, rights of recovery and revenues arising from or pertaining to the foregoing; and (iii) all copies and tangible embodiments of any of the foregoing (in whatever form or medium).

"Labor Organization" has the meaning set forth in Section 2(5) of the National Labor Relations Act, 29 U.S.C. 152 § 152(5).

"Latest Balance Sheet" has the meaning set forth in Section 3.4(a)(ii).

"Law" means any laws (including common laws), rules, regulations, codes, ordinances, treaties, orders and other binding requirements promulgated, issued or declared by any Governmental Entity, and includes Educational Laws.

"Leased Real Property" has the meaning set forth in Section 3.17(a).

"License(s)" means individually and collectively all Contracts of the Company relating to the acquisition, transfer, development, license, use or commercialization of Intellectual Property or any waiver or release of rights in, to or under Intellectual Property.

"Lien" means any mortgage, pledge, conditional sale or other title retention agreement, security interest, encumbrance, lien, charge, claim, restriction, condition, restriction, title defect, easement, right of way, encroachment and any other encumbrance or similar restriction of any kind in respect of any property or asset.

"Losses" means claims, losses, damages, liabilities, obligations, fines, interest, awards, penalties, judgments, charges, fees, set-offs, amounts paid in settlement, Taxes, deficiencies, penalties, costs and expenses (including, without limitation, interest which may be imposed in connection therewith, costs and expenses of investigation, actions, suits, proceedings, arbitration, demands, assessments and fees, expenses and disbursements of internal and external counsel, consultants and other experts), including all direct, indirect, consequential, exemplary, or punitive damages, lost profits and diminution in value.

"Marketing Materials" means any written materials created specifically to encourage or promote student enrollment in the Institution's programs, including without limitation, advertisements, brochures, pamphlets, newsletters, statement stuffers, fulfillment materials, seminars, convention exhibits, telemarketing scripts or talking points, take-one displays, e-mails, website postings, and any other advertisement or marketing materials for the Institution's programs in any media.

"Material Contracts" has the meaning set forth in Section 3.6(a).

"Material Customers" has the meaning set forth in Section 3.19.

"Material Permits" has the meaning set forth in Section 3.9(b).

"Material Suppliers" has the meaning set forth in Section 3.19.

"Measurement Time" means 12:01 a.m. Boston time on the Closing Date.

"Misrepresentation" means any misrepresentation as described or defined in 34 C.F.R. §§ 685.206, 668.71, 668.72, 668.73, and 668.74. Misrepresentation includes, but is not limited to, a "substantial misrepresentation" as used in 20 U.S.C. § 1094(c)(3)(A) and 34 C.F.R. § 685.222, and defined in 34 C.F.R. § 668.71; any cause of action or liability under the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, or any state false claims act; and any unfair or deceptive acts or practices under any state laws or under the Federal Trade Commission Act, 15 U.S.C. § 45, and its implementing regulations.

"Net Adjustment Amount" means an amount, which may be positive, negative or zero, equal to (i) the amount, if any, by which the Purchase Price (as finally determined by Section 2.5) exceeds the Estimated Purchase Price, which shall be positive, or (ii) the amount, if any, by which the Purchase Price (as finally determined by Section 2.5) is less than the Estimated Purchase, which shall be negative, or (iii) zero, if the Purchase Price is equal to the Estimated Purchase Price.

"Net Working Capital" means as of the Measurement Time, an amount equal to (i) the current assets of the Company less (ii) the current liabilities of the Company, in each case determined in accordance with the Accounting Principles and in a similar format as the sample calculation of Net Working Capital, in each case attached hereto as Exhibit A (the "Net Working Capital Schedule"). Net Working Capital shall not include any of the items included in Cash, Indebtedness, Seller Expenses, the Institution Receivables, any Tax assets or liabilities or amounts payable to Kaplan, Inc. or its Affiliates.

"Notice of Claim" means a written notice that specifies with reasonable specificity the basis for a claim for indemnification hereunder.

"Objection Notice" has the meaning set forth in Section 2.5(a).

"Order" means any order, writ, injunction, judgment, determination, requirement, written notice, directive, award, ruling or decree entered into in any Proceeding with any Governmental Entity and any stipulation, settlement agreement, conciliation agreement or compliance agreement made or entered into in connection with any Proceeding.

"Owned Intellectual Property" means any Intellectual Property owned or purported to be owned by the Company.

"Parties" means, collectively, each Person signatory hereto.

"Pass-Through Tax Return" means any Tax Return (such as an IRS Form 1065 and associated IRS Schedules K-1 and corresponding state and local Tax Returns) of the Company (a) with respect to which (i) the Company is treated as a flow-through entity for purposes of such Tax Return, and (ii) any of the income, gain, losses, deductions or other Tax items of the Company reflected on such Tax Returns are allocated to, and reflected on the Tax Returns of, Sellers (or, in

the event that a Seller is classified as a disregarded entity for U.S. federal income Tax purposes, the direct or indirect owner of such Seller that is treated as the owner of such Seller's Company Units for U.S. federal income Tax purposes) or (b) which is a "composite" or similar Tax Return. By way of example and without limitation, Tax Returns primarily concerning property Taxes, sales and use Taxes, payroll Taxes, and withholding Taxes (other than any such withholding Taxes associated with a "composite" or similar Tax Return) are not Pass-Through Tax Returns.

"Payroll Tax Executive Order" means the Presidential Memorandum on Deferring Payroll Tax Obligations in Light of the Ongoing COVID-19 Disaster, as issued on August 8, 2020 and including any administrative or other guidance published with respect thereto by any Governmental Body (including IRS Notice 2020-65).

"Pay-off Letter(s)" has the meaning set forth in Section 2.3(a)(iii).

"Pending Indemnity Claims" shall have the meaning set forth in the Section 7.7.

"Permitted Liens" means (i) mechanic's, materialmen's, carriers' and repairers' Liens arising in the ordinary course of business for amounts that are not yet delinquent or are being contested in good faith, (ii) Liens for Taxes (a) not yet delinquent as of the Closing Date or (b) being contested in good faith by appropriate procedures and for which adequate reserves have been established in the Financial Statements in accordance with GAAP, and (iii) encumbrances and restrictions on property (including, but not limited to, easements, covenants, conditions, rights of way and similar restrictions) that do not materially interfere with the Company's present or intended uses or occupancy of such property.

"Person" means an individual, partnership, corporation, limited liability company, joint stock company, unincorporated organization or association, trust, joint venture, association or other similar entity, whether or not a legal entity.

"Personal Information" means information which on its own or in combination with any other piece of information allows, or is capable of allowing, the identification of a natural person.

"Pre-Closing Income Tax Return" has the meaning set forth in Section 6.3(b).

"Pre-Closing Tax Period" means any taxable period that ends on or before the Closing Date, and, in the case of any Straddle Period, the portion of such period that ends at the end of the Closing Date.

"Pre-Closing Taxes" means (i) any Taxes of the Company with respect to any Pre-Closing Tax Period (including the pre-Closing portion of a Straddle Period), (ii) any Taxes of any Seller (including, capital gains Taxes arising as a result of the transactions contemplated by this Agreement and any withholding Taxes required to be deducted and withheld on any payment to any Seller pursuant to this Agreement) for any Tax period, (iii) any Taxes attributable to any breach or inaccuracy of any representation in Section 3.15 (without giving effect to any limitations or qualifications as to materiality, Company Material Adverse Effect, knowledge or similar limitations), (iv) any Taxes for which the Company (or any predecessor for the foregoing) is held liable under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or non-

U.S. Law) by reason of such entity being included in any consolidated, affiliated, combined, unitary or similar group at any time on or before the Closing Date, (v) any Taxes imposed on or payable by any Person with respect to which the Company or the Purchaser has an obligation to indemnify such Person pursuant to a transaction consummated on or prior to the Closing (including under principles of transferee or successor liability) (other than obligations arising under commercial contracts entered into in the ordinary course of business and not concerning Taxes), (vi) any Transfer Taxes for which the Sellers are responsible for pursuant to <u>Section 8.4(a)</u>, (vii) any Taxes attributable to any breach or violation of, or failure to fully perform, any covenant, agreement, undertaking or obligation of the Sellers set forth in <u>Section 6.3</u>, (viii) any and all Taxes for which any of the Sellers is liable pursuant to <u>Section 6.3</u> and (ix) any Taxes under Sections 951, 951A and 965 of the Code attributable to a Pre-Closing Tax Period (including the pre-Closing portion of a Straddle Period), in each of the above cases, together with any out-of-pocket fees and expenses (including reasonable attorneys' and accountants' fees) incurred in connection therewith.

"<u>Pro Rata Percentage</u>" means, with respect to each Seller, the percentage to be set forth opposite such Seller's name on <u>Schedule 2.2</u> under the heading "Pro Rata Percentage."

"<u>Proceeding</u>" means any litigation, proceeding, cause of action, lawsuit, audit, assessment or reassessment, petition, complaint, charge, grievance, prosecution, demand, hearing, written notice, inquiry, investigation, subpoena, summons, inspection, or administrative or other similar proceeding, mediation or arbitration (including any appeal or application for review) of any kind or nature, in law or in equity.

"<u>Processing</u>" means any operation or set of operations that are performed on Information, including the collection, storage, transmission, transfer, disclosure, destruction and use of Personal Information.

"<u>Purchase Price</u>" means (i) One Hundred Twenty Million Dollars ($120,000,000), <u>minus</u> (ii) the amount of Closing Indebtedness, <u>minus</u> (iii) the amount of Seller Expenses, <u>plus</u> (iv) the amount of Cash, <u>plus</u> (v) the amount by which the Closing Working Capital exceeds the Target Working Capital, <u>minus</u> (vi) the amount by which the Closing Working Capital is less than the Target Working Capital, <u>minus</u> (vii) the Aggregate Rollover Value.

"<u>Purchaser</u>" has the meaning set forth in the introductory paragraph to this Agreement.

"<u>Purchaser Fundamental Representations</u>" means, collectively, <u>Section 5.1</u> (Organization), <u>Section 5.2</u> (Authority), and <u>Section 5.4</u> (Brokers).

"<u>Purchaser Group</u>" means, collectively, Purchaser and its Affiliates, including, for the avoidance of doubt, the Company after the Closing.

"<u>Purchaser Indemnitee</u>" has the meaning set forth in <u>Section 7.2(b)</u>.

"<u>Purchaser Pre-Closing Tax Return</u>" has the meaning set forth in <u>Section 6.3(c)</u>.

"Purchaser Related Party" means (i) the former, current and future direct or indirect holders of any equity, general or limited partnership or limited liability company interest, controlling persons, management companies, portfolio companies, financing sources, incorporators, directors, officers, employees, agents, attorneys, Affiliates, members, managers, general or limited partners, stockholders, representatives, successors or assignees of Purchaser, and (ii) any former, current or future direct or indirect holders of any equity, general or limited partnership or limited liability company interest, controlling persons, management companies, portfolio companies, financing sources, incorporators, directors, officers, employees, agents, attorneys, Affiliates, members, managers, general or limited partners, stockholders, representatives, successors, or assignees of any of the Persons described in clause (i).

"R&W Policy" has the meaning set forth in the Recitals.

"Real Property Lease" has the meaning set forth in Section 3.17(a).

"Registered Intellectual Property" means any Company Intellectual Property that is owned by, or exclusively licensed to, the Company that, in either case, is the subject of an application or registration with or under the authority of any Governmental Entity, including any domain name registration and any application or registration for any patent, copyright or trademark.

"Released Matters" has the meaning set forth in Section 6.4.

"Representative" has the meaning set forth in Section 9.1(a).

"Restricted Area" has the meaning set forth in Section 6.5(a).

"Restricted Cash" means any cash which is not freely usable by Purchaser because it is subject to restrictions, limitations or taxes on use or distribution by law, contract or otherwise, including without limitation, restrictions on dividends and repatriations or any other form of restriction.

"Restricted Period" has the meaning set forth in Section 6.5(a).

"Restricted Persons" means, collectively, RRGTHREE, LLC, Michael J. Perik, Nicole Rowe Colclasure and John Haseley and expressly excludes KV EdTech Partners LLC.

"Rollover" has the meaning set forth in the Recitals.

"Rollover Agreement" means a rollover agreement between a Rollover Investor and Holdco, in a form reasonably acceptable to the Purchaser and the applicable Rollover Investor, setting forth the terms and conditions applicable to the Rollover.

"Rollover Units" has the meaning set forth in the Recitals.

"Seller Expenses" means, without duplication, all fees, costs and expenses incurred or to be incurred by or on behalf of any Seller or the Company in connection with the negotiation and execution of this Agreement and the consummation of the Transactions or the negotiation of any similar transaction prior to the this Agreement, in each case solely to the extent required to be paid

or reimbursed, whether accrued or not, by any Seller or the Company, including (i) the Transaction related accounting, tax, professional, advisory or consulting fees or fees of service providers and related expenses including any brokerage fees, commissions, finders' fees or financial advisory fees, (ii) any success bonuses, single-trigger or double-trigger change of control bonuses, transaction bonuses, discretionary bonuses, retention, severance or other compensatory payments payable to current or former employees, directors, consultants, independent contractors or service providers of the Company or any other third party, directly or indirectly as a result of or in connection with the Closing of the Transactions, including withholding Taxes and any payroll, social security, unemployment or similar Taxes incurred by the Company or Purchaser or assumed from any of the Sellers (to the extent attributable to a Pre-Closing Tax Period (or portion thereof)), and (iii) Sellers' portion of any Transfer Taxes, in each case, to the extent not paid as of immediately prior to the Closing.

"Seller Indemnitee" has the meaning set forth in Section 7.2(b).

"Seller Related Party" means (i) any former, current and future direct or indirect holders of any equity, general or limited partnership or limited liability company interest, controlling persons, management companies, portfolio companies, financing sources, incorporators, directors, officers, employees, agents, attorneys, Affiliates, members, managers, general or limited partners, stockholders, representatives, family members, successors or assignees of any Seller or the Company and (ii) any former, current or future direct or indirect holders of any equity, general or limited partnership or limited liability company interest, controlling persons, incorporators, directors, officers, employees, agents, attorneys, Affiliates, members, managers, general or limited partners, stockholders, successors, or assignees of any of the Persons described in clause (i) above.

"Seller Released Parties" has the meaning set forth in Section 6.4.

"Seller Releasing Parties" has the meaning set forth in Section 6.4.

"Seller Transaction Deductions" has the meaning set forth in Section 6.3(h).

"Shortfall" has the meaning set forth in Section 2.5(e).

"State Educational Agency" means any state or local educational licensing body that provides an Educational Approval necessary for an educational institution to provide educational programs or courses in that state, including any Educational Approval required under applicable state law to offer an educational program online or that is needed to participate in any Student Financial Assistance Program in that state.

"Student Financial Assistance Program" means any government-sponsored student financial assistance program pursuant to which student financial assistance, grants or loans are provided to an educational institution's students.

"Straddle Period" means any taxable period that includes but ends after the Closing Date.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or (ii) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of the partnership or other ownership interests thereof is owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof and for purposes of this <u>clause (ii)</u>, a Person or Persons shall be deemed to own a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be a, or control any, managing director or general partner of such business entity (other than a corporation).  The term "<u>Subsidiary</u>" shall include all Subsidiaries of such Subsidiary.

"<u>Systems</u>" has the meaning set forth in <u>Section 3.12(h)</u>.

"<u>Target Working Capital</u>" means $502,438.

"<u>Tax</u>" means (i) all taxes, assessments, charges, duties, fees, levies, imposts, customs, or other governmental charges in the nature of taxes, including, without limitation, all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, property, unclaimed property, escheat, excise, severance, windfall profits, stamp, license, employment, payroll, social security, withholding, goods and services tax and other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest and (ii) any liability for amounts described in clause (i) payable by reason of any Contract (including any Tax sharing agreement (excluding any commercial contract entered into in the ordinary course of business and not concerning Taxes)), as a transferee or successor, or a result either of being a member of a combined, consolidated, unitary or affiliated group or of a contractual obligation to indemnify any person or other entity (including pursuant to Treasury Regulations Section 1.1502-6 (or any predecessor or successor thereof or any analogous or similar state, local, or foreign Law)) or otherwise.

"<u>Tax Contest</u>" has the meaning set forth in <u>Section 6.3(g)</u>.

"<u>Tax Return</u>" means any return, statement, schedule, form, declaration, report, claim for refund, information return or other document (including any related or supporting schedule, statement or information and including any amendment thereof) filed or submitted or required to be filed or submitted in connection with the determination, assessment or collection of any Tax of any Party or the administration of any laws, regulations or administrative requirements relating to any Tax.

"<u>Temporary Employee</u>" has the meaning set forth in <u>Section 3.13(e)</u>.

"<u>Third-Party Claim</u>" has the meaning set forth in <u>Section 7.3(b)(i)</u>.

"Title IV" means Title IV of the Higher Education Act of 1965, as amended.

"Trade Secrets" means information and materials not generally known to the public, including trade secrets and other confidential or proprietary information

"Transactions" means the transactions contemplated hereby and by the Ancillary Documents.

"Transfer Taxes" has the meaning set forth in Section 8.4(a).

"Treasury Regulations" means the regulations promulgated under the Code by the United States Department of the Treasury.

"Union Students" has the meaning set forth in Section 6.5(a).

"USDE" means the United States Department of Education (or any successor entity).

"WARN Act" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101, *et seq*., and all similar state or local Laws requiring notification to employees prior to separation from employment.

## ARTICLE II

## PURCHASE AND SALE

Section 2.1    Closing. The consummation of the Transaction (the "Closing") shall take place shall take place remotely by exchange of electronic deliveries and signatures concurrently with the execution and delivery of this Agreement on the date hereof (the "Closing Date"). All proceedings to be taken and all documents to be executed and delivered by the Parties at the Closing shall be deemed to have been taken an executed and delivered simultaneously and no proceedings shall be deemed to have been taken or documents executed or delivered until all have been taken, executed and delivered. The Closing shall be deemed to be effective at 12:01 a.m. Eastern time on the Closing Date.

Section 2.2    Purchase and Sale of the Company Units.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will purchase, acquire and accept from each Company Seller, and each Company Seller will sell, assign, transfer, convey and deliver to Purchaser, for an amount (payable and subject to adjustment as provided in this Article II) equal to the portion of the Closing Payment Amount set forth opposite such Company Seller's name in the Funds Flow under the heading "Purchase Price Allocable to Company Seller," in each case, free and clear of all Liens (other than restrictions imposed under applicable securities Laws).

Section 2.3    Closing Deliveries.

(a)    At the Closing, the Company and/or the applicable Seller shall deliver, or shall cause the appropriate Person to deliver, to Purchaser the following:

(i)     a certificate, dated as of the Closing Date, signed by an executive officer of the Company certifying as to (A) the Governing Documents of the Company as in effect as of the Closing Date, (B) the resolutions adopted by the board of managers of the Company and the requisite approvals of the members of the Company authorizing the execution, delivery and performance of this Agreement and each of the Ancillary Documents to which the Company is a party and the consummation of the Transactions, and (C) the incumbency of the Company's officers executing this Agreement and the Ancillary Documents to which the Company is a party;

(ii)     a properly completed and executed IRS Form W-9 from each Seller;

(iii)     pay-off letter(s) (the "Pay-off Letter(s)") and lien releases and/or terminations in respect of the Closing Indebtedness of the Company, in each case, duly executed by the applicable holders of such Closing Indebtedness;

(iv)     manager and officer resignation letters, in each case duly executed by each manager and officer of the Company unless otherwise directed by Purchaser;

(v)     all equity ledgers, minute books and record books in the possession of the Company, if not already located on the premises of the Company;

(vi)     all certificates or instruments of assignment with respect to the Sellers' respective rights, title and interests in the Company Units to Purchaser in a form mutually acceptable to the Sellers and Purchaser;

(vii)     the Escrow Agreement, duly executed by the Representative on behalf of the Sellers;

(viii)     the Rollover Agreements and all certificates or instruments of assignment with respect to the Rollover Investors' respective rights, title and interests in the Rollover Units to Holdco in a form mutually acceptable to Purchaser, duly executed by each applicable Rollover Investor;

(ix)     copies of all consents and waivers identified on Schedule 2.3(a)(x);

(x)     evidence reasonably satisfactory to Purchaser of the termination of the arrangements listed on Schedule 3.18;

(xi)     the Closing Statement; and

(xii)     the Funds Flow.

(b)     At the Closing, Purchaser shall deliver to the Sellers the following:

(i)     a certificate, dated as of the Closing Date, signed by an executive officer of Purchaser certifying as to (A) the Governing Documents of Purchaser as in effect as of the Closing Date, (B) the resolutions adopted by the board of managers of the Purchaser

authorizing the execution, delivery and performance of this Agreement and each of the other Ancillary Documents to which Purchaser is a party and the consummation of the Transactions, and (C) the incumbency of Purchaser's officers executing this Agreement and the Ancillary Documents to which Purchaser is a party;

    (ii)  the Escrow Agreement, duly executed by the Purchaser;

    (iii)  the Rollover Agreements, duly executed by the Purchaser; and

    (iv)  evidence reasonably satisfactory to the Representative that the D&O Tail Policy will be bound effective as of the Closing Date.

   Section 2.4  <u>Purchase Price</u>.

    (a)  <u>Allocation of Purchase Price; Funds Flow</u>. Prior to the date hereof, the Representative shall have delivered to Purchaser (i) a written statement (the "<u>Closing Statement</u>") setting forth: (A) the Representative's good faith estimate of the amounts of the Closing Indebtedness, Seller Expenses, Closing Cash and Net Working Capital (the "<u>Estimated Working Capital</u>") and (B) based on the foregoing estimates, a calculation of the Purchase Price (the "<u>Estimated Purchase Price</u>"), in each case, with reasonable supporting documentation and based on a balance sheet of the Company that the Company shall have prepared as an estimate of the balance sheet of the Company as of the Closing (the "<u>Closing Balance Sheet</u>") and (ii) a statement (the "<u>Funds Flow</u>") setting forth: (A) each Company Seller's Closing Payment Pro Rata Percentage of the Estimated Purchase Price, <u>less</u> the Adjustment Escrow Amount, <u>less</u> the Indemnity Escrow Amount and <u>less</u> the Representative Expense Amount (collectively, the "<u>Closing Payment Amount</u>") and (B) the recipients of the Seller Expenses and, for each such recipient, the amount owed to such recipient and the wire instructions designated by such recipient; and (C) the holders of the outstanding Closing Indebtedness of the Company, the amount of Closing Indebtedness outstanding and the wire instructions for such holder as set forth in the Pay-off Letter(s). The Funds Flow shall also set forth the wire transfer instructions for each Company Seller and each recipient of Seller Expenses with respect to the payments to be made thereto pursuant to the Funds Flow and this <u>Section 2.4</u>. Without limiting the foregoing, the Closing Statement and Closing Balance Sheet shall be prepared in accordance with the Accounting Principles and the Estimated Working Capital component of the Estimated Purchase Price included in the Closing Statement shall be prepared in accordance with the Net Working Capital Schedule.

    (b)  <u>Closing Payments</u>.

    (i)  At the Closing, Purchaser shall pay, or shall cause to be paid, in cash by wire transfer of immediately available funds, to each Company Seller such Company Seller's Closing Payment Pro Rata Percentage of the Closing Payment Amount as set forth in the Funds Flow.

    (ii)  At the Closing, Purchaser shall pay, or shall cause to be paid, in cash by wire transfer of immediately available funds in accordance with the wire transfer instructions set forth on the Funds Flow:

(A) to the holder(s) of the outstanding Closing Indebtedness of the Company, the amount of Closing Indebtedness outstanding as provided in the Pay-off Letter(s);

(B) to each recipient of Seller Expenses, the amount of such Seller Expenses applicable to such recipient, as set forth in the Funds Flow; provided that any Seller Expenses payable to current or former employees of the Company shall be paid to the Company which shall in turn pay the applicable amounts, less applicable withholdings, to such individuals as soon as reasonably practicable after the Closing Date;

(C) to the Escrow Agent, the Indemnity Escrow Amount and Adjustment Escrow Amount for the Escrow Agent to hold pursuant to the terms of the Escrow Agreement in accordance with the wire instructions provided by the Escrow Agent;

(D) to the Representative, an amount equal to $120,000 (such amount, the "Representative Expense Amount", and the account holding such amount, the "Representative Expense Fund"); and

(E) to the Company, the absolute value of any amount of Closing Cash to the extent that Closing Cash is a negative number.

(c) Post-Closing Payments.

(i) The Net Adjustment Amount shall be paid to the Party to which it is owed pursuant to Section 2.5 below.

(ii) The Parties acknowledge that immediately prior to the Measurement Time, pursuant to that certain Distribution Agreement among the Company Sellers and the Company (the "**Distribution Agreement**"), the Company distributed all rights to the Institution Receivables to the Representative to be held by the Representative for the benefit of the Sellers. The Company shall use its commercially reasonable efforts following the Closing to collect the Institution Receivables; provided, however, in no event shall the Company be required to file or threaten to file a Proceeding against any Institution or terminate or materially reduce the Company's ongoing business relationship with any Institution or any make any threat thereof. The Company shall pay to the Representative (on behalf of the Sellers) the aggregate amount actually collected and received by the Company solely with respect to the Institution Receivables:

(A) during the period commencing immediately following the Closing Date and ending on the last day of the second fiscal quarter following the Closing Date; provided, however, that, the amount shall not exceed $1,000,000,

(B) during third fiscal quarter following the Closing Date; provided, however, that, the amount shall not exceed $1,750,000, and

(C)  during fourth fiscal quarter following the Closing Date; provided, however, that, the amount shall not exceed $2,250,000.

The Company shall make any payments required by this <u>Section 2.4(c)(ii)</u> within 30 days of the end of the applicable fiscal quarter. The Representative shall promptly remit all payments pursuant to this <u>Section 2.4(c)(ii)</u> to the Sellers in accordance with the Distribution Agreement. Notwithstanding anything herein to the contrary, in no event shall the Company be required to make payments or remit any collections pursuant to this <u>Section 2.4(c)(ii)</u> or otherwise with respect to the Institution Receivables to the extent in excess of $5,000,000 in the aggregate.

Section 2.5  <u>Post-Closing Adjustment Mechanics.</u>

(a)  As soon as practicable (and in no event later than ninety (90) days after the Closing), Purchaser shall prepare or cause to be prepared and delivered to the Representative a statement (the "<u>Closing Adjustment Statement</u>") setting forth Purchaser's good faith calculations of (i) the amounts of the Closing Indebtedness, Seller Expenses, Closing Cash and Net Working Capital (the "<u>Closing Working Capital</u>") and (ii) based on the foregoing, the Purchase Price, in each case, with reasonable supporting documentation. The Closing Adjustment Statement will be prepared and determined in accordance with the Accounting Principles. Without limiting the foregoing, the calculation of the Closing Working Capital shall be prepared in accordance with the Net Working Capital Schedule  In connection with the review of the Closing Adjustment Statement, the Purchaser and the Company shall provide the Representative with reasonable access during normal business hours and given appropriate written notice, to the personnel, books, records, documents and other information of the Company solely related to the Representative's review of the Closing Statement. Following receipt of the Closing Adjustment Statement, the Representative will be afforded a period of forty-five (45) days to review the Closing Adjustment Statement.  At or before the end of such period, the Representative (on behalf of the Sellers) will, either (i) accept the Closing Adjustment Statement in its entirety or (ii) deliver to the Purchaser a written notice (the "<u>Objection Notice</u>") containing (A) a detailed written explanation of those items in the Closing Adjustment Statement which the Representative (on behalf of the Sellers) disputes and (B) explanations, alternative calculations and other supporting documentation for each item in dispute, in which case only the items specifically identified by the Representative shall be deemed to be in dispute.  The failure by the Representative to deliver the Objection Notice within the forty-five (45) day period shall constitute the acceptance of the Closing Adjustment Statement by the Representative and the Sellers.  From the date of delivery of the Objection Notice until the date which is thirty (30) days thereafter, the Purchaser and the Representative shall work in good faith to agree on the Closing Adjustment Statement.

(b)  If the Purchaser and the Representative cannot agree on the final Closing Adjustment Statement within thirty (30) days after delivery of the Objection Notice, then the parties shall submit their final calculations of the items still in dispute to the Accounting Firm to be resolved by the Accounting Firm in accordance with this <u>Section 2.5</u>.  In resolving any disputed item, the Accounting Firm may not assign a value to any item greater than the greatest value for such item claimed by either Party or less than the smallest value for such item claimed by either Party and may not opine on any other matters other than those which are being disputed.  For the avoidance of doubt, the Accounting Firm shall be instructed by the Purchaser and the

Representative to only to resolve the matters specifically still in dispute following the Representative and Purchaser's good faith attempt to agree on the Closing Adjustment Statement in accordance with this <u>Section 2.5</u> and shall be instructed to not otherwise investigate any matter independently. The fees, costs and expenses of the Accounting Firm shall be allocated to and borne jointly and severally by the Sellers, on the one hand, and Purchaser, on the other hand, in proportion to the amounts by which their proposals of the Net Adjustment Amount differed from the Accounting Firm's final determination of the Net Adjustment Amount. The decision of the Accounting Firm (the "<u>Accountants' Determination</u>") shall be made within thirty (30) days after being engaged, or as soon thereafter as reasonably practicable and shall be (i) in writing, (ii) made in accordance with the Accounting Principles and (iii) non-appealable and incontestable by the Parties and each of their respective Affiliates and successors and assigns and not subject to collateral attack for any reason other than manifest error or fraud. Purchaser and the Representative shall make, or cause to be made, available to the Accounting Firm all relevant books and records relating to the calculations submitted and all other information reasonably requested by the Accounting Firm.

(c)     The "<u>Final Determination Date</u>" shall mean the earliest to occur of (i) the forty-sixth (46th) day following the receipt by the Representative of the Closing Adjustment Statement if the Representative shall have failed to deliver the Objection Notice to the Purchaser within the forty-five (45) day period to deliver such Objection Notice, (ii) the date on which either the Representative or the Purchaser gives the other a written notice to the effect that such Party has no objection to the other Party's determination of the amounts set forth in the Closing Adjustment Statement, (iii) the date on which the Representative and the Purchaser mutually agree to a Closing Adjustment Statement and (iv) the date on which the Representative and the Purchaser shall have received the Accountants' Determination.

(d)     On the Final Determination Date, the Net Adjustment Amount as stated in the Closing Adjustment Statement, as modified through the agreement of the Parties or the Accountants' Determination, if applicable, shall be final and binding on the Parties.

(e)     Within five (5) Business Days of the Final Determination Date:

(i)     If the Net Adjustment Amount is positive, then the Purchaser shall pay the Representative (for distribution to the Sellers in accordance with their respective Pro Rata Percentages) the Net Adjustment Amount in cash by wire transfer of immediately available funds to an account or accounts specified by the Representative.

(ii)    If the Net Adjustment Amount is negative (the absolute value of such Net Adjustment Amount, the "<u>Shortfall</u>"), then (A) Purchaser shall be paid the amount of such Shortfall out of the Adjustment Escrow Funds, and (B) in the event the Adjustment Escrow Funds are less than the Shortfall, the Sellers shall be jointly and severally pay the remainder of the Shortfall in cash to Purchaser, which obligation shall be satisfied by prompt payment to the Purchaser by wire transfer of immediately available funds to an account designated in writing by the Purchaser.

(iii)    For purposes of clarity, if the Net Adjustment Amount is zero, no payment shall be made to any Person pursuant to this Section 2.5.

(iv)    Any portion of the Adjustment Escrow Amount remaining in the Escrow Account on the Final Determination Date (the "Adjustment Escrow Release Date") (after taking into account the distribution required under Section 2.5(e)(ii) above (if applicable)) shall be released to (or as directed by) Representative in accordance with the joint written instructions delivered by Purchaser and Representative to the Escrow Agent no later than five (5) Business Days following the Adjustment Escrow Release Date.

(f)    For all federal, state, local and foreign Tax purposes, any payment by Purchaser, the Representative (on behalf of the Sellers) or the Sellers pursuant to this Section 2.5, shall be treated as an adjustment to the Purchase Price, and the Parties shall file their Tax Returns accordingly, unless a contrary treatment is required by Law.

(g)    For the avoidance of doubt, following the Closing, no distributions shall be made by the Company to any of the Sellers (whether directly or indirectly) for any Tax-related liability of the Company or any of the Sellers for time periods preceding the Closing.

Section 2.6    Tax Treatment.    Purchaser and the Rollover Investors intend to treat the Rollover as a Tax-free contribution of the Rollover Units by the Rollover Investors to Holdco in exchange for equity interests in Holdco that is governed by Code Section 721 and that occurs at the same time as Purchaser's purchase of all of the Company Units that are not Rollover Units from the Sellers, followed by a contribution by Holdco of such Rollover Units to Purchaser that is intended to be treated as a Tax-free transfer under Section 351 of the Code.  Purchaser's purchase of the Company Units that are not Rollover Units is intended to qualify (and be reported for U.S. federal and applicable state and local income Tax purposes) as a sale or exchange under Section 741 of the Code with respect to the Sellers, the Company shall be treated as terminated, its partnership taxable year shall close on the Closing Date, and the Purchaser shall be treated as acquiring all of the assets of the Company from the Sellers. For U.S. federal and applicable state and local income Tax purposes, the Company shall allocate all items of Company income, gain, loss, deduction, or credit attributable to the Sellers for the taxable year of the Closing based on a closing of the Company's books as of the Closing Date. The Parties acknowledge that, pursuant to the Distribution Agreement, the Company distributed beneficial ownership of the Institution Receivables by the Representative, to be held by the Representative on behalf of the Sellers, immediately prior to the Measurement Time and the Company shall receive any payments, and make corresponding payments to the Representative (on behalf of the Sellers) pursuant to Section 2.4(c)(ii) as agent (for income tax purposes) of the Sellers.  The Sellers shall report all taxable income or gain, if any, with respect to the Institution Receivables and the Company (and Purchaser and its Affiliates, to the extent applicable) will not report any income or gain, or deduction or loss, with respect to the Institution Receivables and any payment with respect to the Institution Receivables shall not be treated as an adjustment to the Purchase Price as determined for applicable Tax purposes.  The Parties shall (and shall cause their respective Affiliates, as applicable, to) prepare and file all Tax Returns in a manner consistent with such treatment and not take any

position inconsistent with the foregoing tax treatment, in each case, unless otherwise required by applicable Tax Law.

Section 2.7    Withholding Tax.  Each of Purchaser, the Company, the Escrow Agent and their respective Affiliates and representatives shall be entitled to deduct and withhold from any amounts required to be paid pursuant to the Transactions all Taxes (if any) that are required to be deducted and withheld from any such payment under any provision of applicable Law. Any amounts payable to any service provider of the Company that are compensatory in nature shall be funded through the Company for payment in accordance with the Company's customary payroll practices. All such amounts that are deducted or withheld shall be treated for purposes of this Agreement as having been paid to the Person in respect of which such deduction or withholding was made.

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES REGARDING THE COMPANY

The Sellers, except for KV EdTech Partners LLC, its parents and Affiliates, hereby represent and warrant to Purchaser, as of the date hereof, as follows:

Section 3.1    Organization and Qualification.

(a)    The Company is a limited liability company duly organized, validly existing and in good standing (or the equivalent thereof) under the Laws of its jurisdiction of formation. The Company has the full limited liability company power and authority to own, lease, operate and otherwise hold its assets and properties and to carry on its business as presently conducted.

(b)    The Company is duly qualified or licensed and in good standing to transact business in each jurisdiction where the nature of the business conducted by it makes such qualification or licensing necessary, except in such jurisdictions where the failure to be so duly qualified, licensed or in good standing would not reasonably be expected, individually or in the aggregate, to have a negative impact on the Company or its business.

(c)    Correct and complete copies of the Governing Documents of the Company have been made available to Purchaser.

Section 3.2    Capitalization.  Schedule 3.2 sets forth the name of each Person that is a registered owner of Company Units and the number of Company Units owned by such Person. The Company Units comprise all of the Company's equity interests that are issued and outstanding. The Company Units are held beneficially and of record by the Sellers, and the Company Units have been duly authorized and validly issued, are not subject to and were not issued in violation of any preemptive right, call option, right of first refusal or similar rights, were offered, issued, sold and delivered in compliance with applicable federal and state securities Laws (or pursuant to valid exemptions from such Laws) and are free and clear from any Liens (other than restrictions imposed under applicable securities Laws or applicable Governing Documents).  Except for the Company Units set forth on Schedule 3.20, (i) there are no obligations of the Company to issue

Equity Securities of the Company to any Person, (ii) there are no agreements to which the Company is a party with respect to the voting, ownership or transfer of any Equity Securities of the Company and (iii) the Company has no obligation to purchase, redeem or otherwise acquire any Company Units or other Equity Securities of the Company. There are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other contracts or commitments that could entitle any Person to acquire any interest in the Company. There is no outstanding or authorized equity appreciation, phantom equity, profit participation or similar rights with respect to the Company.  The Company has no Subsidiaries. The Company does not own an equity interest or securities convertible or exercisable into an equity interest in any Person.

Section 3.3    Authority.  The Company has full limited liability company power and authority to execute and deliver this Agreement and each other Ancillary Document to which such the Company is or will be a party, and to consummate the Transactions.  The execution and delivery of this Agreement and each of the Ancillary Documents to which the Company is or will be a party and the performance by the Company of its obligations hereunder and thereunder have been duly authorized by all necessary limited liability company action on the part of the Company. No other action on the part of the Company or its members is necessary to authorize the execution, delivery and performance of this Agreement and each of the Ancillary Documents to which it is a party or the consummation of the Transactions, none of which violates its Governing Documents. This Agreement has been (and each of the Ancillary Documents to which such the Company is or will be a party will be at or prior to the Closing) duly executed and delivered by the Company and constitutes (or will constitute when executed) a valid, legal and binding agreement of the Company (assuming, to the extent applicable, that this Agreement has been and the Ancillary Documents to which the Company is or will be a party will be duly and validly authorized, executed and delivered by Purchaser at or prior to the Closing), enforceable against the Company in accordance with their respective terms, except (a) to the extent that enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally, and (b) that the availability of equitable remedies, including specific performance, is subject to the discretion of the court before which any proceeding thereof may be brought (the "Enforceability Exceptions").

Section 3.4    Financial Statements; Undisclosed Liabilities; etc.

(a)    Attached hereto as Schedule 3.4(a) are correct and complete copies of the following financial statements (such financial statements, the "Financial Statements"):

(i)    the audited balance sheet of the Company as of June 30, 2020 (the "2020 Balance Sheet") and June 30, 2019, respectively, and the related audited statements of operations, changes in members' equity and cash flows and notes thereto for each twelve (12)-month period then ended; and

(ii)    the unaudited balance sheet of the Company as of April 30, 2021 (the "Latest Balance Sheet") and the related unaudited statements of operations, changes in members' equity and cash flows for the ten (10) month period then ended.

(b)     Except as set forth on Schedule 3.4(b), the Financial Statements (i) have been prepared in accordance with GAAP applied on a consistent basis throughout the periods covered thereby, except as may be indicated in the notes thereto and subject, in the case of unaudited Financial Statements, to the absence of notes (none of which, if presented, would materially differ from those in the audited Financial Statements for the year ended June 30, 2020), (ii) fairly and accurately present, in all material respects, the financial condition and results of operations of the Company as of the dates thereof and for the periods therein referred to (subject, in the case of any unaudited Financial Statements, to normal year-end adjustments (none of which would be material, individually or in the aggregate)) and (iii) are derived from the underlying books and records of the Company.

(c)     There is no liability, debt, commitment or obligation of or claim against the Company, whether absolute, accrued or not accrued, contingent or otherwise, and whether or not required to be reflected or reserved for on a balance sheet prepared in accordance with GAAP, except for liabilities and obligations (i) reflected and adequately reserved for on the face of the Latest Balance Sheet or disclosed in the notes thereto, (ii) that have arisen since the date of the Latest Balance Sheet in the ordinary course of the operation of business consistent with past practice of the Company (none of which is a liability resulting from breach of contract, breach of warranty, tort, infringement, misappropriation or violation of Law), or (iii) incurred in connection with the Transactions and satisfied on or prior to the Closing Date.

(d)     Except for Indebtedness set forth on Schedule 3.4(d), the Company does not have any Indebtedness outstanding. The Company is not in default with respect to any Indebtedness or Contracts relating thereto, and no such Indebtedness or any Contracts relating thereto purports to limit the sale of any Company Units or issuance of any Equity Securities of the Company or the operation of the business.

(e)     All of the accounts receivable of the Company have arisen from *bona fide* transactions in the ordinary course of business in accordance with the past custom and practice of the Company and represent valid obligations owed to the Company. None of the accounts receivable of the Company is subject to any defenses, counterclaims or offsets.  All reserves, allowances and discounts with respect to the accounts receivable were and are adequate and consistent in extent with reserves, allowances and discounts previously maintained by the Company in accordance with GAAP in the ordinary course of business.

(f)     The Company has established and maintains a system of internal accounting controls sufficient to provide reasonable assurances (i) that transactions, receipts and expenditures of the Company are being executed and made in accordance with appropriate authorizations of management, (ii) that transactions are recorded as necessary (A) to permit preparation of financial statements in conformity with GAAP and (B) to maintain accountability for assets, (iii) regarding prevention or timely detection of unauthorized acquisition, use or disposition of the assets of the Company and (iv) that the amount recorded for assets on the books and records of the Company is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.  None of the Company, its independent auditors and, to the knowledge of the Company, any current or former employee, consultant or director of the Company, has identified or been made aware of any fraud, whether or not material, that involves the Company's

management or other current or former employees, consultants directors of the Company who have a role in the preparation of financial statements or the internal accounting controls utilized by the Company, or any claim or allegation regarding any of the foregoing. None of the Company and, to the knowledge of the Company, any representative or agent of the Company has received or otherwise had or obtained knowledge of any material complaint, allegation, assertion or claim, whether written or oral, in each case, regarding deficient accounting or auditing practices, procedures, methodologies or methods of the Company or its internal accounting controls or any material inaccuracy in the Financial Statements.

Section 3.5    Consents and Approvals; No Violations; UPE.   Except as set forth on Schedule 3.5, no notices to, filings with, or authorizations, consents or approvals of any Governmental Entity are required by or with respect to the Company or in connection with the execution, delivery or performance by the Company of this Agreement or the Ancillary Documents to which the Company is or will be a party or the consummation by the Company of the Transactions, except for applicable requirements, if any, of federal securities Laws or state "blue sky" Laws. Neither the execution, delivery or performance by the Company of this Agreement or the Ancillary Documents to which the Company is or will be a party nor the consummation by the Company of the Transactions will (i) conflict with or result in any breach of any provision of the Company's Governing Documents, (ii) require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default under or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any Material Contract, Real Property Lease or Material Permit, (iii) result in a violation or breach of any provision of any order, writ, injunction, decree, Law, statute, rule or regulation of any Governmental Entity having jurisdiction over the Company or any of its properties or assets, or (iv) except as contemplated by this Agreement or with respect to Permitted Liens, result in the creation of any Lien upon any of the assets of the Company. The Company is its own ultimate parent entity (as such term is defined in 16 C.F.R. § 801.1(a)(3) and is interpreted by the Premerger Notification Office of the United States Federal Trade Commission ("PNO")) and is not controlled (as such term is defined in 16 C.F.R. § 801.1(b) and is interpreted by the PNO) by any other person or entity (as such terms are defined in 16 C.F.R. § 801.1(a) and are interpreted by the PNO).

Section 3.6    Material Contracts.

(a)    Except as set forth on Schedule 3.6(a) (all Contracts listed or required to be listed on such Schedule, collectively, the "Material Contracts"), the Company is not a party to or bound by any of the following Contracts (to the extent any such Contract is in effect as of the date hereof):

(i)    Contracts pursuant to which the Company is a lessor or a lessee of any tangible personal property, or holds or operates any tangible personal property owned by another Person, other than any leases of tangible personal property under which the aggregate annual payments do not exceed $50,000;

(ii)    Contracts in regard to the employment, or restricting the employment, of any employee of the Company, other than customary offer letters that do not

require notice of termination of employment or provide any severance benefits, and any Employee Benefit Plans providing compensation or benefits payable in connection with the Transactions;

          (iii)    consulting or independent contractor Contracts requiring annual payments in excess of $100,000 per annum;

          (iv)    Collective Bargaining Agreements (or their equivalent);

          (v)    partnership agreements, joint venture agreements, limited liability Contracts, partnership Contracts, or other similar Contracts;

          (vi)    any agreements between or among the Company on the one hand and any Seller or any Affiliates or Representatives of any Seller on the other hand;

          (vii)    Contracts prohibiting in any material respect the Company from freely engaging in any material line of business (not including customary confidentiality agreements), other than those entered into in the ordinary course of business;

          (viii)    commercial Contracts that require the payment by or to the Company after the date hereof of an amount in excess of $100,000 per annum;

          (ix)    any Contract with any Material Customer or Material Supplier (as such Persons are listed on Schedule 3.19);

          (x)    Contracts or indentures relating to Indebtedness;

          (xi)    Contracts that relate to the disposition or acquisition of any business or Equity Securities, or significant amount of assets or properties by the Company, or any merger or business combination with respect to the Company;

          (xii)    Contracts with any Governmental Entity;

          (xiii)    Contracts (A) restricting the Company from competing with any Person, engaging in any line of business, operating in any market, soliciting any employees or customers of any Person, conducting activities in any geographic region or for any period of time, or otherwise materially prohibiting the Company from freely engaging in business anywhere in the world or (B) containing any a right of first refusal, right of first negotiation, right of first offer or option, or exclusivity provision binding the Company;

          (xiv)    Contracts that restrict the ability of the Company to increase prices to a customer of the Company or that include any "most favored nation" provisions;

          (xv)    settlement Contracts entered into by the Company;

          (xvi)    Contracts required to be listed on Schedule 3.12(e);

(xvii)  Contracts involving a commitment by the Company to pay any individual capital expenditure in excess of $100,000; and

(xviii)  any other Contracts that are material to the Company.

(b)  Each Material Contract and each other Contract to which the Company is a party is valid and binding on the Company and enforceable in accordance with its terms against the Company, as the case may be, and each other party thereto (subject to the Enforceability Exceptions).  The Company is not in default or breach under any Material Contract to which it is a party and, to the knowledge of the Company, no other Person party thereto is in default or breach of any Material Contract and, the Company has not received any written notice of any default or breach, nor has any event occurred that with notice or lapse of time, or both, would constitute such a default or breach by the Company. Correct and complete copies of all Material Contracts have been made available to Purchaser.

Section 3.7    Absence of Changes.  Except as set forth on Schedule 3.7, during the period beginning on the date of 2020 Balance Sheet and ending on the date of this Agreement, the Company has conducted its business in the ordinary course in all material respects and the Company has not:

(a)  issued, sold, disposed of transferred or granted any notes, bonds or other debt securities or any capital stock or other Equity Securities or entered into any Contract to purchase or redeem any Equity Securities of the Company;

(b)  split, combined, subdivided or reclassified any of the Company Units, taken any action to wind up its affairs or dissolve, effected or adopted a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring or like change in its capitalization, or other reorganization;

(c)  incurred or canceled any Indebtedness;

(d)  declared, set aside or made any payment or distribution of cash or other property to its stockholders or equityholders with respect to its capital stock or other Equity Securities (other than "tax distributions" made in the ordinary course of business) or purchased or redeemed any shares of its capital stock or other Equity Securities (including, without limitation, any warrants, options or other rights to acquire its capital stock or other Equity Securities);

(e)  mortgaged or pledged any of its properties or assets (tangible or intangible) or subjected them to any Lien, except for operating leases or to the extent such mortgage or pledge results in a Permitted Lien;

(f)  acquired, disposed of or transferred any asset with a value in excess of $100,000 individually or $250,000 in the aggregate;

(g)  forgave, cancelled, compromised, waived or released any debts, claims or rights, other than in the ordinary course of business consistent with past practices;

(h)     acquired (by merger, consolidation, acquisition of stock or assets or otherwise) any Person or enterprise;

(i)     made any capital expenditures or commitments therefor in excess of $100,000 in the aggregate;

(j)     made any loans or advances to, or guarantees for the benefit of, any Persons;

(k)     suffered any damage, destruction or casualty loss;

(l)     amended or authorized any amendment to the Governing Documents of the Company;

(m)     entered into any settlement, conciliation or similar agreement;

(n)     increased the bonus, salary or other compensation or fringe benefits of any officer or employee of the Company;

(o)     instituted any new, amended or terminated any Employee Benefit Plan, except as may be required to maintain the tax-qualified status of the plan or to comply with applicable Law;

(p)     hired or terminated any management-level employee, or entered into or modified any employment Contract with any person;

(q)     engaged or terminated any independent contractor or consultant with annual compensation in excess of $75,000;

(r)     made, changed, adopted or revoked its accounting methods, principles or practices or made, changed, or revoked any material election with respect to Taxes, failed to file any Tax Return or pay and Taxes when due, filed any amended Tax Return, entered into, canceled or modified any agreement with a Governmental Entity, settled any Tax claim or assessment relating to the Company, surrendered any right to claim a refund, offset or other reduction in liability of Taxes or consented to any extension or waiver of the limitation period applicable to any Tax claim or assessment relating to the Company, or entered into any Tax sharing or similar agreement or arrangement (other than pursuant to commercial contracts entered into in the ordinary course of business and not concerning Taxes);

(s)     terminated, amended or entered into any Material Contract; or

(t)     agreed in writing to take any of the actions described above in clauses (a) through (r) of this Section 3.7.

Section 3.8     Litigation.  Except as set forth on Schedule 3.8, there is and, within the past five (5) years, there has been no Proceeding (a) pending or, to the knowledge of the Company, threatened against the Company before any Governmental Entity, (b) pending or, to the knowledge of the Company, threatened against the Company's officers or managers with respect to or

affecting the Company's business, or (c) pending or, to the knowledge of the Company, threatened with respect to the consummation of the Transactions.  Except as set forth on <u>Schedule 3.8</u>, neither the Company nor any of its properties or assets, is subject to, or has been subject to within the past five (5) years, any Order.  Unless otherwise designated on <u>Schedule 3.8</u>, each of the matters listed or required to be listed on <u>Schedule 3.8</u> is fully covered by insurance.  Except as set forth on <u>Schedule 3.8</u>, the Company is not currently planning to initiate any Proceeding before any Governmental Entity.

Section 3.9    <u>Compliance with Applicable Law; Permits</u>.

(a)    The Company has been, and currently is, in compliance in all material respects with all applicable Laws.  No written, or to the knowledge of the Company, oral notices from a Governmental Entity have been received by and, to the knowledge of the Company, no claims have been filed against, the Company alleging a violation of any such Laws.

(b)    The Company holds all material permits, licenses, approvals, certificates and other authorizations of and from all Governmental Entities necessary for the lawful conduct of its business as presently conducted (the "<u>Material Permits</u>"), each of which is set forth on <u>Schedule 3.9(b)</u>.  Correct and complete copies of all Material Permits have been made available to Purchaser.  All of the Material Permits are in full force and effect and are valid and enforceable in accordance with their terms.  The Company is in compliance in all material respects with the Material Permits.  The Company is not in default or received any written notice of, nor is there, to the knowledge of the Company, any threatened claim of default, with respect to any such Material Permit.

Section 3.10    <u>Employee Plans</u>.

(a)    <u>Schedule 3.10(a)</u> lists all Employee Benefit Plans.  Neither the Company nor any direct or indirect member of the Company has any agreement, commitment or obligation (or has made any promise), whether formal or informal, whether written or unwritten and whether legally binding or not, to create, enter into, participate in or contribute to any Employee Benefit Plan not identified on <u>Schedule 3.10(a)</u> or to modify or amend any Employee Benefit Plan.  To the Company's knowledge, no circumstances exist that will materially increase the expense of maintaining any Employee Benefit Plan (or the Employee Benefit Plans taken as a whole) above the level of expense incurred with respect thereto for the most recent fiscal year included in the Financial Statements (other than year-over-year premium increases).

(b)    With respect to each Employee Benefit Plan, the Company has made available to Purchaser correct and complete copies, to the extent applicable, of (i) the current plan document and all amendments thereto (or a written description of any unwritten Employee Benefit Plan), (ii) the last three (or such lesser number if the subject Employee Benefit Plan has been in existence for less than three whole years) annual reports (Form 5500 series and all schedules and financial statements attached thereto) filed with respect to such Employee Benefit Plan; (iii) the most recent summary plan description, and all summaries of material modifications related thereto, distributed with respect to such Employee Benefit Plan; (iv) all material Contracts and agreements relating to such Employee Benefit Plan, including all trust agreements, investment management

agreements, annuity Contracts, insurance Contracts, indemnification agreements and service provider agreements; (v) the most recent determination, opinion or advisory letter issued by the United States Internal Revenue Service with respect to such Employee Benefit Plan; (vi) all material correspondence to or from any Governmental Entity relating to such Employee Benefit Plan received by the Company during the twelve (12) month period preceding the Effective Date; and (vii) all coverage, nondiscrimination, top heavy and Code Section 415 tests performed with respect to such Employee Benefit Plan for the three most recently completed plan years.

(c)     With respect to each Employee Benefit Plan: (i) such Employee Benefit Plan has been established, maintained, administered, operated and funded in all material respects in accordance with its terms and in compliance with all applicable Laws, including ERISA and the Code (and the regulations and rulings issued thereunder), and all other applicable agreements and instruments; (ii) the Company, and, to the knowledge of the Company, each other Person (including each fiduciary of such Employee Benefit Plan) has properly performed in all material respects all of their duties and obligations (whether arising by operation of Law, by contract or otherwise) under or with respect to such Employee Benefit Plan, including all fiduciary, reporting, disclosure and notification duties and obligations; (iii) all returns, reports (including all Form 5500 series annual reports, together with all schedules and audit reports required with respect thereto), notices, statements and other disclosures relating to such Employee Benefit Plan required to be filed with any Governmental Entity or provided to any participant in such Employee Benefit Plan (or the beneficiary of any such participant) have been properly prepared and properly filed or provided on or before their respective due dates and were accurate in all material respects when so filed or provided; (iv) neither the Company nor, to the knowledge of the Company, any fiduciary of such Employee Benefit Plan has breached any fiduciary duty imposed upon it by ERISA or any other applicable Law; (v) no transaction or event has occurred or, to the knowledge of the Company, is threatened to occur that constitutes or could constitute a "prohibited transaction," within the meaning of Section 406 or 407 of ERISA or Section 4975 of the Code for which an exemption is not available, and none of the Transactions will constitute or give rise to a nonexempt prohibited transaction; (vi) all contributions, premiums and other payments due or required to be paid to (or with respect to) such Employee Benefit Plan have been paid on or before their respective due dates and within the applicable time period prescribed by ERISA, if any, or, if not yet due, have been accrued as a liability on the Latest Balance Sheet and no insurance policy in respect of any Employee Benefit Plan requires or permits a retroactive increase in contributions, premiums, or other payments due thereunder; (vii) the Company has not incurred, and there exists no condition or set of circumstances in connection with which the Company could incur, directly or indirectly, any penalty, Tax, fine, Lien or liability under ERISA, the Code or any other Law, or under any indemnification, contribution or similar Contract with respect to such Employee Benefit Plan; and (viii) all employee data necessary to administer each Employee Benefit Plan in accordance with its terms and conditions and all applicable Laws is in possession of the Company and such data is complete, correct, and in a form which is sufficient for the proper administration of each Employee Benefit Plan.

(d)     Each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code is so qualified and its related trust is exempt from taxation under Section 501(a) of the Code. Each such Employee Benefit Plan (i) is the subject of an unrevoked

favorable determination letter issued by the United States Internal Revenue Service with respect to such Employee Benefit Plan's qualified status under the Code, or (ii) utilizes a prototype or volume submitter plan document that is the subject of a current, unrevoked favorable opinion or advisory letter issued by the United States Internal Revenue Service to the sponsor of such prototype or volume submitter plan and upon which the Company and such Employee Benefit Plan are entitled, under applicable United States Internal Revenue Service guidance, to rely. Nothing has occurred, or could reasonably be expected to occur, that could adversely affect the qualification or exemption of any such Employee Benefit Plan or its related trust or require the filing of a submission under the United States Internal Revenue Service's Employee Plans Compliance Resolution System ("EPCRS") or the taking of any corrective action under EPCRS in order to maintain the qualified status of such Employee Benefit Plan.

(e)     The Company is and, at all relevant times, has been in compliance in all material respects with the applicable provisions of the Patient Protection and Affordable Care Act, Pub. L. No. 111 148, the Health Care and Education Reconciliation Act of 2010, Pub. L. No.111 152, and all regulations and guidance issued thereunder (collectively, the "Health Care Reform Laws"), including, to the extent applicable, the employer shared responsibility provisions relating to the offer of medical coverage that qualifies as "minimum essential coverage" that is "affordable" and provides "minimum value" to "full time employees" and their "dependents" (as those terms are defined in Section 4980H of the Code and the related Treasury Regulations) and any applicable information reporting requirements under Sections 6055 and 6056 of the Code. The Company has not incurred (and nothing has occurred, and no condition or circumstance exists, that could subject the Company to) any assessable payment, Tax or penalty under Section 4980D or 4980H of the Code or under any other provision of the Health Care Reform Laws, nor has the United States Internal Revenue Service asserted that any such amounts are due.

(f)     Each Employee Benefit Plan (or portion thereof) that provides deferred compensation subject to Section 409A of the Code satisfies in form and operation the requirements of Sections 409A(a)(2), 409A(a)(3) and 409A(a)(4) of the Code and the guidance thereunder (and has satisfied such requirements for the entire period during which Section 409A of the Code has applied to such Employee Benefit Plan) and no additional Tax or interest under Section 409A(a)(1)(B) of the Code has been or could reasonably be expected to be incurred by a participant with respect to such Employee Benefit Plan. No right to acquire equity in the Company is or has ever been a "nonqualified deferred compensation plan" within the meaning of Section 409A(d)(1) of the Code. The Company does not have any obligation (whether under an Employee Benefit Plan or otherwise) to indemnify, "gross-up", reimburse or otherwise compensate any individual with respect to the additional Taxes or interest imposed under Section 409A or 4999 of the Code.

(g)     Each individual who is classified by the Company as an independent contractor has been properly classified for purposes of participation, vesting and benefit accrual under each Employee Benefit Plan. No Seller Related Party employs or engages any Person (whether an employee, independent contractor otherwise) who provides any services to, or is otherwise required for the conduct and operation of, the business of the Company.

(h)     Neither the Company nor any ERISA Affiliate has ever sponsored, maintained, participated in or contributed to (or been obligated to sponsor, maintain, participate in or contribute to), and neither the Company nor any ERISA Affiliate has or could have any liability (including any contingent liability) under or with respect to, any employee benefit plan that is subject to Section 302 of ERISA, Title IV of ERISA or Section 412 of the Code.  The Company has never sponsored, maintained, participated in or contributed to (or been obligated to sponsor, maintain, participate in or contribute to), the Company has no and could not have any liability (including any contingent liability) under or with respect to, and no Employee Benefit Plan is, (A) any "multiemployer plan," as defined in Section 3(37) or 4001(a)(3) of ERISA or 414(f) of the Code, (B) a multiple employer plan within the meaning of Section 210(a), 4063 or 4064 of ERISA or Section 413(c) of the Code, (C) a "multiple employer welfare arrangement," as defined in Section 3(40) of ERISA, or (D) a self-funded (or self-insured) group health plan. The Company has no current or contingent liability or obligation by reason of at any time being considered a single employer under Section 414 of the Code with any other Person.

(i)     Except as set forth in Schedule 3.10(i), neither the Company nor any Employee Benefit Plan provides or has any obligation to provide (or contribute toward the cost of) life insurance, medical or other welfare benefits to any current or former employee, officer, director, shareholder, member, consultant, independent contractor or other service provider of or to the Company after his or her retirement or other termination of employment or service, and the Company has not represented, promised or contracted (whether in written or oral form) to any such current or former employee, director, officer, shareholder, manager, consultant, independent contractor or other service provider that such benefits would be provided, except to the extent required by COBRA.

(j)     No claim (other than routine claims for benefits or appeals thereof) or Proceeding is pending or, to knowledge of the Company, threatened with respect to (or against the assets of) any Employee Benefit Plan, nor, to the knowledge of the Company, is there any basis for any such claim or Proceeding. No Employee Benefit Plan is the subject of any audit, investigation or Proceeding by any Governmental Entity or a participant in any amnesty, voluntary compliance, self-correction or similar program sponsored by any Governmental Entity, and, to the knowledge of the Company, no such audit, investigation or Proceeding is contemplated or under consideration by any Governmental Entity.

(k)     Except as set forth in Schedule 3.10(k), each Employee Benefit Plan can be unilaterally amended or terminated by the Company at any time (whether before or after Closing) and for any reason without any penalty, cost, expense or liability to the Company (including any surrender charge, market rate adjustment or other early termination charge or penalty), other than reasonable administrative expenses of the type typically incurred in the termination of similar employee benefit plans.

(l)     Except as set forth in Schedule 3.10(l), neither the execution and delivery of this Agreement nor the consummation of the Transaction will alone: (i) entitle any current or former employee, officer, director, manager or independent contractor of the Company to severance, retention or change of control benefits or to any other payment; (ii) otherwise increase the amount of compensation due to any current or former employee, director, officer, manager, or

independent contractor of the Company or forgive Indebtedness owed by any such individual; (iii) result in any benefit or right becoming established or increased, or accelerate the time of payment or vesting of any benefit under any Employee Benefit Plan; (iv) require the Company or any ERISA Affiliate to transfer or set aside any assets to fund or otherwise provide for any benefits for any current or former employee, director, officer, manager or independent contractor of the Company; (v) result in the renewal or extension of the term of any Contract regarding the compensation of any current or former employee, director, officer, manager, or independent contractor of the Company; or (vi) impair any of the rights of the Company with respect to any Employee Benefit Plan.

Section 3.11    Environmental Matters.  Except as set forth on Schedule 3.11,

(a)    the Company is in material compliance with all applicable Environmental Laws;

(b)    the Company holds, is and has been, in material compliance with all Material Permits that are required pursuant to Environmental Laws ("Environmental Permits") for its occupation of the Leased Real Property and its operation of the business as presently conducted at the Leased Real Property.  All Environmental Permits are in full force and effect and, to the knowledge of the Company, there is no action by any Governmental Entity or any other Person to materially and adversely modify, rescind, revoke or cancel any such Environmental Permits;

(c)    the Company has not received any written or, to the knowledge of the Company, any other notice from a Governmental Entity or any other Person alleging that the Company is liable for any violation of, or liability under, any Environmental Laws or for remediation of contamination or other environmental response costs at any location, in any case that has not been fully and finally resolved and, to the knowledge of the Company, there exist no facts or circumstances that reasonably could be expected to result in a material violation by or material liability of the Company under any Environmental Law, or obligation of the Company for remediation or other environmental response costs at any location;

(d)    to the knowledge of the Company, none of the Leased Real Property is listed on the National Priorities List, the Superfund Enterprise Management System, or any comparable list of contaminated or potentially contaminated sites in any jurisdiction and, to the knowledge of the Company, there exist no facts or circumstances at any of the Leased Real Property that reasonably could be expected to result in such a listing;

(e)    neither the Company nor, to the knowledge of the Company, any other Party, has released any Hazardous Substance at, on, under, from or to any of the Leased Real Property and, to the knowledge of the Company, the Company has not released any Hazardous Substance at any other real property, in such manner as reasonably would be expected to give rise to material liability under or result in a material violation of any Environmental Law; and

(f)    all material environmental assessments, including all Phase 1 and Phase 2 reports and environmental compliance assessments generated by or on behalf of Sellers or the Company and related to the Leased Real Property, the Company or the operations or business of

the Company within the Sellers' or the Company's custody or reasonable control have been made available to Purchaser.

Section 3.12    Intellectual Property; Data Security.

(a)    Schedule 3.12(a) sets forth a complete and correct list of all Registered Intellectual Property (specifying the owner thereof and the jurisdiction in which such item has been issued, registered or filed and the applicable issuance, grant, registration or serial number(s) and related dates, as applicable), and any actions that must be taken within ninety (90) days of the date of the Closing to preserve each item of Registered Intellectual Property, including the payment of any registration, maintenance or renewal fees or the filing of any documents, applications or certificates. All Registered Intellectual Property: is in full force and effect; and has been obtained and maintained in compliance with all applicable Laws.  All Registered Intellectual Property that is currently issued or registered is subsisting, valid and enforceable.

(b)    The Owned Intellectual Property as set forth on Schedule 3.12(b)(i), together with the Intellectual Property licensed by the Company and set forth on Schedule 3.12(b)(ii), constitutes all Intellectual Property used in the conduct of the business of the Company as it is being currently conducted.  The Company lawfully owns, or otherwise duly licenses or otherwise has obtained sufficient rights to all Company Intellectual Property that is required to conduct the business of the Company in the manner in which it is currently being conducted. Except as set forth in Section 3.12(b)(iii), the Company is the sole owner of the Owned Intellectual Property, free and clear of any Liens, except Permitted Liens.

(c)    Neither the execution of this Agreement nor the consummation of the Transactions will: (i) result in the loss or impairment of any of the Company Intellectual Property or result in any obligation to disclose any materials (including any source code) held by the Company; (ii) give rise to any right of any Person to terminate any rights under any License or exercise any new or additional rights under any Company Intellectual Property that is owned by the Company; or (iii) cause or result in any of Purchaser or any of its Affiliates, or the Company (A) granting to any third party any right to or with respect to any Intellectual Property; (B) being bound by, or subject to, any exclusivity, non-compete or other material restriction on the operation or scope of their respective businesses; or (C) being obligated to pay any royalties or other fees or consideration or offer any discounts to any Person with respect to any Company Intellectual Property in excess of those payable or offered by the Company in the absence of this Agreement and the Transactions. Each item of Company Intellectual Property existing immediately prior to the Closing will be available on the same terms and conditions immediately after the Closing. No consent or approval is required under any License to maintain such License in force and effect as a result of the execution and delivery of this Agreement and the consummation of the transactions hereby contemplated hereby.

(d)    None of the Company Products (including the use thereof), nor the distribution, sale, marketing and/or offer for sale of any Company Products, Company Intellectual Property or the conduct of the business of the Company violates, infringes (directly, contributorily, by inducement, or otherwise) or misappropriates any intellectual property or other proprietary rights of any Person.  The Company has not received any written notice that it must license or

refrain from using any Intellectual Property or any written offer by any other Person to license any Intellectual Property to the Company. To the Company's knowledge, no Person is infringing, misappropriating or otherwise violating or conflicting with any Company Intellectual Property. There are no Proceedings pending, or to the Knowledge of Company, threatened, (i) against the Company or any Company Intellectual Property, asserting the infringement of any intellectual property or proprietary rights or (ii) against the Company that challenge the validity, enforceability, ownership, use and/or licensing of any Company Intellectual Property.

(e)     Schedule 3.12(e) sets forth a complete and correct list of all Licenses (excluding any commercially available, off-the-shelf license for unmodified object code software that does not require payment of any recurring license fees, subscription fees and/or recurring support and maintenance fees). The Company has all rights and licenses (whether in terms of authorized sites, units, users, seats or otherwise) necessary to use all copies of all Systems used by the Company, in each case as necessary for the conduct of the business as currently conducted. There exists no event or condition that violates or breaches or otherwise constitutes (with or without due notice or lapse of time or both) a default by the Company, or to the Company's knowledge, any other party under any License or other Contract of the Company relating to the acquisition, transfer, development, license, use or commercialization of Intellectual Property or any waiver or release of rights in, to or under Intellectual Property; and, the Company has not received written notice of any such breach, default or violation. The Company does not own any software, code, systems, platform or applications and no software, code, systems, platform and/or applications has been developed by or on behalf of the Company. The Company has not incorporated in any products distributed, marketed, or sold by the Company any open source code.

(f)     The Company has: (i) taken reasonable measures to protect and preserve its rights in the Company Intellectual Property and the confidentiality of all Trade Secrets material to the business of the Company as currently conducted (and any such information intended to be a Trade Secret) owned, held or controlled by the Company; and (ii) only disclosed any such material Trade Secrets pursuant to the terms of a written agreement that requires the Person receiving such Trade Secrets to reasonably protect and not disclose such Trade Secrets.

(g)     No present or former employee, officer, consultant or contractor of the Company has any ownership, license or other right, title or interest in any Owned Intellectual Property. Except as set forth in Schedule 3.12(g), each current and former employee, officer, consultant and contractor of the Company who is or has been involved in the development (alone or with others) of any Owned Intellectual Property by or for the Company, or has or previously had access to any Trade Secrets owned, held or controlled by the Company has executed and delivered to the Company a written and enforceable Contract that: (i) assigns to the Company, without any obligation of payment, royalties, fees or other compensation, all right, title and interest in and to any such Intellectual Property (unless such ownership is conveyed to the Company by operation of law), and (ii) reasonably protects such Trade Secrets. No present or former employee, officer, consultant or contractor of the Company is in violation of any such Contract. Neither the Company nor any officers, employees, agents or contractors of any the Company has done, or failed to do, any act or thing which may, prejudice the validity or enforceability of any Registered Intellectual Property. None of the Contracts of the Company (including any Contract for the

performance of professional services by or on behalf of the Company) assigns or grants to any Person (other than the Company) any ownership right, exclusive license or other exclusive right with respect to any Company Intellectual Property that is used in or necessary for use in the business of the Company as currently conducted or proposed to be conducted.

(h)    All of the computer firmware, computer hardware, and computer software (whether general or special purpose) and other similar or related items of automated, computerized, or software system(s), networks, interfaces, platforms or applications used or relied upon by the Company (collectively "Systems"): (i) are in good working order; (ii) function in all material respects in accordance with all specifications and any other descriptions under which they were supplied; (iii) are substantially free of any material defects, bugs and errors; (iv) do not contain or make available any disabling software, code or instructions, spyware, Trojan horses, worms, viruses or other software routines that permit or cause unauthorized access to, or disruption, impairment, disablement, or destruction of any software, data or other materials ("Contaminants"); and (v) are sufficient for the existing needs of the business of the Company as currently conducted and contemplated to be conducted.  The Company has taken reasonable steps and implemented commercially reasonable safeguards to protect the Systems from the introduction of Contaminants. The Company has taken reasonable steps to safeguard the Systems. The Systems have not suffered any unplanned or critical failures, errors or breakdowns that have caused any substantial disruption or interruption in the operation of the business of the Company.  There has been no material loss, damage, or, to the Company's knowledge, unauthorized access, use, disclosure, modification, or other misuse of any data or information (including any data or information held in the electronic or physical files) that is possessed by or otherwise subject to the control of the Company. The Company has used commercially reasonable efforts to promptly implement material security patches that are generally available for the Systems.

(i)    The Company has: (i) complied in all material respects with its published privacy policies, terms of use, and internal policies, Contracts and all applicable Law relating to data privacy, data protection and the Processing of Personal Information or any other Information (including, to the extent applicable, the Payment Card Industry Data Security Standard, the California Consumer Privacy Act ("CCPA"), the General Data Protection Regulation ("GDPR"), and the Family Education Rights and Privacy Act ("FERPA"), the Gramm-Leach-Bliley Act, the CAN-SPAM Act, the Telephone Consumer Protection Act, the Telemarketing and Consumer Fraud and Abuse Prevention Act, and the Consumer Fraud and Abuse Act); and (ii) taken reasonably sufficient measures to ensure that the Information is protected against loss, damage, and unauthorized access, use, modification, disclosure, or other misuse; and (iii) has not been required to give notice to any customer, supplier, payment card issuer, financial institution, Governmental Authority, data subject, or other individual of any actual or alleged data security breaches, incidents, or failures or any material noncompliance pursuant to applicable Law. The execution of this Agreement and the other Ancillary Documents and the consummation of the transactions contemplated hereunder and thereunder do not violate any privacy policy, terms of use, Contract or applicable Law relating to the use, dissemination, or transfer of any Information.

(j)        No governmental resources or funding, grants, facilities or services of a university, college, other educational institution, government entity or research center or funding from third parties was used in the development of any Company Intellectual Property.

Section 3.13    Labor and Employee Matters.

(a)        Except as set forth on Schedule 3.13, (i) the Company is neither a party to nor bound by any Collective Bargaining Agreement or other written instrument or agreement with any Labor Organization with respect to any Company employees, and the Company is not in the process of negotiating any such Collective Bargaining Agreement or other written instrument or agreement, (ii) there has been no strike (including, without limitation, economic strikes, unfair labor practice strikes and/or sympathy strikes), walk out, slowdown, work stoppage, lockout, concerted refusal to work or other material labor dispute pending or, to the knowledge of the Company, threatened in writing against the Company at any time during the three (3) years preceding the Closing Date, (iii) no Labor Organization represents or, to the Company's knowledge, claims to represent any Company employees, (iv) to the knowledge of the Company, there has been no organizing campaign, demand for recognition, election petition or other such effort by any Labor Organization with respect to any employees of the Company at any time during the three (3) years preceding the Closing Date and no such efforts are ongoing, (v) there have been no pending material grievances and no pending arbitration proceedings arising out of or filed under any Collective Bargaining Agreement at any time during the three (3) years preceding the Closing Date, and (vi) there has been no unfair labor practice charge or complaint against the Company pending at any time during the three (3) years preceding the Closing Date or, to the knowledge of the Company, threatened before the National Labor Relations Board.  The Company has not, at any time during the three (3) years preceding the Closing Date, implemented any workforce changes that would trigger a notice requirement under the WARN Act or similar state, local or foreign Law.

(b)        There are no pending or, to the knowledge of the Company, threatened disputes, Proceedings, disputes, grievances, claims, charges or controversies brought by any employee, former employee or Temporary Employee (as defined below) against the Company, including, but not limited to, any claims under any worker's compensation policy or long-term disability policy (excluding any routine application for benefits) or alleging unlawful harassment, employment discrimination, retaliation, whistleblowing, unfair labor practices, unpaid wages, breach of a Collective Bargaining Agreement, unlawful wage or immigration practices, wrongful termination, unlawful denials of leaves of absence, misclassification of employees or independent contractors, or unlawful tax withholding practices regarding the Company.  The Company has not received any written demand letters or drafts of suits, charges or complaints related to any claims made by any: (i) current or former employees of the Company; (ii) current or former independent contractors of the Company; or (iii) current or former Temporary Employees.

(c)        The employment or engagement of the Company's employees and independent contractors is terminable at will by the Company.  All employee bonus, commission or other amounts earned for the preceding fiscal year have been paid in full to each employee of the Company.

(d)     No employee or independent contractor of the Company is an undocumented alien.  The Company has in its files a Form I-9 (or equivalent form required by any other applicable jurisdiction) that is validly and properly completed in accordance with applicable Law for each employee or independent contractor of with respect to whom such form is required under applicable Law.

(e)     The Company has been at all times and is currently in compliance with all applicable Laws with respect to employment and employee relations, including, without limitation, discrimination, harassment or retaliation in employment, pay equity, terms and conditions of employment, pay rates, termination of employment, wages (including, but not limited to, classification under the Fair Labor Standards Act), hours, temporary or leased employees, overtime pay, vacation and paid time off, leave, occupational safety and health, employee whistleblowing, immigration, data protection, employee privacy, employment practices and the Company has not engaged in any unfair labor practice, as defined in the National Labor Relations Act or other applicable labor Laws or been in breach of any other applicable Law.  To the knowledge of the Company, no current or former employee or independent contractor of the Company has committed any act or omission giving rise to any material liability for any violation or breach by the Company (or any of their directors, managers, officers, business employees, or independent contractors) of any applicable Law or contract.  No individuals engaged by the Company on a temporary or short-term basis through a third-party staffing agency ("Temporary Employees") are current employees of the Company, and all Temporary Employees have been properly classified.  No Temporary Employees (or their agent(s)) have asserted allegations that the Company qualify as a joint or single employer with a staffing agency.

(f)     Any person currently or formerly performing services for the Company as a consultant or independent contractor has been properly so classified under all applicable Laws and was or is not in fact an employee of the Company.

(g)     True, complete and correct copies or summaries of all personnel policies and procedures applicable to employees of the Company have been made available to Purchaser.

(h)     The Company has not received any written notice alleging that any employees, independent contractors, contractors for services, Temporary Employees or consultants of the Company are in violation or breach of any term of any employment contract, invention assignment agreement, patent disclosure agreement, non-competition agreement, non-solicitation agreement, restrictive covenant, statutory obligation, fiduciary duty or any other common law obligation owed to any former employer, contractor, customer or client, relating to the right of any such employee, contractor or consultant to be employed by the Company because of the nature of the business conducted by the Company or to the use of trade secrets, confidential or proprietary information of others.

(i)     There are no outstanding loans between the Company and its employees in excess of $50,000.  No assurances or undertakings have been given to any of the employees of the Company as to the continuation, introduction, increase or improvement of any terms and conditions, remuneration, benefits or other bonus or incentive scheme.

(j) Except as set forth on <u>Schedule 3.13(j)</u>, the Company does not have any (i) liability for compensation to ex-employees; (ii) obligation to reinstate or re-employ any ex-officer or ex-employee of the Company; or (iii) to the knowledge of the Company, grounds for dismissal of any employee of the Company.

Section 3.14  <u>Insurance</u>.  <u>Schedule 3.14</u> contains a list of all policies of fire, liability, workers' compensation, property, casualty and other forms of insurance (specifying the insured, the insurer, the amount of coverage, the type of insurance, the policy number, the expiration date and the annual premium) owned or held by the Company as of the date of this Agreement.  All such policies are in full force and effect, all premiums due and payable with respect thereto have been timely paid (other than retroactive or retrospective adjustments that are not yet, but may be, required to be paid with respect to any period ending prior to the Closing Date), and no written notice of cancellation or termination has been received by the Company with respect to any such policy.  The Company has complied in all material respects with all of its obligations under each such policy.  There is no, and there has been no, claim pending under the Company's insurance policies as to which coverage has been denied or disputed by the underwriters of such policies or that the Company has a reason to believe will be denied or disputed by the underwriters of such policies.  To the knowledge of the Company, (a) no event has occurred that would constitute a material breach or default, or permit termination of any such policies; (b) all claims, occurrences, litigation, and circumstances that could lead to a claim that would be covered by insurance policies have been properly reported in writing to the applicable insurer; (c) there are no open claims with any insolvent carriers; and (d) no policy limits of insurance policies have been exhausted or materially eroded or reduced and policies providing substantially similar insurance coverage have been in effect continuously.  Except as set forth on <u>Schedule 3.14</u>, the Company has maintained continuous coverage under such policies for the past five (5) years.  The insurance policies, taken together, provide adequate insurance coverage for the Company and operations of its business and are sufficient for compliance with applicable Laws and the Contracts of the Company. Correct and complete copies of each policy set forth on <u>Schedule 3.14</u> have been made available to Purchaser.

Section 3.15  <u>Tax Matters</u>.

(a) The Company has prepared and timely filed all Tax Returns filed or required to be filed under applicable Law, and each such Tax Return is true, complete and correct in all respects.  No written claim has been received from a Governmental Entity in a jurisdiction where the Company has not filed a particular type of Tax Return or paid a particular type of Tax that it is or may be required to file such Tax Return or pay such type of Tax in that jurisdiction.  The Company has paid all Taxes due and payable (whether or not shown as due on any Tax Returns).  No extension of time to file any Tax Return has been requested from or granted by any Governmental Entity. There are no Liens for Taxes (other than Permitted Liens) upon any of the assets of the Company.

(b) The amount of the unpaid Taxes of the Company do not exceed the reserve for Tax liabilities (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth or included in the Financial Statements, as adjusted for the passage of time and operations of the Company in accordance with the past

practices of the Company (and such accruals do not exceed comparable amounts incurred in similar periods in prior years). The unpaid Taxes of the Company attributable to Pre-Closing Tax Periods as of the Closing Date do not exceed the amount of such Taxes taken into account as Closing Indebtedness. The Company has not incurred any liability for any Taxes arising from extraordinary gains or losses, as such terms are used in GAAP, outside the ordinary course of business.

(c)     The Company is not currently the subject of any Tax audit, examination or similar Proceeding, nor has the Company received any written notices from any Governmental Entity that such Tax audit, examination or similar Proceeding is contemplated or pending, and no Tax audit, examination or similar Proceeding has occurred in respect of any Tax year. All deficiencies asserted or assessments made as a result of any examinations of any Taxes of the Company have been fully and timely paid.

(d)     All Taxes required to be withheld by or on behalf of the Company in connection with amounts paid or owing to any employee, independent contractor, creditor or other Person have been properly withheld, and all those Taxes either have been duly and timely paid to the proper Governmental Entity. All Taxes required to have been collected and paid on the sale of products or taxable services by the Company (whether or not denominated as sales or use taxes) have been properly and timely collected and paid, or all sales tax exemption certificates or other proof of the exempt nature of sales of all products or services have been properly collected and, if required, submitted to the appropriate Governmental Entity. The Company has complied with all information reporting (including Internal Revenue Service Forms W-2 and 1099) and backup withholding provisions of applicable Law, including maintenance of required records with respect thereto.

(e)     No waiver or extension of any statute of limitations in respect of Taxes or the time in which any Tax may be assessed or collected by any taxing authority (other than extensions which are no longer in effect) have been given or requested with respect to any Taxes of the Company.

(f)     The Company has provided to Purchaser correct and complete copies of all U.S. federal income and other income or material Tax Returns filed by it for the taxable years ending on or after December 31, 2018, and all audit reports and statements of deficiencies assessed by any Governmental Entity against or agreed to by the Company, in each case with respect to material Taxes, since January 1, 2019.

(g)     The Company has not engaged in or otherwise been a party to any "reportable transaction" within the meaning of Section 6707A of the Code and Treasury Regulations Section 1.6011-4(b) (or any similar provisions of state, local or foreign Tax Law).

(h)     The Company is not a party to or bound by, and has no potential liability (for Taxes or otherwise) to, any Person as a result of, or pursuant to, any Tax allocation, sharing or indemnity agreements or arrangements (other than pursuant to commercial contracts entered into in the ordinary course of business and not concerning Taxes).  The Company neither is nor has been (A) a member of an affiliated group within the meaning of Section 1504(a) of the Code (or any similar group defined under a similar provision of state, local, or foreign Law), (B) filing

a consolidated federal income Tax Return with any other Person, or (C) liable for the Taxes of any Person (whether under Treasury Regulation Section 1.1502-6 or any analogous or similar provision of Law, as a transferee or successor, pursuant to any Tax sharing or indemnity agreement or other contractual agreements, or otherwise).

(i)     The Company has been at all times resident for Tax purposes and subject to Tax only in the country in which it was formed. The Company is not currently, nor has ever, engaged in a trade or business, and has never had, a "permanent establishment" (as defined in any applicable income tax treaty or under any applicable Law), a permanent representative, or other place of business or taxable presence, in any country other than the country in which it was formed.

(j)     The Company has disclosed on its Tax Returns all positions taken therein that could reasonably give rise to a substantial understatement of Tax within the meaning of Section 6662 of the Code.

(k)     No power of attorney with respect to any Taxes of or relating to the Company has been filed with any Governmental Entity.

(l)     Neither the execution of this Agreement or any Ancillary Documents nor the consummation of any of the Transactions shall constitute a change in the ownership or effective control of a corporation or in the ownership of a substantial portion of the assets of a corporation for purposes of Section 280G of the Code.

(m)     The Company is not a party to, or bound by, and has no obligation under, any closing or similar agreement, offer in compromise, Tax abatement, Tax incentive, Tax rebate, Tax holiday or similar agreement or any other agreements with any Governmental Authority with respect to any period for which the statute of limitations has not expired.

(n)     No private letter rulings, technical advice memoranda or similar agreement or rulings have been requested, entered into or issued by any Governmental Authority with respect to the Company or any Seller, and there have been no requests for changes in any accounting method by any Governmental Authority with respect to the Company or any Seller.

(o)     The Company will not be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) change in method of accounting for any taxable period (or portion thereof) ending on or prior to the Closing Date pursuant to Section 481 of the Code (or any similar provision of state, local or foreign Law); (ii) use of an improper method of accounting for a taxable period ending on or prior to the Closing Date, (iii) "closing agreement" as described in Section 7121 of the Code (or any similar provision of state, local or foreign Law) executed on or prior to the Closing Date; (iv) installment sale or open transaction disposition made on or prior to the Closing Date; (v) prepaid income received or accrued on or prior to the Closing Date; (vi) Taxes arising pursuant to Sections 951 and 951A of the Code attributable to a Pre-Closing Tax Period (or portion thereof), (vii) election under Section 965 of the Code made in a Pre-Closing Tax Period (or portion thereof), (viii) intercompany transactions or excess loss accounts described in Treasury Regulation Section 1.1502-13, 1.1502 or otherwise pursuant to

Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provisions of federal, state, local or foreign Income Tax Law) entered into in a Pre-Closing Tax Period, (ix) transaction that has the effect of deferring income, accelerating deductions or otherwise shifting the basis of taxation from one period to another, or (x) foreign or United States state or local Tax-related Law comparable to the foregoing.

(p)     None of the assets of the Company are or were property that any Seller is required to treat as being owned by any other Person pursuant to the so-called "safe harbor lease" provisions of former Section 168(f)(8) of the Code.

(q)     From the date of its formation until May 1, 2018, the Company has been treated as a disregarded entity for federal, state and local income Tax purposes. Since May 1, 2018, the Company has been treated as a partnership for federal, state and local income Tax purposes.

(r)     Except as set forth on Schedule 3.15(r), all of the assets of the Company have been properly listed and described on the property Tax rolls for all periods prior to and including the Closing Date, and no portion of the assets of the Company constitutes omitted property for property Tax purposes.

(s)     There is no property or obligation of the Company, including uncashed checks to vendors, customers or employees, or non-refunded overpayments or credits, including in connection with prepaid fees and deposits from customers, that is escheatable or payable to any Governmental Authority under any applicable escheatment or unclaimed property Laws or that may at any time become escheatable to any Governmental Authority under any such Laws.

(t)     The Company is not a party to any joint venture, partnership, other arrangement or Contract which may reasonably be expected to be treated as a partnership for U.S. federal and applicable state and local income Tax purposes.

(u)     The Company has not distributed stock of another Person, or had its stock distributed by another Person in a transaction intended or purported to be governed, in whole or in part, by Section 355 of the Code or Section 361 of the Code.

(v)     Neither the Company nor any Seller has deferred the employer portion of any payroll Taxes of the Company under Section 2302 of the CARES Act for which the original due date was on or before the Closing Date.

(w)     No Seller is subject to any limitation under Section 197(f)(9) of the Code on its ability to amortize any "Section 197 intangible" as defined by Section 197(d)(1) of the Code, and no assets of the Company constitute "Section 197(f)(9) intangibles" within the meaning of Treasury Regulations Section 1.197-2(h)(1)(i).

Section 3.16    Brokers.  Other than Daiwa Corporate Advisory LLC, no broker, finder, agent, representative, financial advisor, investment banker or similar intermediary has acted for or on behalf of the Company in connection with this Agreement or the transactions contemplated hereby, and no broker, finder, agent, representative, financial advisor, investment banker or similar

intermediary is entitled to any broker's, finder's, financial advisor's, investment banker's fee or other commission or similar payment in connection with the transactions contemplated by this Agreement based upon any agreement, understanding or other arrangements made by or on behalf of the Company.

Section 3.17    Real and Personal Property.

(a)    Real Property.  The Company does not own any real property, have any option to purchase any real property, or has owned any real property.  Schedule 3.17(a) sets forth (whether as lessee or lessor) the address and a list of all written or oral leases, subleases or other occupancy agreements (each a "Real Property Lease") of real property (such real property, the "Leased Real Property") to which the Company is a party or by which any of them is bound.  The Company has delivered to Purchaser a true and complete copy of each such Real Property Lease document, including all amendments, extensions, renewals, guaranties and other agreements relating to each written Real Property Lease or a summary of the key terms of any oral Real Property Lease.  Except as set forth on Schedule 3.17(a), (i) all rents, including additional rents and expenses payable to landlord or third parties pursuant to any Real Property Lease are current; (ii) each Real Property Lease is valid and binding on the Company, enforceable in accordance with its terms (subject to proper authorization and execution of such Real Property Lease by the other party thereto and subject to the Enforceability Exceptions), except as would not reasonably be expected to be material to the Company; (iii) the Company is not in breach or default under any Real Property Lease, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under such Real Property Lease; (iv) to the knowledge of the Company, no other party to any Real Property Lease is in breach or default under any Real Property Lease, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default; and (v) the Company has not subleased, licensed or otherwise granted any Person the right to use or occupy any real property under any Real Property Lease or any portion thereof.  The Leased Real Property constitutes all of the real property interests used in connection with the operation of the business of the Company.  To the knowledge of the Company, no parcel of Leased Real Property is subject to any Order or is being condemned, expropriated or otherwise taken by any public authority with or without payment of compensation therefor, nor has any such condemnation, expropriation or taking been proposed.  To the Company's knowledge, the Company has good and marketable leasehold title to all Leased Real Property, in each case, free and clear of all Liens, except Permitted Liens.

(b)    Personal Property.  Except as disclosed on Schedule 3.17(b), the Company holds good and valid title to, or holds a valid and enforceable leasehold interest in, all assets (excluding, for the avoidance of doubt, Company Intellectual Property and Leased Real Property) which is required for  the conduct of its business of the Company in a manner consistent with its past practices or otherwise reflected in the Financial Statements or acquired after the date of the Latest Balance Sheet (other than properties and assets sold or otherwise disposed of in the ordinary course of business since the date of the Latest Balance Sheet, none of which is required for the operation of the business of the Company in a manner consistent with its past practices), free and

clear of all Liens, except for Liens identified on Schedule 3.17(b) and Permitted Liens. Such assets and properties are in good condition and repair, ordinary wear and tear excepted and constitute all assets and properties necessary and sufficient for the operation of the business of the Company immediately following the Closing in all material respects in a manner consistent with its past practices.

Section 3.18    Transactions with Affiliates.   Schedule 3.18 sets forth all Contracts or arrangements between the Company, on the one hand, and any Seller Related Party, on the other hand.   No Seller Related Party has any interest in any property used in the business of the Company, or, to the knowledge of the Company, any claim or right against the Company or any direct or indirect interest in any transaction with the Company.  Except as set forth on Schedule 3.18, there are no other obligations of the Company to any Seller Related Party.  Except as set forth on Schedule 3.18, neither the Company, the Sellers nor any of their Representatives or Affiliates has any direct or indirect interest (other than an equity interest of less than two percent (2%) of a publicly held company) in any competitor, supplier or customer of the Company or in any Person from whom or to whom the Company has purchased or leased any assets, or in any other Person with whom the Company or Seller has any business relationship.  Material Customers and Material Suppliers.  Schedule 3.19 sets forth the Company's top ten (10) customers by revenue for the twelve (12)-month period ended December 31, 2020 ("Material Customers") and its top ten (10) suppliers and vendors by expenditures for the twelve (12)-month period ended December 31, 2020 (the "Material Suppliers"). Except as set forth on Schedule 5.20, since the date of the 2020 Balance Sheet, none of such vendors, customers or resellers has terminated or adversely modified. The relationships of the Company with each Material Customer and Material Supplier are good commercial working relationships and no Material Customer or Material Supplier has terminated or otherwise adversely modified such relationship or the amount, frequency or terms of the business that such vendor, customer or reseller conducts with the Company, nor has the Company received any written notice from any Material Customer or Material Supplier to the effect that any such Person will stop, or adversely modify the amount, frequency or terms of the business that such vendor, customer or reseller conducts with the Company.

Section 3.20    Bank Accounts. Schedule 3.20 sets forth each of the bank accounts of the Company as of the date hereof, together with the authorized signatories for such accounts.

Section 3.21    Education Regulatory Matters.

(a)      Since the Compliance Date, the Company has complied in all material respects with all applicable Educational Laws and has obtained all applicable Educational Approvals required to be obtained from any Educational Agency to conduct its business.

(b)      Since the Compliance Date, the Company and its Affiliates, and each Collaboration Agreement, has complied in all material respects with all applicable Educational Laws concerning the compensation of persons or entities engaged in student recruiting, admissions or financial aid activities, including but not limited to 20 U.S.C. § 1094(a)(20) and 34 C.F.R. § 668.14(b)(22).

(c)     Since the Compliance Date, the services provided by the Company and its Affiliates to any Institution has complied in all material respects with the third party servicer requirements defined at 20 U.S.C. §§ 1088, 1094, and 1099c and implemented at 34 C.F.R. §§ 668.2, 668.23 and 668.25.

(d)     To the Company's knowledge, since the Compliance Date, each Institution that has entered into a Collaboration Agreement with the Company has (i) been in material compliance with all applicable Educational Laws, (ii) obtained and held all Educational Approvals necessary to conduct its operations as currently conducted, and (iii) been in material compliance with the terms and conditions of all such Educational Approvals.  To the Company's knowledge, no action for the suspension, revocation, termination or cancellation of any of Educational Approval of any such Institution or federal funds pursuant to Title IV of any Institution is pending or threatened.

(e)     Since the Compliance Date, the Company and its affiliates have complied in all material respects with all applicable Laws and Educational Laws regarding consumer marketing and student recruiting, including the rules and regulations of the U.S. Federal Trade Commission, and has not committed any Misrepresentation (either affirmatively or by omission) about the Company or about any Institution, or about any educational program or course offered by any Institution, the Institution's financial charges, or the Institution's employability of its graduates. With respect to an Institutions programs and courses supported by the Company pursuant to a Collaboration Agreement, the Company has used only Marketing Materials approved by the Institution, including but not limited to Marketing Materials about an Institution's education programs, the Institution's financial charges, or the employability of the Institution's graduates.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller severally (and not jointly and severally), solely as to such Seller, hereby represents and warrants to Purchaser, as of the date hereof, as follows:

Section 4.1     <u>Authority</u>.  Such Seller has the requisite power, authority and legal capacity to execute and deliver this Agreement and each other Ancillary Document to which it is a party and to consummate the Transactions.  The execution and delivery of this Agreement and each Ancillary Document to which such Seller is a party and the consummation of the Transactions contemplated thereby have been duly authorized by all necessary action on the part of such Seller. No other action on the part of such Seller is necessary to authorize the execution, delivery and performance of this Agreement, each Ancillary Document to which it is a party and the Transactions.  To the extent such Seller is a business entity, such Seller is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is authorized.  This Agreement and each Ancillary Document to which such Seller is a party has been duly executed and delivered by such Seller and constitutes a valid, legal and binding agreement of such Seller (assuming that each such Ancillary Document to which such Seller is a party has been duly and validly authorized, executed and delivered by the other parties thereto), enforceable against such Seller in accordance with its terms, subject to the Enforceability Exceptions.

Section 4.2    <u>Consents and Approvals; No Violations</u>.    Except as set forth on <u>Schedule 4.2</u>, no notice to, filing with, or authorization, consent or approval of any Governmental Entity is required by or with respect to such Seller or in connection with for the execution, delivery or performance of this Agreement (or any Ancillary Document to which such Seller is a party) by such Seller or the consummation by such Seller of the transactions contemplated hereby, except for applicable requirements, if any, of any applicable securities Laws.    Neither the execution, delivery nor performance of this Agreement or each Ancillary Document to which such Seller is a party nor the consummation by such Seller of the transactions contemplated hereby will (i) conflict with or result in any breach of any provision of such Seller's Governing Documents, (ii) require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default under or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any material agreement to which such Seller is party, (iii) result in a violation or breach of any provision of any order, writ, injunction, decree, Law, statute, rule or regulation of any Governmental Entity having jurisdiction over such Seller or over the Company Units; or (iv) except as contemplated by this Agreement or with respect to Permitted Liens, result in the creation of any Lien upon any of the assets of the Company.

Section 4.3    <u>Title to the Company Units; Ownership of Sellers</u>.    Seller owns of record and beneficially the Company Units set forth across from such Seller's name on <u>Schedule 4.3</u>, and, except as set forth on <u>Schedule 4.3</u>, such Seller has good, valid and marketable title to such Company Units, free and clear of all Liens (other than Permitted Liens). Upon the consummation of the Transactions, good and valid title to the Company Units will pass to Purchaser, free and clear of any and all Liens (other than restrictions imposed on transfer under applicable federal and/or state securities laws or regulations)

Section 4.4    <u>Litigation</u>.    There is no Proceeding pending or, to such Seller's knowledge, threatened against such Seller before any Governmental Entity, and such Seller is not subject to any outstanding Order that, in either case, would, individually or in the aggregate (a) have an adverse effect on such Seller's ownership of his, her or its Company Units, (b) prevent or materially delay the consummation by such Seller of the Transactions, or (c) otherwise prevent or materially delay performance by such Seller of any of such Seller's obligations under this Agreement.

Section 4.5    <u>Brokers</u>.    Other than Daiwa Corporate Advisory LLC, no broker, finder, agent, representative, financial advisor, investment banker or similar intermediary has acted for or on behalf of Seller in connection with this Agreement or the transactions contemplated hereby, and no broker, finder, agent, representative, financial advisor, investment banker or similar intermediary is entitled to any broker's, finder's, financial advisor's, investment banker's fee or other commission or similar payment in connection with the transactions contemplated by this Agreement based upon any agreement, understanding or other arrangements made by or on behalf of any Seller.

# ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to the Sellers, as of the date hereof, as follows:

Section 5.1    Organization.  Purchaser is a limited liability company, duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and has all requisite power and authority to carry on its businesses as now being conducted, except where the failure to have such power or authority would not prevent or materially delay the consummation of the transactions contemplated hereby.

Section 5.2    Authority.  Purchaser has the requisite limited liability company power and authority to execute and deliver this Agreement and each Ancillary Document to which it is a party and to carry out its obligations hereunder and thereunder.  The execution and delivery of this Agreement and each of the Ancillary Documents to which Purchaser is a party and the performance by Purchaser of its obligations hereunder and thereunder (or with respect to the Ancillary Documents to which Purchaser is or will be a party, will be prior to the Closing) duly authorized by all necessary action on the part of Purchaser and no other proceeding (including by its equityholders) on the part of Purchaser is necessary to authorize this Agreement and each of the Ancillary Documents to which Purchaser is or will be a party or to consummate the Transactions. This Agreement has been (and the Ancillary Documents to which Purchaser is or will be a party will be at or prior to the Closing) duly and validly executed and delivered by Purchaser and constitutes (or will constitute) a valid, legal and binding agreement of Purchaser (assuming this Agreement has been and the Ancillary Documents to which Purchaser is or will be a party will be duly authorized, executed and delivered by the other parties thereto at or prior to the Closing), enforceable against Purchaser in accordance with their respective terms, subject to the Enforceability Exceptions.

Section 5.3    Consents and Approvals; No Violations.  No material notices to, filings with, or authorization, consent or approval of any Governmental Entity is necessary for the execution, delivery or performance by Purchaser of this Agreement or the Ancillary Documents to which Purchaser is or will be a party or the consummation by Purchaser of the Transactions, except for applicable requirements, if any, of applicable securities Laws.  Neither the execution, delivery or performance by Purchaser of this Agreement and the Ancillary Documents to which Purchaser is a party nor the consummation by Purchaser of the transactions contemplated hereby will (i) conflict with or result in any breach of any provision of Purchaser's Governing Documents, (ii) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, lease, license, Contract, agreement or other instrument or obligation to which Purchaser is a party or by which Purchaser or any of its properties or assets may be bound, or (iii) violate any Order applicable to Purchaser or any of Purchaser's Subsidiaries or any of their respective properties or assets.

Section 5.4    Brokers.  No broker, finder, financial advisor or investment banker is entitled to any brokerage, finder's, financial advisor's or investment banker's fee or commission or similar payment in connection with the transactions contemplated by this Agreement based

upon arrangements made by or on behalf of Purchaser or any of its Affiliates for which any Seller or the Company may become liable.

Section 5.5    Acquisition of Equity for Investment.  Purchaser has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its purchase of the Company Units.  Purchaser confirms that it can bear the economic risk of its investment in the Company Units and can afford to lose its entire investment in the Company Units, has been furnished the materials relating to the purchase of the Company Units which Purchaser has requested, and the Company has provided Purchaser and its representatives the opportunity to ask questions of the officers and management employees of the business and to acquire additional information about the business and financial condition of the Company. Purchaser is acquiring the Company Units for investment and not with a view toward or for sale in connection with any distribution thereof, or with any present intention of distributing or selling such Company Units.

## ARTICLE VI
## COVENANTS

Section 6.1    Indemnification; Directors' and Officers' Insurance.

(a)    Purchaser agrees that all rights to indemnification or exculpation now existing in favor of the current and former directors and officers of the Company (each a "D&O Indemnified Party"), as provided in the Company's Governing Documents in effect as of the Closing Date with respect to any matters occurring prior to the Closing Date, shall survive the Closing.  For a period of six (6) years following the Closing Date, except as required by Law, Purchaser shall cause the Governing Documents of the Company to contain indemnification and exculpation provisions that are at least as favorable, in the aggregate, as those existing in the Company's Governing Documents as of the date of this Agreement.

(b)    Contemporaneously with the Closing, the Company shall purchase and pay for in full a "tail" policy arranged by the Company prior to the Closing, providing directors' and officers' liability insurance coverage for a period of six (6) years following the Closing Date for the benefit of the D&O Indemnified Parties with respect to matters occurring prior to the Closing in a coverage amount acceptable to Purchaser (such purchased policy, the "D&O Tail Policy"). Purchaser agrees to reimburse the Company for the total amount paid by the Company to purchase the D&O Tail Policy which amount shall not exceed $39,000. Purchaser shall cause the Company to not take any action following the Closing to cause the D&O Tail Policy to be cancelled or any provision therein to be amended or waived; provided, that neither the Purchaser, the Company nor any Affiliate thereof shall be obligated to pay any other premiums or amounts in respect of such D&O Tail Policy.

(c)    The directors and officers of the Company entitled to the indemnification, liability limitation, exculpation and insurance set forth in this Section 6.1 are intended to be third-party beneficiaries of this Section 6.1.  This Section 6.1 shall survive the consummation of the Closing.

(d)     Notwithstanding anything to the contrary, no D&O Indemnified Party shall have any rights with respect to indemnification, exculpation, advancement, contribution or recovery of any kind from Purchaser or the Company or any of their respective Affiliates or Subsidiaries for any matter which (i) is a claim in connection with or arising under this Agreement or any other document, certificate or agreement referenced herein or executed or delivered in connection with the transactions contemplated by this Agreement or (ii) such D&O Indemnified Party may be liable to Purchaser or the Company or their respective Affiliates or Subsidiaries for Fraud based on the representations and warranties contained in this Agreement (including the costs and expenses of defending any claims with respect to such matter) or any other document, certificate or agreement referenced in this Agreement or executed or delivered in connection with the consummation of the transactions contemplated by this Agreement.

Section 6.2     No Public Disclosure.  No press release or public announcement related to this Agreement, the Ancillary Documents or the transactions contemplated hereby or thereby, shall be issued or made by the Sellers or the Representative (nor will the Sellers or the Representative permit any of theirs advisors or Affiliates to do any thereof) without the prior approval of the Purchaser.

Section 6.3     Tax Matters.

(a)     Within one hundred and eighty (180) days following the Closing, Purchaser shall prepare and deliver to the Sellers a schedule (the "Allocation Schedule") allocating the Purchase Price (and any other amounts required to be taken into account for federal income Tax purposes) among the assets of the Company and the covenants in this Agreement.  The Allocation Schedule shall be prepared in accordance with the methodology attached hereto as Exhibit B (the "Allocation Principles"), which Allocation Principles represent the Parties' joint application of the principles of Section 1060 of the Code and the applicable Treasury Regulations.  Sellers shall have a period of thirty (30) days to review the Allocation Schedule and the Parties shall discuss in good faith any reasonable comments that the Sellers may have to the Allocation Schedule. Once finally determined, the Allocation Schedule shall be binding upon each the Parties for all purposes (including financial accounting purposes, financial and regulatory reporting purposes and Tax purposes).  To the extent that the Purchase Price (or any other amounts required to be taken into account for federal income Tax purposes) is adjusted pursuant to this Agreement, the Allocation Schedule shall be adjusted in accordance with the principles of Section 1060 of the Code and the applicable Treasury Regulations.  The Parties shall file Tax Returns (including, without limitation, Internal Revenue Service Form 8594 with its federal income tax return for the taxable year that includes the Closing Date) consistent with the Allocation Schedule, as finally determined pursuant to this Section 6.3(a), and to act in accordance with such allocation in the course of any Tax audit, Tax review or Tax litigation relating to this matter.  In the event that any of the allocations set forth in the Allocation Schedules are disputed by any Governmental Authority, the party receiving notice of such dispute shall promptly notify and consult with the other party concerning the resolution of such dispute.

(b)     Representative shall prepare, or cause to be prepared, all Pass-Through Tax Returns of the Company for all taxable periods ending on or before the Closing Date (excluding, for the avoidance of doubt, any Tax Return of the Company for any Straddle Period which shall

be prepared in accordance with <u>Section 6.3(c)</u>) (each such Tax Return, a "<u>Pre-Closing Income Tax Return</u>").  All such Pre-Closing Income Tax Returns shall be prepared in accordance with this Agreement and otherwise with past practice, except as otherwise required by Law (and treating the taxable year of the Company as closing at the end of the Closing Date).  Not later than thirty (30) days prior to the due date for filing thereof, Representative shall provide Purchaser with drafts of any such Pre-Closing Income Tax Return.  Purchaser shall have the right to review and approve any such Pre-Closing Income Tax Return during the twenty-five (25) day period following the receipt of such Pre-Closing Income Tax Return, which approval shall not be unreasonably withheld, conditioned or delayed.  For the avoidance of doubt, Sellers shall be responsible on a flow-through basis for all Taxes reported on a Pass-Through Tax Return.

(c)     Purchaser shall prepare and file, or cause to be prepared and filed, all Tax Returns of the Company other than Pre-Closing Income Tax Returns ("<u>Purchaser Pre-Closing Tax Returns</u>").  All such Purchaser Pre-Closing Tax Returns shall be prepared in accordance with this Agreement and otherwise with past practice, except as otherwise required by Law (and treating the taxable year of the Company as closing at the end of the Closing Date). No later than thirty (30) days prior to the due date for filing thereof (or such shorter time as is commercially reasonable in the case of a Tax Return other than an income Tax Return), Purchaser shall provide Representative with drafts of all such Purchaser Pre-Closing Tax Returns that are income Tax Returns or reflect Taxes that were included in Indebtedness or with respect to which Sellers will be obligated to pay any amounts pursuant to this <u>Section 6.3(c)</u>.  Representative shall have the right to review and approve any such Purchaser Pre-Closing Tax Returns during the twenty-five (25) day period (or shorter, as applicable) following the receipt of such Purchaser Pre-Closing Tax Returns, which approval shall not be unreasonably withheld, conditioned, or delayed. Except as required by applicable Law, any Purchase Pre-Closing Tax Return shall apply the interim closing method and the calendar day convention set forth under Treasury Regulations Section 1.706-4 to the extent possible. In the case of any Pre-Closing Income Tax Return or Purchaser Pre-Closing Tax Return that is due on or after the Closing Date, the Representative (on behalf of the Sellers) shall pay to the Company, no later than five (5) days prior to the due date of such Tax Return, (i) all Taxes reported as due from the Company on such Tax Return, to the extent that the Sellers (or any of their Affiliates) are liable for such Taxes under this Agreement (including, Pre-Closing Tax Period Taxes and Straddle Period Taxes) (except to the extent such Taxes were previously taken into account in as a reduction the Purchase Price (including by inclusion in Closing Indebtedness, Seller Expenses, or Closing Working Capital, each as finally determined)) and (ii) reasonable, documented out of pocket expenses (including reasonable attorneys' and accountants' fees) incurred by Purchaser or the Company in the preparation of such Tax Returns, apportioned to the extent applicable based on the ratio of the Sellers' share of the Taxes to the total Taxes reflected on such Tax Return

(d)     Except as required by Law (and, in which case, after prior notification), Purchaser shall not, and shall not allow the Company (or its Affiliates in respect of the Company), (i) to amend any Tax Return of the Company for a Pre-Closing Tax Period or Straddle Period, (ii) to enter into any voluntary disclosure agreement or otherwise voluntarily approach any Governmental Entity with respect to for any Pre-Closing Taxes or a Pre-Closing Tax Period of the Company, or (iii) otherwise take any action outside of the ordinary course of business (except to

the extent expressly contemplated by this Agreement) with respect to Pre-Closing Taxes or a Pre-Closing Tax Period of the Company, in each of the foregoing cases without the prior written consent of the Representative, such consent not to be unreasonably withheld, conditioned or delayed. For the avoidance of doubt, this Section 6.3(d) shall not prohibit or restrict in any way any action by or with respect to the Company with respect to a post-Closing Tax period (or the portion of the Straddle Period after the Closing Date) of the Company (e.g., taking a position on a Tax Return with respect to a post-Closing Tax period (or the portion of the Straddle Period after the Closing Date) that is inconsistent with a previously filed Tax Return relating to a Pre-Closing Tax Period).

(e) To the extent permissible under applicable Law, the parties agree to elect (and cause the Company to elect) to have the tax year of the Company end on the Closing Date and, if such election is not permitted or required in a jurisdiction with respect to a specific Tax such that the Company is required to file a Tax Return for a Straddle Period, to utilize the following conventions for determining the amount of Taxes attributable to the portion of the Straddle Period ending on the Closing Date: (i) in the case of Taxes other than Taxes based upon or related to income, gains or receipts (including sales and use Taxes), the amount attributable to the portion of the Straddle Period ending on the Closing Date shall equal the Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of calendar days in the portion of the Straddle Period ending on the Closing Date and the denominator of which is the number of calendar days in the entire Straddle Period, based on an interim closing of the books as of the close of business on the Closing Date; and (ii) in the case of all other Taxes (including income Taxes, sales Taxes, employment Taxes and withholding Taxes), the amount attributable to the portion of the Straddle Period ending on the Closing Date shall be deemed equal to the amount which would be payable if the relevant Straddle Period ended on the Closing Date based on an interim closing of the books as of the close of business on the Closing Date.

(f) Purchaser and the Representative shall (and Purchaser shall cause the Company and its Affiliates to, and the Sellers shall cause their Affiliates to) (i) assist each other in the preparation and timely filing of any Tax Return of the Company or any of its Subsidiaries for a Pre-Closing or a Straddle Tax Period; (ii) assist each other in any Tax Contest, audit or other Proceeding with respect to Taxes or Tax Returns of the Company for a Pre-Closing Tax Period or Straddle Tax Period; (iii) make available to each other any information, records, or other documents relating to any Taxes or Tax Returns of the Company for a Pre-Closing Tax Period or Straddle Period; and (iv) assist each other in such other matter concerning Taxes as may be reasonably requested by another Party. Notwithstanding the foregoing, nothing in this Agreement shall be read to place any obligation on Purchaser or its Affiliates to provide to Representative or the Sellers any Tax Returns or other information or documentation with respect to Taxes or Tax Returns that do not relate to a Pre-Closing Tax Period of the Company.

(g) If any Governmental Authority issues to the Company a notice of its intent to audit or conduct another Proceeding with respect to Taxes of the Company for any Pre-Closing Tax Period or Straddle Period or a notice of deficiency for Taxes for any Pre-Closing Tax Period or Straddle Period, Purchaser shall notify the Representative of the receipt of such communication within ten (10) days of receipt and provide the Representative with copies of all correspondence

and other documents received from the Governmental Authority. The Purchaser shall, at Purchaser's sole cost and expense, control any audit or other Proceeding in respect of any Taxes or Tax Returns of the Company (a "<u>Tax Contest</u>") for any post-Closing Tax period or Straddle Period; provided, however, that (Y) the Representative, at the Sellers' sole cost and expense, shall have the right to control any Tax Contest that relates solely to a Pre-Closing Tax Period; and (Z) the Representative, at the Sellers' sole cost and expense, shall have the right to participate in any Tax Contest to the extent it relates to a Pre-Closing Tax Period or Straddle Period; and provided, further, that if, pursuant to clause (Y) above, the Representative controls any Tax Contest relating solely to a Pre-Closing Tax Period, (i) the Representative shall keep Purchaser reasonably informed regarding the status of such Tax Contest, (ii) Purchaser, at its sole cost and expense, shall have the right to participate, or cause the Company to participate, in such a Tax Contest, and (iii) the Representative shall not settle or resolve such a Tax Contest without the prior written consent of Purchaser, such consent not to be unreasonably withheld or delayed; and provided, further, that if the Purchaser controls any Tax Contest relating to a Pre-Closing Tax Period or Straddle Period, (I) the Purchaser shall keep the Representative reasonably informed regarding the status of such Tax Contest, and (II) the Purchaser shall not settle or resolve such a Tax Contest if such settlement could reasonably be expected to adversely affect the Sellers without the prior written consent of the Representative, such consent not to be unreasonably withheld or delayed. Notwithstanding the above, neither Purchaser nor the Company shall be required to enter into any Tax-related litigation or to appeal any matter to the Internal Revenue Service's Office of Appeals, any successor body or any comparable state or local Governmental Authority.

(h) Any and all Tax deductions or losses arising from any payments made or accruable hereunder that are economically borne by the Sellers (including from payment or accrual of items of Indebtedness or Seller Expenses) (collectively, "<u>Seller Transaction Deductions</u>") shall be reportable directly on a Tax Return of the Company for a Pre-Closing Tax Period to the maximum extent allowable by Law.

(i) Notwithstanding anything in this Agreement to the contrary (including <u>Section 7.1</u>), the provisions of <u>Section 3.15</u>, <u>Section 6.3</u>, and <u>Section 7.2(a)(iii)</u> shall survive until the date that is sixty (60) days after the expiration of the applicable statute of limitations (giving effect to any waiver, mitigation or extension thereof) relating to the underlying subject matter thereof.

(j) To the extent that any obligation or responsibility pursuant to <u>ARTICLE VII</u> may overlap with any obligation or responsibility pursuant to this <u>Section 6.3</u>, the provisions of this <u>Section 6.3</u> shall govern.

Section 6.4 <u>Release</u>. Effective from and after the Closing, each Seller does for itself and its Affiliates, and each of its and their respective current and former officers, directors, managers, employees, equityholders, partners, stockholders members, advisors, executors, administrators, representatives, successors and assigns (collectively, the "<u>Seller Releasing Parties</u>") irrevocably and unconditionally release and forever discharge Purchaser, Holdco, the Company and each of their respective current and former officers, directors, managers, employees, equityholders, partners, stockholders, members, advisors, successors and assigns (collectively, the "<u>Seller Released Parties</u>") from and against all Released Matters. "<u>Released Matters</u>" means any

and all suits, claims, demands, damages, debts, liabilities, executions, judgments, duties, obligations, costs, bonds, contracts, covenants (whether express or implied), expenses (including attorneys' and accountants' fees and expenses) and other losses, rights, actions and causes of action of any nature whatsoever, whether in law or equity, whether now known or unknown, suspected or unsuspected, that such Seller Releasing Party now has, or at any time previously had, or shall or may have in the future, in each case, in respect of any cause, matter or thing relating to any of the Seller Released Parties occurring or arising on or prior to the Closing Date, including, but not limited to, any matter related to any Seller Releasing Party's employment as an employee with the Company or any Affiliate (or termination thereof) including, but not limited to, actions under any federal, state or local employment law or statute (including Title VII of the Civil Rights Acts of 1964 and 1991 and the Americans with Disabilities Act), federal or state law or common law doctrine relating to discrimination, sexual harassment, wrongful discharge or breach or interference with employment contract rights, and the Employee Retirement Income Security Act of 1974, as amended. Notwithstanding the foregoing, each Seller Releasing Party is not releasing (a) any rights available to it under this Agreement or any other Ancillary Document entered into by it, (b) if (and only if) such Seller is an officer or director of the Company, any claims made under applicable indemnification and exculpation provisions under applicable Governing Documents in such Seller's capacity as a director or officer or directors' and officers' liability insurance policies in accordance with Section 6.1, (c) if (and only if) such Seller is a present employee of the Company, such Seller's right, if any, to any accrued salary, bonus, expenses or reimbursements currently owed to such Seller by of the Company Group as a result of employment with the Company or (d) any rights, obligations, covenants, agreements, or matters that Sellers may have between or among themselves that are unrelated to the Company or the transactions contemplated hereby. It is the intention of each Seller in executing this release, and in giving and receiving the consideration called for in this Agreement, that the release contained in this Section 6.4 shall be effective as a full and final accord and satisfaction and general release of and from all Released Matters and the final resolution by such Seller and the Seller Released Parties of all Released Matters. Each Seller hereby (i) represents to the Released Parties that it and its Affiliates have not voluntarily or involuntarily assigned or transferred or purported to assign or transfer to any Person any Released Matters and that no Person other than such Seller has any interest in any Released Matter by Law or Contract by virtue of any action or inaction by such Seller or any of its Affiliates and (ii) intentionally and specifically waives any statute or rule which may prohibit the release of future rights or a release with respect to unknown claims. The invalidity or unenforceability of any part of this Section 6.4 shall not affect the validity or enforceability of the remainder of this Section 6.4 which shall remain in full force and effect.

Section 6.5    Restrictive Covenants.

(a)    From and after the Closing and until the five (5) year anniversary of the Closing Date (the "Restricted Period"), each Restricted Person shall not, and shall not permit any of its Affiliates to, directly or indirectly, as a proprietor, director, officer, employee, partner, shareholder, equityholder, consultant, volunteer, owner or otherwise, (i) own, operate, perform, render services to or participate in or counsel or assist others in rendering, performing or engaging in the affairs of any business that is competitive with the business of the Company anywhere in the United States of America (the "Restricted Area") or (ii) intentionally interfere in any material

respect with the business relationships (whether formed prior to or after the date of this Agreement) between the Company and customers or suppliers of the Company. For purposes of this <u>Section 6.5(a)</u>, the "business of the Company" means the business conducted by the Company as of the Closing Date and as conducted at any time during the twelve (12) month period preceding the Closing Date, which consists of (A) the development and marketing of higher education courses and programs in partnership with traditional universities and (B) the sale of educational products to members of state and national Labor Organizations and their family members (collectively, "<u>Union Students</u>"), recruitment and enrollment of Union Students, services to support the success of Union Students, such as mentoring and online tutoring, and professional development for higher education faculty related to online teaching and learning. Notwithstanding anything herein to the contrary, this <u>Section 6.5(a)</u> shall not preclude or restrict any Seller from owning not more than three percent (3%) of the securities of any Person listed on a national securities exchange.

(b)     During the Restricted Period, each Seller (except for KV EdTech Partners LLC, its parents and Affiliates) shall not, and shall not permit any of its Affiliates to, directly or indirectly, persuade or encourage or attempt to persuade or encourage any business customer, partner, Affiliate, supplier, distributor, referral source or vendor of the Company to cease doing business with, or reduce in any way its business with, the Company.

(c)     During the Restricted Period, no Seller shall (nor shall any Seller permit any of its Affiliates to), on behalf of itself or any other Person, directly or indirectly, (i) solicit or hire any Person who is, at such time, an employee or independent contractor of the Company or who was an employee or independent contractor of the Company at any time during the twelve (12) month period preceding such solicitation or hiring or (ii) induce or attempt to induce any employee or independent contractor of the Company to terminate his, her or its employment, or otherwise cease, diminish or adversely modify his, her or its relationship with the Company; <u>provided</u> that the foregoing shall not prohibit any Seller from using solicitations (such as general newspaper or internet advertisements) not targeted at any such current or former employees or independent contractors of the Company and hiring any Person that responds to such non-targeted solicitations; <u>provided further</u> that the foregoing shall not prohibit any Seller from soliciting or hiring any Person whose relationship with the Company was terminated by the Company after the Closing. This subpart 6.5(c) shall not apply to KV EdTech Partners LLC, its parents or Affiliates.

(d)     From and after the Closing, each Seller shall, and shall cause its Affiliates to, keep confidential and not disclose to any other Person or use for his, her, or its own benefit or the benefit of any other Person any information, whether oral or written, regarding the Purchaser Group. The obligation of each Seller, and such Seller's Affiliates under this <u>Section 6.5(d)</u> shall not apply to information that (i) is or becomes generally available to the public without breach of the commitment provided for in this <u>Section 6.5(d)</u>, (ii) is required to be disclosed by Law or Order of a court or tribunal or other Governmental Entity, <u>provided</u> that in any such case, such Seller or such Seller's Affiliate (as applicable) shall notify Purchaser as early as reasonably practicable before disclosure (to extent permitted by Law) to allow Purchaser to take appropriate measures to preserve the confidentiality of such information, (iii) is received from a third party not in breach of any confidentiality obligations and entitled to disclosed it or (iv) is developed by such Seller without use of or reliance on any such information.

(e)     Each Seller on behalf of himself, herself or itself and his, her or its Affiliates agrees not to make any negative or disparaging public statements or public communications regarding any the Company, the Purchaser or their respective Affiliates, any of their respective services or practices, or any of their respective directors, managers, partners, officers, agents, representatives, direct or indirect equity holders or Affiliates, either orally or in writing, at any time from and after the date hereof.

(f)     Each Seller on behalf of himself, herself or itself and his, her or its Affiliates acknowledges and agrees that (i) the making of the covenants and agreements set forth in this Section 6.5 are a material inducement to Purchaser entering into this Agreement and a condition to Purchaser's consummation of the Transactions; (ii) the services and products of the Company are or could be marketed and distributed throughout the Restricted Area; (iii) the Company competes with other businesses that are or could be located in any part of the Restricted Area; (iv) the covenants and agreements contained in this Section 6.5 are essential to the continued growth and stability of the business, goodwill and customer base of the Company and each member of the Purchaser Group and to the continuing viability of the endeavors of the Company and each other member of the Purchaser Group; and (v) this Section 6.5 (including the territorial, time and scope limitations set forth in Sections 6.5(a) through (c)) is reasonable and necessary for the protection of the Company and each other member of the Purchaser Group. No Seller or Restricted Person, or any of their Affiliates, will challenge the reasonableness or enforceability of any of the covenants or agreements set forth in this Section 6.5.  If any covenant or agreement in this Section 6.5 is found to be unreasonable, arbitrary, against public policy or otherwise not enforceable in accordance with its terms, then such covenant shall be considered to be divisible with respect to scope, time and geographic area, and such lesser scope, time or geographic area, or all of them, as a court of competent jurisdiction may determine to be reasonable, not arbitrary or not against public policy, shall be effective, binding and enforceable against each Seller and Restricted Person.

(g)     A breach of this Section 6.5 by any Restricted Person or Seller, or any of their Affiliates, cannot be adequately compensated in any proceeding for damages at Law, and equitable relief would be necessary to protect the Company and each other member of the Purchaser Group from a violation of this Agreement and from the harm that this Agreement is intended to prevent. Accordingly, each Seller and Restricted Person on behalf of itself and its Affiliates agrees that if there occurs any actual or threatened breach of those provisions, then the Company and each other member of the Purchaser Group shall (in addition to any other remedies that they may have) be entitled to enforce their rights and the obligations of such Seller or Restricted Person, or any of their Affiliates, under this Section 6.5 not only by a proceeding or proceedings for damages, but also by a proceeding or proceedings for specific performance, temporary or permanent injunctive relief or other equitable relief in order to enforce or prevent any violations (whether anticipatory, continuing or future) of this Section 6.5 (including the extension of the Restricted Period by a period equal to (i) the length of the violation of this Section 6.5 plus (ii) the length of any proceedings necessary to stop such violation) and recover attorneys' fees and costs for the same, and that relief may be granted without the necessity of proving actual damages or the inadequacy of money damages, or posting bond. In the event of a breach or violation by any Seller or Restricted Person, or any of their Affiliates, of this Section,

the running of the Restricted Period (but not the obligations of any Seller or Restricted Person, or any of their Affiliates, under this <u>Section 6.5</u>) shall be tolled with respect to such Seller or Restricted Person, or any of their Affiliates, during the continuance of any actual breach or violation.

Section 6.6    <u>Further Assurances</u>. Following the Closing, each of the Parties hereto shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

**ARTICLE VII**
**INDEMNIFICATION**

Section 7.1    <u>Survival of Representations and Warranties and Covenants</u>.  The representations and warranties of the Sellers and Purchaser contained in <u>Article III</u>, <u>Article IV</u> and <u>Article V</u> or in any certificate delivered hereunder shall survive the Closing until the one (1)-year anniversary of the Closing Date; <u>provided</u> that the Fundamental Representations shall survive the Closing until the date that is three (3) years following the Closing Date.  The covenants or other agreements contained in this Agreement that contemplate performance prior to Closing shall survive the Closing until the date that is six (6) months following the Closing Date.  The covenants or other agreements contained in this Agreement that contemplate performance after the Closing (including the agreements contained in <u>Section 7.2</u>) shall survive the Closing until the expiration of the stated duration of such covenant as specified in this Agreement. Any claim for breach of any representation or warranty, or failure to perform any covenant or agreement, brought by an Indemnified Party after the expiration of the applicable survival period will be void and invalid, and no Party shall have any liability with respect thereto; <u>provided</u>, that, notwithstanding anything in this <u>Section 7.1</u> to the contrary, any claim pending on the expiration of the survival period applicable to such claim for which a Notice of Claim has been given in accordance with <u>Section 7.3(a)</u> or <u>Section 7.3(b)</u>, as applicable, on or before such date shall survive until such claim has been finally resolved.

Section 7.2    <u>General Indemnification</u>.

(a)    Subject to the limitations set forth in this <u>Article VII</u>, from and after the Closing, each Seller shall severally and not jointly, in accordance with such Seller's Pro Rata Percentage, defend, indemnify and hold harmless Purchaser and its Affiliates (including the Company following the Closing), each of their respective officers, employees, directors, managers, partners, members, equityholders, heirs, personal representatives and successors and permitted assigns (each, a "<u>Purchaser Indemnitee</u>") from and against any and all Losses arising from, in connection with or resulting from (i) any breach of any representation or warranty of the Company or the Sellers contained in <u>Article III</u> or <u>Article (c)</u> or in any certificate delivered hereunder, (ii) any breach by the Sellers of any of their covenants or agreements contained herein or in any certificate delivered hereunder, (iii) any Pre-Closing Taxes, (iv) any Indebtedness or Seller Expenses, in each case, as of immediately prior to the Closing and to the extent not taken into account in the calculation of the Purchase Price as finally determined in accordance with <u>Section</u>

2.5, (v) any inaccuracy in the Funds Flow, (vi) any breach of any consent, notice or other Contract or violation of Applicable Law relating to any loan applied for or received by the Company under the Paycheck Protection Program established under the CARES Act, and (vii) any matters set forth on Schedule 7.2(a)(vii).

(b)     Subject to the limitations set forth in this Article VII, from and after the Closing, Purchaser shall defend, indemnify and hold harmless the Sellers, their respective Affiliates, and each of their respective officers, employees, directors, managers, partners, members, equityholders, heirs, personal representatives and successors and permitted assigns (each, a "Seller Indemnitee" and together with the Purchaser Indemnitees, the "Indemnitees") from and against any and all Losses arising from, in connection with or resulting from (i) any breach of any representation or warranty of Purchaser contained in Article V or in any certificate delivered hereunder and (ii) any breach by Purchaser of any of its covenants or agreements contained herein or in any certificate delivered hereunder.

(c)     The obligations to indemnify and hold harmless pursuant to this Section 7.2 shall survive the consummation of the Transactions for the applicable period set forth in Section 7.1.

Section 7.3     Procedures.

(a)     Direct Claims. As promptly as is reasonably practicable after becoming aware of any claim or demand not involving a Third Party Claim that any Person entitled to indemnification pursuant to Section 7.2 (an "Indemnified Party") in good faith believes may result in a Loss under this Article VII, but in no event more than twenty (20) days after first becoming aware of such claim, the Indemnified Party shall notify the Responsible Party with a Notice of Claim, including the facts alleged to constitute the basis for such claim, the amount or the estimated amount of Losses sought thereunder to the extent then ascertainable, and any other material details pertaining thereto; provided, that the failure to timely give such notice shall not affect the rights of an Indemnified Party hereunder unless such failure has prejudiced the defenses or other rights available to the Responsible Party with respect to such claim. The Responsible Party and the Indemnified Party shall use commercially reasonable efforts to settle any disputes relating to the matters identified in the Notice of Claim within thirty (30) days after the date Notice of Claim is delivered.

(b)     Third Party Claims.

(i)     If a claim or demand by a Person who is not a Party or an Affiliate thereof (other than a Tax Contest) (a "Third-Party Claim") is made, commenced or threatened in writing against an Indemnified Party, and if such Person intends to seek indemnity with respect thereto under this Article VII, such Indemnified Party shall promptly give a Notice of Claim to the Responsible Party; provided that the failure to give such Notice of Claim shall not relieve the Responsible Party of its obligations hereunder, except to the extent that the Responsible Party is actually prejudiced thereby.

(ii)     The Responsible Party shall have fifteen (15) days after receipt of such notice, by providing written notice to the Indemnified Party, to assume the conduct and control, through counsel reasonably acceptable to the Indemnified Party and at the expense of the Responsible Party, of the defense thereof, if (i) the Responsible Party conducts the defense of such Third-Party Claim actively and diligently, (ii) the Responsible Party acknowledges in writing its obligation to indemnify the Indemnified Party for the Losses in respect of such Third-Party Claim, (iii) such Third-Party Claim seeks solely monetary damages, the amount of which will be paid by the Responsible Party, and does not involve criminal or quasi-criminal allegations, (iv) the Indemnified Party has not determined in good faith that joint representation would be inappropriate because of a conflict of interest, and (v) the applicable Third-Party Claim is not asserted directly by or on behalf of a Person that is a supplier or customer of the Company.  If the Responsible Party assumes the defense of any such Third-Party Claim, the Indemnified Party shall, in its sole discretion, have the right to employ at the Indemnified Party's cost (unless the Indemnified Party determines in good faith that there exists a conflict of interest that would make it inappropriate for the same counsel to represent both the Indemnified Party and the Responsible Party, then the Indemnified Party shall be entitled to retain a single firm to serve as its own counsel, at the expense of the Responsible Party) separate counsel (who may be selected by the Indemnified Party in its sole discretion) in any such action and to participate in the defense thereof. The Responsible Party, and not the Indemnified Party, shall have the exclusive right to compromise or settle any Third-Party Claim of which it elects to conduct the defense and settlement; provided, that the prior written consent of the Indemnified Party shall be required with respect to any such compromise or settlement if (A) the Indemnified Party or any of its Affiliates or representatives would be required to pay any monetary damages as a result of such compromise or settlement, (B) such compromise or settlement contains any sanction or restriction that would adversely affect the conduct of any business of the Indemnified Party or its Affiliates in any material respect, (C) such compromise or settlement does not fully and unconditionally release the Indemnified Party with respect to such Third-Party Claim or (D) such compromise or settlement includes a finding or admission of any violation of Law by the Indemnified Party or any of its Affiliates or representatives.  The Indemnified Party will not consent to a settlement of, or the entry of any Order arising from, any such Third Party Claim without the prior written consent of the Responsible Party (such consent not to be unreasonably withheld or delayed) unless the proposed settlement or Order would require payment of Losses that exceed the Indemnity Escrow Amount by at least 125% and such Third Party Claim has been tendered to the R&W Insurance Policy insurer and such insurer has accepted coverage.

(iii)     If the Responsible Party does not notify the Indemnified Party within thirty (30) days after the receipt of the Indemnified Party's Notice of Claim hereunder that it elects to undertake the defense thereof, or if the conditions set forth in clauses (i) through (iv) of Section 7.3(b)(ii) are not satisfied, the Indemnified Party shall have the right to contest, settle or compromise the claim but shall not thereby waive any right to indemnity therefor pursuant to this Agreement; provided, that the Responsible Party shall reimburse the Indemnified Party for the costs of defending against such Third-Party Claim (including reasonable attorneys' fees and expenses of a single firm) and shall remain otherwise responsible for any indemnifiable Losses with respect to amounts arising from or related to such Third-Party Claim.

(iv)     All of the Parties shall cooperate in the defense or prosecution of any Third-Party Claim in respect of which indemnity may be sought hereunder, and Purchaser shall (and shall cause the Company to) furnish such records, information and testimony, and attend such conferences, discovery proceedings, hearings, trials and appeals, as may be reasonably requested in connection therewith.

(c)     Meaning of Responsible Party for Purposes of Section 7.3.  For purposes of this Section 7.3, "Responsible Party" means (i) the Representative with respect to any claim for indemnification pursuant to Section 7.2(a) and (ii) Purchaser with respect to any claim for indemnification pursuant to Section 7.2(b).

(d)     Cooperation.  For all purposes of this Article VII, Purchaser and the Representative shall cooperate with and make available to the other Party and its respective representatives all information, records and data, and shall permit reasonable access to its facilities and personnel, as may be reasonably required in connection with the resolution of such disputes, subject to Section 7.3.  The Parties shall use reasonable best efforts to avoid production of confidential information (consistent with applicable Law) and to cause all communications among employees, counsel and others representing any party to a Third Party Claim to be made so as to preserve any applicable attorney-client or work product privileges.  Without limiting the foregoing, with respect to a Third Party Claim for which any Seller is the party responsible for the defense thereof, Purchaser shall use all reasonable efforts to make available to the Representative and its representatives all books and records of Purchaser and the Company relating to such Third Party Claim, and shall cooperate at the cost and expense of the Representative with the Representative in the defense of the Third Party Claim.

Section 7.4     Limitations on Indemnification Obligations.  Notwithstanding anything to the contrary contained herein, the rights of the Indemnitees to any payment with respect to any indemnification pursuant to Section 7.2 are subject to the following limitations:

(a)     the amount of any and all Losses pursuant to Section 7.2(a) or Section 7.2(b) shall be determined (i) net of any amounts actually recovered by the Indemnitees under insurance policies (other than the RWI Policy) or other collateral sources (such as contractual indemnified parties of any Person which are contained outside of this Agreement), with respect to such Losses and (ii) including all reasonable out-of-pocket costs and expenses, Taxes and premium increases incurred in connection with such recoveries;

(b)     except in connection with breaches of Fundamental Representations, Pre-Closing Taxes or Fraud, the Purchaser Indemnitees shall not be entitled to recover Losses pursuant to Section 7.2(a)(i) until the total amount which such Purchaser Indemnitee would recover under Section 7.2(a)(i) (as limited by the provisions of Section 7.4(a)), but for this Section 7.4(b), exceeds $600,000 (the "Deductible") in which case such Purchaser Indemnitee shall only be entitled to recover Losses in excess of the Deductible, subject to the other limitations herein;

(c)     except in connection with breaches of Purchaser Fundamental Representations or Fraud, the Seller Indemnitees shall not be entitled to recover Losses pursuant to Section 7.2(b)(i) until the total amount which such Seller Indemnitee would recover under

Section 7.2(b)(i) (as limited by the provisions of Sections 7.4(a)), but for this Section 7.4(c), exceeds the Deductible, in which case such Seller Indemnitee shall only be entitled to recover Losses in excess of the Deductible, subject to the other limitations herein;

(d)      except in connection with breaches of Fundamental Representations, Pre-Closing Taxes or Fraud, the Purchaser Indemnitees shall not be entitled to recover Losses from any Seller pursuant to Section 7.2(a)(i) in an aggregate amount in excess of the Indemnity Escrow Amount;

(e)      in connection with breaches of Fundamental Representations or any and all Losses pursuant to Sections 7.2(a)(ii) through (vii), the Purchaser Indemnitees shall not be entitled to recover Losses from any Seller in excess of an amount equal to the applicable Seller's Pro Rata Percentage of the Purchase Price;

(f)      in no event shall any of the Indemnitees be entitled to seek or receive indemnification for the same Loss more than once under this Article VII even if a claim for indemnification in respect of such Loss has been made as a result of a breach of more than one representation, warranty, covenant or agreement contained in this Agreement;

(g)      for purposes of this Article VII, if any representation or warranty contained herein is qualified by knowledge, materiality, "Company Material Adverse Effect," "material adverse effect" or a derivative thereof, such qualification will be ignored and deemed not included in such representation or warranty for purposes of (i) determining whether such representation or warranty has been breached, was misrepresented or is inaccurate and (ii) calculating the amount of Losses with respect to such breach, misrepresentation or inaccuracy; and

(h)      in any case where an Indemnitee actually recovers, under insurance policies or from other collateral sources, to reduce the amount of indemnifiable Losses pursuant to Section 7.4(a) and was not previously taken into account pursuant thereto, any amount in respect of a matter for which such Indemnitee was indemnified pursuant to Section 7.2(a) or Section 7.2(b), such Indemnitee shall, subsequent to the receipt of such recovery promptly pay over to the other Party the amount so recovered or realized (after deducting therefrom the amount of the reasonable out-of-pocket costs and expenses and premium increases incurred by such Indemnitee in procuring such recovery or realization), but not in excess of the sum of (i) any amount previously so paid to or on behalf of such Indemnitee in respect of such matter and (ii) any amount expended by the Indemnitee in pursuing or defending any claim arising out of such matter.

(i)      Purchaser Indemnitees shall not be entitled to recover Losses pursuant to Section 7.2(a)(iii) to the extent such Losses were taken into account in the calculation of the Purchase Price as finally determined in accordance with Section 2.5.

(j)      Notwithstanding anything to the contrary in this Agreement, no Seller shall be liable for any claim with respect to another Seller's breach of any representation or warranty contained in Article IV or noncompliance by another Seller with such Seller's individual covenants or agreements contained in this Agreement or any Ancillary Agreement or the Fraud of any other

Seller. In addition to the foregoing, KV EDTech Partners LLC shall not be liable for any claim with respect to another Seller's breach of any representation or warranty contained in Article III.

(k)     The Sellers shall not have any right of contribution or other recourse against the Company or its respective managers, directors, officers, employees, Affiliates, agents, attorneys, representatives, assigns or successors for any Third-Party Claims asserted by a Purchaser Indemnitee, it being acknowledged and agreed that the covenants and agreements of the Sellers herein are solely for the benefit of the Purchaser Indemnitees.

Section 7.5     Exclusive Remedy.  Except for claims based on Fraud, the Parties agree that the sole and exclusive remedies of the Parties for any Losses based upon, arising out of or otherwise in respect of the matters set forth in this Agreement or the transactions contemplated hereby are the indemnification obligations of the Parties set forth in this Article VII. Notwithstanding the foregoing, the provisions of this Section 7.5 will not, however, prevent or limit a cause of action (a) under Section 8.16 to obtain an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, or (b) under Section 2.5 to enforce any decision or determination of the Accounting Firm.  To the extent that any Party has any Losses for which it may assert any right to indemnification, reimbursement, contribution or recovery in connection with this Agreement (whether under this Agreement or under any common law or any statute or otherwise) other than pursuant to this Article VII or Section 2.5 (i) each Seller hereby waives, releases and agrees not to assert such right, and (ii) Purchaser hereby waives, releases and agrees not to assert such right, in each case, regardless of the theory upon which any claim may be based, whether contract, equity, tort, fraud, negligent or intentional misrepresentation, warranty, strict liability or any other theory of liability, in each case, other than a claim against a Party for Fraud.

Section 7.6     Source of Recovery.  Subject to the other provisions of this Section 7.6, any indemnification payment to the Indemnitees pursuant to this Article VII shall be effected within thirty (30) days after the final determination thereof, by wire transfer of immediately available funds from the indemnifying Party to an account designated in writing by the applicable Indemnitee.  With respect to any indemnification obligations for Losses pursuant to Section 7.2(a)(i) except in connection with breaches of Fundamental Representations, Pre-Closing Taxes or Fraud, all Losses shall be satisfied in the following order of priority: (i) first, all Losses in excess of the Deductible shall be satisfied from the Indemnity Escrow Funds (to the extent available), by the Parties delivering joint written instructions to the Escrow Agent to effect such distribution to Purchaser; and (ii) second, to the extent applicable and to the fullest extent possible, such Losses shall be recovered under the R&W Policy in accordance with its terms. All Losses arising from Fraud, breaches of Fundamental Representations or pursuant to Sections 7.2(a)(ii) through (vii) shall be satisfied directly by Sellers in accordance with this Article VII.  For purposes of this Article VII, a "final determination" shall exist when (x) the parties to the dispute have reached an agreement in writing and the indemnifying Party has agreed that Losses (or portion thereof) are required to be paid by the indemnifying Party or (y) a court of competent jurisdiction shall have entered an order or stipulation that Losses (or portion thereof) are required to be paid by the indemnifying Party.  All indemnification payments or reimbursements made pursuant to this

<u>Article VII</u> shall be treated by the Parties as an adjustment to the Purchase Price for all applicable Tax purposes except to the extent otherwise required by applicable Law.

Section 7.7 <u>Release of Indemnity Escrow Amount</u>. Any portion of the Indemnity Escrow Amount remaining in the Escrow Account on the first anniversary of the Closing Date (the "<u>Indemnity Escrow Release Date</u>") (minus the aggregate amount of Losses claimed by the Purchaser Indemnitees against such funds pursuant to this Article VII and not fully resolved (the "<u>Pending Indemnity Claims</u>") prior to the Indemnity Escrow Release Date shall be released to (or as directed by) Representative in accordance with the joint written instructions delivered by Purchaser and Representative to the Escrow Agent no later than ten (10) Business Days following the Indemnity Escrow Release Date. At any time following the Indemnity Escrow Release Date, upon the final determination of any Pending Indemnity Claims, the applicable portion of the Indemnity Escrow Amount with respect to such Pending Indemnity Claims held in the Escrow Account shall be promptly released to (or as directed by) Purchaser or Representative, as the case may be, in accordance with the joint written instructions of Purchaser and Representative.

## ARTICLE VIII

## MISCELLANEOUS

Section 8.1 <u>Entire Agreement; Assignment</u>. This Agreement and the Ancillary Documents constitute the entire agreement among the Parties with respect to the subject matter hereof and thereof and supersede all other prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof and thereof. This Agreement may not be assigned by any Party (whether by operation of law or otherwise) without the prior written consent of the other Parties; <u>provided</u> that Purchaser may, without the prior written consent of any other Party, (a) make a collateral assignment of all or part of its rights under this Agreement to any lender to Purchaser or the Company (provided, no such assignment shall relieve Purchaser of its obligations hereunder), (b) assign this Agreement to an Affiliate of Purchaser or (c) assign this Agreement to another Person in connection with the sale of all or substantially all of Purchaser's or the Company's business, including pursuant to a direct or indirect merger, sale of equity interests or sale of assets. Any attempted assignment of this Agreement not in accordance with the terms of this <u>Section 8.1</u> shall be null and void.

Section 8.2 <u>Notices</u>. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given (and shall be deemed to have been duly given upon receipt) by delivery in person, by E-mail, by a nationally- recognized overnight delivery service or by registered or certified mail (postage prepaid, return receipt requested) as follows:

SRC Intermediate Holdings Inc.
c/o Student Resource Center Holdings Inc.
Sterling Small Market Education Fund, L.P.
401 North Michigan Avenue, Suite 3300
Chicago, IL 60611
Attention: General Counsel
Email: aepstein@sterlingpartners.com

with a copy (which shall not constitute notice) to:

Baker & Hostetler LLP
One North Wacker Drive, Suite 4500
Chicago, Illinois 60606
Attention: Adam Skilken; Matthew Oliver
Email: askilken@bakerlaw.com; moliver@bakerlaw.com

if to the Representative:

Higher Education Partners LLC
c/o Monitor Clipper Partners
116 Huntington Avenue, 9th Floor
Boston, MA  02116
Attention:      Travis R. Metz
E-Mail:          tmetz@monitorclipper.com

with a copy (which shall not constitute notice) to:

Rubin and Rudman LLP
53 State Street, 15th floor
Boston, MA 02109
Attention: Michael F. Connolly
Phone: (617) 330-7101
E-mail: mfc@rubinrudman.com

or to such other address as the Person to whom notice is given may have previously furnished to the other in writing in the manner set forth above.

Section 8.3      Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of Delaware.

Section 8.4     Fees and Expenses; R&W Policy.

(a)     Except as otherwise expressly set forth in this Agreement or in any Ancillary Document, whether or not the Transactions are consummated, all fees and expenses incurred in connection with this Agreement, the Ancillary Documents and the Transactions, including the fees and disbursements of counsel, financial advisors and accountants, shall be paid by the Party incurring such fees or expenses.  All transfer, stamp, documentary, sales and use, value added, registration, conveyance, deed and other similar Taxes, and related fees imposed on any of the Parties by any Governmental Entity in connection with the transactions contemplated by this Agreement ("Transfer Taxes"), together with any interest, penalties or additions to such Transfer Taxes, shall be borne and paid fifty-percent (50%) by the Sellers and fifty-percent (50%) by Purchaser. The Representative and Purchaser shall, at Sellers' expense, (i) cooperate in timely making all filings, returns, reports and forms as necessary or appropriate to comply with the provisions of all applicable Laws in connection with the payment of such Transfer Taxes, and (ii) cooperate to minimize, to the fullest extent possible under such Laws, the amount of any such Transfer Taxes payable in connection therewith.

(b)     The Parties acknowledge that concurrently with the execution hereof, Purchaser has entered into a conditional binder agreement with respect the R&W Policy. Concurrently with Closing, Purchaser has paid or shall pay, all costs and expenses related to the R&W Policy, including the total premium, underwriting costs, brokerage commission, and Taxes related to such policy and other fees and expenses.  The R&W Policy shall expressly provide that the insurer or insurers issuing such policy shall have no right, and waive any right, of subrogation, contribution or otherwise against the Representative or any Seller (including any former, current or future officers, directors, managers, employees, shareholders, members and equityholders of the Representative or any Seller) based upon, arising out of, or in any way connected to this Agreement, the Transactions, or such R&W Policy, except in the event of Fraud in the making of the representations, warranties and covenants in this Agreement.  Purchaser and its Affiliates shall not amend, waive, modify or otherwise revise the foregoing subrogation provision in any R&W Policy in a manner adverse to the Sellers.

Section 8.5     Construction; Interpretation.    The term "this Agreement" means this Agreement together with all schedules and exhibits hereto, as the same may from time to time be amended, modified, supplemented or restated in accordance with the terms hereof.  The headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.  No Party, nor its respective counsel, shall be deemed the drafter of this Agreement for purposes of construing or enforcing the provisions hereof, and all provisions of this Agreement shall be construed according to their fair meaning and not strictly for or against any Party, and no presumption or burden of proof will arise favoring or disfavoring any Person by virtue of its authorship of any provision of this Agreement.  Unless otherwise indicated to the contrary herein by the context or use thereof: (a) the words, "herein," "hereto," "hereof" and words of similar import refer to this Agreement as a whole, including the schedules and exhibits, and not to any particular section, subsection, paragraph, subparagraph or clause contained in this Agreement; (b) masculine gender shall also include the feminine and neutral genders, and vice versa; (c) words importing the singular shall also include the plural, and vice versa; (d) the words

"include," "includes" or "including" shall be deemed to be followed by the words "without limitation"; (e) the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not mean simply "if"; (f) references to "dollar", "dollars" or "$" shall be to the lawful currency of the United States; (g) the word "or" shall not be exclusive; and (h) the word "shall" and "will" indicate a mandatory obligation. When a document is referenced as being "made available" in this Agreement that shall mean such document was uploaded to the data room established by the Company at Intralinks.com titled "Data Room - Student Resource Center" by 5:00 p.m. (Eastern Time) on the day that is two (2) Business Days prior to the date hereof.

Section 8.6    <u>Exhibits and Schedules</u>.  All exhibits and schedules or other documents expressly incorporated into this Agreement, are hereby incorporated into this Agreement and are hereby made a part hereof as if set out in full in this Agreement.  Any item disclosed on any schedule referenced by a particular section in this Agreement shall be deemed to have been disclosed with respect to every other section in this Agreement if the relevance of such disclosure to such other section is reasonably apparent on the face of such disclosure.  The specification of any dollar amount in the representations or warranties contained in this Agreement or the inclusion of any specific item in any schedule is not intended to imply that such amounts, or higher or lower amounts or the items so included or other items, are or are not material, and no Party shall use the fact of the setting of such amounts or the inclusion of any such item in any dispute or controversy as to whether any obligation, items or matter not described herein or included in a schedule is or is not material for purposes of this Agreement.

Section 8.7    <u>Computation of Time</u>.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" mean "to but excluding" and the word "through" means "to and including." Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon a day that is not a Business Day, the Party having such privilege or duty may exercise such privilege or discharge such duty on the next succeeding day that is a Business Day.

Section 8.8    <u>Parties in Interest</u>.  This Agreement shall be binding upon and inure solely to the benefit of each Party and its successors and permitted assigns and, except as provided in <u>Section 6.1</u> and <u>Section 8.17</u>, and regarding the Indemnitees defined in <u>Section 7.2(b)</u>, nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement.

Section 8.9    <u>Severability</u>.  Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable Law, but if any term or other provision of this Agreement is held to be invalid, illegal or unenforceable under applicable Law, all other provisions of this Agreement shall remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision of this Agreement is invalid, illegal or unenforceable under applicable Law, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 8.10    Amendment.  Subject to applicable Law and Section 8.11, this Agreement may be amended or modified only by a written agreement executed and delivered by duly authorized officers of Purchaser and Representative.  This Agreement may not be modified or amended except as provided in the immediately preceding sentence and any purported amendment by any Party or Parties effected in a manner which does not comply with this Section 8.10 shall be null and void.

Section 8.11    Waiver.

(a)    Representative, on behalf of all Sellers, may waive compliance by Purchaser with any term or provision of this Agreement.  Purchaser may waive compliance by any Seller or the Company with any term or provision of this Agreement.

(b)    Any agreement on the part of any Party to any such waiver shall be valid only if set forth in a written instrument signed on behalf of such Party as described in Section 8.11(a).  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.  The failure of or delay by any Party to assert any of its rights hereunder shall not constitute a waiver of such rights.

Section 8.12    Counterparts; Electronic Signatures.  This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile, pdf, email or other electronic means shall be effective as delivery of a manually executed counterpart to this Agreement.

Section 8.13    Knowledge of the Company.  For all purposes of this Agreement, the phrase "to the Company's knowledge," "to the knowledge of the Company" and "known by the Company" and any derivations thereof or phrases having similar import thereto shall mean as of the applicable date, the actual knowledge of any of Michael J. Perik, John Haseley, Nicole Rowe Colclasure, Steve Wynne, Daniel Jones or Luis Rosa, in each case after reasonable inquiry within the scope of his or her responsibilities.

Section 8.14    Waiver of Jury Trial.  EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (a) ARISING UNDER THIS AGREEMENT OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE.  EACH PARTY HEREBY FURTHER AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT A PARTY MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

Section 8.15   Jurisdiction and Venue.   Each of the Parties submits to the exclusive jurisdiction of any state or federal court sitting in Wilmington, Delaware (and any applicable appellate court in the event of any appeal), in any action or proceeding arising out of or relating to this Agreement, agrees that all claims in respect of the action or proceeding may be heard and determined in any such court and agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court.   Each of the Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto.   Each Party agrees that service of summons and complaint or any other process that might be served in any action or proceeding may be made on such Party by sending or delivering a copy of the process to the Party to be served at the address of the Party and in the manner provided for the giving of notices in Section 8.2.   Nothing in this Section 8.15 shall affect the right of any Party to serve legal process in any other manner permitted by Law.   Each Party agrees that a final, non-appealable judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by Law.

Section 8.16   Remedies. Any and all remedies provided herein will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by Law or equity upon such Party, and the exercise by a Party of any one (1) remedy will not preclude the exercise of any other remedy.   The Parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that the Parties do not fully and timely perform their respective obligations under or in connection with the provisions of this Agreement in accordance with their specific terms or otherwise breach such provisions.   The Parties agree that Purchaser shall be entitled to an injunction or injunctions, specific performance and other equitable relief to prevent breaches or non-performance of this Agreement and to enforce specifically the terms and provisions of this Agreement, in each case without posting a bond or undertaking and without proof of damages and this being in addition to any other remedy to which they are entitled at law or in equity.   The Parties further agree that they will not oppose the granting of an injunction, specific performance and other equitable relief when expressly available pursuant to the terms of this Agreement on the basis that the other Parties have an adequate remedy at law or an award of specific performance is not an appropriate remedy for any reason at law or equity.

Section 8.17   Non-Recourse.   All claims or causes of action (whether in contract or in tort, at law or in equity) that may be based upon, arise out of or relate to this Agreement or the Ancillary Documents, or the negotiation, execution or performance of this Agreement or the Ancillary Documents (including any representation or warranty made in or in connection with this Agreement or the Ancillary Documents or as an inducement to enter into this Agreement or the Ancillary Documents) may be made only against the entities and/or individuals that are expressly identified as parties hereto and thereto.   Except to the extent named as a party to this Agreement or any Ancillary Document (then only to the extent of the specific obligations of such parties set forth in this Agreement or such Ancillary Document), no Purchaser Related Party or Seller Related Party shall have any liability (whether in contract or in tort, in law or in equity, or based upon any theory that seeks to impose liability of any Party that is an entity against its owners or affiliates) for any obligations or liabilities arising under, in connection with or related to this Agreement or such Ancillary Document or any Transactions contemplated hereby or thereby or for any claim

based on, in respect of, or by reason of this Agreement or such Ancillary Document (as the case may be), the Transactions contemplated hereby and thereby or the negotiation or execution hereof or thereof; and each Party (on behalf of itself and its Affiliates) waives and releases all such liabilities, claims and obligations against any Purchaser Related Party or Seller Related Party. The Purchaser Related Parties and the Seller Related Parties are expressly intended as third-party beneficiaries of this provision of this <u>Section 8.17</u>.

**ARTICLE IX**
**REPRESENTATIVE OF THE SELLERS**

Section 9.1    <u>Authorization of Representative</u>.

(a)    Higher Education Partners LLC, a Delaware limited liability company, is hereby appointed, authorized and empowered to act as a representative ("<u>Representative</u>"), for the benefit of the Sellers, as the sole and exclusive agent and attorney-in-fact to act on behalf of each Seller, in connection with and to facilitate the consummation of the transactions contemplated hereby which shall include the power and authority:

(i)    to execute and deliver any Ancillary Documents (with such modifications or changes therein as to which the Representative, in its sole discretion, shall have consented) and to agree to such amendments or modifications thereto as the Representative, in its sole discretion, determines to be desirable;

(ii)    to negotiate, execute and deliver any amendments, waivers and consents in connection with this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby as the Representative, in its sole discretion, may deem necessary or desirable;

(iii)    to collect and receive all monies and other proceeds and property payable to the Representative as described herein, and, subject to any applicable withholding retention Laws, and net of any out-of-pocket expenses incurred by the Representative (including any Seller Expenses paid by Representative), <u>provided</u> that, Representative shall disburse and pay the same to the Sellers in accordance with the Sellers' Pro Rata Percentage at such time after the Closing Date as Representative determines in its reasonable discretion;

(iv)    to enforce and protect the rights and interests of the Sellers and to enforce and protect the rights and interests of Representative arising out of or under or in any manner relating to this Agreement and each Ancillary Document or the transactions provided for herein or therein, and to take any and all actions which Representative believes are necessary or appropriate under the Ancillary Documents and/or this Agreement for and on behalf of the Sellers, including asserting or pursuing any claim, action, proceeding or investigation (a "<u>Claim</u>") against Purchaser or its Affiliates, compromising or settling any such Claims, conducting negotiations with Purchaser, its Affiliates or their respective representatives regarding such Claims, and, in connection therewith, to: (A) assert any claim or institute any action, proceeding or investigation; (B) investigate, defend, contest or litigate any claim, action, proceeding or investigation initiated by Purchaser, its Affiliates or any other Person, or by any federal, state or local Governmental

73

Entity against Representative and/or any of the Sellers, and receive process on behalf of any or all Sellers in any such claim, action, proceeding or investigation and compromise or settle on such terms as Representative shall determine to be appropriate, and give receipts, releases and discharges with respect to, any such claim, action, proceeding or investigation; (C) file any proofs of debt, claims and petitions as the Representative may deem advisable or necessary; (D) settle or compromise any claims asserted under this Agreement; and (E) file and prosecute appeals from any decision, judgment or award rendered in any such action, proceeding or investigation, it being understood that Representative shall not have any obligation to take any such actions, and shall not have any liability for any failure to take any such actions;

(v)     to refrain from enforcing any right of any Seller and/or the Representative arising out of or under or in any manner relating to this Agreement or any Ancillary Document; <u>provided</u> that no such failure to act on the part of Representative, except as otherwise provided in this Agreement or in any Ancillary Document, shall be deemed a waiver of any such right or interest by Representative or by such Seller unless such waiver is made in accordance with <u>Section 8.11</u> and in writing signed by the waiving Party or by Representative;

(vi)     to make, execute, acknowledge and deliver all such other agreements, guarantees, orders, receipts, endorsements, notices, requests, instructions, certificates, stock powers, letters and other writings, and, in general, to do any and all things and to take any and all action that the Representative, in its sole and absolute discretion, may consider necessary or proper or convenient in connection with or to carry out the transactions contemplated by this Agreement, the Ancillary Documents, and all other agreements, documents or instruments referred to herein or therein or executed in connection herewith and therewith; and

(vii)     to authorize distributions from the Escrow Account on behalf of the Sellers.

(b)     The Sellers acknowledge and agree that the Representative is a party to this Agreement in its capacity as such solely to perform certain administrative functions in connection with the consummation of the transactions contemplated hereby. Accordingly, the Sellers acknowledge and agree that the Representative shall have no liability to, and shall not be liable for any losses of, any Seller in connection with any obligations of the Representative in its capacity as such under this Agreement or any of the Ancillary Documents to which it is a party or otherwise in respect of this Agreement or the transactions contemplated hereby, except to the extent such losses shall be proven to be the direct result of gross negligence or willful misconduct by the Representative in connection with the performance of its obligations hereunder or under any of the Ancillary Documents to which it is a party.

(c)     The Representative shall not be entitled to any fee, commission or other compensation for the performance of its services hereunder, but shall be entitled to reimbursement from the Sellers of all its expenses incurred as the Representative. In connection with this Agreement and any instrument, agreement or document relating hereto or thereto, and in exercising or failing to exercise all or any of the powers conferred upon the Representative hereunder (i) the Representative shall incur no responsibility whatsoever to any Seller by reason of any error in judgment or other act or omission performed or omitted hereunder or in connection with this

Agreement or any such other agreement, instrument or document, excepting only responsibility for any act or failure to act which represents willful misconduct, and (ii) the Representative shall be entitled to rely on the advice of counsel, public accountants or other independent experts experienced in the matter at issue, and any error in judgment or other act or omission of the Representative pursuant to such advice shall in no event subject the Representative to liability to any Seller. Each Seller shall indemnify, *pro rata* based upon such Seller's Pro Rata Percentage, the Representative against all losses, damages, liabilities, claims, obligations, costs and expenses, including reasonable attorneys', accountants' and other experts' fees and the amount of any judgment against them, of any nature whatsoever (including, but not limited to, any and all expense whatsoever reasonably incurred in investigating, preparing or defending against any litigation, commenced or threatened or any claims whatsoever), arising out of or in connection with any funds flow claim, investigation, challenge, action or proceeding or in connection with any appeal thereof, relating to the acts or omissions of the Representative hereunder, or otherwise in its capacity as the Representative. The foregoing indemnification shall not apply in the event of any action or proceeding which finally adjudicates the liability of the Representative hereunder for its willful misconduct. In the event of any indemnification hereunder, upon written notice from the Representative to a Seller as to the existence of a deficiency toward the payment of any such indemnification amount, such Seller shall promptly deliver to the Representative full payment of his or her ratable share of the amount of such deficiency, in accordance with such Seller's Pro Rata Percentage.

(d)     All of the indemnities, immunities and powers granted to the Representative under this Agreement shall survive the Closing Date and/or any termination of this Agreement and/or the Ancillary Documents.

(e)     Purchaser and its Affiliates and the Escrow Agent shall have the right to conclusively rely upon (without independent verification, inquiry or further evidence of any kind whatsoever) all actions taken or omitted to be taken, decisions, or instructions by the Representative pursuant to this Agreement and any other Ancillary Document to which the Representative is a party (including any amendment, extension or waiver of this Agreement), all of which actions, omissions, decisions and instructions shall be legally binding upon the Sellers. Purchaser shall not have any liability to any Seller with respect to any payments made to Representative hereunder for further distribution by Representative to any Seller.

(f)     The grant of authority provided for herein (i) is coupled with an interest and shall be irrevocable and survive the death, incompetency, bankruptcy or liquidation of any Seller, and (ii) shall survive the consummation of the transactions contemplated by this Agreement or any termination of this Agreement.

(g)     Notices or communications to or from the Representative shall constitute notice to or from the Sellers.

(h)     Higher Education Partners LLC is permitted to assign its rights and obligations as the Representative hereunder to Michael J. Perik by providing written notice of such assignment to the Sellers, Purchaser and the Escrow Agent. Upon sending such written notice of assignment, Michael J. Perik shall be the Representative for all purposes of this Agreement.

(i)        Sellers direct the establishment of the Representative Expense Fund, which shall be delivered to the Representative at Closing to use to pay any costs, expenses, Taxes, Losses or other obligations of Sellers charged or arising after the Closing in the Representative's sole discretion.  The Representative shall release the remaining balance of the Representative Expense Fund (if any) to the Sellers in accordance with their Pro Rata Percentages on the first anniversary of the Closing Date or on such earlier date as the Representative deems appropriate.

*    *    *    *    *

DocuSign Envelope ID: 26CD6938-3865-4C86-908A-576CA263C3F1

**IN WITNESS WHEREOF**, each of the Parties has caused this Unit Purchase Agreement to be duly executed on its behalf as of the day and year first above written.

<u>**COMPANY**</u>**:**

**STUDENT RESOURCE CENTER, LLC**

By: _Michael J. Perik_ _____
        Name: Michael J. Perik
        Title: Chief Executive Officer

**PURCHASER:**

**SRC INTERMEDIATE HOLDINGS INC.**

By: _____
      Name: M. Avi Epstein
      Title: President

**SELLERS:**

**HIGHER EDUCATION PARTNERS LLC**

By: _____
   Name: Travis R. Metz
   Title: Manager

**KV EDTECH PARTNERS LLC**

By: _____
   Name: Thomas G. Horton
   Title: Senior Vice President, Strategy and
   Integration

**RRGTHREE, LLC**

By: _____
   Name: John Haseley
   Title: Manager

**ADVANTAGE CAPITAL COMMUNITY
DEVELOPMENT FUND XXXII, L.L.C.**

By: _____
   Name: Christopher Harris
   Title: Authorized Principal

**ENHANCED CAPITAL OHIO RURAL FUND,
LLC**

By: _____
   Name: Andrew Eick
   Title: Authorized Principal

*[Signature Page to Unit Purchase Agreement]*

**SELLERS:**

**HIGHER EDUCATION PARTNERS LLC**

By: _____
      Name: Travis R. Metz
      Title:  Manager


**KV EDTECH PARTNERS LLC**

By: _____
      Name: Thomas G. Horton
      Title: Senior Vice President, Strategy and
      Integration

**RRGTHREE, LLC**

By: _____
      Name: John Haseley
      Title:  Manager


**ADVANTAGE CAPITAL COMMUNITY
DEVELOPMENT FUND XXXII, L.L.C.**

By: _____
      Name: Christopher Harris
      Title:  Authorized Principal


**ENHANCED CAPITAL OHIO RURAL FUND,
LLC**

By: _____
      Name: Andrew Eick
      Title:  Authorized Principal


*[Signature Page to Unit Purchase Agreement]*

**MONITOR CLIPPER EQUITY PARTNERS III, L.P.**

By:  Monitor Clipper Partners III, LP, its general partner

    By:  MCP GP III, Inc., its general partner

    By:  *April E. Evans* _____
        Name: April E. Evans
        Title:  Manager

**MONITOR CLIPPER EQUITY PARTNERS (NQP) III, L.P.**

By:  Monitor Clipper Partners III, LP, its general partner

    By:  MCP GP III, Inc., its general partner

    By:  *April E. Evans* _____
        Name: April E. Evans
        Title:  Manager

**USS GUARANTOR LLC**

By:  *Michael J. Perik* _____
      Name: Michael J. Perik
      Title:  Manager

**MWJ HOLDINGS, LLC**

By:  *Michael J. Perik* _____
      Name: Michael J. Perik
      Title:  Manager

*[Signature Page to Unit Purchase Agreement]*

**Nicole Rowe Colclasure**

*Nicole Marie Rowe Colclasure*
Nicole Rowe Colclasure

**Daniel Jones**

Daniel Jones

**Stephen Wynne**

Stephen Wynne

**Luis Rosa**

*Luis Rosa*
Luis Rosa

**REPRESENTATIVE:**

**HIGHER EDUCATION PARTNERS LLC,**
**solely in its capacity as the Representative**

By:
 Name: Travis R. Metz
 Title: Manager

*[Signature Page to Unit Purchase Agreement]*