IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STERLING SMALL MARKET EDUCATION FUND, L.P., SRC INTERMEDIATE HOLDINGS, INC., and STUDENT RESOURCE CENTER, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:22-cv-00790-JLH |
| MICHAEL PERIK, NICOLE ROWE COLCLASURE, JOHN HASELEY, DANIEL JONES, HIGHER EDUCATION PARTNERS, LLC, RRGTHREE, LLC, USS GUARANTOR, LLC, and MWJ HOLDINGS, LLC, | ) ) ) ) ) ) ) | |
| Defendants and Counterclaim Plaintiffs | ) ) ) | |

## ANSWER WITH COUNTERCLAIMS TO
## PLAINTIFFS' SECOND AMENDED COMPLAINT

Defendants Michael Perik ("Perik"), Nicole Rowe Colclasure ("Rowe"), John Haseley ("Haseley"), Daniel Jones ("Jones"), Higher Education Partners, LLC ("HEP"), RRGThree, LLC ("RRG"), USS Guarantor, LLC ("USSG") and MWJ Holdings, LLC ("MWJ") (collectively, the "Defendants") state as follows:

1.      Defendants admit that Sterling Small Market Education Fund, L.P. ("Sterling") and SRC Intermediate Holdings, Inc. ("SRC Intermediate") (collectively "Plaintiffs") brought this action, but deny that they engaged in any fraudulent conduct which induced or could have induced plaintiffs to enter into a Unit Purchase Agreement ("UPA") on June 25, 2021 to acquire Student Resources Center, LLC ("SRC" or the "Company" and collectively with Sterling and SRC Intermediate, "Plaintiffs"), which UPA was the product of extensive negotiations, phone calls and meetings during which the Defendants never made any intentional misrepresentations

or material omissions.  The representations and warranties set forth in the UPA were true and accurate when made.  Defendants admit that Plaintiffs purport to bring a fraud claim, but deny the remaining allegations in the second sentence of paragraph 1, including the allegation that Defendants engaged in any post-closing fraud.  Indeed, Defendants met with Plaintiffs' representatives on a regular basis where Company business was discussed, and no false representations or material omissions were made to Plaintiffs' representatives.  Defendants specifically deny that they also engaged in any cover-up scheme after they entered into the UPA.

2.      Defendants deny the allegations in paragraph 2, including that Michael Perik and Daniel Jones committed any post-termination contractual breaches nor any intentional interference with the Company's Collaboration Agreement with Eastern Gateway Community College ("EGCC").

3.      Defendants deny that SRC partners with higher education institutions in the "development and management" of courses for unions and other professional services. Defendants state that SRC is an education services company that connects certain state and national union members and their families with colleges offering higher education opportunities without incurring debt.  Defendants admit that Student Resource Center was founded by Michael Perik.

4.      Defendants admit that at the time of the transaction, SRC's primary institutional partner was EGCC.  Defendants admit that the issue of EGCC's accreditation was discussed during the parties' negotiation and due diligence period during which time EGCC was, had been and remains at all times accredited by the Higher Learning Commission ("HLC") as its accreditor.  While EGCC was always and is fully accredited, Defendants admit that EGCC's ability to service its students in a manner compliant with HLC's accreditation relates directly to

SRC's own commercial viability and educational impact.  Defendants deny any remaining allegations in paragraph 4.

5.	Defendants deny that they were ever asked in any meetings or follow-up regulatory diligence calls about whether Defendants knew about or had seen any reports or draft reports from HLC with respect to its mid-cycle review that was underway at EGCC.  Had they been asked that question, they would have referred Plaintiffs' representatives to EGCC. Defendants had no direct role with the education regulators including the U.S. Department of Education ("DOE") or the Ohio Department of Higher Education ("ODHE") as well as the regional and program specific accreditors.  HLC had no direct contact with Defendants.  During the parties' negotiation and due diligence period, Defendants did disclose to Plaintiffs' representatives on more than one occasion that EGCC had certain issues with the methodology and the way that the HLC conducted its site visit that occurred during the mid-cycle review that was then underway, but that the Plaintiffs never asked to see any reports from HLC to EGCC prior to HLC's final report.  Plaintiffs never asked Defendants whether they had seen a "visit team report" from HLC relating to EGCC's mid-cycle review prior to November 8, 2021.  When asked about HLC's mid-cycle review visit at EGCC, Defendants informed the Plaintiffs' representatives that it was a "botched visit" which raised the concerns of multiple civil rights groups, union groups and at least one state attorney general's office.  Plaintiffs' representatives asked one follow-up question as to the cause of those concerns and Defendants asserted that they had received reports about racial bias of one onsite reviewer.  Plaintiffs' representatives asked no further questions of Defendants about the HLC mid-cycle review visit.  Upon information and belief, neither Plaintiffs nor their counsel asked any questions relating to HLC, the "botched" site visit or the accreditation process of Michael Geoghegan, as EGCC's President, during their one

Zoom call, at which regulatory issues were discussed, prior to the transaction closing in June 2021.

6.      The allegations in paragraph 6 purport to characterize the contents of and quote snippets of Section 3.21 from the UPA, which speaks for itself.  Further answering, the language in Section 3.21 was used and agreed to by EGCC in separate agreements, including its Managed Services Agreement with the Student Services Center ("SSC"), which was executed on June 7, 2021, approximately two weeks prior to the execution of the UPA on June 25, 2021. Accordingly, that EGCC agreed to the precise language in Section 3.21 of the UPA, at the same time that the UPA was executed, demonstrates that there was no misrepresentation in Section 3.21.  Further answering, Defendants state that Plaintiffs are fundamentally misrepresenting the HLC accreditation process.  The HLC board is the only body that can impose a sanction or adverse action against a public college like EGCC.  Until the HLC board conducts its final review and votes for such a sanction, the status quo remains and there is nothing false in the representations made under 3.21.  Furthermore, for SRC's management to have breached the language of Section 3.21, they would have had to have known that the HLC board voted to take "adverse action" that could lead to a threatened suspension or termination of accreditation.  The board never took such a vote or action.  Finally, Defendants note that in the action of *EGCC v. Cardona, et al.,* C.A. No. 2:22-CV-3326-JLG-EPD, pending in the U.S. District Court for the Eastern District of Ohio on October 21, 2022, the Court held that EGCC had satisfied its accreditation requirements, which the Department of Education, through counsel, conceded at a hearing in that action.  *See* Opinion and Order dated October 21, 2022, Docket no. 37, p.4.

7.      Defendants deny that any of their pre-closing statements were false and deny that any of the representations and warranties set forth in Section 3.21 were false.  Indeed, as of the

date of the transaction, on June 25, 2021, each Institution that had entered into a collaboration agreement with SRC, including EGCC, had (i) been in material compliance with all applicable Educational Laws, and (ii) obtained and held all Educational Approvals necessary to conduct its operations as conducted and had been in material compliance with the terms and conditions of all such Educational Approvals. *Specifically, EGCC was in compliance with HLC's standards as was publicly disclosed on HLC's website, which described EGCC's status as being accredited.* Had EGCC not been in compliance with HLC's accreditation standards that would have been reflected in HLC's website and on the EGCC's website. Likewise, EGCC had obtained and held all Educational Approvals necessary to conduct its operations and has not had to cease or suspend its operations. Finally, EGCC had been in material compliance with the terms and conditions of all such Educational Approvals. Defendants' representation as of June 25, 2021 that, to the Company's knowledge, no action for the suspension, revocation, termination, or cancellation of any Educational Approval of any Institution, including EGCC, of federal funds pursuant to Title IV of any Institution, including EGCC, was pending or threatened was true and accurate. At the time of the UPA, all parties knew that the HLC's mid-cycle review was in process, which was a matter of public record. Plaintiffs' regulatory counsel and at least one of Plaintiffs' representatives were well aware of the HLC accreditation process. The HLC website disclosed at that time that EGCC was "accredited" meaning that EGCC was in compliance with all accrediting body standards and requirements.

8.      Defendants admit that on November 8, 2021, HLC publicly released the results of its accreditation review for EGCC and that HLC placed EGCC on probation for a period of two years, but deny that the probation consisted of any more than that and that EGCC's accreditation remained and remains intact. Schools remain accredited while on probation, which is a sanction

that indicates a college is remediating any concerns. Defendants deny that EGCC being placed on probation by HLC caught Sterling and SRC Holdings by complete surprise where Defendants had informed Plaintiffs' representatives of that possible outcome prior to November 8, 2021. Defendants had informed Plaintiffs' representatives that EGCC had requested a *de novo* review from HLC, which HLC had committed to do. And, on numerous occasions post-closing, Plaintiffs' representatives were repeatedly informed of the potential fall-out from the "botched visit" conducted by HLC at EGCC in November 2020. Moreover, Defendants state that Perik had specific conversations with Plaintiffs' representatives Shoshana Vernick ("Vernick"), Jeffrey Keith ("Keith"), who was considered to have been an expert on the accreditation process, and/or Brian Schwartz ("Schwartz") in the months of August, September and October 2021, including that HLC could issue a sanction to EGCC, including the possibility of probation, which would not, and did not, affect the EGCC's accreditation.

9. Defendants deny that they were well aware of HLC's plans to "sanction" EGCC prior to November 8, 2021. HLC's decision to place EGCC on probation was made by the HLC board of trustees at a board meeting a few business days prior to November 8, 2021. Defendants admit that certain of them had been provided with a copy of the draft HLC mid-cycle visit team report in or about December 2020, which is a document that speaks for itself, and that Defendants assisted EGCC in responding to certain factual errors in that draft report at the request of EGCC. Defendants further answer that the draft HLC report of the peer review team, which was provided by HLC to EGCC, was the property of EGCC and subsequently forwarded to Defendants on a confidential and limited basis to assist with the facts as alleged. Defendants state the draft HLC mid-cycle report specifically stated that such draft report was not to be shared with anyone because, according to HLC representative at the time, "the content of the

report, including team recommendations, is not final and is subject to change." The HLC representative states in its cover email that it had "complete discretion in updating the report based on information supplied by [EGCC]." Defendants deny that HLC's findings in its final report, which were made at its board meeting that proceeded November 8, 2021, were "severe" nor did it have any material impact on the student enrollment or the services that EGCC offered and provided its union students as evidenced by the strength of EGCC's spring 2022 enrollments.

10. Defendants deny that EGCC had been found to be out of compliance with HLC accreditation standards and requirements prior to November 8, 2021. Defendants deny that they ever concealed from Plaintiffs that the HLC mid-cycle review site visit resulted in a troubled process for EGCC. Defendants deny that they never informed Plaintiffs' representatives that EGCC could have been placed on probation by HLC. Indeed, Defendant Perik specifically informed Plaintiffs' representatives Keith and Vernick in October 2021, after the HLC *de novo* review, that HLC could put EGCC on probation. Defendants admit that they never disclosed HLC's "findings" during the parties' negotiations because there were no "findings" made by HLC until its board meeting prior to the release of its report on November 8, 2021. Defendants admit that they did not disclose that draft HLC report that had been provided to them by EGCC for assistance with EGCC's response to the Plaintiffs. Defendants deny that EGCC had any "probation problems" with HLC prior to HLC's public announcement on November 8, 2021. Defendants are without sufficient information or knowledge to admit or deny whether Plaintiffs learned of HLC's report at the same time as any member of the public on November 8, 2021 when HLC's letter was published on-line. Defendants deny that they ever concealed any

material information concerning HLC or EGCC that they were authorized to share with the Plaintiffs.

11.     Defendants deny that EGCC had and continues to have accreditation issues that have had any significant operational and financial hardship for SRC.  Defendants further deny that the HLC report undermined SRC's ability to fulfill its educational mission and impact. Indeed, SRC's mission, along with the mission of EGCC, was to provide union members and their families with a high quality education at no or low cost to the union member students. During Defendants' tenure at SRC, the unions who were served by EGCC and SRC had not objected to nor stopped having union members from applying to EGCC.  The union enrollment after the HLC's public letter on November 8, 2021 was unaffected by the announcement and the revenues from the union program at EGCC for the spring semester of 2022 exceeded the goal that had been set prior to HLC announcement.  Defendants deny Plaintiffs' misleading allegation that EGCC's probation has or would undermine the educational mission and impact of SRC. Defendants deny Plaintiffs' misleading allegation that EGCC's probation has or will continue to cause SRC to suffer revenue loss and material reputational harm and has caused financial damage to Plaintiffs.  Indeed, any financial damages or harm suffered by Plaintiffs and SRC has been exclusively caused by Plaintiffs' own actions and omissions.

12.     Defendants deny that Plaintiffs have been damaged by being forced to reckon with the issues underlying HLC's report and findings issued or about November 8, 2021. Defendants also deny that they made any post-closing (or pre-closing) material misrepresentations concerning EGCC to Plaintiffs nor has any statements, actions or omissions of the Defendants caused any harm to SRC's educational impact and commercial viability. Plaintiffs, on the other hand, have caused direct harm to SRC by their own gross negligence and

willful misconduct by, *inter alia*, abruptly terminating SRC's management team without notice and completely alienating EGCC, which has destroyed the SRC's collaboration with EGCC. Defendants deny that they ever made any material misrepresentations or intentional misrepresentations to Plaintiffs after the closing and deny that Defendants ever put EGCC's students' educational pursuits at risk, endangered SRC's relationship with existing partners, imperiled any future business prospects, and/or diminished SRC's value in any way. Defendants deny that they have damaged Plaintiffs' efforts from establishing any new partnerships to diversify their educational choices. Defendants also deny that they did not assist EGCC, where appropriate, with its remedial efforts. Finally, Defendants deny that they have done anything to not support SRC's "good standing with external stakeholders." Indeed, any damage to SRC was caused by Plaintiffs gross negligence and willful misconduct in the operation and maintenance of SRC's business.

13. Denied. Defendants deny that they made any pre-closing false representations or material omissions regarding EGCC. Defendants further deny that they made any false representations or material omissions in the UPA, which was heavily negotiated by counsel, including regulatory counsel for Plaintiffs, which included representation and warranty insurance for Plaintiffs' benefit but paid for by the parties, and whereby Plaintiffs and their counsel were provided direct access to EGCC and its President both prior to the closing and after the closing.

14. Defendants deny that they ever made any ongoing false misrepresentations or material omissions regarding EGCC after the transaction closed. Defendants also deny that the HLC report caused any losses to be mitigated by SRC and deny that the HLC report caused any public relations crisis and operational destruction for SRC.

15.     Defendants deny that Plaintiffs have suffered any damages other than those caused by their own actions and omissions.  Defendants deny that they ever made any intentional pre or post-closing material misrepresentations or material omissions.

16.     Defendants deny that they committed any fraud upon Plaintiffs.

17.     Defendants deny that neither Perik, Jones, nor the other individual Defendants, ever "directed" the EGCC President Michael Geoghegan ("Geoghegan") to interfere with SRC's and EGCC's contractual relationship.  Defendants also deny that Geoghegan was Perik's and Jones' "longtime collaborator."  Defendants further state that Geoghegan is a public employee of the State of Ohio and reports to EGCC's board of directors, with oversight from the Ohio Attorney General's office.  The actions that EGCC took against SRC were done pursuant to Ohio law.  Defendants deny that any of their actions involved EGCC seeking to terminate the Collaboration Agreement.  Defendants deny that any of their actions established a new company to compete with SRC for EGCC's business and union partnerships.  Defendants deny the remaining allegations in paragraph 17.

18.     Defendants deny that Perik or any of the individual Defendants "hinted at this scheme" at a March 22 meeting.  Defendants deny that they ever said that they would work with Geoghegan to put SRC "out of business."  Defendants further deny Geoghegan ever testified or said that Perik ever worked to "undermine" SRC.  Defendants deny that any alleged "signal messages" or emails to or from Geoghegan suggests, hints or indicates that Defendants had been working to set up any business to compete with or undermine SRC.  Plaintiffs were aware at all times that the "signal messages" to which they refer relate to the Student Service Center, a related company not owned or controlled by Plaintiffs nor SRC.  Defendants further state that the "signal message" to which they refer emanated from the chief financial officer of SRC regarding

SSC employees migrating to EGCC, which was confirmed by counsel. To allege that such communication was attributed to Perik to allege a "conspiracy" is a violation of the court rules. Defendants deny that any email or other communications between Jones and Geoghegan relate in any way to any efforts to "undermine" Defendants' former company SRC. To allege that any such communications constitute evidence of any conspiracy is also a violation of the court rules. Defendants deny the remaining allegations in paragraph 18.

19.     Defendants deny that SRC suffered any damages due to Defendants' wrongful conduct.

## PARTIES

20.     Defendants are without sufficient information or knowledge to admit or deny the allegations asserted in paragraph 20.

21.     Defendants are without sufficient information or knowledge to admit or deny the allegations asserted in paragraph 21.

22.     Defendants admit that SRC is a Delaware limited liability company and that SRC Intermediate is a Delaware corporation. Defendants are without sufficient information or knowledge to admit or deny the remaining allegations in paragraph 22.

23.     Defendants admit that Michael Perik was the Chief Executive Officer and co-founder of SRC prior to his termination by Plaintiffs on or about March 23, 2022.

24.     Defendants admit that Nicole Rowe Colclasure was the President and co-founder of SRC prior to her constructive termination by Plaintiffs on or about March 23, 2022.

25.     Defendants admit that John Haseley was the Chief Strategy Officer and co-founder of SRC prior to his constructive termination on or about March 23, 2022.

26.     Defendants admit that Daniel Jones was the Chief Engagement Officer of SRC prior to his constructive discharge on or about March 23, 2022.

27.     Defendants admit the allegations in paragraph 27.

28.     Defendants admit the allegations in paragraph 28.

29.     Defendants admit the allegations in paragraph 29.

30.     Defendants admit the first sentence in paragraph 30.  Defendants deny the second sentence in paragraph 30.  Defendants admit the third sentence in paragraph 30.

## JURISDICTION and VENUE

31.     Paragraph 31 calls for a legal conclusion to which no answer is required.

32.     The first and third sentences in Paragraph 32 call for legal conclusions to which no answer is required.  The second sentence of paragraph 32 purports to characterize the contents of and quotes from Section 8.15 of the UPA, which is a written document that speaks for itself.

33.     Paragraph 33 calls for a legal conclusion to which no answer is required.  Section 8.15 of the UPA is a written document that speaks for itself.

## FACTS

**I.      Student Resource Center's Business**

34.     Defendants admit the allegations in paragraph 34.

35.     Defendants deny that SRC partners with higher education institutions in the "development and administration" of courses for unions.  Defendants admit the remaining allegations in paragraph 35.

36.     Defendants admit the allegations in paragraph 36.

37.     Defendants admit the allegations in paragraph 37.

38.     Defendants admit the allegations in paragraph 38.

39.     Defendants admit the allegations in paragraph 39.

40.     The allegation set forth in paragraph 40 is a quotation from a website that speaks for itself.

41.     Defendants are without sufficient information or knowledge to admit or deny the allegations set forth in Paragraph 41.

42.     Defendants state that the allegations set forth in paragraph 42 are quotations from statements contained on the HLC website referenced in footnotes 3 and 4 and that they speak for themselves.

43.     Defendants are without sufficient information or knowledge to admit to deny the allegations in the first sentence of paragraph 43.  Defendants state that the remaining allegations set forth in paragraph 43 are quotations from statements contained on the HLC website referenced in footnotes 3 and 4 and that they speak for themselves.

## II.     Perik's Connection to EGCC.

44.     Defendants deny the allegations in paragraph 44.

45.     Defendants admit that Perik, while he was with SRC, communicated on a regular basis with Geoghegan, while he was employed with EGCC.  Defendants deny the remaining allegations in paragraph 45.

46.     Defendants admit that Higher Education Partners, LLC ("HEP") had entered into a collaboration agreement with Cincinnati State Technical Community College ("CSTCC") and that Geoghegan was the former chief financial officer of CSTCC.  Defendants deny the remaining allegations in paragraph 46.

47.     Defendants admit that HEP had entered into a Collaboration Agreement with EGCC in or around 2017.  Defendants deny the remaining allegations in paragraph 47.

48.     Defendants deny the allegations in paragraph 48.

49.     Defendants deny the allegations in paragraph 49.

**III.    Student Resource Center's Collaboration Agreement with EGCC.**

50.     Defendants admit the allegations in paragraph 50.

51.     Defendants admit that SRC and EGCC executed their Collaboration Agreement in 2017 and that the Collaboration Agreement was amended twice.  Defendants are without sufficient information or knowledge to admit or deny the remaining allegations in paragraph 51.

52.     Defendants state that the allegations set forth in paragraph 52 consist of certain terms in the Collaboration Agreement attached as Exhibit B and speak for themselves.

53.     Defendants state that the allegations set forth in paragraph 53 consist of certain terms in the Collaboration Agreement attached as Exhibit B and speak for themselves.

**IV.    SRC Generates Significant Interest in Educational Benefit Program.**

54.     Defendants admit the allegations in paragraph 54.

55.     Defendants admit the allegations in paragraph 55.

56.     Defendants admit the allegations in paragraph 56.

57.     Defendants admit the allegations in paragraph 57.

**V.    SRC Hits the Market and Sterling Considers Acquiring the Company.**

58.     Defendants admit that they sought buyers or investors for SRC in or about 2020 and retained the services of an investment banker in the process, but deny the remaining allegations in paragraph 58.

59.     Defendants admit that Sterling submitted an indication of interest to the investment banker working for Defendants, but deny the remaining allegations in paragraph 59.

60.     Defendants admit the allegations in paragraph 60.

61.     Defendants admit that Perik and Rowe met with Sterling representatives and their investment banker to discuss SRC's business.  At that meeting, there was a discussion about regulators and Perik informed the group that SRC did not have direct contact with the regulators of the schools where SRC had ongoing collaboration relationships.  While SRC was a service provider to the collaborating colleges and the unions, and, as such would do what they could to assist them in a wide variety of political and other issues, SRC was not responsible for dealing with the regulators and accreditors on behalf of the academic institutions.  Defendants deny that Sterling representatives asked them whether SRC, EGCC or Central State University ("CSU") had any issues with accreditors, including HLC.  Defendants deny that Perik and Rowe ever stated that SRC, EGCC and CSU did not have any issues with accreditors, including HLC.  Defendants deny that either Perik or Rowe made any false representations at that general-topic introductory meeting on January 26, 2021.

62.     Defendants deny that Plaintiffs ever focused on EGCC's accreditation until after the November 8, 2021 report from HLC and state that, at all times, EGCC's accreditation remained intact.  Defendants admit that approximately 95% of SRC's annual revenue was due to the union program with EGCC, but deny that the union program with EGCC was put in jeopardy due to HLC placing EGCC on probation as of November 8, 2021.  Defendants deny that EGCC's probation caused any material damage or harm to SRC's business as was evidenced by the fact that there was no material change in the union student enrollment transacting at EGCC through mid-March 2022.  To the contrary, any damage to SRC's business has been caused by Plaintiffs' gross negligence and willful misconduct, *inter alia*, in abruptly terminating the Defendants in March 2022, completely alienating EGCC and failing to assist the union student body membership.

63.     Defendants admit that Perik met with Plaintiffs' representatives to discuss SRC's financial performance. Defendants admit that the Plaintiffs' representatives at that meeting did not raise or mention EGCC's accreditation. Nor did Perik mention accreditation. Defendants further state that Perik truthfully responded to all questions asked by Plaintiffs' representatives at that meeting.

64.     Defendants admit that Plaintiff Sterling submitted an initial Letter of Intent to the investment bank to enter into a definitive purchase agreement with Defendants and selling shareholders of SRC.

65.     Defendants are without sufficient information or knowledge as to what their investment bank told to Sterling. Defendants admit that they had been in negotiations with another potential buyer or investor seeking to enter into a transaction for SRC.

66.     Defendants admit the allegations in paragraph 66.

67.     Defendants admit the allegations in paragraph 67.

**VI.     Sterling Conducts Due Diligence Into SRC, Including Accreditation Issues.**

68.     Defendants admit the allegations in paragraph 68.

69.     Defendants admit that Sterling requested access to and received documents and information relating to SRC, including SRC's collaboration agreements with EGCC and CSU, as well as the agreements with the unions. Defendants established an electronic database of all Company documents and agreements. Defendants admit that the HLC draft site visit report, which had been provided to Defendants in strict confidence by EGCC and was not to be shared with anyone, was not the property of the Defendants nor SRC and was not put in the electronic database. Defendants were not asked for any documents related to partner colleges' accreditation, as accreditation statuses are public. Defendants were specifically informed by

EGCC to not share that draft HLC report with anyone. Defendants also state that HLC had also informed EGCC that the draft report was not to be shared with anyone because the content of the report, including any recommendations, was not final and subject to change, and, in this instance, EGCC had requested a *de novo* review and HLC promised to conduct a *de novo* review. Defendants deny that they were ever asked about the existence of that draft report by Plaintiffs. Had they been asked, they would have referred Plaintiffs to the EGCC administration.

70.     Defendants admit the allegations in paragraph 70.

71.     Defendants admit the allegations in paragraph 71.

72.     Defendants admit that they had a Zoom meeting with Sterling's representatives and that the parties discussed regulatory matters. Defendants deny that Sterling's representatives questioned Defendants about whether HLC had issued a site visit team report or draft report. Indeed, Sterling asked Perik one question about "[h]ow was the HLC mid-cycle site visit" or words to that effect, and Perik responded that it was a "botched visit" which resulted in the ire of multiple civil rights and union groups and at least one state attorney general's office. Defendants state that there was one follow-up question, which was answered. At no time were the Defendants asked about the existence of any draft HLC report. Defendants state had they been asked by Plaintiffs, they would have referred Plaintiffs to EGCC's administration.

73.     Defendants deny that Perik made the two statements in the first sentence of paragraph 73. Defendants also deny that Perik made the statement in second sentence in paragraph 73. Defendants deny that neither Perik nor any of the other Defendants made any false statements at this meeting on May 13, 2021. Defendants deny that any of them sat silent in the face of any alleged false statement made by Perik or anyone. Defendants admit that they had received a copy of a draft mid-cycle review report from EGCC President Geoghegan, but HLC

promised to conduct a *de novo* review, did conduct such a *de novo* review, the draft report had no impact on EGCC's accreditation, and even when the HLC issued its final report on November 8, 2021, that report only imposed a probation period as a sanction with recommendations and did not cause any material decline in enrollment or revenues for the EGCC program. Defendants further state that the imposition of probation as a sanction is not considered to be an "adverse action" by HLC and did not jeopardize EGCC's accreditation.

74.     Defendants deny that EGCC's relationship with HLC was raised during a Zoom meeting with Sterling's representatives on May 27, 2021. Defendants admit that Perik informed the group that EGCC had asked SRC to update its collaboration agreement to remove discussion of certain services that SRC no longer provided, but had been included in the 2017 collaboration agreement, which succeeded a 2016 collaboration agreement. EGCC had raised this issue with Perik in February 2021 and, as a result, SRC revised its collaboration agreement with EGCC. Accordingly, Defendants admit that the scope of services that SRC provided to EGCC was discussed, but not in the context of HLC's role as the accreditor for EGCC. Defendants deny the remaining allegations in paragraph 74.

75.     Defendants admit that Sterling submitted a written diligence request to Defendants following the May 22, 2021 Zoom meeting. Defendants state that the diligence request is a written document that speaks for itself. Defendants admit that Perik responded that SRC had never received a request from HLC concerning SRC's scope of services provided to EGCC; instead, that request had come from EGCC representatives who wanted an understanding of SRC's then current roles and responsibilities in preparing a *de novo* review for EGCC. Accordingly, based on that call, the SRC collaboration agreement with EGCC was updated.

Defendants deny any suggestion that what they were doing or said here was incorrect, false or misleading in any way.

76.     Defendants state that the written communication quoted in paragraph 76 is a written document that speaks for itself.

77.     Defendants deny that the written communication set forth in paragraph 77 was false or misleading when it was made by Perik.  Defendants deny that neither Perik nor themselves ever made a knowingly false and misleading statement to Plaintiffs.

78.     Defendants deny the allegations in paragraph 78.  Moreover, Defendants state that the request to amend the collaboration agreement was from EGCC not HLC and that the agreement was amended at EGCC's request.  This matter was concluded at that time and had nothing to do with the HLC's draft site visit report.  Defendants further state that:  Plaintiffs and their regulatory counsel had a Zoom call with EGCC President Geoghegan to discuss regulatory and other issues and Plaintiffs did not ask about the on-going mid-cycle review process with HLC, nor the "botched" site visit that took place in November 2020, nor anything about the HLC's *de novo* review of the same.

**VII.    Sterling Forms SRC Intermediate and SRC Intermediate Executes a Purchase Agreement with Defendants to Acquire SRC.**

79.     Defendants admit their negotiations with Sterling lasted through May and June 2021.  Defendants admit that Sterling conducted a due diligence process, but that Sterling only met with EGCC once during this diligence process; never asked or inquired about the HLC mid-cycle review meeting with EGCC other than its two conversations with Perik; never had any follow-up questions when Perik informed Sterling that the HLC mid-cycle visit was a "botched visit" and never asked EGCC or its President about the same.  Defendants admit that Sterling formed an entity SRC Intermediate to purchase SRC.

80.     Defendants admit the allegations in paragraph 64 and note that the UPA is a written document that speaks for itself.

81.     Defendants admit the allegations in paragraph 81 and note that the UPA is a written document that speaks for itself.

82.     Defendants admit the allegations in paragraph 82 and note that the UPA is a written document that speaks for itself.

83.     Defendants admit the allegations in paragraph 83 and note that the UPA is a written document that speaks for itself.  Further answering, the above language was included in the EGCC Managed Services Center Agreement dated June 8, 2021, in which EGCC made virtually the identical representations and warranties as to its regulatory compliance to with HLC, among others, two weeks prior to the date of the UPA.

84.     Defendants admit the allegations in paragraph 84 and note that the UPA is a written document that speaks for itself.

85.     Defendants admit the allegations in paragraph 85 and note that the UPA is a written document that speaks for itself.

86.     Defendants admit the allegations in paragraph 86 and note that the UPA is a written document that speaks for itself.

87.     Defendants admit the allegations in paragraph 87 and note that the UPA is a written document that speaks for itself.

88.     Defendants admit the allegations in paragraph 88 and note that the UPA is a written document that speaks for itself.

89.     Defendants deny the allegations in paragraph 89.  Defendants state that EGCC was compliant with HLC's accreditation standards as was publicly disclosed on EGCC's website

and on HLC's website. Moreover, the HLC draft mid-cycle report, including any recommendations, was not final and was subject to change; EGCC had requested a *de novo* review; and HLC had promised a *de novo* review. Defendants deny that their representations in UPA Section 3.21(d)(i) was false at the time that was drafted when UPA was executed on June 25, 2021. Defendants state that the EGCC made the same representations in its Managed Services Agreement with the Student Services Center dated June 7, 2021, which was approximately two weeks before the UPA was executed. Defendants also state that this representation was reviewed with EGCC after the UPA was executed and EGCC confirmed that it was true and accurate when made.

90.     Defendants deny the allegations in paragraph 90. Defendants further state that the minor representation that the collaborating colleges, including EGCC, had obtained and held Educational Approvals necessary to conduct their operations as they were being conducted at the time and, accordingly, the representation and warranty in any of their representations set forth in Section 3.21(d)(iii) was not false. Defendants state that the EGCC made the same representation in its Managed Services Agreement with the Student Services Center dated June 7, 2021, which was approximately two weeks before the UPA was executed. Defendants further state that this representation was reviewed with EGCC after the UPA was executed and EGCC confirmed that it was true and accurate when made.

91.     Defendants deny the allegations in paragraph 91. Defendants' representation in Section 3.21(d)(iii) that Defendants were not aware of any action for the suspension, revocation, termination or cancellation of any of Educational Approvals of any Institution of federal funds pursuant to Title IV of any Institution was pending or threatened was not false. Defendants

further state that this representation was reviewed with EGCC after the UPA was executed and EGCC confirmed that this representation was true and accurate when made.

92.     Defendants admit the allegations in paragraph 92 and note that the UPA is a written document that speaks for itself.

93.     Defendants state that the language in paragraph 93 is from the UPA, which is a written document that speaks for itself.  Defendant Perik denies that he breached the restrictive covenant in the UPA Section 6.5(a).  Defendants deny the remaining allegations in paragraph 93.

94.     Defendants state that the language in paragraph 94 is from the UPA, which is a written document that speaks for itself.

95.     Defendants deny the allegations set forth in paragraph 95.

96.     Defendants state that the definition of "Fraud" in Section 1.1, in the UPA, is a document that speaks for itself.

97.     Defendants state that Section 8.3 in the UPA is a document that speaks for itself.

98.     Defendants state that Section 8.15 in the UPA is a document that speaks for itself.

**VIII.   Parties Conduct Regular Business Meetings Post-Closing.**

99.     Defendants admit the allegations in paragraph 99.

100.    Defendants admit that there was one in-person meeting as well as weekly telephone calls prior to November 8, 2021.  Defendants admit that they did not disclose the draft HLC mid-cycle review team report because that report was provided to them in confidence by EGCC, and Defendants were explicitly instructed by EGCC to not share that report with anyone. Moreover, the cover email from HLC to EGCC enclosing the draft report also advised that the EGCC should limit the distribution of the draft report because the content, including team recommendations, was not final and was subject to change.  The HLC team had complete

discretion in revising the draft report based on information supplied by EGCC. While Defendants were bound to not distribute the draft report, Plaintiffs were informed that the HLC mid-cycle review team visit was a "botched visit" that resulted in the ire of multiple civil rights organizations, union groups and one state attorney general, that the HLC review process was ongoing, that EGCC had asked HLC for a *de novo* review of the site visit, and HLC agreed to conduct a *de novo* review of that mid-cycle review site visit. Accordingly, the HLC draft report was not binding nor relevant in light of the *de novo* review promised by HLC and was confidential. Moreover, Defendants state that they had on-going communications with Plaintiffs after the transaction closed about the status of the HLC mid-cycle review and the EGCC union free college program, and that Perik had assisted EGCC with its response to HLC's questions and financial questions relating to the union free college program. Accordingly, Defendants deny that they concealed that they assisted EGCC in responding to questions raised by HLC. Defendants also deny that they knew that the HLC site visit review team recommended probation for EGCC based on the draft HLC mid-cycle team review report, because that draft report was a draft, not binding and the mid-cycle review was to be reviewed *de novo*. Plaintiffs were aware of the *de novo* review of the mid-cycle review process were aware that the HLC review process was prolonged, and that HLC's final recommendation would occur after its board meeting prior to issuing its final report. Defendants had conversations with Plaintiffs' representatives about the unions using the public records laws to seek HLC's documents and correspondence; about actions taken by civil rights groups, unions and others advocating on behalf of EGCC based on HLC's mid-cycle review visit; about the fact that HLC could impose a sanction of probation for EGCC; and the fact that as late as the fall of 2021 that EGCC's accreditation had been intact. Accordingly, Defendants deny that Plaintiffs were not aware of the HLC mid-cycle review

process and Defendants deny that they took any steps to mislead the Plaintiffs. Defendants at all times responded to any inquiries relating to HLC and EGCC's accreditation status from Plaintiffs' representatives truthfully and honestly. Defendants deny the remaining allegations in paragraph 100.

## IX.    HLC Puts EGCC on Probation for Failing to Comply With Accreditation Criteria.

101.    The allegations in the first sentence of paragraph 101 purport to characterize and quote from a letter dated November 8, 2021, attached to Plaintiffs' Complaint as Exhibit B, which is a document that speaks for itself. Further answering, as Sterling was well aware and according to the HLC website, "probation" is considered a sanction that would not result in an "action for the suspension, revocation, termination or cancellation of any Educational Approval of any such Institutions of federal funds pursuant to Title IV of any Institution is pending or threatened." Suspension, revocation, termination or cancellation are all defined as an "adverse action" by HLC. Probation is a sanction and "not an adverse action" according to HLC. Probation, by itself, would not result in any withdrawal of HLC's accreditation of EGCC. Defendants deny the remaining allegations in paragraph 101.

102.    The allegations in the first sentence of paragraph 102 purport to characterize and quote from a letter dated November 8, 2021, attached to Plaintiffs' Complaint as Exhibit B, which is a document that speaks for itself. Further answering, HLC's concerns were based on EGCC's rapid growth and were to be addressed by EGCC going forward. At no time was there any action for the suspension, revocation, termination or cancellation of EGCC's accreditation by HLC.

103. The allegations in paragraph 103 purport to characterize and quote from a letter dated November 8, 2021, attached to Plaintiffs' Complaint as Exhibit B is a document that speaks for itself.

104. Defendants deny the allegations in paragraph 104. Defendants further state that there was no material change in the union student enrollment trajectory at EGCC and no damage to the union free college tuition program through mid-March 2022.

105. Defendants admit that Plaintiffs spent money and resources after HLC issued its report on November 8, 2021, but deny that those expenditures were helpful to EGCC or to the union partners. Defendants further state that EGCC responded promptly and appropriately to the HLC report on its website and with its union partners. Defendants deny the remaining allegations in paragraph 105.

106. Defendants deny the allegations in paragraph 106.

107. Defendants deny the allegations in paragraph 107.

108. Defendants admit that they were blindsided by the HLC letter dated November 8, 2021. Perik admits that he knew the HLC mid-cycle team visit was "bad" and he emphasized that it was a "botched visit." Perik also said that he was surprised by the length of the final HLC report, which he read for the first time on or after November 8, 2021. Defendants deny the remaining allegations in paragraph 108.

109. Defendants deny the allegations in paragraph 109.

110. Defendants deny that their pre-closing statements were false or included any material omissions or false representations in the UPA and deny that there were any false post-closing statements or material omissions. Defendants deny that Plaintiffs were caught by surprise by the November 8, 2021 letter. Defendants deny that they were ever asked by Plaintiffs

as to whether they were aware of any accreditation issues and state that EGCC and the other schools with which SRC collaborates were duly accredited. Defendants state that prior to November 8, 2021, EGCC was at all times accredited and in compliance with Education Laws and Education Approvals. Defendants further state that there were no pending or threatened actions for suspension, revocation, termination or cancellation of any Educational Approval of any Institution with which SRC had a collaboration arrangement, including EGCC, as was reflected, at the time, of the current status of accreditation on the HLC website. Defendants also state that EGCC was in material compliance with the terms and conditions necessary to conduct its operations as conducted.

111. Defendants deny that any pre-closing statements and the representations in the UPA Section 3.21(d) were false. Defendants admit that EGCC generated 95% of SRC's gross revenue. Defendants deny that the subsequent HLC placing EGCC on probation could have or did cause any material harm -- let alone "severe harm" -- to SRC's business as was evidenced by the fact that there was no material change in the student enrollment trajectory at EGCC through mid-March 2022. Any harm caused to the business of SRC was due exclusively to the Plaintiffs' gross negligence and willful misconduct.

112. Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 112. Further answering, Defendants state that SRC's concentration of business with EGCC as a risk factor for SRC had nothing to do with the confidential draft HLC report to EGCC after its mid-cycle review team visit, which HLC agreed to conduct, and did conduct, a *de novo* review in the spring or summer of 2021.

113. Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 113, and deny the same.

**X.  Defendants Knew as of December 2020 that the HLC was Investigating and Evaluating EGCC.**

114.    Defendants are without sufficient information or knowledge to admit or deny the allegations in the first two sentences in paragraph 114.  Defendants deny the last sentence in paragraph 114.

115.    Defendants admit that in December 2020, Perik, Rowe and Jones received a copy of the draft HLC mid-cycle review report, which was provided to them in confidence by EGCC with instructions to not share that draft document with anyone else.  Defendants state that the draft HLC mid-cycle review report is a document that speaks for itself.  Defendants deny that HLC, in its draft report, made any "findings" nor that HLC, by its draft report, recommended that EGCC be put on probation based on the that draft because, according to HLC, "the content of the [draft] report, including team recommendations, is not final and subject to change" and that the HLC subsequently agreed to conduct a *de novo*  review of the mid-cycle review.

   a.  Defendants admit to first sentence of paragraph 115(a), but deny the remainder of the allegations in that paragraph.

   b.  Defendants state EGCC's email to Jones in paragraph 115(b) is a document that speaks for itself.  Defendants further state that they received the HLC draft report as confidential and were instructed to treat that draft report and its contents in confidence.

   c.  Defendants state that the allegations described in paragraph 115(c) appear to be snippets of email communications from email exchanges between Defendants Perik and Rowe and constitutes a mischaracterization of an incomplete summary of the email exchange.  Accordingly, Defendants deny the allegations in paragraph 115(c).

116.     The allegations in paragraph 116 appear to be snippets of an email exchange documents between certain of the Defendants and constitutes a mischaracterization of an incomplete summary of the email exchange.  Accordingly, Defendants deny the allegations in paragraph 116.

117.     The allegations in paragraph 117 appear to be snippets of an email exchange documents between certain of the Defendants and constitute a mischaracterization of an incomplete summary of the email exchange.  Accordingly, Defendants deny the allegations in paragraph 117.

118.     Defendants admit that Perik drafted "Talking Points" but deny the remaining allegations in paragraph 118, which takes those talking points out of context.  Defendants deny that HLC mid-cycle draft report threatened that EGCC would lose its accreditation.  Defendants deny the remaining allegations in paragraph 118.

119.     Defendants admit that on or about December 20, 2020, Haseley drafted a memo regarding the union college program, but deny Plaintiffs' mischaracterization of that memo and use snippets of the content of this memo out of context.  Defendants deny that HLC told EGCC that it would lose its accreditation.  Defendants deny the remaining allegations in paragraph 119.

120.     Defendants admit that they expended time and effort in assisting EGCC with certain aspects of its response to the draft report of HLC.  Defendants deny the remainder of paragraph 120.

121.     Defendants admit the first two sentences of paragraph 121.  The third and fourth sentences in paragraph 121 constitute excerpts from a draft letter and constitutes an incomplete summary of the same.  Accordingly, Defendants deny the allegations in the last two sentences of paragraph 121.

122.     Defendants deny the allegation in paragraph 122 that "Perik, upon reviewing this draft letter and in recognition of the fact that the HLC would likely stick with its findings, wrote to Rowe, Haseley, and Wurst[.]"    The remaining allegations in paragraph 122 quote from an email document and constitute a mischaracterization of an incomplete summary of the email exchange and deny the same.

123.     Defendants deny the first sentence in paragraph 123.  Defendants state that the second statement in paragraph 123 consists of a snippet taken from an email document and constitutes a mischaracterization of an incomplete summary of the email exchange and deny the same.

124.     The allegations in the first sentence in paragraph 124 are quotes from an email document and constitutes a mischaracterization of an incomplete summary of the email exchange and accordingly, Defendants deny the same.  Defendants admit the allegation in the second sentence of paragraph 124.

125.     Defendants deny the allegations in paragraph 125, including that the document described constituted as a "final report" from HLC because HLC had agreed to conduct a *de novo* review and the final report was not issued until after the HLC board meeting in November 2021.

126.     Defendants deny the allegations in paragraph 126.

127.     Defendants deny the allegations in paragraph 127.

128.     Defendants deny the allegations in paragraph 128.  Further answering, Defendants state that HLC had agreed to a *de novo* review on its mid-cycle team review process.

129.     Defendants deny the allegations in paragraph 129.  Further answering, the Defendants state that the quoted language in paragraph 129 appears to be from snippets of a written communication taken out of context and, accordingly, Defendants deny the same.

130.     Defendants deny the allegations in paragraph 130.  Further answering, HLC agreed to conduct a *de novo* review of the mid-cycle team review process.

131.     Defendants deny the allegations in paragraph 131.

**XI.     Even After the Deal Closes, Defendants – Including Members of Management – Continue to Withhold Information about the HLC's Review of EGCC.**

132.     Defendants deny the allegations in paragraph 132.

133.     Defendants deny the allegations in paragraph 133 and state that the quoted language from an email exchange mischaracterized the exchange and is taken out of context.

134.     The allegations in paragraph 134 are quoted from an email document and constitutes a mischaracterization of an incomplete summary of that email exchange.  Defendants deny the allegations in paragraph 134.

135.     Defendants admit that an outside law firm retained by a union partner of EGCC was commissioned to conduct an investigation into HLC using the Ohio public records statutes and that Perik agreed to pay up to $50,000 for this effort.  This investigation was done to support EGCC.  Defendants state that Plaintiffs' representative Keith was aware of this investigation and on October 13, 2021, Keith sent Perik and Rowe an email that HLC, as an accreditor, was subject to the public records laws and attached a law review article from the University of Chicago Law School as support.  Defendants also state that Keith, as Plaintiffs' representative was well aware that one of the unions had retained counsel to conduct this investigation.  Defendants deny the remaining allegations in paragraph 135.

136.     Defendants deny the allegations in the first sentence of paragraph 136 and, moreover, state that the allegations in the first sentence of paragraph 136 contain conclusions of law to which no response is required.  Further answering, Defendants state that Plaintiffs' representatives Vernick, Schwartz and/or Keith were indeed informed by Defendants that HLC could sanction EGCC with probation after HLC's *de novo* review of its mid-cycle review. Defendants deny the allegations in the second sentence of paragraph 136.

137.     Defendants deny the allegations in paragraph 137.

**XII.    Representatives of Sterling and SRC Holdings Confront Defendants, and Defendant Rowe Finally Admits to Knowing About the HLC's Review of EGCC Before the Parties Closed Their Deal.**

138.     Defendants admit that there was a meeting with Plaintiffs' representatives in Washington, DC, but deny the remaining allegations in paragraph 138.

139.     Defendants deny that Sterling had not known of HLC's mid-cycle review of EGCC, which including the "botched visit" in November 2020, EGCC's request for a *de novo* review and the fact that the mid-cycle review was in fact delayed for that *de novo* review. Defendants did not believe that EGCC would be put on probation.  Defendants admit that they did not share the draft HLC mid-cycle team review report with the Plaintiffs as they were instructed by EGCC.  Defendant Rowe truthfully answered all questions posed to her by Plaintiffs during this meeting.  Defendants informed Plaintiffs during this meeting that any attempt to drastically change the SRC management team would be a material change to the Collaboration Agreement and would need approval from the collaborating colleges, including EGCC.  Defendants informed Plaintiffs that any such actions taken by Plaintiffs could have disastrous effects for SRC, the collaboration with SRC's partners and for the Defendants who

were all minority shareholders in SRC. Defendants deny that Jones threatened a "laundry list" of litigation and a "disaster." Defendants deny the remaining allegations in paragraph 139.

140. Defendants admit that Perik communicated with Geoghegan on a regular basis while he was the CEO of SRC. Defendants deny the remaining allegations in paragraph 140.

141. Defendants admit that Geoghegan did not want SRC to make abrupt changes in its management team at the time. Defendants deny the remaining allegations in paragraph 141.

142. Defendants deny the allegations in paragraph 142. Further answering, Defendants state that the meeting was designed to resolve the proposed management changes based on the relationship with EGCC. Defendants explained that EGCC did not want significant management changes at that time and, to do so, could damage the collaboration relationship. SRC threatened Defendants, who told SRC that they would put their thoughts as to a transition and have that presented to SRC, which they did to no avail.

143. Defendants state that the letter dated March 14, 2022, on behalf of Defendants is a document that speaks for itself and was sent on behalf of Defendants to resolve the potential dispute concerning the proposed management changes at SRC. Defendants deny the characterization of that letter in paragraph 143.

144. Defendants state that the letter referenced in paragraph 144 is a document that speaks for itself. Defendants deny the mischaracterizations of that letter in paragraph 144. Defendants admit that any management change at that time would not be in the best interest of SRC. Defendants deny the remaining allegations in paragraph 144.

## XIII. Student Resource Center Terminates Perik and Notifies the Other Defendants That an Internal Investigation is Underway

145. Defendants admit that SRC issued an employment termination letter to Perik on March 23, 2022. Defendants deny the remaining allegations in paragraph 145.

146.     Defendants admit that SRC sent nearly identical letters to Rowe, Jones and Haseley effectively constructively discharging each of them from their duties and responsibilities as the senior management team of SRC, which caused each of them to immediately resign from their positions at SRC.  Defendants deny the remaining allegations in paragraph 146.

147.     Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 147.

148.     Defendants are without sufficient information or knowledge to admit or deny when SRC became aware that Rowe, Haseley and Jones had resigned.  Defendants admit that their counsel communicated to SRC that Rowe, Haseley and Jones resigned from their employment at SRC on March 23, 2022.  Defendants deny the remaining allegations in paragraph 148.

149.     Defendants deny the allegations in paragraph 149.

150.     Defendants deny that Perik was properly removed from the board of SRC Holdings for cause.  By a Written Consent of a Majority of the Board of Directors of SRC Holdings dated May 2, 2022, SRC board members Schwartz, Vernick and Keith improperly voted to remove Perik from all future board meetings pending the outcome of SRC's alleged investigation.  Perik did not receive any advance notice of the board meeting.  Perik received notice of this action May 12, 2022.  On May 16, 2022, Perik objected to being excluded from any board meetings pending SRC's "investigation."  On June 30, 2022, Perik was informed that Schwartz, Vernick and Keith voted by written consent in lieu of a meeting that Perik was removed from the board of directors of SRC.  Perik received no advance notice of that board meeting or board vote.  Perik has objected to such unilateral board actions of Schwartz, Vernick and Keith.

151.     Defendants deny that their equity interests in SRC were properly repurchased by SRC Holdings pursuant to the purported terms of the Restrictive Units Agreements ("RUA") that were limited to additional Incentive Units provided the Defendants pursuant to the 2021 Company Equity Incentive Plan and not the Defendants' Preferred Units or "Roll Over Units" awarded under the UPA.  At the time of the UPA, the value of Defendants "Preferred Units' or "Roll Over Units" was approximately $30 million as the amount of the purchase price that Sterling paid for SRC that was provided to the Defendants in roll over equity.  Defendants subsequently received additional Incentive Units through the RUAs, which did not affect their Preferred Units or Roll Over Units.  By letter dated September 14, 2022, the remaining SRC board of directors determined that the Fair Market Value of all of Defendants' equity in the Company -- including their Preferred Units – was $0 and would be repurchased by the Company under the RUAs for $0.  By letter dated September 27, 2022, Defendants objected to SRC Holdings' repurchase of any of Defendants' Preferred Units under the RUAs, which was improper and invalid under the terms of the Company's Operating Agreement and the UPA, was void for fraud, was inconsistent with Defendants' investment terms under the UPA, and were void for lack of any consideration.  Accordingly, Defendants deny that their equity in SRC was repurchased for $0 by SRC Holdings.

**XIV.   Student Resource Center Installs a New, Experienced Leadership Team.**

152.     Defendants deny the allegations in paragraph 152.

153.     Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 152, but deny that Phillip Braithwaite was a natural fit to replace Perik as CEO of SRC.  Defendants deny the remaining allegations in paragraph 153.

154.     Defendants deny the allegations in paragraph 154.

**XV. Perik and Jones' Interference Causes EGCC to Unlawfully Terminate the Collaboration Agreement.**

155. Defendants deny that Perik directed Geoghegan to issue any notice to SRC. Defendant Perik also denies that he provided Geoghegan with assistance with any such notice. Defendants are without sufficient information or knowledge to admit or deny the remaining allegations in paragraph 155.

156. Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 156.

157. Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 157 and deny the same.

158. Defendants deny the allegations in paragraph 158.

159. Defendants deny that any email communications purport to show that, in late March 2022, after Defendants were terminated or constructively terminated from SRC, they threatened to put the company "out of business." Defendants admit that Jones met with Geoghegan to discuss joining EGCC to continue the EGCC relationship with SRC and the existing collaboration, but once EGCC considered terminating that relationship, the communications between Geoghegan and Jones ceased. Defendants deny the remaining allegations in paragraph 159.

160. Defendants admit that Jones followed up with Geoghegan after their meeting and delivered documents relating to EGCC transition planning, but deny that those documents concerned EGCC's termination of the SRC relationship. Defendants deny the remaining allegations in paragraph 160.

161. Defendants deny the allegations in paragraph 161.

162. Defendants deny the allegations in paragraph 162.

163.     Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 163 and deny the same.

164.     Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 164 and deny the same.

165.     Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 165 and deny the same.

166.     Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 166 and deny the same.

167.     Defendants deny the allegations in paragraph 167.

168.     Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 168 and deny the same.

169.     Defendants deny the suggestion in the allegation of Perik's, Jones' and EGCC's actions were improper as alleged in paragraph 169.  Defendants are without information or knowledge to admit or deny the remaining allegations in paragraph 169.

170.     Defendants admit that SRC filed a complaint against EGCC and that complaint is a document that speaks for itself.  Defendants deny the remaining allegations in paragraph 170.

171.     Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 171 and deny the same.

172.     Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 172 and deny the same.

173.     Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 173 and deny the same.

174. Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 174 and deny the same.

175. Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 175 and deny the same.

176. Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 176 and deny the same.

177. Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 177 and deny the same.

**XVI. Perik's Communications with EGCC Following his Termination from Student Resource Center.**

178. Defendants deny the allegations in paragraph 178.

179. Defendants deny the allegations in paragraph 179.

180. Defendants deny the allegations in paragraph 180.

181. Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 181.

182. Defendants are without sufficient information or knowledge to admit or deny the allegations in paragraph 182 and deny the same.

183. Defendants deny the allegations in paragraph 183. Further answering, Defendants state that Student Service Center was a sister company to SRC, but not owned or controlled by SRC or Sterling as Plaintiffs are fully aware.

184. Defendants deny the allegations in paragraph 184.

185. Defendants deny the first sentence in paragraph 185. Defendants admit that there were communications between counsel regarding Perik's personal email account and that no

emails from Perik's personal email account were provided to Plaintiffs' counsel before or after his termination from SRC.

186.     Defendants are without knowledge or information sufficient to admit or deny the allegations in paragraph 186 and deny the same.

187.     Defendants admit that counsel for SRC had requested all of the Company's email, texts, and other electronic documents in Perik's possession, which had been provided (and SRC's counsel had all of Perik's business emails and electronic documents on SRC's server). Defendant Perik admits that he has not produced his personal emails or personal text messages to SRC's counsel.  Defendants deny the remaining allegations in paragraph 187.

188.     Defendants deny the allegations in paragraph 188.

## CLAIMS FOR RELIEF

### COUNT I - FRAUDULENT INDUCEMENT
### (Against All Defendants)

189.     Defendants restate their answers to the allegations set forth above as if those answers were written herein.

190.     Defendants deny the allegations in paragraph 190 and in subparagraphs 190(a) through 190(d).

191.     Defendants deny the allegations in paragraph 191.

192.     Defendants deny the allegations in paragraph 192.

193.     Defendants deny the allegations in paragraph 193.

194.     Defendants deny the allegations in paragraph 194 with the exception that the revenue from EGCC represented 95% of SRC's annual revenue prior to March 23, 2022.

195.     Defendants deny the allegations in paragraph 195.

## COUNT II - FRAUDULENT CONCEALMENT
### (Against All Defendants)

196.     Defendants restate their answers to the allegations set forth above as if those answers were written herein.

197.     Defendants deny the allegations in paragraph 197.

198.     Defendants deny the allegations in paragraph 198 and in subparagraphs 198(a) through 198(f).

199.     Defendants deny the allegations in paragraph 199.

200.     Defendants deny the allegations in paragraph 200, with the exception that the revenue from EGCC represented 95% of SRC's annual revenue prior to March 23, 2022.

201.     Defendants deny the allegations in paragraph 201.

202.     Defendants deny the allegations in paragraph 202.

## COUNT III - FRAUD
### (Against All Defendants)

203.     Defendants restate their answers to the allegations set forth above as if those answers were written herein.

204.     The allegation in paragraph 204 is a provision from the UPA which, as a document, speaks for itself.  To the extent that the allegations in paragraph 200 calls for a response from Defendants, that allegation is denied.

205.     The allegation in paragraph 205 is a partial recitation of Section 3.21(d) from the UPA which, as a document, speaks for itself.  To the extent that the allegation in paragraph 205 calls for a response from Defendants, those allegations are denied.

206.     Defendants deny the allegations in paragraph 206.

207.     Defendants deny the allegations in paragraph 207.

208.    Defendants deny the allegations in paragraph 208 and in subparagraphs 208(a) and 208(b).

209.    Defendants deny the allegations in paragraph 209.

210.    Defendants deny the allegations in paragraph 210, with the exception that the revenue from EGCC represented 95% of SRC's annual revenue prior to March 23, 2022.

211.    Defendants deny the allegations in paragraph 211.

## COUNT IV - CONSPIRACY TO COMMIT FRAUD
### (Against All Defendants)

212.    Defendants restate their answers to the allegations set forth above as if those answers were written herein.

213.    Defendants deny the allegations in paragraph 213.

214.    Defendants deny the allegations in paragraph 214.

215.    Defendants deny the allegations in paragraph 215 and in subparagraphs 215(a) through 215(f).

216.    Defendants deny the allegations in paragraph 216.

217.    Defendants deny the allegations in paragraph 217.

218.    Defendants deny the allegations in paragraph 218.

219.    Defendants deny the allegations in paragraph 219, with the exception that the revenue from EGCC represented 95% of SRC's annual revenue prior to March 23, 2022.

220.    Defendants deny the allegations in paragraph 220.

## COUNT V – TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Perik and Jones)

221.    Defendants restate their answers to the allegations set forth above as if those answers were written herein.

222. The allegations in paragraph 222 are not directed to Rowe, Haseley, HEP, RRG, USSG and MWJ, and therefore no response is required. The allegations in paragraph 222 call for legal conclusions to which no response is required. To the extent a response is required, Perik and Jones deny the same.

223. The allegations in paragraph 223 are not directed to Rowe, Haseley, HEP, RRG, USSG and MWJ, and therefore no response is required. Defendants Perik and Jones admit the allegations in paragraph 223.

224. The allegations in paragraph 224 are not directed to Rowe, Haseley, Jones, HEP, RRG, USSG and MWJ, and therefore no response is required. Defendant Perik denies the allegations in paragraph 224.

225. The allegations in paragraph 225 are not directed to Rowe, Haseley, Jones, HEP, RRG, USSG and MWJ, and therefore no response is required. Defendant Perik denies the allegations in paragraph 225.

226. The allegations in paragraph 226 are not directed to Rowe, Haseley, HEP, RRG, USSG and MWJ and therefore no response is required. Defendants Perik and Jones deny the allegations in paragraph 226.

227. The allegations in paragraph 227 are not directed to Rowe, Haseley, HEP, RRG, USSG and MWJ, and therefore no response is required. Defendants Perik and Jones deny the allegations in paragraph 227.

228. The allegations in paragraph 228 are not directed to Rowe, Haseley, HEP, RRG, USSG and MWJ, and therefore no response is required. Defendants Perik and Jones deny the allegations in paragraph 228.

229. The allegations in paragraph 223 are not directed to Rowe, Haseley, HEP, RRG, USSG and MWJ, and therefore no response is required. Defendants Perik and Jones deny the allegations in paragraph 223.

## COUNT VI – BREACH OF CONTRACT – UNIT PURCHASE AGREEMENT
### (Against Perik, Higher Education Partners, LLC, USS Guarantor, LLC and MWJ Holdings, LLC and Jones)

230. Defendants restate their answers to the allegations set forth above as if those answers were written herein.

231. Perik, Jones, HEP, USSG, and MWJ state that the allegations in paragraph 231 call for legal conclusions to which no response is required. To the extent a response is required, they deny the same.

232. The allegations in paragraph 226 are not directed to Rowe, Haseley, or RRG, and therefore no response is required. Perik, HEP, USSG, MWJ and Jones admit the allegations in paragraph 232.

233. Defendants state that they allegations set forth in paragraph 233 call of a legal conclusion to which no response is required. To the extent a response is required, they deny the same.

234. The allegations in paragraph 234 are not directed to Rowe, Haseley, Jones, or RRG, and therefore no response is required. Perik, HEP, USSG, and MWJ state that the allegations in paragraph 234 call for legal conclusions to which no response is required. To the extent a response is required, they deny the same.

235. The allegations in paragraph 235 are not directed to Rowe, Haseley, Jones, HEP, USSG, MWJ or RRGG, and no response is required. Perik denies the allegations in paragraph 235.

236. Defendants deny the allegations in paragraph 236.

237. Defendants deny the allegations in paragraph 237.

238. Defendants deny the allegations in paragraph 238.

239. Defendants deny the allegations in paragraph 239.

## AFFIRMATIVE DEFENSES

Defendants assert the following affirmative defenses to the claims set forth in the Complaint. By asserting these affirmative defenses, however, Defendants do not waive, but expressly reserve, the right to amend their Answer to add, supplement, or modify defenses based on any amendment of the Complaint, any material produced throughout discovery, and/or further analysis of the Plaintiffs' allegations. By asserting the defenses set forth below, Defendants do not allege or admit that they have the burden of proof and/or the burden of persuasion with respect to any of these matters.

## FIRST DEFENSE

Plaintiffs' claims are barred, in whole or in part, because they fail to state a claim upon which relief can be granted.

## SECOND DEFENSE

Defendants state that the Plaintiffs have not complied with the terms and conditions of its agreement(s), and, therefore, they are barred from recovery hereunder.

## THIRD DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs (i) failed to establish reasonable reliance upon any statement of fact by Defendants; (ii) failed to establish detrimental reliance upon any statement of fact by Defendants; and (iii) failed to establish any damages as a result of their detrimental reliance upon any statement of fact by Defendants.

## FOURTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

## FIFTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, are estopped by reason of their own acts and conduct from asserting any claims hereunder.

## SIXTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs' alleged or purported damages, if any, were the result of the acts, actions, inaction, or negligence of a third person, party, or entity for whom the Defendants are not responsible.

## SEVENTH DEFENSE

In the event that the Plaintiffs establish liability against the Defendant(s), which the Defendants deny, Plaintiffs' recovery is barred, in whole or in part, because Plaintiffs' alleged or purported damages, if any, were the caused by an intervening or superseding act, action, inaction, or negligence of a third person, party, or entity for whom the Defendants are not responsible.

## EIGHTH DEFENSE

Plaintiffs willfully and intentionally breached their contract(s), causing substantial harm to the Defendants, and thus are barred from any recovery thereunder.

## NINTH DEFENSE

Defendants deny that the Plaintiffs can establish any liability, but to extent any Defendant is found liable, Plaintiffs' claims are limited, capped or barred by the terms of the parties' contract(s).

## TENTH DEFENSE

Defendants deny that the Plaintiffs have established any liability, but to extent any Defendant is found liable, the Plaintiffs' claims are subject to an offset and/or the counterclaims.

## ELEVENTH DEFENSE

Plaintiffs failed to mitigate their alleged damages. Plaintiffs failed to take all reasonable and necessary steps to reduce the losses they allegedly suffered.

## TWELFTH DEFENSE

Plaintiffs' claims are barred under the doctrine of equitable estoppel.

## THIRTEEN DEFENSE

Plaintiffs' claims are barred, in whole or in part, because any decrease in value of SRC occurred for reasons completely unrelated to the alleged activity at issues in the Complaint.

## FOURTEENTH DEFENSE

Plaintiffs' claim for intentional interference with contract is barred because there is no malice.

## FIFTEEN DEFENSE

Plaintiffs' claims for intentional misconduct are barred for lack of any wrongful intent.

## SIXTEEN DEFENSE

Plaintiffs' claims for conspiracy are barred because there is no and was no agreement to conspire.

**Defendants demand a jury trial on all claims so triable.**

## DEFENDANTS' COUNTERCLAIMS

## INTRODUCTION

1.      Counterclaim Plaintiff Michael Perik ("Perik") formed Student Resource Center, LLC ("SRC" or the "Company") in or about 2015, joined by Nicole Rowe Colclasure ("Rowe") and John Haseley ("Haseley") in 2016.  Counterclaim and Plaintiff Daniel Jones ("Jones") joined thereafter (Perik, Rowe, Haseley and Jones are collectively referred to as the "Founders" or "Counterclaim Plaintiffs").  SRC is an education services company that connects union members and their families with collaborating colleges offering higher education opportunities without debt.  SRC grew from 5,500 students in 2016 to over 42,500 students in 2021.  After SRC sought investors based on the rapid growth of the union college benefit program, Sterling Small Market Education Fund L.P. ("Sterling") and SRC Intermediate Holdings, Inc. ("SRC Intermediate") executed a Unit Purchase Agreement (the "UPA") to acquire a majority interest in SRC from the Founders and other selling shareholders on June 25, 2021, for $120 million.  After certain funds were disbursed at closing, approximately $2.9 million was due to the Founders for pre-closing institutional receivables that were to be collected by SRC post-closing. In addition, the Founders retained their roll over equity in Preferred Units consisting of a 30% minority interest in the Company valued at $30 million at the time of closing.

2.      At or about the time of the closing, Sterling and SRC Intermediate set up Student Resource Center Holdings, LLC ("SRC Holdings") to operate the Company and executed an Amended and Restated LLC Agreement of Student Resource Center Holdings LLC ("LLCA"). M. Avi Epstein ("Epstein") was the president of SRC Holdings, and Brian Schwartz ("Schwartz"), Shoshana Vernick ("Vernick"),  Jeffrey Keith ("Keith") and Perik were the initial members of the board of directors of SRC Holdings until Perik was subsequently removed from the board.  Counterclaim Defendants Sterling and SRC Intermediate, intentionally or recklessly damaged the union college benefit program with Eastern Gateway Community College

"("EGCC") and Central State University ("CSU"), on the one hand, and the union members and their families who enrolled in the collaborating colleges, on the other hand. Counterclaim Defendants, through their agents, officers and directors, mismanaged the finances and refusing to pay the institutional receivables due to the selling shareholders in accordance with the UPA after the closing while paying themselves and their partners over $500,000 in annual management fees; abruptly terminated the SRC management team consisting of the Founders who had been running SRC for nearly seven years and replacing them with individuals with no or limited public higher education experience and no expertise with the state and national unions involved in the program; and completely alienated EGCC as the most significant collaborating institution in terms of revenue for SRC (EGCC was responsible for 95% of SRC's revenue).

3.      Rather than pay the $2.9 million owed to the Founders, Sterling and SRC Intermediate, SRC Holdings, and SRC (collectively, the "Counterclaim Defendants") decided to go on the offensive and filed their Complaint in this action against the selling shareholders for fraud. Sterling and SRC Intermediate alleged that the Counterclaim Plaintiffs committed pre-closing and post-closing fraud by not disclosing a confidential draft report that the Higher Learning Commission ("HLC") had issued to EGCC in December 2020 (well before Sterling and SRC Intermediate delivered their letter of intent to acquire SRC),

- *even though* EGCC had objected to HLC's original mid-cycle review site visit in November 2020;

- *even though* the purported findings in that draft report were not final and subject to change;

- *even though* EGCC requested a *de novo* review of that mid-cycle review and HLC granted such a *de novo* review in early 2021;

- *even though* EGCC was always then and remained fully accredited during this process;

- *even though* Perik had informed the Sterling and SRC Intermediate's principals in May, 2021, of the ongoing dispute between EGCC and HLC arising out of the HLC's "botched visit" in November 2020, which resulted in HLC's *de novo* review process;

- *even though* Sterling had the opportunity and did ask for numerous documents in due diligence, but none about the HLC mid-cycle review;

- *even though* Sterling hired regulatory counsel to assist with its due diligence, as well as its own education industry expert who was on the board of SRC;

- *even though* the HLC regulatory process, time table and consequences including taking an adverse action (which could affect accreditation) as opposed to probation (which would not affect accreditation) is and was clearly set forth on the HLC website; and

- *even though* Sterling and SRC Holdings were informed of HLC's progress in its *de novo* review on numerous times after the closing.

HLC provided EGCC with their draft report in confidence because their findings and conclusions were subject to change and could damage EGCC if that draft report were distributed. EGCC in turn provided a copy of that confidential draft report to the Defendants with specific instructions to not share it with anyone for the same reasons.

4. After its *de novo* review, HLC released its final mid-cycle review report to EGCC and the public on November 8, 2021, which final report was critical of EGCC's exponential growth and placed EGCC on probation to address its concerns. EGCC accepted HLC's concerns and addressed the same with their students and the unions that were sending their members to take college courses at EGCC. There were no material economic or other consequences for the unions nor for SRC as was evidenced by EGCC meeting its goals for the enrollment trajectory of the union free college benefit program, which continued to increase through the March, 2022. On March 23, 2022, however, Counterclaim Defendants terminated or constructively terminated Perik, Rowe, Haseley and Jones for allegedly concealing the draft HLC mid-cycle review report

that they received from EGCC in strict confidence in December 2020 that was subsequently subject to a "do-over" or *de novo* review.

5.     In response to the actions of the Counterclaim -- specifically by terminating Perik, Rowe, Haseley and Jones -- EGCC terminated its collaboration with SRC for materially breaching the collaboration agreement.  While Counterclaim Defendants had an opportunity to cure by bringing Perik, Rowe, Haseley and Jones back at least temporarily until they could retain the proper management team to satisfy EGCC, Counterclaim Defendants in an act of gross negligence, refused to do so and instead SRC sued EGCC in the Ohio Federal Court alleging that they would go out of business based on EGCC's notice of breach without attempting to cure the alleged breach of the collaboration agreement with EGCC.  Although Counterclaim Defendants' Ohio litigation was initially successful in preventing EGCC from terminating their agreement with SRC, their actions have seriously jeopardized or possibly destroyed the valuable collaboration between EGCC and over 42,500 union students who were served by SRC when Perik, Rowe, Haseley and Jones managed SRC.

6.     To add further injury to the damage caused, Counterclaim Defendants conducted a vote by written consent in lieu of a meeting to ban Perik from all of SRC Holding's board meetings pending Counterclaim Defendants' alleged investigation into the preliminary draft HLC mid-cycle report given to Counterclaim Plaintiffs in confidence in or about December 2020, which was to be subject to a *de novo* review in the spring and summer of 2021.  Perik was provided a board seat to represent the 30% roll over equity held by Counterclaim Plaintiffs by virtue of their Preferred Units in the Company.  Counterclaim Defendants, through their agents, officers and directors, then voted to remove Perik by another written consent in lieu of a meeting from the board and offered no replacement.  Those actions left no board representation for the

minority shareholders, including Perik, Rowe, Jones and Haseley, and prevented them from any participation in the governance of the Company.

7. Counterclaim Defendants through their agents and along with their employment counsel, completed their freeze-out scheme by claiming to exercise SRC's purported rights under the Restrictive Units Agreements to repurchase all of the Preferred Units held by Counterclaim Plaintiffs as their roll over equity. However, as is the case with the repurchase provisions in the LLCA, as the SRC Operating Agreement, SRC's repurchase right in the Restrictive Covenant Agreements is limited to Incentive Units provided to Counterclaim Plaintiffs pursuant to the 2021 Company Equity Incentive Plan. Counterclaim Defendants continued their bad conduct by asserting that the fair market value of Counterclaim Plaintiffs' roll over equity units and Incentive Units is $0. At the time of the UPA, on June 25, 2021, the value of the Counterclaim Plaintiffs' roll over equity or Preferred Units was $30 million and Counterclaim Defendants made no efforts whatsoever, let alone the good faith efforts required by the Restrictive Units Agreement, to value SRC in connection with the alleged repurchase. They did not hire a financial advisor to value SRC or even undertake their own valuation. Instead, they simply "determined" in bad faith to pay Counterclaim Plaintiffs $0. Even if SRC had a repurchase right that covered the roll over equity, and it does not, such determination was a breach of Restrictive Unit Agreements and a blatant attempt to take Counterclaim Plaintiffs' Units for no value. Counterclaim Plaintiffs promptly objected that SRC's attempt to repurchase their Preferred Units was improper, invalid and done in bad faith under the LLCA and the UPA.

8. In sum, Counterclaim Plaintiffs bring counterclaims against Sterling, SRC Intermediate, and SRC for refusing to pay the institutional receivables of approximately $2.9 million that were due and owing to Counterclaim Plaintiffs while paying their employees and

partners as directors of SRC their management fees in bad faith; for wrongfully excluding Perik from all board of directors' meetings and then for improperly removing Perik from the board; and for claiming to repurchase all of Counterclaim Plaintiffs' roll over equity in the form of their Preferred Units, which were valued by Sterling at $30 million on June 2021, for $0. Counterclaim Plaintiffs seek, among other things, declaratory and injunctive relief as holders of their Preferred Units in the Company, damages for the payment of the institutional receivables that have been due and owing pursuant to the UPA and damages for any diminution of the value of their equity interests in the Company.

## PARTIES

9. Counterclaim Plaintiff Michael Perik was the chief executive officer and co-founder of Student Resource Center. Mr. Perik was a member of the board of directors of SRC Holdings until the was unilaterally removed from his seat by a consent in lieu of a meeting on or about June 30, 2022. Mr. Perik is a citizen of Rhode Island.

10. Counterclaim Plaintiff Nicole Rowe Colclasure was the president and co-founder of Student Resource Center. Ms. Rowe is a citizen of Arkansas.

11. Counterclaim Plaintiff John Haseley was the chief strategy officer and co-founder of Student Resource Center. Mr. Haseley is a citizen of Ohio.

12. Counterclaim Plaintiff Daniel Jones was the chief engagement officer and co-founder of Student Resource Center. Mr. Jones is a citizen of Ohio.

13. Counterclaim Plaintiff Higher Education Partners, LLC is a Delaware limited liability company, with its principal place of business at 10 High Street, Jamestown, Rhode Island.

14. Counterclaim Plaintiff RRGTHREE, LLC is an Ohio limited liability company, with its principal place of business at 35 North Street, Suite 340, Columbus, Ohio.

15. Counterclaim Plaintiff USS Guarantor, LLC is a Rhode Island limited liability company, with its principal place of business at 101 Dyer Street, Suite 3A, Providence, Rhode Island.

16. Counterclaim Plaintiff MWJ Holdings, LLC is a Delaware limited liability company, with its principal place of business at 10 High Street, Jamestown, Rhode Island.

17. Counterclaim Plaintiffs collectively hold thirty percent (30%) of the units or shares of the Student Resource Center Holdings LLC, as were provided to them as Preferred Units under the UPA and have owned those units or shares in the Company at all relevant times. Counterclaim Plaintiffs have never voluntarily relinquished or sold those shares or units and the attempt by the board to repurchase those rights for $0 is improper, null and void.

18. Counterclaim Defendant Sterling Small Market Education Fund, L.P. is a limited partnership organized and exiting under the laws of Delaware. Sterling's general partner is Sterling Fund Management, LLC, a Delaware limited liability company, with members upon information and belief residing in Illinois, Maryland, and Florida.

19. Counterclaim Defendant SRC Intermediate Holdings, Inc. is a corporation organized under the laws of Delaware.

20. Counterclaim Defendant Student Resource Center Holdings, LLC, is a Delaware limited liability corporation, which owns SRC Intermediate Holdings, Inc., which is, in turn, the sole member of Student Resource Center, LLC.

21. Counterclaim Defendant Student Resource Center, LLC, is a Delaware limited liability corporation.

**FACTS**

I.     **Student Resource Center**

22.     In or about 2015 and 2016, Counterclaim Plaintiffs Perik, Rowe and Haseley founded SRC as a service provider that partners with higher education institutions to offer on-line courses to certain national, state and local unions for their members.  Jones joined them in 2017.

23.     The SRC business developed over time partnering with different providers and institutions, but the fundamental business model stayed the same.

24.     SRC served approximately 5,500 students in 2016.  SRC's business grew exponentially to the point where SRC was serving over 42,500 students in 2021.

25.     To build the SRC business, the Counterclaim Plaintiffs expended great efforts and resources to develop relationships with the particular higher education institutions that would be available for the union college benefit program.

26.     By 2021, the two higher education institutions in Ohio that were providing college level courses to unions through SRC were EGCC and CSU.  In order for SRC to participate in a profit share arrangement with EGCC, SRC had to abide by the bundled services exemption to the incentive compensation rules as part of Title IV.

27.     SRC supports the union college benefit program in collaboration with the public colleges in Ohio by helping administer the educational benefit programs offered to unions and professional associations; providing guidance, non-academic coaching, mentoring and other student support services to improve student persistence and completion outcomes; and conducting market research to meet unmet demands of adult learners.

28.     As of 2021, SRC served multiple unions by offering the college benefit program to the union members and their families, including Service Employees International Union

53

("SEIU"), American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO"), American Federation of State, County and Municipal Employees ("AFSCME"), and the Fraternal Order of Police ("FOP").

29.     The SRC business was successful and profitable through 2021.  SRC's adjusted earnings were approximately $7.5 million for 2020 and approximately $12 million for 2021 due to the increase in student enrollment members.

30.     In 2021, EGCC accounted for approximately 95% of the SRC revenues for the union college benefit program.

**II.     The Higher Education Regulators and Accreditors.**

31.     The higher education institutions served by SRC are public colleges in Ohio, which are regulated by the United States Department of Education ("DOE"), the Ohio Department of Education ("ODOE"), and the various accreditors.

32.     EGCC's accreditor was HLC.  In November 2020, HLC conducted its mid-cycle site team review meeting at EGCC with one member visiting the school in person and the other team members participating virtually over zoom.

33.     That HLC visit was subsequently characterized as a "botched" visit.  The lead reviewer, who was there in person, missed more than one-half of the meetings and insulted EGCC and the union student body.

34.     In December 2020, HLC sent its draft mid-cycle team meeting report to EGCC with a cover email that provided "HLC advises institutions to limit the distribution of the draft report, because the content of the report, including team recommendations, is not final and is subject to change.  The team has complete discretion in updating the report based on the information supplied by the institution."

35.     EGCC subsequently forwarded that confidential draft report to Perik, Rowe, Haseley and Jones for assistance with checking the facts that were considered relevant by HLC in the draft report.  This draft report was provided by EGCC with strict instructions to not share the draft report with anyone, especially where HLC provided it to EGCC to not be shared and where the findings and observations by HLC were not final and subject to change.

36.     Counterclaim Plaintiffs and EGCC discovered over one hundred factual errors in the HLC draft report.  Counterclaim Plaintiffs worked closely with EGCC to address those errors with HLC.  President Geoghegan, on behalf of EGCC, requested a "do-over" review of the HLC mid-cycle review team meeting.  In or about February 2020, HLC granted President Geoghegan's request for a *de novo* review of HLC mid-cycle review as a "do-over" for the draft mid-cycle team review report.

## III.     SRC Seeks Investors Based on its Growth.

37.     Throughout its existence, SRC has always had a core staff and the same management team of Perik, Rowe, Haseley and Jones.  In order to grow beyond its current base, SRC hired an investment banker to find a partner with resources that would allow SRC to expand.

38.     Through that process, SRC received expressions of interest from a number of suitors including Sterling, which focused, in part, on the education sector.

39.     Sterling and SRC's management had a few preliminary calls in January 2021 to discuss an overview of the SRC business, the union student body and the collaboration with public colleges and junior colleges.

40.     In early February, Sterling submitted a letter of intent to SRC's investment bank stating that it was seeking to negotiate a purchase agreement to become a significant shareholder

of SRC. At that time, however, SRC had already begun exclusive negotiations with another suitor and SRC's investment banker rejected Sterling's letter of intent.

41.     In early May 2021, after the negotiations failed with the other potential investor, Sterling was notified and, on May 4, 2021, Sterling and SRC executed a letter of intent to negotiate a purchase agreement.

## IV.     Sterling's Due Diligence.

42.     Once the parties executed the Letter of Intent on May 4, 2021, Sterling commenced its due diligence process in which SRC provided their organizational documents, their collaborating agreements with the particular public colleges, including EGCC and CSU, their agreements with the national, state and local unions, their employment agreements, their financial and tax documents and their material agreements.

43.     During this process, Sterling had only two zoom calls regarding regulatory matters. Sterling engaged the law firm of Duane Morris to conduct their due diligence on regulatory matters. In addition, Sterling employee Jeff Keith was considered to be an expert on higher education regulations and accreditation.

44.     On or about May 13, 2021, the Counterclaim Plaintiffs had a zoom meeting with Sterling regarding regulatory matters. At that meeting, the parties discussed that HLC was in the middle of its mid-cycle review process, as was evident from HLC's website, and the Counterclaim Defendants through their employees and representatives asked about how that mid-cycle review team meeting went. Perik responded that the HLC's initial mid-cycle review team site visit was a "botched" visit that spawned numerous complaints from civil rights and union groups and attracted the interest from at least one state attorney general. In response, there was one follow-up question from Sterling as to what caused those complaints, to which Perik responded that there were allegations of racial bias relating to the one on-site HLC reviewer.

There were no other questions from Sterling concerning HLC during that due diligence meeting and other regulatory matters were discussed.

45.     In Sterling's due diligence list sent to SRC in May, after the zoom meeting discussed above, item number 12 requested a list and description of all permits, licenses and certifications necessary for the Company to operate its business in the ordinary course. Sterling noted that "accreditations for EGCC and CSU had been provided" and asked for a list of all permits, licenses and certifications necessary for the Company. SRC complied with that request, as well as all requests relating to any governmental regulations and filings.

46.     The above questions were the only questions asked in Sterling's due diligence list relating to the accreditation process. Sterling updated its due diligence list asking for other diligence materials at least twice in May 2021 and never asked for any additional diligence relating to HLC or any accreditors.

47.     Sterling never asked for any HLC mid-cycle review team draft reports nor any correspondence relating to what Perik referred to as a "botched" visit during his call with Sterling on May 13, 2021.

48.     Sterling did have numerous questions throughout May and June concerning the bundled services exemption that was approved by the Ohio Attorney General and as a prerequisite to the state colleges, SRC and union relationship. Throughout this process, Counterclaim Plaintiffs answered all of Sterling's questions.

49.     In June 2021, Sterling and its regulatory counsel had only one zoom conference with Michael Geoghegan during which Sterling and EGCC discussed the bundled services exemption and the state subsidies for the union college benefit program. At no time did Sterling or its representatives ask President Geoghegan about the HLC mid-cycle review process, which

was ongoing and for which HLC was conducting a *de novo* review based on HLC's "botched" site visit in November 2020 that Perik had informed Sterling and their representatives about on May 13, 2021. In fact, neither Sterling, its regulatory counsel nor its accreditation expert even mentioned "HLC" or "accreditation" in their only meeting with President Geoghegan who had actually met with HLC during that "botched" site visit in November 2020.

50. As the parties moved towards the closing on June 25, 2021, Sterling and its counsel were increasingly concerned about the tuition waiver that is necessary to qualify for state subsidies. Ultimately, Sterling was satisfied and did in fact close on June 25, 2021.

## V. EGCC Executes its Managed Services Agreement with Student Services Center Just Prior to the UPA.

51. On or about June 7, 2021, EGCC executed a Managed Services Agreement with Student Services Center ("SSC") in order for SSC to provide EGCC with additional student support, including financial aid support.

52. As part of that Managed Services Agreement, SSC was responsible for providing seven employees to assist students of EGCC for approximately $30,000 per year.

53. As part of that Managed Services Agreement, EGCC represented and warranted in Section 4.7 that:

> Compliance with Laws. (a) EGCC has all material licenses, permits, authorizations, certifications, accreditations and similar approvals necessary to conduct the business and operations of EGCC, in the manner and to the full extent that they are now being conducted and in accordance with applicable Law, including with respect to participation in the Title IV Programs; (b) no proceeding for the suspension or cancellation of any Educational Approval is pending or, to the knowledge of EGCC, threatened; (c) EGCC has not received any notice that any Educational Approval will not be renewed, and EGCC has no knowledge of any basis for non-renewal; and (d) EGCC has no knowledge of any threatened or pending investigation, audit, or review of any Educational Approval.

54. This representation and warranty was made by EGCC as of June 7, 2021 -- approximately two weeks before the UPA was executed on June 25, 2021.

55. The representations and warranty under Section 4.7 in the Managed Services Agreement is essentially the same representation and warranty in Section 3.21 of the UPA.

## VI. The Parties' Closing and Post-Closing Obligations.

56. Prior to the closing on June 25, 2021, Sterling formed SRC Intermediate as the entity to purchase SRC.

57. On June 25, 2021, the parties signed the UPA and executed multiple closing documents to effectuate the transaction.

58. Article II of the UPA provided the purchase and sale obligations at closing, including the allocation of the purchase price and flow of funds, as well as a provision for post-closing payments. Pursuant to Section 2.4(c)(ii), the pre-closing invoices relating to the institutional receivables due from the institutions (EGCC and CSU) which were due and owing but not yet collected or received by SRC would be due to the Counterclaim Plaintiffs and the selling shareholders in three distributions during the year following the closing.

59. As is demonstrated below, however, none of those payments were made to the Counterclaim Plaintiffs and selling shareholders.

60. Article III of the UPA entitled "Representations and Warranties Regarding the Company" provided representations and warranties made by SRC to Sterling and SRC Intermediate.

61. In Section 3.21(d), SRC represented and warranted that:

> To the Company's knowledge, since the Compliance Date, each Institution that has entered into a Collaboration Agreement with the Company has (i) been in material compliance with all applicable Educational Laws, (ii) obtained and held all Educational Approvals necessary to conduct its operations as currently conducted, and (iii) been in material compliance with the terms and conditions of all such Educational Approvals. To the Company's knowledge, no action for the suspension, revocation, termination or cancellation of any of Educational Approval of any such Institution or federal funds pursuant to Title IV of any Institution is pending or threatened.

62.     The above representation and warranties in Section 3.21(d) related to all aspects of all "Education Regulatory Matters", including the SRC's compliance with all education laws, compensation for recruiting, admissions and financial aid, third party servicer requirements, accreditation, marketing and the requirements of all agencies, departments and organizations. SRC was in compliance with all such rules and requirements.

63.     Each representation in Section 3.21(d), including each representation relating to EGCC, was true when made, true at the date of closing on June 25, 2021 and subsequently true up to November 2021.

64.     First, prior to and at the date of closing, EGCC had been in material compliance with all applicable Education Laws as defined in the UPA under Section 3.21(d)(i).

65.     Second, the representation and warranty in Section 3.21(d)(ii) that EGCC had obtained and held all Educational Approvals necessary to conduct its operations as it currently conducted was true prior to and as of the date of the closing on June 25, 2021.

66.     Third, the representation and warranty in Section 3.21(d)(iii) that EGCC had been in material compliance with the terms and conditions of all such Educational Approvals was true prior to and as of the date of the closing on June 25, 2021.

67.     And finally, the representation and warranty in the last sentence in Section 3.21(d) that "[t]o the Company's knowledge, no action for suspension, revocation, termination or cancellation of any Educational Approval of any such Institution … is pending or threatened" was true prior to and as of the date of the closing on June 25, 2021.

68.     Specifically, there had been "no action for the suspension, revocation, termination or cancellation of any Educational Approval" for EGCC or CSU.  The HLC draft mid-cycle review report sent to EGCC in December 2020 based on its November 2020 mid-cycle team

review site visit was a confidential draft issued to EGCC to address with HLC and HLC reserved its rights to make changes, including changes to the review team's proposed findings.

69.     Moreover, EGCC requested that HLC conduct a "do-over" and HLC agreed to conduct a *de novo* review in early 2021.

70.     At all times through early November 2021, HLC maintained that EGCC was compliant with all Educational Approvals, which was publicly disclosed on its website.

71.     At no time did any of the Counterclaim Plaintiffs make any false representations and warranties in the UPA or otherwise to any of the Counterclaim Defendants.

## VII.    SRC Business Post-Closing

72.     Counterclaim Plaintiffs continued with the SRC business, achieving continued growth and success after the closing.

73.     Student Resource Center Holdings, LLC ("SRC Holdings") now governed the SRC business pursuant to the Amended and Restated Limited Liability Agreement of SRC Holdings effective as of June 25, 2021 (the "LLCA").

74.     Pursuant to the LLCA, the board of directors consisted of Sterling employees, partners and representatives Brian Schwartz ("Swartz"), Soshana Vernick ("Vernick") and Jeffrey Keith ("Keith") plus Counterclaim Plaintiff Perik, who was designated to represent the minority unit holders who held the roll-over equity.

75.     The LLCA provided for an Advisory Services Agreement between SRC Holdings and Sterling Fund Management LLC ("SFM"), which agreed to provide the following services:

> SFM will render management consulting and financial services to the Companies and their subsidiaries, which services may include advice and assistance concerning any and all aspects of the operations, planning and financing of the Companies and their subsidiaries, as needed from time to time, including advising each Company and its subsidiaries in their relationships with banks and other financial institutions and with accountants, attorneys, financial advisors and other professionals. SFM will use commercially reasonable efforts to cause its

employees and agents to provide each Company and its subsidiaries with the benefit of their special knowledge, skill and business expertise to the extent relevant to the business and affairs of such Company and its subsidiaries. In addition, SFM may render advice and assistance in connection with any acquisitions, dispositions or financing transactions undertaken by any Company and its subsidiaries.

76. According to the SFM Advisory Agreement, SRC Holdings was to pay SFM a management fee for its services in an amount equal to $500,000 per year as base compensation, to be increased annually on June 30 by five percent (5%) each year for a period of five (5) years with automatic successive annual renewals after that five-year term is completed.

77. Sterling and SRC Holdings also entered into a separate Personal Services Agreement under which Jeffrey Keith agreed to perform consulting services for SRC. As discussed above, Keith is the operations partner for Sterling and a member of the SRC Holdings board of directors. Keith is also the resident Sterling expert on the higher education regulatory environment and accreditation.

78. According to the website for Sterling Partners, Keith has a graduate degree or certificates in financial law and attended Harvard's Graduate School of Education IEM program and Yale's Endowment Institute. According to another website for a Sterling fund, their partners describe Keith as "our resident expert and guru on higher education … [who] has the ability to simplify complex issues in a manner that not only protects but informs decision making."

79. According to the SRC Personal Services Agreement with Keith, SRC agreed to pay Keith approximately $50,000 per year commencing on July 1, 2021 through June 2022. That agreement is signed by Epstein on behalf of SRC and Keith as of July 1, 2021.

80. According to Section 9.2 of the LLCA, the SRC Holdings board of directors was responsible for maintaining complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's

business.  Section 9.2 further provides that the financial books and records of SRC shall be kept on a cash or accrued method of accounting, as determined from time to time by the Board, and shall be maintained in accordance with sound accounting practices.

81.     After the closing on June 25, 2021, Counterclaim Plaintiffs had regular telephone calls on a weekly basis with Schwartz, Vernick and Keith and the board of directors met three times between June and November 2021.  The parties met only once in person during this time period.

82.     By this time, EGCC had already requested and received a *de novo* review of the HLC mid-cycle team review meeting.  While Perik and others continued to render assistance to EGCC and President Geoghegan, the Counterclaim Plaintiffs had no direct contact with HLC.

83.     Based on the HLC's *de novo* review process, the draft HLC report received by Counterclaim Plaintiffs in December 2020 was no longer relevant; however, the Counterclaim Plaintiffs were still prohibited from sharing that draft report, which was moot, with anyone.

84.     Counterclaim Plaintiffs did inform the Counterclaim Defendants on numerous occasions that the HLC mid-cycle review timing had been extended to account for the HLC *de novo* review process based on the HLC's "botched" visit in November 2020.  Keith, in particular, as the Counterclaim Defendants' education guru and accreditation expert, was aware of the extended HLC mid-cycle review process.

85.     For example, on September 12, 2021, in advance of a call with Counterclaim Defendants, Perik sent a memo which included the paragraph set forth below:

> As I briefed you before, EGCC has had an ongoing issue with HLC related to a visit last Fall.  Last week, over 30 Civil Rights and Union Groups wrote both the Secretary of Education and the Inspector General asking for an investigation.  On Thursday, the school was informed that the Department had indeed initiated an inquiry into this matter and was taking it very seriously.  EGCC and its board is

gratified by this action, I can provide more details on our call. I am enclosing the letter that was shared with us.

86. Similarly, Keith and Counterclaim Plaintiffs discussed the fact that one of the unions collaborating with EGCC had issued public records requests to HLC seeking documents, emails and communications involving the standard mid-cycle review process. In fact, on October 13, 2021, Keith sent an email to Perik and Rowe attaching a law review article from the Chicago Law School that provided support for the union's public records law requests that the HLC and other accreditors were subject to the public records laws.

87. And, again, at an in-person meeting with Counterclaim Defendants in October, 2021, Perik informed Schwartz, Vernick and Keith that EGCC could get a phone call from HLC saying that EGCC was being placed on probation. Vernick, in particular, returned to that conversation with Perik about how to handle the "public relations fallout" if and when HLC placed EGCC on probation.

88. On October 25, 201, Perik and Keith had another conversation about the HLC review process when Keith forwarded a link to the HLC website section concerning EGCC. The information on that site clearly showed that there was still an open and unresolved review by HLC of EGCC. Keith was obviously familiar with the HLC accreditation process which was unusually long in this instance based on HLC's *de novo* review of its prior mid-cycle team review meeting, which Perik told Counterclaim Defendants on May 13, 2021 was a "botched visit."

89. Any allegations that the Counterclaim Defendants did not know that the November 2020 HLC mid-cycle team site visit was a "botched" visit, that EGCC had requested a "do-over" by HLC, that HLC agreed to do a *de novo* review as a "do-over" and that the HLC mid-cycle review was extended is false and misleading.

## VIII. HLC Places EGCC on Probation.

90.     On November 8, 2021, HLC placed EGCC on probation.  The overarching concerns of HLC arise out of the rapid growth of the EGCC student body resulting from the union college benefit program and EGCC's ongoing efforts to keep up with that growth.

91.     The Counterclaim Defendants were aware of the possibility of probation as an HLC sanction based on its mid-cycle review process. Still, the Counterclaim Plaintiffs and Counterclaim Defendants were surprised by HLC's recommendations and findings.

92.     According to the HLC website and regulations, the sanction of "probation" does not call for or threaten "suspension, revocation, termination or cancellation" of HLC's accreditation.  Had HLC intended to call for or threaten the "suspension, revocation, termination or cancellation" of HLC's accreditation, HLC would have had to institute an "adverse action" which did not happen to EGCC.

93.     EGCC promptly and professionally took steps to accept HLC's report, addressed that report with the student body, including the union members and families who were part of the union college benefit program.  EGCC published the HLC determination on its website and also posted a questions and answers page on the EGCC website.

94.     The HLC report dated November 8, 2021, was approved by the HLC board of directors just days before that report was released to EGCC and the public on November 8, 2021. Upon information and belief, no one, including the Counterclaim Plaintiffs and EGCC had a heads-up disclosure from HLC or saw a draft of the November 8, 2021 final report before it was publicly released by HLC.

95.     No HLC recommendations or draft recommendations could become final until the HLC board of directors met and voted on November 8, 2021.

96.     Sterling and SRC Holdings were initially paralyzed.  Eventually, they began to retain a number of consultants and communications firms, other personnel and advisors and created multiple external affairs and public relations experts to "contain" the damage.  Yet, those efforts were inconsequential.

97.     The HLC's report dated November 8, 2021, did not dissuade the union members who continued to enroll in the union college benefit program, nor did it dissuade President Geoghegan and EGCC from their commitment to continue to provide free or low-cost college education to all of its students, including the union member students through the union college benefit program.

98.     Indeed, the union student enrollment did not drop by year-end 2021, nor did the union program enrollments materially decline in the semester commencing in early 2022.

99.     Counterclaim Defendants were well aware that the enrollment trajectory for union members joining through the union college benefit program at EGCC continued to grow.

100.     On December 1, 2021, Vernick sent an email to Perik, Rowe and others in which she concluded that the news about HLC's letter on November 8, 2021 was not affecting enrollment (and thus would not negatively affect SRC's revenues or profits).  That email confirmed to Perik, Rowe and others that HLC putting EGCC on probation did not impact the business of SRC

101.     As of March 2022, the number of students enrolled in the union college benefit program was a near all-time high of approximately 40,000 students.

102.     Counterclaim Plaintiffs continued to work closely with EGCC and the unions that sent students to the union college benefit program with EGCC and CSU.

103.     Counterclaim Plaintiffs fully cooperated with SRC Holdings' regulatory counsel in matters relating to the Department of Education.

104.     Counterclaim Plaintiffs continued to assist EGCC in the wake of the HLC report dated November 8, 2021.

## IX.     Counterclaim Defendants Refuse to Pay Institutional Receivables.

105.     On or about February 20, 2022, Counterclaims Defendants informed Counterclaim Plaintiffs that they were not in a position to determine the amount of the institutional receivables from prior to the closing that were collected and received by the Company after the closing because the work of their accounting reconciliation was still ongoing. Counterclaim Defendants, accordingly informed Counterclaim Plaintiffs that the payment that was due on March 1, 2022 would not be forthcoming.

106.     On March 7, 2022, the sellers' representative for transaction informed M. Avi Epstein, as SRC Holdings President ("Epstein"), that SRC Holdings' position was unacceptable and demanded payment of the institutional receivables that were due and owing.

107.     At that time, the amount of the pre-closing institutional receivables that had been collected and received by the Company was $2,960,631 and the amount owing at that time was $1 million pursuant to Section 2.4(c)(iii) of the UPA.  The fact that over $2.9 million was collected and received by the Company was confirmed by EGCC.

108.     Thus, as of early March, 2022, SRC Holdings and Sterling were in default under the UPA.  Moreover, SRC Holdings and Sterling would owe another $1,750,000 within thirty (30) days under the UPA.

109.     In April, 2022, the seller's representative reminded Epstein and the Counterclaim Defendants that $1 million was due and owing and as of April 30, 2022, the next $1,750,000 would be due and owing for the institutional receivables pursuant to the UPA Section 2.4(c)(ii).

The remainder of $210,631 would be due and owing on July 30, 2022.  The total amount due and owing was $2,960,631.28 as of July 30, 2022.

110.    Counterclaim Defendants refused to acknowledge that the payments were due and never paid the amounts due and owing.

111.    Counterclaim Defendants have breached the UPA as of March 1, 2022 and remain in breach despite receiving notices of breach and demands to be paid.

112.    Perik was outspoken within SRC and SRC Holdings in complaining about the mismanagement of the Company's finances, the gross negligence in the way Counterclaim Defendants ran the business, the bad faith refusal to pay Counterclaim Defendants for monies owed for pre-closing payments collected and received by the Company and for the contempt that Counterclaim Defendants had for their business partners, including EGCC, CSU and the unions that the Company served.

## X.    Counterclaim Defendants Terminate or Constructively Terminate Perik, Rowe, Haseley and Jones in March and Destroyed the Collaboration with EGCC.

113.    On March 9, 2022, Perik, Rowe, Haseley and Jones met with Counterclaim Defendants at which time they were effectively terminated from their leadership positions with the Company.  Counterclaim Plaintiffs objected to such a drastic change for the collaboration and warned them of the adverse impact that such a drastic change would have on the collaborating colleges and, in particular, for EGCC, which was responsible for 95% of SRC's revenue.

114.    Counterclaim Plaintiffs noted that the relationship between EGCC and the unions had been developed over several years and that such a drastic change would have an adverse impact on the business of SRC.  Moreover, Perik, who had been the CEO of SRC since inception, had always maintained that he would retire, but noted that he should not be abruptly

terminated or constructively terminated, which would jeopardize the critical relationships that SRC had with EGCC and the unions.

115.    Counterclaim Plaintiffs warned the Counterclaim Defendants that the bundled services arrangement between the colleges and SRC was something that could easily become unbundled if SRC did not have the right personnel in place.  Counterclaim Plaintiffs were not threatening or trying to threaten Counterclaim Defendants.  To the contrary.  They were trying to advise the Counterclaim Defendants who were out of their element.

116.    Upon information and belief, President Geoghegan also advised Counterclaim Defendants of the same.

117.    After that meeting on March 9, 2022, Counterclaim Plaintiffs, through counsel, followed-up with a letter which contained a list of the issues to be addressed by Counterclaim Defendants, including (1) a commitment to address the roll-over equity of 30% of the Company which, at closing, was worth $30 million; (2) the timing of the payments of the institutional receivables due and owing to Counterclaim Plaintiffs in the amount of $2.9 million; (3) continued employment of Counterclaim Plaintiffs through June 30, 2022; (4) severance payments for approximately one year; (5) mutual releases and non-disparagement agreements; (6) board approval; and (7) an orderly transition plan process which would be created and spear-headed by Haseley in order for Counterclaim Defendants to take full control of the business. Counterclaim Plaintiffs warned Counterclaim Defendants that "replacing the executive management team with over 75 years of experience with unions and public colleges will be a massive challenge, which will likely materially impact the future of the SRC business." A copy of that letter dated March 14, 2022 is attached hereto as Exhibit A.

118.    The above list of requests was made as an outline for discussion purposes, not steadfast demands.  Counterclaim Plaintiffs did expect Counterclaim Defendants to at least respond to the outline of the points raised.

119.    Counterclaim Defendants did not respond to the proposed terms presented to their counsel.

120.    Upon information and belief, EGCC through President Geoghegan also expressed his view that such a drastic change would constitute a breach of the SRC collaboration agreement with EGCC.

121.    On or about March 23, 2022, Counterclaim Defendants sent a termination letter to Perik and nearly identical letters to Rowe, Haseley and Jones stripping them of their roles, responsibilities and authority at SRC pending an "investigation" relating to the HLC draft mid-cycle review report, which had been addressed by EGCC and done over in a *de novo* review process by HLC, and which had no material impact on student body nor any financial consequences to SRC, EGCC and CSU.

122.    Upon receiving the letters from SRC Holdings, Sterling and SRC, Rowe, Haseley and Jones immediately resigned from the Company, asked counsel to send notice to counsel for the Company and informed EGCC President Geoghegan of their decision.

123.    On March 23, 2022, President Geoghegan sent an email to Counterclaim Defendants entitled "SRC Developments" which email reads as follows:

> I have been informed today that you have fired Michael Perik as CEO of SRC and that Nicole Rowe, Dan Jones and John Haseley have resigned as a result. This is a stunning and ill-advised development and the arrogance on your part in not contacting me as to these actions is nothing short of breathtaking. You obviously do not understand how this collaboration works and your ignorance of this speaks volumes about who you are. I have not yet consulted with our attorneys from the Ohio Attorney General's office but my layman's reading of Section 7.2.4 (e) of the Collaboration Agreement requires that as President of the College I must

> approve any material changes in the agreement. To put it mildly, the actions you took today are a very material change. Please be advised that if you don't rescind the actions you took today, we will re-evaluate the bundled services arrangement we have with SRC which provides the Title IV exemption they have in this agreement. Hopefully, you will come to your senses.

124.     Upon information and belief, Counterclaim Defendants ignored President Geoghegan's email.

125.     Counterclaim Defendants also had an opportunity to cure under the collaboration agreement with EGCC, but did not do so.

126.     Counterclaim Defendants removed Perik from the board of directors based on allegations of an investigation into the draft HLC mid-cycle review visit report from its November 2020 visit to EGCC, which draft report was sent to EGCC in confidence in December and which President Geoghegan asked Perik and his team for assistance in confidence. HLC then granted EGCC's request for a "do-over" to which HLC promised to do a *de novo* process. Counterclaim Defendants were well aware of the "botched" visit in November 2020; knew that HLC was in the middle of its mid-cycle team review process; and knew that the process had been extended by a *de novo* review that went on for months after the closing date.

## XI.     SRC Holdings Directors Unilaterally Vote to Exclude Perik from All Board Meetings and then Vote to Remove Perik from the Board of Directors.

127.     On May 2, 2022, the Counterclaim Defendants conducted a vote by written consent of the majority of the board of directors of the SRC Holdings and voted to preclude Perik from attending *any* board meeting because there might be discussion as to their investigation into Perik's knowledge of the HLC draft mid-cycle report in December 2020. Perik, though counsel, objected. Perik was not informed of this vote nor was he asked for his input.

128.     On June 30, 2022, the SRC board of directors, without Perik, voted to permanently remove Perik from the board.  Prior to May 2, 2022, that time, Perik was the only non-Sterling member on the board.  Perik was also the director appointed to the board to represent the interests of the minority shareholders who were provided with their Preferred Units under the UPA and the Company's LLCA.  No minority shareholder was appointed to the board to replace Perik.

129.     Counterclaim Defendants removed Perik from the board of directors using the so-called "investigation" as a pretext to conceal their financial improprieties in the running the union college tuition program.  Indeed, this was done in part to hide the true nature of the SRC finances, which included paying themselves their management fees while refusing to pay Counterclaim Defendants' institutional receivables that were due and owing.

130.     Meanwhile, on May 10, 2022, EGCC submitted a notice of breach of the collaboration agreement by SRC for removing or constructively removing Perik, Rowe, Haseley and Jones from their leadership positions at the Company.

131.     In EGCC's notice of material breach of the collaboration agreement with SRC, EGCC objected to the SRC termination of Perik, Rowe, Haseley and Jones and follows:

> As you are aware, SRC has made a number of unilateral decisions regarding its executive management team.  In particular, SRC terminated Michael Perik.  This termination constituted a breach by SRC which led to the termination of other leadership team members each of whom resigned from their management positions with SRC due to Michael Perik's termination.  All of these individuals were part of the SRC management team that was deeply familiar with the terms of the Agreement and the Collaboration's operation and growth.  In their management positions, these terminated individuals provided SRC, EGCC, the Agreement, and the Collaboration extensive professional experience with community college education, enrollment, and student support services connections to external partners who would further the Collaboration and its enrollment of adult learners, and intimate knowledge of the Collaboration's operations and plans for expansion.

By terminating Michael Perik which led to the departure of other leadership team members, SRC has materially changed the nature of the Collaboration and has done so without notifying or consulting with the Operating Committee. In executing the Agreement, EGCC relied heavily on these individual's ability to develop, advance, and steer the Collaboration down a successful development and implementation path.

132.    In response to EGCC's notice of breach, Counterclaim Defendants had sixty days to cure any breach of the collaboration agreement.

133.    During that time period, the Counterclaim Defendants engaged in a bizarre path with EGCCC that included misrepresenting who was still working for SRC, the finances of SRC, and the relationships with the colleges, including EGCC, and the union students, who were the lifeline of the SRC's business plan.

134.    The audacious and next step for Counterclaim Defendants to file a lawsuit against EGCC, which was SRC's most significant customer and business relationship, in the United States District Court for the Southern District of Ohio. *Student Resource Center, LLC v. Eastern Gateway Community College*, 22-CV-2653. SRC moved for temporary injunctive relief and EGCC opposed the same declaring a business divorce from SRC. A hearing was held on July 7, 2022, which resulted in a ruling that EGCC could not prematurely terminate the collaboration agreement without following the process, but the net result of the Counterclaim Defendants' litigation strategy was to ruin the Company's relationship with EGCC forever.

135.    At that hearing on July 7, 2022, EGCC President Geoghegan testified under oath that the HLC mid-cycle review which led to its probation did not harm, jeopardize or impact the SRC collaboration with EGCC in any way. Any harm caused to SRC was done by Counterclaim Defendants.

**XII. Counterclaim Defendants Purport to Take All of Counterclaim Plaintiffs' Preferred Units or Roll-over Equity for $0.**

136.    In or about August, 2021, Counterclaim Plaintiffs were awarded 10,000 Incentive Units, referred to in the relevant agreements as the "Restricted Units."  The award of the Restricted Units did not include Counterclaim Plaintiffs' Preferred Units that they acquired as part of the purchase price under the UPA and were valued at 30% of the Company or $30 million at the time the UPA was executed on June 25, 2021.  The Restricted Units are separate and distinct from the Preferred Units.

137.    Pursuant to Section 7.8 of the LLCA, the Restricted Units were subject to repurchase terms by the Company.  Counterclaim Plaintiffs' other units—*i.e.* the Preferred Units—are not subject to the repurchase rights in Section 7.8.  By its clear and unambiguous terms, the repurchase option in Section 7.8 is limited to the Restricted Units.  The Restricted Units Agreement contains a similar repurchase option that is almost verbatim of the language in the LLCA.

138.    Consistent with Section 7.8 of the LLCA, at the time SRC Holdings offered the Restricted Units, Aimee Leishure, who was the SRC chief financial officer at the time, confirmed for Counterclaim Plaintiffs that the Restricted Units were additional to—and did not impact their Preferred Units—and were given for their service as employees of the Company.

139.     Counterclaim Plaintiffs were also informed by the SRC Holdings that it had retained employment counsel named Thomas Wippman to prepare the Restricted Units Agreements ("RUA") on their behalf.

140.    Notwithstanding the express language in Section 7.8 of the LLCA and the language in the RUA, Counterclaim Defendants are now taking the position that the repurchase option in the RUA gave SRC Holdings the option to repurchase *all* of Counterclaim Plaintiffs'

units—*i.e.* their Restricted Units and their Preferred Units—for $0, even though the parallel repurchase option in the LLCA does not give the SRC Holding that right. Counterclaim Defendants' position is contrary to the agreements and the facts.

141.     First, the Restricted Units were awarded to Counterclaim Plaintiffs as a gift. It is not commercially reasonable to read the RUAs in such a way to allow the repurchase rights to attach to the Preferred Units, which were part of the consideration for the UPA, and were highly valuable. Such a reading would allow the Counterclaim Defendants to provide Counterclaim Plaintiffs with a gift (the Incentive Units) and then use that gift to take away property with a much greater value from Counterclaim Plaintiffs. No reasonable person would agree to those terms and reading the RUA in that way is not commercially reasonable.

142.     Second, the Company's own representative, Aimee Leishure, confirmed that the RUA repurchase right, like the repurchase option in Section 7.8 of the LLCA, did not attach to Counterclaim Plaintiffs' Preferred Units. Prior to executing the RUAs, Ms. Leishure stated that the RUAs served solely to effectuate the issuance of additional Incentive Units, which were a gift from the Company for Counterclaim Plaintiffs' service to the SRC and SRC Holdings. She specifically told Counterclaim Plaintiffs that the RUAs were unrelated to and did not affect their rights to their Preferred Units. SRC Holdings and the other Counterclaim Defendants cannot now change its own interpretation of the RUA in a transparent attempt to (a) take away Counterclaim Plaintiffs' Preferred Units for no value and (b) deprive them of standing to bring their derivative claims.

143.     Counterclaim Defendants' position is also belied by the plain language of the LLCA and the Restricted Unit Agreements. A copy of the Restricted Units Agreement is attached hereto as Exhibit B.

144. Under the LLCA, Preferred Units have superior rights to Incentive Units, making them much more valuable than Incentive Units. Under the LLCA, there are no terms subjecting Counterclaim Plaintiffs' Preferred Units to forfeiture or repurchase by the SRC Holdings. To the contrary, the repurchase option applies only to Incentive Units, and it has never been modified or amended. Nor could the repurchase option in Section 7.8 be expanded to include the Preferred Units through the RUA. Under Section 10.4 of the LLCA, any amendment to the LLCA requires a board vote and the consent of the "Majority-in-Interest of the Members" which is defined as the consent of members holding greater than 50% of the Preferred Units. That never happened. A copy of the LLCA is attached hereto as Exhibit C.

145. But even assuming *arguendo*, that the RUA does on its face apply to Counterclaim Plaintiffs' Preferred Units, which it does not, that is not what the parties intended at the time. Any reading of the RUA that would result in that outcome would be a product of mutual mistake and, accordingly, requires reformation. Indeed, as set forth above, reading the RUA to cover the Preferred Units would be inconsistent with the LLCA, statements made by SRC at the time the RUA was executed and any notion of commercial reasonableness. No one – including Counterclaim Plaintiffs – would accept a gift of Incentive Units if by doing so they gave SRC the unilateral ability to take their much more valuable Preferred Units for $0.

**COUNT I**
**(Breach of Contract: Institutional Receivables against Sterling, SRC Holdings, SRC Intermediate and SRC)**

146. Counterclaim Plaintiffs repeat and incorporate by reference the proceeding paragraphs as though fully set forth herein.

147. Sterling and SRC Intermediate, on the one hand, and Counterclaim Plaintiffs, on the other, executed the UPA whereby Sterling and SRC Intermediate agreed to acquire a

majority interest in SRC from the Founders and other selling shareholders on June 25, 2021 and to pay the amounts set forth in Article II of the UPA.

148.    SRC collected and received over $2.9 million for pre-closing institutional receivables, which was confirmed by EGCC.

149.    Thus, pursuant to Section 2.4(c) of the UPA, the Counterclaim Plaintiffs were due $2,960,631.28 as of July 30, 2022 for pre-closing institutional receivables that were to be collected by SRC Holdings after the closing.

150.    The Counterclaim Plaintiffs demanded that the Counterclaim Defendants acknowledge the obligation to pay $2,960,631.28 as of July 30, 2022.

151.    The Counterclaim Plaintiffs have performed their respective obligations under the UPA and the LLCA.

152.    Counterclaim Defendants refused to acknowledge that the payments were due and never paid the amounts due and owing under Section 2.4(c) of the UPA.

153.    Counterclaim Defendants have breached their obligations under UPA and the LLCA as of March 1, 2022 and remains in breach despite receiving notices of breach and demands to be paid.

154.    Counterclaim Plaintiffs have suffered and continue to suffer substantial financial harm as a result of the breach of the parties' agreement requiring payment of the pre-closing institutional receivables in the amount of $2,960,631.28 to the Counterclaim Plaintiffs.

155.    Counterclaim Plaintiffs are entitled to a judgment in their favor awarding the outstanding amounts owed for the pre-closing institutional receivables in the amount of $2,960,631.28 plus interest and attorneys' fees.

## COUNT II
## (Declaratory Judgment—against Sterling, SRC Intermediate, SRC, and SRC Holdings)

156.     Counterclaim Plaintiffs Perik, Rowe, Jones, and Haseley repeat and incorporate by reference the proceeding paragraphs as though fully set forth herein.

157.     As set forth above, the SRC Holdings has purported to exercise a repurchase right in the RUA to repurchase Perik, Rowe, Jones, and Haseley's Incentive Units and Preferred Units for $0.  However, the repurchase right in the RUA only applied only to the Incentive Units and not the Preferred Units.

158.     Counterclaim Plaintiffs received their Preferred Units as a significant part of the purchase price under the UPA transaction.

159.     The UPA does not have a mechanism to allow the SRC Holdings to repurchase the Preferred Units provided to the Counterclaim Plaintiffs.

160.     The LLCA does not have a mechanism that allows SRC Holdings to repurchase Preferred Units and only allows SRC Holdings to repurchase Incentive Units in accordance with Section 7.8 of the LLCA.

161.     Thus, SRC Holdings had no right to repurchase Perik, Rowe, Jones, and Haseley's Preferred Units and they continue to own those units.

162.     Thus, an actual and justiciable controversy presently exists between the parties concerning the parties' rights, duties, obligations, and liabilities under the RUA.

163.     Accordingly, Counterclaim Plaintiffs Perik, Rowe, Jones, and Haseley seek a declaration that the  attempt to repurchase the Preferred Units for $0 pursuant to the RUA is null and void, and that they remain members of SRC Holdings.

## COUNT III
## (Breach of Contract—against Sterling, SRC Intermediate, SRC Holdings and SRC)

164. Plaintiffs Perik, Rowe, Jones, and Haseley repeat and incorporate by reference the proceeding paragraphs as though fully set forth herein.

165. The RUA is a valid and enforceable contract.

166. Counterclaim Plaintiffs Perik, Rowe, Jones, and Haseley performed their obligations under the RUA.

167. The RUA obligated SRC Holdings to repurchase the Incentive Units at "Fair Market Value as of the last day of the calendar quarter immediately preceding the date of such termination of employment."

168. "Fair Market Value" under the terms of the RUA had "the meaning as set forth in the LLCA, which such other factors as the Board may consider necessary or appropriate."

169. Under the terms of the LLCA, the Fair Market Value was defined as "the fair market value of such Units, which amount shall be determined by the Board in good faith."

170. The Board failed to act in good faith when it purported to value the Incentive Units at $0. The Board had no reasonable basis to determine that each Incentive Unit was worth $0, particularly when SRC Holdings generated millions in annual revenue.

171. The Board made no efforts whatsoever, let alone the good faith efforts required by the RUA, to value the Incentive Units in connection with the alleged repurchase. The Board did not hire a financial advisor to value the SRC Holdings or SRCor even undertake its own valuation. Instead, it arbitrarily "determined" in bad faith to pay Perik, Rowe, Jones, and Haseley $0 for their Incentive Units.

172. Counterclaim Plaintiffs Perik, Rowe, Jones, and Haseley have been damaged by the Counterclaim Defendants' breach.

## COUNT IV
### (Breach of Contract—against Sterling, SRC Intermediate, SRC Holdings and SRC)

173.     Even if the Court were to determine that the plain language of the RUA covered both the Incentive Units and the Preferred Units, and the Court does not find that there was a mutual mistake such that the RUA should be reformed to only cover the Incentive Units, the Company still breached the terms of the RUA by purporting to repurchase the Preferred Units for $0.

174.     The RUA is a valid and enforceable contract.

175.     Counterclaim Plaintiffs Perik, Rowe, Jones, and Haseley performed their obligations under the RUA.

176.     The RUA obligated the SRC Holdings to repurchase the Preferred Units at "Fair Market Value as of the last day of the calendar quarter immediately preceding the date of such termination of employment."

177.     "Fair Market Value" under the terms of the RUA had "the meaning as set forth in the LLCA, which such other factors as the Board may consider necessary or appropriate."

178.     Under the terms of the LLCA, however, there was no definition for "Fair Market Value" with respect to Preferred Units, only Incentive Units.

179.     The Board failed to use a Fair Market Value when it purported to repurchase the Preferred Units and instead acted in bad faith by valuing the Preferred Units at $0 when the value of their Preferred Units was 30% of the Company or $30 million as of June 25, 2021.

180.     Moreover, the Board failed to undertake any efforts to value the Preferred Units in connection with the alleged repurchase, let alone good faith efforts.  The Board did not hire a financial advisor to value SRC Holdings or SRC, or even undertake its own valuation.  Instead, it

arbitrarily "determined" in bad faith to pay Perik, Rowe, Jones, and Haseley $0 for their Preferred Units.

181.    Counterclaim Plaintiffs Perik, Rowe, Jones, and Haseley have been damaged by the Counterclaim Defendants' breach.

## PRAYERS FOR RELIEF

**WHEREFORE**, the Defendants and Counterclaim Plaintiffs respectfully request that this Honorable Court enter judgment in their favor as follows:

A.    That the Court dismiss the Plaintiffs' Complaint and enter judgment for the Defendants on all Counts of the Plaintiff's Complaint with prejudice;

B.    That the Court enter judgment in favor of the Counterclaim Plaintiffs on Count I of the Counterclaim and award the Counterclaim Plaintiffs damages, as compensation for the Counterclaim Defendants' breach of contract in the principal amount of $2,960,631.28 plus interest and attorneys' fees;

C.    That the Court issue a declaratory judgment as requested in Count II of the Counterclaim that declares that the RUAs are invalid and/or do not cover Counterclaim Plaintiffs' Preferred Units;

D.    That the Court enter judgment in favor of Counterclaim Plaintiffs, on Counts III and IV of the Counterclaims and award such damages and other relief as may be reasonably necessary to compensate for the harm and loss caused by the Counterclaim Defendants' breach of the RUA;

E.    That the Court award the Counterclaim Plaintiffs their reasonable expenses incurred in this litigation, including their reasonably attorneys fees, costs and expenses; and

F.      That the Court enter such other relief that is just and proper.

**Counterclaim Plaintiffs and Defendants demand a jury trial on all claims so triable.**

|  |  |
|---|---|
|  | MORRIS, NICHOLS, ARSHT & TUNNELL LLP |
|  | |
|  | */s/ Kevin M. Coen* |
|  | Kevin M. Coen (#4775) |
| OF COUNSEL: | Alec F. Hoeschel (#7066) |
|  | 1201 N. Market Street |
| Michael F. Connolly | Wilmington, Delaware 19801 |
| Jason A. Webber | (302) 658-9200 |
| RUBIN AND RUDMAN LLP | kcoen@morrisnichols.com |
| 53 State Street | ahoeschel@morrisnichols.com |
| Boston, MA 02109 | |
| (617) 330-7000 | |
| mconnolly@rubinrudman.com | *Attorneys for Defendants and Counterclaim* |
| jwebber@rubinrudman.com | *Plaintiffs Michael Perik, Nicole Rowe* |
|  | *Colclasure, John Haseley, Daniel Jones,* |
|  | *Higher Education Partners, LLC,* |
| Dated: January 12, 2024 | *RRGTHREE, LLC, USS Guarantor, LLC, and* |
|  | *MWJ Holdings, LLC* |